☐ Check if this is an
   amended filing

Official Form 205

# Involuntary Petition Against a Non-Individual

12/15

Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

| Part 1: | Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed |
|---|---|

**1. Chapter of the Bankruptcy Code**

*Check one:*

☐ Chapter 7

☑ Chapter 11

| Part 2: | Identify the Debtor |
|---|---|

**2. Debtor's name**

Paniolo Cable Company, LLC

**3. Other names you know the debtor has used in the last 8 years**

Include any assumed names, trade names, or *doing business as* names.

**4. Debtor's federal Employer Identification Number (EIN)**

☑ Unknown

___ - ___ ___ ___ ___ ___ ___ ___
EIN

**5. Debtor's address**

| Principal place of business | Mailing address, if different |
|---|---|
| | 77-808 Kamehameha Hwy |
| Number    Street | Number    Street |
| PO Box 4511 | |
| | P.O. Box |
| Kaneohe    HI   96744 | Mililani    HI   96789 |
| City    State   ZIP Code | City    State   ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| | Various locations |
| | Number    Street |
| County | |
| | City    State   ZIP Code |

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 1 of 73

**6. Debtor's website (URL)**       _____

**7. Type of debtor**

- [x] Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- [ ] Partnership (excluding LLP)
- [ ] Other type of debtor. Specify: _____

**8. Type of debtor's business**

*Check one:*

- [ ] Health Care Business (as defined in 11 U.S.C. § 101(27A))
- [ ] Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- [ ] Railroad (as defined in 11 U.S.C. § 101(44))
- [ ] Stockbroker (as defined in 11 U.S.C. § 101(53A))
- [ ] Commodity Broker (as defined in 11 U.S.C. § 101(6))
- [ ] Clearing Bank (as defined in 11 U.S.C. § 781(3))
- [x] None of the types of business listed.
- [ ] Unknown type of business.

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

- [x] No
- [ ] Yes. Debtor _____ Relationship _____

  District _____ Date filed _____ Case number, if known_____
                           MM / DD / YYYY

  Debtor _____ Relationship _____

  District _____ Date filed _____ Case number, if known_____
                           MM / DD / YYYY

---

### Part 3:    Report About the Case

**10. Venue**

*Check one:*

- [x] Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.
- [ ] A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

- [x] The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.
- [ ] Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

- [ ] No
- [x] Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

---

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed 11/13/18   Page 2 of 73

## 13. Each petitioner's claim

| | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien * |
|---|---|---|---|
| | HSBC Securities (USA), Inc. | Principal & Interest Owed on Notes | $ 199,143,920* |
| | Sunrise Partners Limited Partnership | Principal & Interest Owed on Notes | $ 10,000,000* |
| | Deutsche Bank Trust Company Americas | Fees and expenses | $ 24,557 |
| | | Total of petitioners' claims* | $ 209,168,477* |

**\*Those Petitioning Creditors with liens have not yet valued such liens. Attached declarations from each are incorporated herein.**

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

---

### Part 4:  Request for Relief

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

| Petitioners or Petitioners' Representative | Attorneys |
|---|---|
| **Name and mailing address of petitioner** | |
| HSBC Securities (USA), Inc. | Andrew V. Beaman |
| Name | Printed name |
| 452 Fifth Avenue | Chun Kerr LLP |
| Number    Street | Firm name, if any |
| New York    NY    10018 | 999 Bishop Street, Suite 2100 |
| City    State    ZIP Code | Number    Street |
| | Honolulu    Hawaii    96813 |
| **Name and mailing address of petitioner's representative, if any** | City    State    ZIP Code |
| | Contact phone  808-528-8200   Email abeaman@chunkerr.com |
| Name | |
| | Bar number  002914 |
| Number    Street | |
| | State     Hawaii |
| City    State    ZIP Code | |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11/13/2018

✗_____
Thomas J. Curran, Managing Director

✗   /s/ Andrew V. Beaman
_____
Signature of attorney

Date signed   11/13/2018

| Debtor | Paniolo Cable Company, LLC | Case number (if known) |
|--------|---------------------------|------------------------|
|        | Name                      |                        |

| 13. Each petitioner's claim | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien* |
|---|---|---|---|
| | HSBC Securities (USA), Inc. | Principal & Interest Owed on Notes | $ 199,143,920* |
| | Sunrise Partners Limited Partnership | Principal & Interest Owed on Notes | $ 10,000,000* |
| | Deutsche Bank Trust Company Americas | Fees and expenses | $ 24,557 |
| | | Total of petitioners' claims* | $ 209,168,477* |

**\*Those Petitioning Creditors with liens have not yet valued such liens. Attached declarations from each are incorporated herein.**

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

**Part 4: Request for Relief**

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

**Petitioners or Petitioners' Representative**

**Attorneys**

**Name and mailing address of petitioner**

| HSBC Securities (USA), Inc. | |
|---|---|
| Name | |

| 452 Fifth Avenue | | |
|---|---|---|
| Number | Street | |

| New York | NY | 10018 |
|---|---|---|
| City | State | ZIP Code |

**Name and mailing address of petitioner's representative, if any**

| | |
|---|---|
| Name | |

| | |
|---|---|
| Number | Street |

| | | |
|---|---|---|
| City | State | ZIP Code |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11/13/2018

**X** _[signature]_

Thomas J. Curran, Managing Director

**Toby L. Gerber**
Printed name

**Norton Rose Fulbright US LLP**
Firm name, if any

**2200 Ross Avenue, Suite 3600**
Number    Street

| Dallas | Texas | 75201 |
|---|---|---|
| City | State | ZIP Code |

Contact phone  214-855-8000   Email  toby.gerber@nortonrosefulbright.com

Bar number  07813700

State  Texas

**X** _[signature]_
Signature of attorney

Date signed  11/13/2018

**Name and mailing address of petitioner**

Deutsche Bank Trust Company Americas, as Agent
Name c/o Deutsche Bank National Trust Company

100 Plaza One, MS:JCY03-0801
Number    Street

Jersey City                    NJ           07311-3901
City                          State        ZIP Code

**Name and mailing address of petitioner's representative, if any**

Deutsche Bank National Trust Company
Name

100 Plaza One, MS:JCY03-0801
Number    Street

Jersey City                    NJ           07311-3901
City                          State        ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11/13/2018

✗ _____

Rodney Gaughan, Vice President
DEUTSCHE BANK NATIONAL TRUST COMPANY
for DEUTSCHE BANK TRUST COMPANY AMERICAS

Toby L. Gerber
Printed name

Norton Rose Fulbright US LLP
Firm name, if any

2200 Ross Avenue, Suite 3600
Number    Street

Dallas                         TX          75201
City                          State        ZIP Code

Contact phone  214-855-8000    Email  toby.gerber@nortonrosefulbright.com

Bar number     07813700

State          Texas

✗ _____
Signature of attorney

Date signed    11/13/2018

---

**Name and mailing address of petitioner**

Sunrise Partners Limited Partnership
Name

2 American Way
Number    Street

Greenwich                      CT          06831
City                          State        ZIP Code

**Name and mailing address of petitioner's representative, if any**

Paloma Partners Management Company, general partner of
Name Sunrise Partners Limited Partnership

2 American Way
Number    Street

Greenwich                      CT          06831
City                          State        ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11/13/2018

✗ _____

Douglas Ambrose, Executive Vice President

Toby L. Gerber
Printed name

Norton Rose Fulbright US LLP
Firm name, if any

2200 Ross Avenue, Suite 3600
Number    Street

Dallas                         Texas       75201
City                          State        ZIP Code

Contact phone  214-855-8000    Email  toby.gerber@nortonrosefulbright.com

Bar number     07813700

State          Texas

✗ _____
Signature of attorney

Date signed    11/13/2018

---

Official Form 205              Involuntary Petition Against a Non-Individual              page 4

Debtor    Paniolo Cable Company, LLC
          Name

Case number (if known) _____

**Name and mailing address of petitioner**

Deutsche Bank Trust Company Americas, as Agent
Name  c/o Deutsche Bank National Trust Company

100 Plaza One, MS:JCY03-0801
Number    Street

Jersey City                    NJ        07311-3901
City                           State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

Deutsche Bank National Trust Company
Name

100 Plaza One, MS:JCY03-0801
Number    Street

Jersey City                    NJ        07311-3901
City                           State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11/13/2018

✗ _____
    Rodney Gaughan, Vice President


Toby L. Gerber
Printed name

Norton Rose Fulbright US LLP
Firm name, if any

2200 Ross Avenue, Suite 3600
Number    Street

Dallas                         TX        75201
City                           State     ZIP Code

Contact phone  214-855-8000    Email toby.gerber@nortonrosefulbright.com

Bar number     07813700

State          Texas

✗ _____
Signature of attorney

Date signed    11/13/2018


**Name and mailing address of petitioner**

Sunrise Partners Limited Partnership
Name  c/o Paloma Partners Management Company
2 American Way Lane
Number    Street

Greenwich                      CT        06831
City                           State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

Paloma Partners Management Company, general partner of
Name  Sunrise Partners Limited Partnership

2 American Way Lane
Number    Street

Greenwich                      CT        06831
City                           State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11/13/2018

✗ _____
    Douglas Ambrose, Executive Vice President


Toby L. Gerber
Printed name

Norton Rose Fulbright US LLP
Firm name, if any

2200 Ross Avenue, Suite 3600
Number    Street

Dallas                         Texas     75201
City                           State     ZIP Code

Contact phone  214-855-8000    Email toby.gerber@nortonrosefulbright.com

Bar number     07813700

State          Texas

✗ _____
Signature of attorney

Date signed    11/13/2018


Official Form 205              Involuntary Petition Against a Non-Individual              page 4

IN RE PANIOLO CABLE COMPANY, LLC

DOCUMENTS ATTACHED IN RESPONSE TO PART 3, ITEM 12

OF THE INVOLUNTARY PETITION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

IN RE:       §
          §
**PANIOLO CABLE COMPANY, LLC,**  §  **CASE NO. _____**
          §  **(Involuntary Chapter 11)**
  **Alleged Debtor.**    §
          §

## DECLARATION OF HSBC SECURITIES (USA) INC.
## IN SUPPORT OF INVOLUNTARY CHAPTER 11 PETITION AGAINST
## PANIOLO CABLE COMPANY, LLC

I, Thomas J. Curran, declare as follows:

1. I am a managing director of HSBC Securities (USA) Inc. I submit this declaration in support of the Involuntary Chapter 11 Petition Against Paniolo Cable Company, LLC.

2. I am over the age of 18 and have personal knowledge of the facts stated in this Declaration, each of which is true and correct.

3. HSBC Securities (USA) Inc. is the owner and holder of the original principal sum of $152,442,006 of Series A Senior First Lien Secured Notes, the original principal sum of $22,204,327 of Series B Senior First Lien Secured Notes, and $643,416 of Series C Subordinated Unsecured Notes (collectively, the "HSBC USA Notes") issued by Paniolo Cable Company, LLC under the Amended and Restated Note Purchase Agreement, dated as of October 1, 2007 among Paniolo Cable Company, LLC, as Issuer, Deutsche Bank AG, New York Branch, as Initial Purchaser, Deutsche Bank Trust Company Americas, as Purchasers' Agent, Registrar, Paying Agent, Collateral Agent and Securities Intermediary, and the purchasers party to the agreement from time to time. No valuation of the liens securing the HSBC USA Notes has been made. Effective as of September 25, 2015, Paniolo Cable Company, LLC acknowledged,

confirmed and agreed that immediately prior to such date, Paniolo Cable Company, LLC was indebted to the holders of the notes under the Note Agreement in the following amounts: (i) to the holders of the Series A first lien secured notes in the principal amount of $186,296,177, (ii) to the holders of the Series B second lien secured notes in the principal amount of $22,204,327, and (iii) to the holders of the Series C subordinated unsecured notes in the principal amount of $643,416, in each case plus accrued interest thereon plus accrued and unpaid fees, costs and expenses due under the Note Agreement.

4.      HSBC Securities (USA) Inc. acquired the HSBC USA Notes via unconditional transfer pursuant to the documents attached hereto as HSBC Exhibit A, which set forth the consideration for and terms of the transfer. The HSBC USA Notes were not transferred for the purpose of commencing the case.

5.      As of October 31, 2018, there was currently outstanding, past due and unpaid under the HSBC USA Notes, as follows: the sum of $176,296,177 under Series A Senior First Lien Secured Notes, the sum of $22,204,327 under Series B Senior Second Lien Secured Notes, and the sum of $643,416 of Series C Subordinated Unsecured Notes, plus accrued and unpaid interest, plus accrued and unpaid fees, costs and expenses.

6.      Neither Paniolo Cable Company, LLC or any other person has disputed Paniolo Cable Company,  LLC's liability for the HSBC USA Notes or the amount due thereunder.

7.      HSBC Securities (USA) Inc. has authorized Norton Rose Fulbright US LLP and Chun Kerr LLP to act as counsel in its capacity as a petitioning creditor.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 13 , 2018 in New York, New York.

/s/ _____

Name: Thomas J. Curran

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November, 2018, a copy of the foregoing Declaration has been served upon the persons entitled to notice by either U.S. first class mail, postage prepaid or by electronic notification and as required under the Federal Rules of Bankruptcy Procedure.

*/s/ Toby L. Gerber*

**HSBC EXHIBIT A**

# PURCHASE AGREEMENT

This Purchase Agreement, dated as of March 5 __, 2018 (this "Agreement"), is by and among KA Finanz ("Seller") and HSBC Securities (USA) Inc. ("Buyer"). Capitalized terms used but not defined in this Agreement will have the meanings ascribed to them in the Note Purchase Agreement (as defined below).

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller outstanding principal amount of Series A Senior First Lien Secured Notes with an original face amount of $16,607,264.00 due May 20, 2027, CUSIP 698491AA5 (the " Notes") of Paniolo Cable Company, LLC (the "Issuer") all issued pursuant to that certain Amended and Restated Note Purchase Agreement, dated as of October 1, 2007, among the Issuer, Deutsche Bank AG, New York Branch, Deutsche Bank Trust Company Americas and the other parties thereto from time to time (the "Note Purchase Agreement") on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, for and in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## 1. PURCHASE AND SALE OF THE NOTES

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date (as defined below), Seller shall sell, transfer, assign and convey the Transferred Rights (as defined below) to Buyer, and, in consideration thereof, Buyer shall pay to Seller the purchase price (the "Purchase Price") on a delivery versus payment basis via the Depository Trust Company ("DTC") with respect to Notes, and in each case using the accounts and instructions set forth on the Schedule to this Agreement, as payment in full for the Transferred Rights. As used in this Agreement, the "Closing Date" means the date upon which the conditions of closing set forth in Section 4 hereof have been satisfied or waived. As used in this Agreement, the "Transferred Rights" means, collectively, (a) the Notes and all right, title, duties, obligations and interest of Seller in and to the Notes and the Note Purchase Agreement, (b) all payments and distributions in connection with the Notes, whether in the form of principal, interest, premium, fees or otherwise, in each case, accruing or relating to any time on or after the Trade Date (as defined below); (c) all agreements, documents and instruments entered into by Issuer or Seller related to the Notes (including, without limitation, the Financing Documents (as defined in the Note Purchase Agreement)); (d) all of Seller's voting, consent, approval, waiver or other contractual rights under the Notes and any related agreements, documents or instruments; (e) any and all claims (including "claims" as defined in §101(5) of the Bankruptcy Code, 11 U.S.C. §§101 et seq., as amended), suits, causes of action, and any other right of Seller with respect to the Notes, whether known or unknown, whether arising before, on or after the Closing Date, against the Issuer, any of its affiliates, any guarantor, or any other person or entity arising under or in connection with the Notes; (f) any of Seller's rights, duties and obligations under any Guarantee, Collateral and security of any kind for or in respect of the foregoing; and (g) Seller's rights to any and all proceeds of any of the foregoing. The sale of the Transferred Rights shall be without recourse to Seller and except as expressly set forth herein, without representation or warranty by Seller.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 13 of 73

## 2. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as of the date of this Agreement (the "Agreement Date") and as of the Closing Date that:

(a)    Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)    Seller has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Seller in connection with this Agreement (collectively, the "Seller Transaction Documents") and to consummate the transaction contemplated in this Agreement (the "Transaction"). The Seller Transaction Documents have been or will be duly authorized, executed and delivered by Seller and constitute legally valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)    The execution and delivery of the Seller Transaction Documents by Seller, and the performance by Seller of its obligations pursuant to the Seller Transaction Documents, will not (i) result in a breach or violation of any provision of Seller's organizational documents, (ii) violate or any statute, law, writ, order, rule or regulation of any government, governmental agency, authority, commission, court or other tribunal (collectively, "Governmental Authority") applicable to Seller, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Seller, (iv) breach or violate any material agreement to which Seller is a party or by which Seller or any of its properties may be bound or (v) result in a breach or violation of any provisions of the Note Purchase Agreement, or any other Financing Documents.

(d)    Seller is the sole legal and beneficial owner of the Transferred Rights, has good legal and beneficial title to the Transferred Rights and has the full right to transfer the Transferred Rights. The Transferred Rights are owned by Seller free and clear of any lien, pledge, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind (collectively, "Liens"). Upon delivery of the Transferred Rights to Buyer on the Closing Date against payment of the Purchaser Price as contemplated by this Agreement, Seller will transfer to Buyer good and valid legal and beneficial title to the Transferred Rights free and clear of any and all Liens (other than any Liens created by Buyer upon delivery of the Transferred Rights). Other than pursuant to this Agreement or the Seller Transaction Documents, Seller has not sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Transferred Rights, in whole or in part.

(e)    Neither the execution and delivery by Seller of the Seller Transaction Documents, nor the performance by Seller of its obligations under the Seller Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(f)    Neither Seller, nor, to the best of Seller's knowledge, anyone acting on its behalf, has taken any action which could subject the sale of the Transferred Rights to the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") and the sale of the Transferred Rights pursuant to and in accordance with this Agreement does not require registration pursuant to the Securities Act or any other applicable securities laws. Seller has not offered to sell, or solicited any offers to buy, all or any portion of the Transferred Rights in violation of the Securities Act or any other applicable securities laws. The Transferred Rights were not offered or sold to the Buyer by any form of

general solicitation or general advertising. Seller acquired the Transferred Rights without a view toward distribution thereof in violation of the Securities Act or any other applicable securities laws. Seller is not, and has not been during the period it has owned the Transferred Rights, an "affiliate" (as such term is defined in Rule 144(a)(i) promulgated pursuant to the Securities Act) of the Issuer.

(g)     Seller (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Buyer on a professional arm's-length basis and neither Buyer nor any of its affiliates is acting as a fiduciary or advisor to Seller with respect to the Transaction.

(h)     Either (i) no interest in the Transferred Rights is being sold by or on behalf of the following (collectively, a "Benefit Plan"): (A) an "employee benefit plan" (as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it ("ERISA")) that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it (the "Code"); or (C) any entity whose assets include (for purposes of ERISA 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan" or (ii) the transaction exemption set forth in one or more prohibited transaction class exemptions issued by the U.S. Department of Labor ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the sale of the Transferred Rights pursuant to this Agreement.

(i)     There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Seller who might be entitled to any fee or commission from Buyer or any of its affiliates upon consummation of the Transaction.

(j)     There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Seller's knowledge, threatened , against Seller that could reasonably be expected to (i) impede the consummation of the Transaction or (ii) materially and adversely affect the Transferred Rights or any action taken or to be taken by Seller under this Agreement.

(k)     Seller has complied with, and has performed, all of its obligations (if any) required to be complied with or performed by it under the Note Purchase Agreement and the other Financing Documents.

(l)     The Note Purchase Agreement and the Financing Documents are the only agreements or documents setting forth the terms of the Transferred Rights and the Issuer's and Seller's respective rights and obligations with respect thereto. Seller has not given its consent to change, nor has it waived (except to the extent that certain temporary forbearance arrangements that have expired by their terms may have been deemed to constitute a waiver for the relevant forbearance periods), any term or provision with respect to the Notes, the Note Purchase Agreement or Financing Documents, including, without limitation, with respect to the amount or time of any payment of principal or the rate or time of any payment of interest.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed 11/13/18   Page 15 of 73

(m)     Seller has not received any payment or other distribution (whether interest, fees or any other distribution) under or in respect of the Transferred Rights on or since January ___, 2018 (the "Trade Date").

(n)     Seller has not effected or received, and shall not effect or receive, the benefit of any set-off against Issuer on account of the Transferred Rights on or since the Trade Date.

(o)     Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller holding any funds or property of, or owing amounts or property to, Issuer) nor had any relationship with the Issuer (including, without limitation, being an "affiliate" or an "insider" as defined in United States Bankruptcy Code, as amended, § 101(2) and § 101(31) respectively), that will result in Buyer receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other holders of notes of the same class or type as the Notes.

(p)     Seller has not received any written notice that (i) any payment or other transfer made to or for the account of Seller from or on account of Issuer or any obligor under the Transferred Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any claim, counterclaim, defense or claim or right of set-off, reduction, recoupment, impairment, avoidance, disallowance or subordination.

(q)     Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights that is not known to Seller and that may be material to a decision to sell the Transferred Rights ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller and Seller waives and releases any claims that it might have against Buyer whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Transaction; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(r)  Seller makes no representation as to the amount and collectability of any make-whole compensation, legal fees or post petition interest with respect to the Notes or other Transferred Rights. Seller assumes no responsibility with respect to (i) any statements, representations or warranties made by Issuer or any other obligor in the Financing Documents, (ii) the financial condition of the Issuer or any other obligor under the Financing Documents, (iii) the collectability or value of the Notes or other Transferred Rights or (iv) the performance or observance by the Issuer or any other obligor their respective obligations under the Notes and Financing Documents.

## 3.  REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Agreement Date and as of the Closing Date that:

(a)     Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)     Buyer has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Buyer in connection with this Agreement (collectively, the "Buyer Transaction Documents") and to consummate

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 16 of 73

the Transaction. The Buyer Transaction Documents have been or will be duly authorized, executed and delivered by Buyer and constitute legally valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Buyer Transaction Documents by Buyer, and the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, will not (i) result in a breach or violation of any provision of Buyer's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Buyer, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Buyer or (iv) breach or violate any material agreement to which Buyer is a party or by which Buyer or any of its properties may be bound.

(d)     Neither the execution and delivery by Buyer of the Buyer Transaction Documents, nor the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(e)     Buyer (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Seller on a professional arm's-length basis and neither Seller nor any of its affiliates is acting as a fiduciary or advisor to Buyer with respect to the Transaction.

(f)     Buyer is a "qualified institutional buyer" (as defined in Rule 144A(a)(1) promulgated pursuant to the Securities Act). Buyer is acquiring the Transferred Rights for its own account and not with a view toward distribution thereof in violation of the Securities Act or any other securities laws.

(g)     Buyer understands and acknowledges that (i) the Transferred Rights are being offered and sold to it in reliance on one or more specific exemptions from registration under the Securities Act and other applicable securities laws, and that Seller is relying in part upon the truth and accuracy of, and Buyer's compliance with, the representations, warranties and understandings of Buyer set forth in the Transaction Documents (as defined below) in order to determine the availability of such exemptions and (ii) the Transferred Rights have not been registered pursuant to the Securities Act or any other applicable securities laws, and there are restrictions on Buyer's ability to resell the Transferred Rights pursuant to applicable securities laws and pursuant to the Note Purchase Agreement.

(h)     Either (i) no interest in the Transferred Rights is being acquired by or on behalf of one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the purchase and holding of the Transferred Rights and the exercise of Buyer's rights with respect to the Transferred Rights or under this Agreement.

(i)     There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of its affiliates upon consummation of the Transaction.

(j)     There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Buyer's knowledge, threatened, against Buyer that could reasonably be expected to impede the consummation of the Transaction.

(k)     Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Transferred Rights that is not known to Buyer and that may be material to a decision to purchase the Transferred Rights ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Transferred Rights notwithstanding its lack of knowledge of the Buyer Excluded Information and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the Transaction; provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(l)     The consideration given for the purchase by Buyer of the Transferred Rights may differ both in kind and in amount from any payments or distributions which Buyer may ultimately receive with respect to the Transferred Rights, and Buyer shall not have any recourse to Seller for any deficiency.

## 4.  CONDITIONS OF CLOSING

(a)     The obligation of Seller to transfer the Transferred Rights to Buyer on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Seller or in part) and payment of the Purchase Price to Seller as set forth herein:

(i)     The representations and warranties of Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date that shall be true and correct as of such specific date), and Buyer shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Buyer at or prior to the Closing Date.

(b)     The obligation of Buyer to pay the Purchase Price on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Buyer in whole or in part):

(i)     The representations and warranties of Seller shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date that shall be true and correct as of such specific date), and Seller shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Seller at or prior to the Closing Date.

## 5.     DISTRIBUTIONS

All distributions, cash, payments, property and proceeds in respect of the Transferred, no matter the form (collectively, "Distributions"), whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, are for the account of Buyer without any additional consideration. If at

any time on or after the Trade Date Seller receives any Distributions, Seller will (a) accept and hold the Distributions for the account and sole benefit of Buyer, (b) have no equitable or beneficial interest in the Distributions and (c) promptly deliver the Distributions to Buyer.

6. **VOTING**

On and after the Trade Date, Buyer has sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents, approvals or waivers, or otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Transferred Rights. If for any reason Seller is entitled to exercise voting power with respect to the Transferred Rights after the Trade Date, then, to the extent permitted by applicable law, Seller will exercise such voting power solely in accordance with the prior written instructions of Buyer, and in the absence of instruction shall abstain from voting.

7. **MISCELLANEOUS**

(a)     Each party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents, deeds, assignments, transfers, conveyances and other instruments and papers, (ii) take or cause to be taken all such other and further actions and assurances as the other party may reasonably request, and (iii) cooperate with the other party's reasonable requests, in each case, to effectuate the intent and purposes, and carry out the terms, of the Seller Transaction Documents and Buyer Transaction Documents (collectively, the "Transaction Documents").

(b)     All representations, warranties, covenants and agreements contained in or made pursuant to this Agreement shall survive the consummation of the transactions contemplated hereunder.

(c)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without regard to any conflicts of law provision that would require the application of the laws of any other jurisdiction). Each party irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit or proceeding arising out of or based upon this Agreement or any matter relating to it. Buyer and Seller waive any objection that either one may have to the laying of venue in any such court or that any such court is an inconvenient forum or do not have personal jurisdiction over Buyer and Seller.

(d)     Buyer and Seller agree to bear their own respective legal and other costs and expenses in connection with this Agreement and the consummation of the Transaction; provided, however, that Buyer and Seller will share equally any transfer fees or transfer costs imposed by the Issuer or any other third party in connection with the transfer of the Notes from Seller to Buyer.

(e)     This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties. In no event will either party assign or transfer any of its rights or obligations pursuant to this Agreement without the express prior written consent of the other party.

(f)     The Transaction Documents constitute the entire understanding of the parties with respect to the subject matter thereof, and supersede all prior understandings with respect to the subject matter of this Agreement.

(g)     This Agreement may be amended with (and only with) the written consent of Seller and Buyer.

RESTRICTED

(h)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement. Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart.

(i)     Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

(j)     Each of the parties agrees that, without the prior written consent of the other party, not to disclose, and to otherwise keep confidential, the terms of the Transaction, except that any party may make any such disclosure (i) as required to implement or enforce this Agreement, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it, and (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so might result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority; provided however, that the parties may disclose information regarding the Transaction (x) to their respective affiliates, directors, officers, employees, agents, advisors, counsel, accountants, auditors, limited partners, shareholders and other interest holders and (y) (other than with respect to the Purchase Price) to the extent necessary to effect the Transaction or a subsequent transfer of the Transferred Rights or any portion thereof.

(k)     EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY LAWSUIT, ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY LAWSUIT, ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

[*signature page follows*]

IN WITNESS WHEREOF, this Purchase Agreement is executed as of the date set forth above.

**SELLER:**

**KA FINANZ**

By: _____
Name:
Title:


**BUYER:**

**HSBC SECURITIES (USA) INC.**

**Thomas Curran**
**Head of Credit Trading**

By: _____
Name: *Thomas Curran*
Title:

RESTRICTED

# NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of August 23, 2017 (this "Agreement"), is by and between American General Life Insurance Company ("Seller") and HSBC Securities (USA) Inc. ("Buyer"). Capitalized terms used but not defined in this Agreement will have the meanings ascribed to them in the Note Purchase Agreement (as defined below).

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller $52,789,068 in outstanding principal amount of Series A Senior First Lien Secured Notes due May 20, 2027, CUSIP 698491AA5 (the "Notes") of Paniolo Cable Company, LLC (the "Issuer") issued pursuant to that certain Amended and Restated Note Purchase Agreement, dated as of October 1, 2007, among the Issuer, Deutsche Bank AG, New York Branch, Deutsche Bank Trust Company Americas and the other parties thereto from time to time (the "Note Purchase Agreement") on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, for and in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## 1. PURCHASE AND SALE OF THE NOTES

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date (as defined below), Seller shall sell, transfer, assign and convey the Transferred Rights (as defined below) to Buyer, and, in consideration thereof, Buyer shall pay to Seller the purchase price (the "Purchase Price") on a delivery versus payment basis via the Depository Trust Company ("DTC") using the accounts and instructions set forth on the Schedule to this Agreement, as payment in full for the Transferred Rights,. As used in this Agreement, the "Closing Date" means the date upon which the conditions of closing set forth in Section 4 hereof have been satisfied or waived. As used in this Agreement, the "Transferred Rights" means, collectively, (a) the Notes and all right, title and interest of Seller in and to the Notes and the Note Purchase Agreement, (b) all payments and distributions in connection with the Notes, whether in the form of principal, interest, premium, fees or otherwise, accruing or relating to any time on or after the Trade Date (as defined below); (c) all agreements, documents and instruments related to the Notes (including, without limitation, the Financing Documents (as defined in the Note Purchase Agreement)); (d) all voting, consent, approval, waiver or other contractual rights under the Notes and any related agreements, documents or instruments; (e) any and all claims (including "claims" as defined in §101(5) of the Bankruptcy Code, 11 U.S.C. §§101 et seq., as amended), suits, causes of action, and any other right of Seller with respect to the Notes, whether known or unknown, whether arising before, on or after the Closing Date, against the Issuer, any of its affiliates, any guarantor, or any other person or entity arising under or in connection with the Notes; (f) any Guarantee, Collateral and security of any kind for or in respect of the foregoing; and (g) any and all proceeds of any of the foregoing.

## 2. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as of the date of this Agreement (the "Agreement Date") and as of the Closing Date that:

(a)     Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 22 of 73

(b)     Seller has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Seller in connection with this Agreement (collectively, the "Seller Transaction Documents") and to consummate the transaction contemplated in this Agreement (the "Transaction"). The Seller Transaction Documents have been or will be duly authorized, executed and delivered by Seller and constitute legally valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Seller Transaction Documents by Seller, and the performance by Seller of its obligations pursuant to the Seller Transaction Documents, will not (i) result in a breach or violation of any provision of Seller's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any government, governmental agency, authority, commission, court or other tribunal (collectively, "Governmental Authority") applicable to Seller, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Seller, (iv) breach or violate any material agreement to which Seller is a party or by which Seller or any of its properties may be bound or (v) result in a breach or violation of any provisions of the Note Purchase Agreement, or any other Financing Documents.

(d)     Seller is the sole record, legal and beneficial owner of the Transferred Rights, has good legal and beneficial title to the Transferred Rights and has the full right to transfer the Transferred Rights. The Transferred Rights are owned by Seller free and clear of any lien, pledge, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind (collectively, "Liens"). Upon delivery of the Transferred Rights to Buyer on the Closing Date against payment of the Purchaser Price as contemplated by this Agreement, Seller will transfer to Buyer good and valid legal and beneficial title to the Transferred Rights free and clear of any and all Liens (other than any Liens created by Buyer upon delivery of the Transferred Rights). Other than pursuant to this Agreement or the Seller Transaction Documents, Seller has not sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Transferred Rights, in whole or in part.

(e)     Neither the execution and delivery by Seller of the Seller Transaction Documents, nor the performance by Seller of its obligations under the Seller Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(f)     Neither Seller, nor, to the best of Seller's knowledge, anyone acting on its behalf, has taken any action which could subject the sale of the Transferred Rights to the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") and the sale of the Transferred Rights pursuant to this Agreement does not require registration pursuant to the Securities Act or any other applicable securities laws. Seller has not offered to sell, or solicited any offers to buy, all or any portion of the Transferred Rights in violation of the Securities Act or any other applicable securities laws. The Transferred Rights were not offered or sold to the Buyer by any form of general solicitation or general advertising. Seller acquired the Transferred Rights without a view toward distribution thereof in violation of the Securities Act or any other applicable securities laws. Seller is not, and has not been during the period it has owned the Transferred Rights, an "affiliate" (as such term is defined in Rule 144(a)(i) promulgated pursuant to the Securities Act) of the Issuer.

(g)     Seller (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 23 of 73

obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Buyer on a professional arm's-length basis and neither Buyer nor any of its affiliates is acting as a fiduciary or advisor to Seller with respect to the Transaction.

(h) Either (i) no interest in the Transferred Rights is being sold by or on behalf of the following (collectively, a "Benefit Plan"): (A) an "employee benefit plan" (as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it ("ERISA")) that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it (the "Code"); or (C) any entity whose assets include (for purposes of ERISA 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan" or (ii) the transaction exemption set forth in one or more prohibited transaction class exemptions issued by the U.S. Department of Labor ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the sale of the Transferred Rights pursuant to this Agreement.

(i) There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Seller who might be entitled to any fee or commission from Buyer or any of its affiliates upon consummation of the Transaction.

(j) There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Seller's knowledge, threatened, against Seller that could reasonably be expected to (i) impede the consummation of the Transaction or (ii) materially and adversely affect the Transferred Rights or any action taken or to be taken by Seller under this Agreement.

(k) Seller has complied with, and has performed, all of its obligations (if any) required to be complied with or performed by it under the Note Purchase Agreement and the other Financing Documents.

(l) The Note Purchase Agreement and the Financing Documents are the only agreements or documents setting forth the terms of the Transferred Rights and the Issuer's and Seller's respective rights and obligations with respect thereto. Seller has not given its consent to change, nor has it waived, any term or provision with respect to the Notes, the Note Purchase Agreement or Financing Documents, including, without limitation, with respect to the amount or time of any payment of principal or the rate or time of any payment of interest.

(m) Seller has not received any payment or other distribution (whether interest, fees or any other distribution) under or in respect of the Transferred Rights on or since August 2, 2017 (the "Trade Date").

(n) Seller has not effected or received, and shall not effect or receive, the benefit of any set-off against Issuer on account of the Transferred Rights.

(o) Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller holding any funds or property of, or owing amounts or property to, Issuer) nor had any relationship with the Issuer (including, without limitation, being an "affiliate" or an "insider" as defined

3

in United States Bankruptcy Code, as amended, § 101(2) and § 101(31) respectively), that will result in Buyer receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other holders of notes of the same class or type as the Notes.

(p)     Seller has not received any written notice that (i) any payment or other transfer made to or for the account of Seller from or on account of Issuer or any obligor under the Transferred Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any claim, counterclaim, defense or claim or right of set-off, reduction, recoupment, impairment, avoidance, disallowance or subordination.

(q)     Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights  that is not known to Seller and that may be material to a decision to sell the Transferred Rights ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller and Seller waives and releases any claims that it might have against Buyer whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Transaction; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(r)  Seller makes no representation as to the amount and collectability of any make-whole compensation, legal fees or post petition interest with respect to the Notes or other Transferred Rights.

## 3.   REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Agreement Date and as of the Closing Date that:

(a)     Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)     Buyer has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Buyer in connection with this Agreement (collectively, the "Buyer Transaction Documents") and to consummate the Transaction.  The Buyer Transaction Documents have been or will be duly authorized, executed and delivered by Buyer and constitute legally valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Buyer Transaction Documents by Buyer, and the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, will not (i) result in a breach or violation of any provision of Buyer's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Buyer, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Buyer or (iv) breach or violate any material agreement to which Buyer is a party or by which Buyer or any of its properties may be bound.

566-564/AGR/5391823.2

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 25 of 73

(d)     Neither the execution and delivery by Buyer of the Buyer Transaction Documents, nor the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(e)     Buyer (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Seller on a professional arm's-length basis and neither Seller nor any of its affiliates is acting as a fiduciary or advisor to Buyer with respect to the Transaction.

(f)     Buyer is a "qualified institutional buyer" (as defined in Rule 144A(a)(1) promulgated pursuant to the Securities Act). Buyer is acquiring the Transferred Rights for its own account and not with a view toward distribution thereof in violation of the Securities Act or any other securities laws.

(g)     Buyer understands and acknowledges that (i) the Transferred Rights are being offered and sold to it in reliance on one or more specific exemptions from registration under the Securities Act and other applicable securities laws, and that Seller is relying in part upon the truth and accuracy of, and Buyer's compliance with, the representations, warranties and understandings of Buyer set forth in the Transaction Documents (as defined below) in order to determine the availability of such exemptions and (ii) the Transferred Rights have not been registered pursuant to the Securities Act or any other applicable securities laws, and there are restrictions on Buyer's ability to resell the Transferred Rights pursuant to applicable securities laws and pursuant to the Note Purchase Agreement.

(h)     Either (i) no interest in the Transferred Rights is being acquired by or on behalf of one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the purchase and holding of the Transferred Rights and the exercise of Buyer's rights with respect to the Transferred Rights or under this Agreement.

(i)     There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of its affiliates upon consummation of the Transaction.

(j)     There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Buyer's knowledge, threatened, against Buyer that could reasonably be expected to impede the consummation of the Transaction.

(k)     Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Transferred Rights that is not known to Buyer and that may be material to a decision to purchase the Transferred Rights ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Transferred Rights notwithstanding its lack of knowledge of the Buyer Excluded Information and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the Transaction;

566-564/AGR/5391823.2

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 26 of 73

provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(l) The consideration given for the purchase by Buyer of the Transferred Rights may differ both in kind and in amount from any payments or distributions which Buyer may ultimately receive with respect to the Transferred Rights, and Buyer shall not have any recourse to Seller for any deficiency.

(m) Buyer is fully aware that, with regard to the sale of the Notes and Transferred Rights, Seller is relying upon the truth and accuracy of these representations and warranties.

(n) Disclosure of any information concerning the Issuer or the Financing Documents is made subject to any confidentiality provisions of the Financing Documents, and Buyer covenants and agrees to comply with such confidentiality provisions.

(o) Buyer is not a person (either alone or together with others) directly or indirectly controlling or controlled by the Issuer or under direct or indirect common control with the Issuer within the meaning of the Act. Buyer is not an affiliate (as such term is defined in Rule 405 promulgated under the Act) of the Issuer.

## 4. CONDITIONS OF CLOSING

(a) The obligation of Seller to transfer the Transferred Rights to Buyer on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Seller in whole or in part):

(i) The representations and warranties of Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Buyer shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Buyer at or prior to the Closing Date.

(ii) Seller shall have received Buyer's executed assignment and assumption agreement in the form as Exhibit F to the Note Purchase Agreement (the "Assignment and Assumption Agreement") for delivery to the Purchasers' Agent for it acceptance and recordation.

(b) The obligation of Buyer to pay the Purchase Price on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Buyer in whole or in part):

(i) The representations and warranties of Seller shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Seller shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Seller at or prior to the Closing Date.

566-564/AGR/5391823.2

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed 11/13/18  Page 27 of 73

(ii)    Buyer shall have received Seller's executed Assignment and Assumption Agreement and the Purchasers' Agent confirmation of its acceptance and recordation of the transfer contemplated hereby and thereby.

## 5.    DISTRIBUTIONS

All distributions, cash, payments, property and proceeds in respect of the Transferred Rights, no matter the form (collectively, "Distributions"), whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, are for the account of Buyer without any additional consideration. If at any time on or after the Trade Date Seller receives any Distributions, Seller will (a) accept and hold the Distributions for the account and sole benefit of Buyer, (b) have no equitable or beneficial interest in the Distributions and (c) promptly deliver the Distributions to Buyer.

## 6.    VOTING

On and after the Trade Date, Buyer has sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents, approvals or waivers, or otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Transferred Rights. If for any reason Seller is entitled to exercise voting power with respect to the Transferred Rights after the Trade Date, then, to the extent permitted by applicable law, Seller will exercise such voting power solely in accordance with the prior written instructions of Buyer.

## 7.    MISCELLANEOUS

(a)    Each party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents, deeds, assignments, transfers, conveyances and other instruments and papers, (ii) take or cause to be taken all such other and further actions and assurances as the other party may reasonably request, and (iii) cooperate with the other party, in each case, to effectuate the intent and purposes, and carry out the terms, of the Seller Transaction Documents and Buyer Transaction Documents (collectively, the "Transaction Documents").

(b)    All representations, warranties, covenants and agreements contained in or made pursuant to this Agreement shall survive the consummation of the transactions contemplated hereunder.

(c)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without regard to any conflicts of law provision that would require the application of the laws of any other jurisdiction).  Each party irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit or proceeding arising out of or based upon this Agreement or any matter relating to it.  Buyer and Seller waive any objection that either one may have to the laying of venue in any such court or that any such court is an inconvenient forum or do not have personal jurisdiction over Buyer and Seller.

(d)    Buyer and Seller agree to bear their own respective legal and other costs and expenses in connection with this Agreement and the consummation of the Transaction; provided, however, that Buyer and Seller will share equally any transfer fees or transfer costs imposed by the Issuer or any other third party in connection with the transfer of the Notes from Seller to Buyer.

566-564/AGR/5391823.2

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed 11/13/18  Page 28 of 73

(e)     This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties. In no event will either party assign or transfer any of its rights or obligations pursuant to this Agreement without the express prior written consent of the other party.

(f)     The Transaction Documents constitute the entire understanding of the parties with respect to the subject matter thereof, and supersede all prior understandings with respect to the subject matter of this Agreement.

(g)     This Agreement may be amended with (and only with) the written consent of Seller and Buyer.

(h)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement. Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart.

(i)     Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

(j)     Each of the parties agrees that, without the prior written consent of the other party, not to disclose, and to otherwise keep confidential, the terms of the Transaction, except that any party may make any such disclosure (i) as required to implement or enforce this Agreement, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it, and (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so might result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority; provided however, that the parties may disclose information regarding the Transaction (x) to their respective affiliates, directors, officers, employees, agents, advisors, counsel, accountants, auditors, limited partners, shareholders and other interest holders and (y) (other than with respect to the Purchase Price) to the extent necessary to effect the Transaction or a subsequent transfer of the Transferred Rights or any portion thereof.

(k)     EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY LAWSUIT, ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY LAWSUIT, ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

(l)     As between Buyer and Seller, in the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Assignment and Assumption Agreement, the terms of this Agreement shall control and govern.

*[signature page follows]*

566-564/AGR/5391823.2

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 29 of 73

IN WITNESS WHEREOF, this Note Purchase Agreement is executed as of the date set forth above.

**SELLER:**

**AMERICAN GENERAL LIFE INSURANCE COMPANY**

By: AIG Asset Management (U.S.), LLC, its investment adviser

By: _Marcy Lyons_
Name: Marcy Lyons
Title: Managing Director

**BUYER:**

**HSBC SECURITIES (USA) INC.**

By: _____
Name:
Title:

IN WITNESS WHEREOF, this Note Purchase Agreement is executed as of the date set forth above.

SELLER:

AMERICAN GENERAL LIFE INSURANCE COMPANY

By: AIG Asset Management (U.S.), LLC, its investment adviser

By:
Name:
Title:

BUYER:

HSBC SECURITIES (USA) INC.

By:
Name:
Title:

# NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of August 23, 2017 (this "Agreement"), is by and between Athene Annuity and Life Company (f/k/a Aviva Annuity and Life Company) ("Seller") and HSBC Securities (USA) Inc. ("Buyer"). Capitalized terms used but not defined in this Agreement will have the meanings ascribed to them in the Note Purchase Agreement (as defined below).

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller $24,998,914.00 in outstanding principal amount of Series A Senior First Lien Secured Notes due May 20, 2027, CUSIP 698491AA5 (the "Notes") of Paniolo Cable Company, LLC (the "Issuer") issued pursuant to that certain Amended and Restated Note Purchase Agreement, dated as of October 1, 2007, among the Issuer, Deutsche Bank AG, New York Branch, Deutsche Bank Trust Company Americas and the other parties thereto from time to time (the "Note Purchase Agreement") on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, for and in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## 1.    PURCHASE AND SALE OF THE NOTES

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date (as defined below), Seller shall sell, transfer, assign and convey the Transferred Rights (as defined below) to Buyer, and, in consideration thereof, Buyer shall pay to Seller the purchase price (the "Purchase Price") on a delivery versus payment basis via the Depository Trust Company ("DTC") using the accounts and instructions set forth on the Schedule to this Agreement, as payment in full for the Transferred Rights,. As used in this Agreement, the "Closing Date" means the date upon which the conditions of closing set forth in Section 4 hereof have been satisfied or waived. As used in this Agreement, the "Transferred Rights" means, collectively, (a) the Notes and all right, title and interest of Seller in and to the Notes and the Note Purchase Agreement, (b) all payments and distributions in connection with the Notes, whether in the form of principal, interest, premium, fees or otherwise, accruing or relating to any time on or after the Trade Date (as defined below); (c) all agreements, documents and instruments related to the Notes (including, without limitation, the Financing Documents (as defined in the Note Purchase Agreement)); (d) all voting, consent, approval, waiver or other contractual rights under the Notes and any related agreements, documents or instruments; (e) any and all claims (including "claims" as defined in §101(5) of the Bankruptcy Code, 11 U.S.C. §§101 et seq., as amended), suits, causes of action, and any other right of Seller with respect to the Notes, whether known or unknown, whether arising before, on or after the Closing Date, against the Issuer, any of its affiliates, any guarantor, or any other person or entity arising under or in connection with the Notes; (f) any Guarantee, Collateral and security of any kind for or in respect of the foregoing; and (g) any and all proceeds of any of the foregoing.

## 2.    REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as of the date of this Agreement (the "Agreement Date") and as of the Closing Date that:

(a)    Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 32 of 73

(b)     Seller has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Seller in connection with this Agreement (collectively, the "Seller Transaction Documents") and to consummate the transaction contemplated in this Agreement (the "Transaction"). The Seller Transaction Documents have been or will be duly authorized, executed and delivered by Seller and constitute legally valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Seller Transaction Documents by Seller, and the performance by Seller of its obligations pursuant to the Seller Transaction Documents, will not (i) result in a breach or violation of any provision of Seller's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any government, governmental agency, authority, commission, court or other tribunal (collectively, "Governmental Authority") applicable to Seller, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Seller, (iv) breach or violate any material agreement to which Seller is a party or by which Seller or any of its properties may be bound or (v) result in a breach or violation of any provisions of the Note Purchase Agreement, or any other Financing Documents.

(d)     Seller is the sole record, legal and beneficial owner of the Transferred Rights, has good legal and beneficial title to the Transferred Rights and has the full right to transfer the Transferred Rights. The Transferred Rights are owned by Seller free and clear of any lien, pledge, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind (collectively, "Liens"). Upon delivery of the Transferred Rights to Buyer on the Closing Date against payment of the Purchaser Price as contemplated by this Agreement, Seller will transfer to Buyer good and valid legal and beneficial title to the Transferred Rights free and clear of any and all Liens (other than any Liens created by Buyer upon delivery of the Transferred Rights). Other than pursuant to this Agreement or the Seller Transaction Documents, Seller has not sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Transferred Rights, in whole or in part.

(e)     Neither the execution and delivery by Seller of the Seller Transaction Documents, nor the performance by Seller of its obligations under the Seller Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(f)     Neither Seller, nor, to the best of Seller's knowledge, anyone acting on its behalf, has taken any action which could subject the sale of the Transferred Rights to the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") and the sale of the Transferred Rights pursuant to this Agreement does not require registration pursuant to the Securities Act or any other applicable securities laws. Seller has not offered to sell, or solicited any offers to buy, all or any portion of the Transferred Rights in violation of the Securities Act or any other applicable securities laws. The Transferred Rights were not offered or sold to the Buyer by any form of general solicitation or general advertising. Seller acquired the Transferred Rights without a view toward distribution thereof in violation of the Securities Act or any other applicable securities laws. Seller is not, and has not been during the period it has owned the Transferred Rights, an "affiliate" (as such term is defined in Rule 144(a)(i) promulgated pursuant to the Securities Act) of the Issuer.

(g)     Seller (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently

566-564/AGR/5391825.2

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 33 of 73

obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Buyer on a professional arm's-length basis and neither Buyer nor any of its affiliates is acting as a fiduciary or advisor to Seller with respect to the Transaction.

(h)      Either (i) no interest in the Transferred Rights is being sold by or on behalf of the following (collectively, a "Benefit Plan"): (A) an "employee benefit plan" (as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it ("ERISA")) that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it (the "Code"); or (C) any entity whose assets include (for purposes of ERISA 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan" or (ii) the transaction exemption set forth in one or more prohibited transaction class exemptions issued by the U.S. Department of Labor ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the sale of the Transferred Rights pursuant to this Agreement.

(i)      There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Seller who might be entitled to any fee or commission from Buyer or any of its affiliates upon consummation of the Transaction.

(j)      There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Seller's knowledge, threatened, against Seller that could reasonably be expected to (i) impede the consummation of the Transaction or (ii) materially and adversely affect the Transferred Rights or any action taken or to be taken by Seller under this Agreement.

(k)      Seller has complied with, and has performed, all of its obligations (if any) required to be complied with or performed by it under the Note Purchase Agreement and the other Financing Documents.

(l)      The Note Purchase Agreement and the Financing Documents are the only agreements or documents setting forth the terms of the Transferred Rights and the Issuer's and Seller's respective rights and obligations with respect thereto. Seller has not given its consent to change, nor has it waived, any term or provision with respect to the Notes, the Note Purchase Agreement or Financing Documents, including, without limitation, with respect to the amount or time of any payment of principal or the rate or time of any payment of interest.

(m)      Seller has not received any payment or other distribution (whether interest, fees or any other distribution) under or in respect of the Transferred Rights on or since August 2, 2017 (the "Trade Date").

(n)      Seller has not effected or received, and shall not effect or receive, the benefit of any set-off against Issuer on account of the Transferred Rights.

(o)      Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller holding any funds or property of, or owing amounts or property to, Issuer) nor had any relationship with the Issuer (including, without limitation, being an "affiliate" or an "insider" as defined

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 34 of 73

in United States Bankruptcy Code, as amended, § 101(2) and § 101(31) respectively), that will result in Buyer receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other holders of notes of the same class or type as the Notes.

(p)  Seller has not received any written notice that (i) any payment or other transfer made to or for the account of Seller from or on account of Issuer or any obligor under the Transferred Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any claim, counterclaim, defense or claim or right of set-off, reduction, recoupment, impairment, avoidance, disallowance or subordination.

(q)  Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights that is not known to Seller and that may be material to a decision to sell the Transferred Rights ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller and Seller waives and releases any claims that it might have against Buyer whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Transaction; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(r)  Seller makes no representation as to the amount and collectability of any make-whole compensation, legal fees or post petition interest with respect to the Notes or other Transferred Rights.

## 3.  REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Agreement Date and as of the Closing Date that:

(a)  Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)  Buyer has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Buyer in connection with this Agreement (collectively, the "Buyer Transaction Documents") and to consummate the Transaction.  The Buyer Transaction Documents have been or will be duly authorized, executed and delivered by Buyer and constitute legally valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)  The execution and delivery of the Buyer Transaction Documents by Buyer, and the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, will not (i) result in a breach or violation of any provision of Buyer's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Buyer, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Buyer or (iv) breach or violate any material agreement to which Buyer is a party or by which Buyer or any of its properties may be bound.

4

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 35 of 73

(d)     Neither the execution and delivery by Buyer of the Buyer Transaction Documents, nor the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(e)     Buyer (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Seller on a professional arm's-length basis and neither Seller nor any of its affiliates is acting as a fiduciary or advisor to Buyer with respect to the Transaction.

(f)     Buyer is a "qualified institutional buyer" (as defined in Rule 144A(a)(1) promulgated pursuant to the Securities Act).  Buyer is acquiring the Transferred Rights for its own account and not with a view toward distribution thereof in violation of the Securities Act or any other securities laws.

(g)     Buyer understands and acknowledges that (i) the Transferred Rights are being offered and sold to it in reliance on one or more specific exemptions from registration under the Securities Act and other applicable securities laws, and that Seller is relying in part upon the truth and accuracy of, and Buyer's compliance with, the representations, warranties and understandings of Buyer set forth in the Transaction Documents (as defined below) in order to determine the availability of such exemptions and (ii) the Transferred Rights have not been registered pursuant to the Securities Act or any other applicable securities laws, and there are restrictions on Buyer's ability to resell the Transferred Rights pursuant to applicable securities laws and pursuant to the Note Purchase Agreement.

(h)      Either (i) no interest in the Transferred Rights is being acquired by or on behalf of one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs,  such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the purchase and holding of the Transferred Rights and the exercise of Buyer's rights with respect to the Transferred Rights or under this Agreement.

(i)     There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of its affiliates upon consummation of the Transaction.

(j)     There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Buyer's knowledge, threatened, against Buyer that could reasonably be expected to impede the consummation of the Transaction.

(k)     Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Transferred Rights that is not known to Buyer and that may be material to a decision to purchase the Transferred Rights ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Transferred Rights notwithstanding its lack of knowledge of the Buyer Excluded Information and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the Transaction;

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 36 of 73

provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(l)     The consideration given for the purchase by Buyer of the Transferred Rights may differ both in kind and in amount from any payments or distributions which Buyer may ultimately receive with respect to the Transferred Rights, and Buyer shall not have any recourse to Seller for any deficiency.

(m) Buyer is fully aware that, with regard to the sale of the Notes and Transferred Rights, Seller is relying upon the truth and accuracy of these representations and warranties.

(n)     Disclosure of any information concerning the Issuer or the Financing Documents is made subject to any confidentiality provisions of the Financing Documents, and Buyer covenants and agrees to comply with such confidentiality provisions.

(o)     Buyer is not a person (either alone or together with others) directly or indirectly controlling or controlled by the Issuer or under direct or indirect common control with the Issuer within the meaning of the Act.  Buyer is not an affiliate (as such term is defined in Rule 405 promulgated under the Act) of the Issuer.

## 4.  CONDITIONS OF CLOSING

(a)     The obligation of Seller to transfer the Transferred Rights to Buyer on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Seller in whole or in part):

(i)     The representations and warranties of Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Buyer shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Buyer at or prior to the Closing Date.

(ii)     Seller shall have received Buyer's executed assignment and assumption agreement in the form as Exhibit F to the Note Purchase Agreement (the "Assignment and Assumption Agreement") for delivery to the Purchasers' Agent for it acceptance and recordation.

(b)     The obligation of Buyer to pay the Purchase Price on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Buyer in whole or in part):

(i)     The representations and warranties of Seller shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Seller shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Seller at or prior to the Closing Date.

566-564/AGR/5391825.2

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 37 of 73

(ii)     Buyer shall have received Seller's executed Assignment and Assumption Agreement and the Purchasers' Agent confirmation of its acceptance and recordation of the transfer contemplated hereby and thereby.

## 5.     DISTRIBUTIONS

All distributions, cash, payments, property and proceeds in respect of the Transferred Rights, no matter the form (collectively, "Distributions"), whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, are for the account of Buyer without any additional consideration. If at any time on or after the Trade Date Seller receives any Distributions, Seller will (a) accept and hold the Distributions for the account and sole benefit of Buyer, (b) have no equitable or beneficial interest in the Distributions and (c) promptly deliver the Distributions to Buyer.

## 6.     VOTING

On and after the Trade Date, Buyer has sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents, approvals or waivers, or otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Transferred Rights. If for any reason Seller is entitled to exercise voting power with respect to the Transferred Rights after the Trade Date, then, to the extent permitted by applicable law, Seller will exercise such voting power solely in accordance with the prior written instructions of Buyer.

## 7.  MISCELLANEOUS

(a)     Each party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents, deeds, assignments, transfers, conveyances and other instruments and papers, (ii) take or cause to be taken all such other and further actions and assurances as the other party may reasonably request, and (iii) cooperate with the other party, in each case, to effectuate the intent and purposes, and carry out the terms, of the Seller Transaction Documents and Buyer Transaction Documents (collectively, the "Transaction Documents").

(b)     All representations, warranties, covenants and agreements contained in or made pursuant to this Agreement shall survive the consummation of the transactions contemplated hereunder.

(c)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without regard to any conflicts of law provision that would require the application of the laws of any other jurisdiction). Each party irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit or proceeding arising out of or based upon this Agreement or any matter relating to it. Buyer and Seller waive any objection that either one may have to the laying of venue in any such court or that any such court is an inconvenient forum or do not have personal jurisdiction over Buyer and Seller.

(d)     Buyer and Seller agree to bear their own respective legal and other costs and expenses in connection with this Agreement and the consummation of the Transaction; provided, however, that Buyer and Seller will share equally any transfer fees or transfer costs imposed by the Issuer or any other third party in connection with the transfer of the Notes from Seller to Buyer.

566-564/AGR/5391825.2

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 38 of 73

(e)　　This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties. In no event will either party assign or transfer any of its rights or obligations pursuant to this Agreement without the express prior written consent of the other party.

(f)　　The Transaction Documents constitute the entire understanding of the parties with respect to the subject matter thereof, and supersede all prior understandings with respect to the subject matter of this Agreement.

(g)　　This Agreement may be amended with (and only with) the written consent of Seller and Buyer.

(h)　　This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement. Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart.

(i)　　Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

(j)　　Each of the parties agrees that, without the prior written consent of the other party, not to disclose, and to otherwise keep confidential, the terms of the Transaction, except that any party may make any such disclosure (i) as required to implement or enforce this Agreement, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it, and (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so might result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority; provided however, that the parties may disclose information regarding the Transaction (x) to their respective affiliates, directors, officers, employees, agents, advisors, counsel, accountants, auditors, limited partners, shareholders and other interest holders and (y) (other than with respect to the Purchase Price) to the extent necessary to effect the Transaction or a subsequent transfer of the Transferred Rights or any portion thereof.

(k)　　EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY LAWSUIT, ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY LAWSUIT, ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

(l)　　As between Buyer and Seller, in the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Assignment and Assumption Agreement, the terms of this Agreement shall control and govern.

*[signature page follows]*

566-564/AGR/5391825.2

U.S. Bankruptcy Court - Hawaii　#18-01319　Dkt # 1　Filed 11/13/18　Page 39 of 73

IN WITNESS WHEREOF, this Note Purchase Agreement is executed as of the date set forth above.

**SELLER:**

**ATHENE ANNUITY AND LIFE COMPANY**
(f/k/a Aviva Annuity and Life Company)

By: Athene Asset Management, L.P., its investment adviser

By: AAM GP Ltd., its general partner

By: _____
Name:  Roger D. Fors
Title:    Senior Vice President, Fixed Income

**BUYER:**

**HSBC SECURITIES (USA) INC.**

By: _____
Name:
Title:

9

IN WITNESS WHEREOF, this Note Purchase Agreement is executed as of the date set forth above.

SELLER:

ATHENE ANNUITY AND LIFE COMPANY
(f.k.a. Aviva Annuity and Life Company)

By: Athene Asset Management, L.P., its investment adviser

By: AAM GP Ltd., its general partner

By: _____
Name:
Title:

BUYER:

HSBC SECURITIES (USA) INC.

By: _____
Name: _____
Title: _____

9

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of August 23, 2017 (this "Agreement"), is by and between CCG Trust Corporation ("Seller") and HSBC Securities (USA) Inc. ("Buyer"). Capitalized terms used but not defined in this Agreement will have the meanings ascribed to them in the Note Purchase Agreement (as defined below).

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller $31,969,817.00 in outstanding principal amount of Series A Senior First Lien Secured Notes due May 20, 2027, CUSIP 698491AA5 (the "Notes") of Paniolo Cable Company, LLC (the "Issuer") issued pursuant to that certain Amended and Restated Note Purchase Agreement, dated as of October 1, 2007, among the Issuer, Deutsche Bank AG, New York Branch, Deutsche Bank Trust Company Americas and the other parties thereto from time to time (the "Note Purchase Agreement") on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, for and in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## 1. PURCHASE AND SALE OF THE NOTES

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date (as defined below), Seller shall sell, transfer, assign and convey the Transferred Rights (as defined below) to Buyer, and, in consideration thereof, Buyer shall pay to Seller the purchase price (the "Purchase Price") on a delivery versus payment basis via the Depository Trust Company ("DTC") using the accounts and instructions set forth on the Schedule to this Agreement, as payment in full for the Transferred Rights,. As used in this Agreement, the "Closing Date" means the date upon which the conditions of closing set forth in Section 4 hereof have been satisfied or waived. As used in this Agreement, the "Transferred Rights" means, collectively, (a) the Notes and all right, title and interest of Seller in and to the Notes and the Note Purchase Agreement, (b) all payments and distributions in connection with the Notes, whether in the form of principal, interest, premium, fees or otherwise, accruing or relating to any time on or after the Trade Date (as defined below); (c) all agreements, documents and instruments related to the Notes (including, without limitation, the Financing Documents (as defined in the Note Purchase Agreement)); (d) all voting, consent, approval, waiver or other contractual rights under the Notes and any related agreements, documents or instruments; (e) any and all claims (including "claims" as defined in §101(5) of the Bankruptcy Code, 11 U.S.C. §§101 et seq., as amended), suits, causes of action, and any other right of Seller with respect to the Notes, whether known or unknown, whether arising before, on or after the Closing Date, against the Issuer, any of its affiliates, any guarantor, or any other person or entity arising under or in connection with the Notes; (f) any Guarantee, Collateral and security of any kind for or in respect of the foregoing; and (g) any and all proceeds of any of the foregoing.

## 2. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as of the date of this Agreement (the "Agreement Date") and as of the Closing Date that:

(a)     Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed 11/13/18   Page 42 of 73

(b)     Seller has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Seller in connection with this Agreement (collectively, the "Seller Transaction Documents") and to consummate the transaction contemplated in this Agreement (the "Transaction"). The Seller Transaction Documents have been or will be duly authorized, executed and delivered by Seller and constitute legally valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Seller Transaction Documents by Seller, and the performance by Seller of its obligations pursuant to the Seller Transaction Documents, will not (i) result in a breach or violation of any provision of Seller's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any government, governmental agency, authority, commission, court or other tribunal (collectively, "Governmental Authority") applicable to Seller, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Seller, (iv) breach or violate any material agreement to which Seller is a party or by which Seller or any of its properties may be bound or (v) result in a breach or violation of any provisions of the Note Purchase Agreement, or any other Financing Documents.

(d)     Seller is the sole record, legal and beneficial owner of the Transferred Rights, has good legal and beneficial title to the Transferred Rights and has the full right to transfer the Transferred Rights. The Transferred Rights are owned by Seller free and clear of any lien, pledge, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind (collectively, "Liens"). Upon delivery of the Transferred Rights to Buyer on the Closing Date against payment of the Purchaser Price as contemplated by this Agreement, Seller will transfer to Buyer good and valid legal and beneficial title to the Transferred Rights free and clear of any and all Liens (other than any Liens created by Buyer upon delivery of the Transferred Rights). Other than pursuant to this Agreement or the Seller Transaction Documents, Seller has not sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Transferred Rights, in whole or in part.

(e)     Neither the execution and delivery by Seller of the Seller Transaction Documents, nor the performance by Seller of its obligations under the Seller Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(f)     Neither Seller, nor, to the best of Seller's knowledge, anyone acting on its behalf, has taken any action which could subject the sale of the Transferred Rights to the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") and the sale of the Transferred Rights pursuant to this Agreement does not require registration pursuant to the Securities Act or any other applicable securities laws. Seller has not offered to sell, or solicited any offers to buy, all or any portion of the Transferred Rights in violation of the Securities Act or any other applicable securities laws. The Transferred Rights were not offered or sold to the Buyer by any form of general solicitation or general advertising. Seller acquired the Transferred Rights without a view toward distribution thereof in violation of the Securities Act or any other applicable securities laws. Seller is not, and has not been during the period it has owned the Transferred Rights, an "affiliate" (as such term is defined in Rule 144(a)(i) promulgated pursuant to the Securities Act) of the Issuer.

(g)     Seller (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently

566-564/AGR/5391826.2

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 43 of 73

obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Buyer on a professional arm's-length basis and neither Buyer nor any of its affiliates is acting as a fiduciary or advisor to Seller with respect to the Transaction.

(h)     Either (i) no interest in the Transferred Rights is being sold by or on behalf of the following (collectively, a "Benefit Plan"): (A) an "employee benefit plan" (as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it ("ERISA")) that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it (the "Code"); or (C) any entity whose assets include (for purposes of ERISA 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan" or (ii) the transaction exemption set forth in one or more prohibited transaction class exemptions issued by the U.S. Department of Labor ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the sale of the Transferred Rights pursuant to this Agreement.

(i)     There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Seller who might be entitled to any fee or commission from Buyer or any of its affiliates upon consummation of the Transaction.

(j)     There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Seller's knowledge, threatened, against Seller that could reasonably be expected to (i) impede the consummation of the Transaction or (ii) materially and adversely affect the Transferred Rights or any action taken or to be taken by Seller under this Agreement.

(k)     Seller has complied with, and has performed, all of its obligations (if any) required to be complied with or performed by it under the Note Purchase Agreement and the other Financing Documents.

(l)     The Note Purchase Agreement and the Financing Documents are the only agreements or documents setting forth the terms of the Transferred Rights and the Issuer's and Seller's respective rights and obligations with respect thereto. Seller has not given its consent to change, nor has it waived, any term or provision with respect to the Notes, the Note Purchase Agreement or Financing Documents, including, without limitation, with respect to the amount or time of any payment of principal or the rate or time of any payment of interest.

(m)     Seller has not received any payment or other distribution (whether interest, fees or any other distribution) under or in respect of the Transferred Rights on or since August 2, 2017 (the "Trade Date").

(n)     Seller has not effected or received, and shall not effect or receive, the benefit of any set-off against Issuer on account of the Transferred Rights.

(o)     Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller holding any funds or property of, or owing amounts or property to, Issuer) nor had any relationship with the Issuer (including, without limitation, being an "affiliate" or an "insider" as defined

566-564/AGR/5391826.2

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 44 of 73

in United States Bankruptcy Code, as amended, § 101(2) and § 101(31) respectively), that will result in Buyer receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other holders of notes of the same class or type as the Notes.

(p)     Seller has not received any written notice that (i) any payment or other transfer made to or for the account of Seller from or on account of Issuer or any obligor under the Transferred Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any claim, counterclaim, defense or claim or right of set-off, reduction, recoupment, impairment, avoidance, disallowance or subordination.

(q)     Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights  that is not known to Seller and that may be material to a decision to sell the Transferred Rights ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller and Seller waives and releases any claims that it might have against Buyer whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Transaction; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(r)     Seller makes no representation as to the amount and collectability of any make-whole compensation, legal fees or post petition interest with respect to the Notes or other Transferred Rights.

## 3.   REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Agreement Date and as of the Closing Date that:

(a)     Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)     Buyer has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Buyer in connection with this Agreement (collectively, the "Buyer Transaction Documents") and to consummate the Transaction.  The Buyer Transaction Documents have been or will be duly authorized, executed and delivered by Buyer and constitute legally valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Buyer Transaction Documents by Buyer, and the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, will not (i) result in a breach or violation of any provision of Buyer's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Buyer, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Buyer or (iv) breach or violate any material agreement to which Buyer is a party or by which Buyer or any of its properties may be bound.

566-564/AGR/5391826.2

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 45 of 73

(d)     Neither the execution and delivery by Buyer of the Buyer Transaction Documents, nor the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(e)     Buyer (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Seller on a professional arm's-length basis and neither Seller nor any of its affiliates is acting as a fiduciary or advisor to Buyer with respect to the Transaction.

(f)     Buyer is a "qualified institutional buyer" (as defined in Rule 144A(a)(1) promulgated pursuant to the Securities Act). Buyer is acquiring the Transferred Rights for its own account and not with a view toward distribution thereof in violation of the Securities Act or any other securities laws.

(g)     Buyer understands and acknowledges that (i) the Transferred Rights are being offered and sold to it in reliance on one or more specific exemptions from registration under the Securities Act and other applicable securities laws, and that Seller is relying in part upon the truth and accuracy of, and Buyer's compliance with, the representations, warranties and understandings of Buyer set forth in the Transaction Documents (as defined below) in order to determine the availability of such exemptions and (ii) the Transferred Rights have not been registered pursuant to the Securities Act or any other applicable securities laws, and there are restrictions on Buyer's ability to resell the Transferred Rights pursuant to applicable securities laws and pursuant to the Note Purchase Agreement.

(h)     Either (i) no interest in the Transferred Rights is being acquired by or on behalf of one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the purchase and holding of the Transferred Rights and the exercise of Buyer's rights with respect to the Transferred Rights or under this Agreement.

(i)     There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of its affiliates upon consummation of the Transaction.

(j)     There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Buyer's knowledge, threatened, against Buyer that could reasonably be expected to impede the consummation of the Transaction.

(k)     Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Transferred Rights that is not known to Buyer and that may be material to a decision to purchase the Transferred Rights ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Transferred Rights notwithstanding its lack of knowledge of the Buyer Excluded Information and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the Transaction;

5

provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(l)    The consideration given for the purchase by Buyer of the Transferred Rights may differ both in kind and in amount from any payments or distributions which Buyer may ultimately receive with respect to the Transferred Rights, and Buyer shall not have any recourse to Seller for any deficiency.

(m) Buyer is fully aware that, with regard to the sale of the Notes and Transferred Rights, Seller is relying upon the truth and accuracy of these representations and warranties.

(n)    Disclosure of any information concerning the Issuer or the Financing Documents is made subject to any confidentiality provisions of the Financing Documents, and Buyer covenants and agrees to comply with such confidentiality provisions.

(o)    Buyer is not a person (either alone or together with others) directly or indirectly controlling or controlled by the Issuer or under direct or indirect common control with the Issuer within the meaning of the Act. Buyer is not an affiliate (as such term is defined in Rule 405 promulgated under the Act) of the Issuer.

## 4.  CONDITIONS OF CLOSING

(a)    The obligation of Seller to transfer the Transferred Rights to Buyer on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Seller in whole or in part):

(i)    The representations and warranties of Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Buyer shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Buyer at or prior to the Closing Date.

(ii)    Seller shall have received Buyer's executed assignment and assumption agreement in the form as Exhibit F to the Note Purchase Agreement (the "Assignment and Assumption Agreement") for delivery to the Purchasers' Agent for it acceptance and recordation.

(b)    The obligation of Buyer to pay the Purchase Price on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Buyer in whole or in part):

(i)    The representations and warranties of Seller shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Seller shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Seller at or prior to the Closing Date.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 47 of 73

(ii)    Buyer shall have received Seller's executed Assignment and Assumption Agreement and the Purchasers' Agent confirmation of its acceptance and recordation of the transfer contemplated hereby and thereby.

## 5.    DISTRIBUTIONS

All distributions, cash, payments, property and proceeds in respect of the Transferred Rights, no matter the form (collectively, "Distributions"), whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, are for the account of Buyer without any additional consideration. If at any time on or after the Trade Date Seller receives any Distributions, Seller will (a) accept and hold the Distributions for the account and sole benefit of Buyer, (b) have no equitable or beneficial interest in the Distributions and (c) promptly deliver the Distributions to Buyer.

## 6.    VOTING

On and after the Trade Date, Buyer has sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents, approvals or waivers, or otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Transferred Rights. If for any reason Seller is entitled to exercise voting power with respect to the Transferred Rights after the Trade Date, then, to the extent permitted by applicable law, Seller will exercise such voting power solely in accordance with the prior written instructions of Buyer.

## 7.  MISCELLANEOUS

(a)    Each party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents, deeds, assignments, transfers, conveyances and other instruments and papers, (ii) take or cause to be taken all such other and further actions and assurances as the other party may reasonably request, and (iii) cooperate with the other party, in each case, to effectuate the intent and purposes, and carry out the terms, of the Seller Transaction Documents and Buyer Transaction Documents (collectively, the "Transaction Documents").

(b)    All representations, warranties, covenants and agreements contained in or made pursuant to this Agreement shall survive the consummation of the transactions contemplated hereunder.

(c)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without regard to any conflicts of law provision that would require the application of the laws of any other jurisdiction). Each party irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit or proceeding arising out of or based upon this Agreement or any matter relating to it. Buyer and Seller waive any objection that either one may have to the laying of venue in any such court or that any such court is an inconvenient forum or do not have personal jurisdiction over Buyer and Seller.

(d)    Buyer and Seller agree to bear their own respective legal and other costs and expenses in connection with this Agreement and the consummation of the Transaction; provided, however, that Buyer and Seller will share equally any transfer fees or transfer costs imposed by the Issuer or any other third party in connection with the transfer of the Notes from Seller to Buyer.

566-564/AGR/5391826.2

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed 11/13/18  Page 48 of 73

(e)    This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties. In no event will either party assign or transfer any of its rights or obligations pursuant to this Agreement without the express prior written consent of the other party.

(f)    The Transaction Documents constitute the entire understanding of the parties with respect to the subject matter thereof, and supersede all prior understandings with respect to the subject matter of this Agreement.

(g)    This Agreement may be amended with (and only with) the written consent of Seller and Buyer.

(h)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement. Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart.

(i)    Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

(j)    Each of the parties agrees that, without the prior written consent of the other party, not to disclose, and to otherwise keep confidential, the terms of the Transaction, except that any party may make any such disclosure (i) as required to implement or enforce this Agreement, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it, and (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so might result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority; provided however, that the parties may disclose information regarding the Transaction (x) to their respective affiliates, directors, officers, employees, agents, advisors, counsel, accountants, auditors, limited partners, shareholders and other interest holders and (y) (other than with respect to the Purchase Price) to the extent necessary to effect the Transaction or a subsequent transfer of the Transferred Rights or any portion thereof.

(k)    EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY LAWSUIT, ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY LAWSUIT, ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

(l)    As between Buyer and Seller, in the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Assignment and Assumption Agreement, the terms of this Agreement shall control and govern.

[*signature page follows*]

566-564/AGR/5391826.2

IN WITNESS WHEREOF, this Note Purchase Agreement is executed as of the date set forth above.

**SELLER:**

**CCG TRUST CORPORATION**

By:
Name:  Anton Tereschenko
Title:  Managing Director

**BUYER:**

**HSBC SECURITIES (USA) INC.**

By: _____
Name:
Title:

9

IN WITNESS WHEREOF, this Note Purchase Agreement is executed as of the date set forth above.

SELLER:

CCG TRUST CORPORATION

By:
Name:
Title:

BUYER:

HSBC SECURITIES (USA) INC.

By:
Name:
Title:

9

# PURCHASE AGREEMENT

This Purchase Agreement, dated as of September 14, 2017 (this "Agreement"), is by and among Deutsche Bank AG, London Branch ("DBAGL"), Deutsche Bank AG, New York Branch ("DBAGNY", and collectively with DBAGL, "Seller") and HSBC Securities (USA) Inc. ("Buyer"). Capitalized terms used but not defined in this Agreement will have the meanings ascribed to them in the Note Purchase Agreement (as defined below).

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from DBAGL outstanding principal amount of Series A Senior First Lien Secured Notes with an original face amount of $59,932,094 due May 20, 2027, CUSIP 698491AA5 (the "Series A Notes") of Paniolo Cable Company, LLC (the "Issuer") and $28,845,566 in outstanding principal amount of Series B Second Lien Secured Notes due May 20, 2027, CUSIP 698491AB3 of the Issuer (the "Series B Notes"), and to purchase from DBAGNY $643,416 in principal amount of Series C Subordinated Unsecured Notes, CUSIP 698491AC1 of the Issuer (the "Series C Notes", and collectively with the Series A Notes and the Series B Notes, the "Notes") all issued pursuant to that certain Amended and Restated Note Purchase Agreement, dated as of October 1, 2007, among the Issuer, Deutsche Bank AG, New York Branch, Deutsche Bank Trust Company Americas and the other parties thereto from time to time (the "Note Purchase Agreement") on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, for and in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## 1.    PURCHASE AND SALE OF THE NOTES

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date (as defined below), Seller shall sell, transfer, assign and convey the Transferred Rights (as defined below) to Buyer, and, in consideration thereof, Buyer shall pay to Seller the purchase price (the "Purchase Price") on a delivery versus payment basis via the Depository Trust Company ("DTC") with respect to the Series A Notes and Series B Notes, and in each case using the accounts and instructions set forth on the Schedule to this Agreement, as payment in full for the Transferred Rights. The parties acknowledge and agree that an affiliate of Seller, Deutsche Bank Trust Company Americas ("DBTCA"), serves as Purchasers' Agent, Registrar, Paying Agent, Collateral Agent and Securities Intermediary for the Notes, and nothing in this Agreement shall impact those roles or the rights of DBTCA under the Note Purchase Agreement or any of the Financing Agreements. All references herein to Seller shall refer solely to DBAGL or DBAGNY, as applicable, and not to DBTCA. As used in this Agreement, the "Closing Date" means the date upon which the conditions of closing set forth in Section 4 hereof have been satisfied or waived. As used in this Agreement, the "Transferred Rights" means, collectively, (a) the Notes and all right, title and interest of Seller in and to the Notes and the Note Purchase Agreement, (b) all payments and distributions in connection with the Notes, whether in the form of principal, interest, premium, fees or otherwise, accruing or relating to any time on or after the Trade Date (as defined below), which, for the avoidance of doubt will include any interest accrued and unpaid as of the Trade Date, but exclude any rights to professional fees of Seller or its affiliates that may be paid or reimbursed after the Trade Date; (c) all agreements, documents and instruments entered into by Issuer or Seller related to the Notes (including, without limitation, the Financing Documents (as defined in the Note Purchase Agreement)); (d) all of Seller's voting, consent, approval, waiver or other contractual rights under the Notes and any related agreements, documents or instruments; (e) any and all claims (including "claims" as defined in §101(5) of the Bankruptcy Code, 11 U.S.C. §§101 et seq., as amended), suits, causes of action, and any other right of Seller with respect to the Notes, whether known or unknown, whether arising before, on or

after the Closing Date, against the Issuer, any of its affiliates, any guarantor, or any other person or entity arising under or in connection with the Notes; (f) any of Seller's rights under any Guarantee, Collateral and security of any kind for or in respect of the foregoing; and (g) Seller's rights to any and all proceeds of any of the foregoing. The sale of the Transferred Rights shall be without recourse to Seller and except as expressly set forth herein, without representation or warranty by Seller.

## 2.     REPRESENTATIONS AND WARRANTIES OF SELLER

Seller (it being understood that representations as to the Series A Notes and Series B Notes and related Transferred Rights are made by DBAGL, and representations as to the Series C Notes and related Transferred Rights are made by DBAGNY) represents and warrants to Buyer as of the date of this Agreement (the "Agreement Date") and as of the Closing Date that:

(a)     Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)     Seller has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Seller in connection with this Agreement (collectively, the "Seller Transaction Documents") and to consummate the transaction contemplated in this Agreement (the "Transaction"). The Seller Transaction Documents have been or will be duly authorized, executed and delivered by Seller and constitute legally valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Seller Transaction Documents by Seller, and the performance by Seller of its obligations pursuant to the Seller Transaction Documents, will not (i) result in a breach or violation of any provision of Seller's organizational documents, (ii) violate or breach any statute, law, order, rule or regulation of any government, governmental agency, authority, commission, court or other tribunal (collectively, "Governmental Authority") applicable to Seller, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Seller, (iv) breach or violate any material agreement to which Seller is a party or by which Seller or any of its properties may be bound or (v) result in a breach or violation of any provisions of the Note Purchase Agreement, or any other Financing Documents.

(d)     Seller is the sole legal and beneficial owner of the Transferred Rights, has good legal and beneficial title to the Transferred Rights and has the full right to transfer the Transferred Rights. The Transferred Rights are owned by Seller free and clear of any lien, pledge, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind (collectively, "Liens"). Upon delivery of the Transferred Rights to Buyer on the Closing Date against payment of the Purchaser Price as contemplated by this Agreement, Seller will transfer to Buyer good and valid legal and beneficial title to the Transferred Rights free and clear of any and all Liens (other than any Liens created by Buyer upon delivery of the Transferred Rights). Other than pursuant to this Agreement or the Seller Transaction Documents, Seller has not sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Transferred Rights, in whole or in part.

(e)     Neither the execution and delivery by Seller of the Seller Transaction Documents, nor the performance by Seller of its obligations under the Seller Transaction Documents, requires the consent,

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 53 of 73

approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(f)     Neither Seller, nor, to the best of Seller's knowledge, anyone acting on its behalf, has taken any action which could subject the sale of the Transferred Rights to the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") and the sale of the Transferred Rights pursuant to this Agreement does not require registration pursuant to the Securities Act or any other applicable securities laws.  Seller has not offered to sell, or solicited any offers to buy, all or any portion of the Transferred Rights in violation of the Securities Act or any other applicable securities laws.  The Transferred Rights were not offered or sold to the Buyer by any form of general solicitation or general advertising.  Seller acquired the Transferred Rights without a view toward distribution thereof in violation of the Securities Act or any other applicable securities laws.  Seller is not, and has not been during the period it has owned the Transferred Rights, an "affiliate" (as such term is defined in Rule 144(a)(i) promulgated pursuant to the Securities Act) of the Issuer.

(g)     Seller (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Buyer on a professional arm's-length basis and neither Buyer nor any of its affiliates is acting as a fiduciary or advisor to Seller with respect to the Transaction.

(h)     Either (i) no interest in the  Transferred Rights is being sold by or on behalf of the following (collectively, a "Benefit Plan"): (A) an "employee benefit plan" (as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it ("ERISA")) that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it (the "Code"); or (C) any entity whose assets include (for purposes of ERISA 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan" or (ii) the transaction exemption set forth in one or more prohibited transaction class exemptions issued by the U.S. Department of Labor ("PTEs"),  such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the sale of the Transferred Rights pursuant to this Agreement.

(i)     There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Seller who might be entitled to any fee or commission from Buyer or any of its affiliates upon consummation of the Transaction.

(j)     There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Seller's knowledge, threatened, against Seller that could reasonably be expected to (i) impede the consummation of the Transaction or (ii) materially and adversely affect the Transferred Rights or any action taken or to be taken by Seller under this Agreement.

(k)     Seller has complied with, and has performed, all of its obligations (if any) required to be complied with or performed by it under the Note Purchase Agreement and the other Financing Documents.

566-590/AGR/5405560.1

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed 11/13/18  Page 54 of 73

(l)     The Note Purchase Agreement and the Financing Documents are the only agreements or documents setting forth the terms of the Transferred Rights and the Issuer's and Seller's respective rights and obligations with respect thereto.  Seller has not given its consent to change, nor has it waived (except to the extent that certain temporary forbearance arrangements that have expired by their terms may have been deemed to constitute a waiver for the relevant forbearance periods), any term or provision with respect to the Notes, the Note Purchase Agreement or Financing Documents, including, without limitation, with respect to the amount or time of any payment of principal or the rate or time of any payment of interest.

(m)     Seller has not received any payment or other distribution (whether interest, fees or any other distribution) under or in respect of the Transferred Rights on or since  September ___, 2017  (the "Trade Date").

(n)     Seller has not effected or received, and shall not effect or receive, the benefit of any set-off against Issuer on account of the Transferred Rights on or since the Trade Date.

(o)     Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller holding any funds or property of, or owing amounts or property to, Issuer) nor had any relationship with the Issuer (including, without limitation, being an "affiliate" or an "insider" as defined in United States Bankruptcy Code, as amended, § 101(2) and § 101(31) respectively), that will result in Buyer receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other holders of notes of the same class or type as the Notes.

(p)     Seller has not received any written notice that (i) any payment or other transfer made to or for the account of Seller from or on account of Issuer or any obligor under the Transferred Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any claim, counterclaim, defense or claim or right of set-off, reduction, recoupment, impairment, avoidance, disallowance or subordination.

(q)     Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights  that is not known to Seller and that may be material to a decision to sell the Transferred Rights ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller and Seller waives and releases any claims that it might have against Buyer whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Transaction; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(r)  Seller makes no representation as to the amount and collectability of any make-whole compensation, legal fees or post petition interest with respect to the Notes or other Transferred Rights. Seller assumes no responsibility with respect to (i) any statements, representations or warranties made by Issuer or any other obligor in the Financing Documents, (ii) the financial condition of the Issuer or any other obligor under the Financing Documents, (iii) the collectability or value of the Notes or other Transferred Rights or (iv) the performance or observance by the Issuer or any other obligor of their respective obligations under the Notes and Financing Documents.

566-590/AGR/5405560.1

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 55 of 73

## 3. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the Agreement Date and as of the Closing Date that:

(a)     Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)     Buyer has all necessary power and authority to execute, deliver, and perform its obligations under this Agreement and each of the other documents to be executed or delivered by Buyer in connection with this Agreement (collectively, the "Buyer Transaction Documents") and to consummate the Transaction. The Buyer Transaction Documents have been or will be duly authorized, executed and delivered by Buyer and constitute legally valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general equitable principles.

(c)     The execution and delivery of the Buyer Transaction Documents by Buyer, and the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, will not (i) result in a breach or violation of any provision of Buyer's organizational documents, (ii) violate or breach any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Buyer, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Buyer or (iv) breach or violate any material agreement to which Buyer is a party or by which Buyer or any of its properties may be bound.

(d)     Neither the execution and delivery by Buyer of the Buyer Transaction Documents, nor the performance by Buyer of its obligations pursuant to the Buyer Transaction Documents, requires the consent, approval, order or authorization of, or registration with, or the giving of notice to, any Governmental Authority or any other person or entity.

(e)     Buyer (i) is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits, risks and suitability of entering into the Transaction, (ii) has conducted its own analysis and due diligence and independently obtained such information as it deems necessary in order to make an informed investment decision with respect to the Transferred Rights, (iii) is able to bear the risks attendant to the Transaction and (iv) is dealing with Seller on a professional arm's-length basis and neither Seller nor any of its affiliates is acting as a fiduciary or advisor to Buyer with respect to the Transaction.

(f)     Buyer is a "qualified institutional buyer" (as defined in Rule 144A(a)(1) promulgated pursuant to the Securities Act). Buyer is acquiring the Transferred Rights for its own account and not with a view toward distribution thereof in violation of the Securities Act or any other securities laws.

(g)     Buyer understands and acknowledges that (i) the Transferred Rights are being offered and sold to it in reliance on one or more specific exemptions from registration under the Securities Act and other applicable securities laws, and that Seller is relying in part upon the truth and accuracy of, and Buyer's compliance with, the representations, warranties and understandings of Buyer set forth in the Transaction Documents (as defined below) in order to determine the availability of such exemptions and (ii) the Transferred Rights have not been registered pursuant to the Securities Act or any other applicable securities laws, and there are restrictions on Buyer's ability to resell the Transferred Rights pursuant to applicable securities laws and pursuant to the Note Purchase Agreement.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 56 of 73

(h)    Either (i) no interest in the Transferred Rights is being acquired by or on behalf of one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the purchase and holding of the Transferred Rights and the exercise of Buyer's rights with respect to the Transferred Rights or under this Agreement.

(i)    There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of its affiliates upon consummation of the Transaction.

(j)    There is no action, lawsuit, arbitration, claim or proceeding pending or, to the best of Buyer's knowledge, threatened, against Buyer that could reasonably be expected to impede the consummation of the Transaction.

(k)    Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Transferred Rights that is not known to Buyer and that may be material to a decision to purchase the Transferred Rights ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Transferred Rights notwithstanding its lack of knowledge of the Buyer Excluded Information and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the Transaction; provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(l)    The consideration given for the purchase by Buyer of the Transferred Rights may differ both in kind and in amount from any payments or distributions which Buyer may ultimately receive with respect to the Transferred Rights, and Buyer shall not have any recourse to Seller for any deficiency.

## 4. CONDITIONS OF CLOSING

(a)    The obligation of Seller to transfer the Transferred Rights to Buyer on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Seller in whole or in part) and payment of the Purchase Price as set forth herein:

(i)    The representations and warranties of Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Buyer shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Buyer at or prior to the Closing Date.

(b)    The obligation of Buyer to pay the Purchase Price on the Closing Date is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Buyer in whole or in part):

(i)    The representations and warranties of Seller shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that

566-590/AGR/5405560.1

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 57 of 73

time (except for representations and warranties that speak as of a specific date), and Seller shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Seller at or prior to the Closing Date.

## 5.    DISTRIBUTIONS

All distributions, cash, payments, property and proceeds in respect of the Transferred Rights, no matter the form (collectively, "Distributions"), whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, are for the account of Buyer without any additional consideration. If at any time on or after the Trade Date Seller receives any Distributions, Seller will (a) accept and hold the Distributions for the account and sole benefit of Buyer, (b) have no equitable or beneficial interest in the Distributions and (c) promptly deliver the Distributions to Buyer.

## 6.    VOTING

On and after the Trade Date, Buyer has sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents, approvals or waivers, or otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Transferred Rights. If for any reason Seller is entitled to exercise voting power with respect to the Transferred Rights after the Trade Date, then, to the extent permitted by applicable law, Seller will exercise such voting power solely in accordance with the prior written instructions of Buyer, and in the absence of instruction shall abstain from voting.

## 7.  MISCELLANEOUS

(a)     Each party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents, deeds, assignments, transfers, conveyances and other instruments and papers, (ii) take or cause to be taken all such other and further actions and assurances as the other party may reasonably request, and (iii) cooperate with the other party, in each case, to effectuate the intent and purposes, and carry out the terms, of the Seller Transaction Documents and Buyer Transaction Documents (collectively, the "Transaction Documents").

(b)     All representations, warranties, covenants and agreements contained in or made pursuant to this Agreement shall survive the consummation of the transactions contemplated hereunder.

(c)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without regard to any conflicts of law provision that would require the application of the laws of any other jurisdiction).   Each party irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit or proceeding arising out of or based upon this Agreement or any matter relating to it. Buyer and Seller waive any objection that either one may have to the laying of venue in any such court or that any such court is an inconvenient forum or do not have personal jurisdiction over Buyer and Seller.

(d)     Buyer and Seller agree to bear their own respective legal and other costs and expenses in connection with this Agreement and the consummation of the Transaction; provided, however, that Buyer and Seller will share equally any transfer fees or transfer costs imposed by the Issuer or any other third party in connection with the transfer of the Notes from Seller to Buyer.

7

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 1  Filed  11/13/18  Page 58 of 73

(e)     This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties. In no event will either party assign or transfer any of its rights or obligations pursuant to this Agreement without the express prior written consent of the other party.

(f)     The Transaction Documents constitute the entire understanding of the parties with respect to the subject matter thereof, and supersede all prior understandings with respect to the subject matter of this Agreement.

(g)     This Agreement may be amended with (and only with) the written consent of Seller and Buyer.

(h)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement. Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart.

(i)     Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

(j)     Each of the parties agrees that, without the prior written consent of the other party, not to disclose, and to otherwise keep confidential, the terms of the Transaction, except that any party may make any such disclosure (i) as required to implement or enforce this Agreement, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it, and (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so might result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority; provided however, that the parties may disclose information regarding the Transaction (x) to their respective affiliates, directors, officers, employees, agents, advisors, counsel, accountants, auditors, limited partners, shareholders and other interest holders and (y) (other than with respect to the Purchase Price) to the extent necessary to effect the Transaction or a subsequent transfer of the Transferred Rights or any portion thereof.

(k)     EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY LAWSUIT, ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY LAWSUIT, ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

*[signature page follows]*

566-590/AGR/5405560.1

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 59 of 73

IN WITNESS WHEREOF, this Purchase Agreement is executed as of the date set forth above.

SELLER:

DEUTSCHE BANK AG, LONDON BRANCH

By:
Name:
Title:    **RUPERT PITT**
          **DIRECTOR**
By:
Name:
Title:    PETER HAAGENSEN
          MANAGING DIRECTOR

DEUTSCHE BANK AG, NEW YORK BRANCH

By:
Name:
Title:    Giav Chong
          Director
By:
Name:
Title:    Pierre Grollet-Aumon
          Managing Director

BUYER:

HSBC SECURITIES (USA) INC.

By:
Name:
Title:

IN WITNESS WHEREOF, this Purchase Agreement is executed as of the date set forth above.

**SELLER:**

**DEUTSCHE BANK AG, LONDON BRANCH**

By: _____
Name:
Title:
By: _____
Name:
　Title:

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By: _____
Name:
Title:
By: _____
Name:
Title:

**BUYER:**

**HSBC SECURITIES (USA) INC.**

By: _____
Name: *Thomas Currey*
Title: *MD Credit Trading*

9

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 61 of 73

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

IN RE:

PANIOLO CABLE COMPANY, LLC,

    Alleged Debtor.

§
§
§
§
§
§
§

CASE NO. _____
(Involuntary Chapter 11)

## DECLARATION OF SUNRISE PARTNERS LIMITED PARTNERSHIP
## IN SUPPORT OF INVOLUNTARY CHAPTER 11 PETITION AGAINST
## PANIOLO CABLE COMPANY, LLC

I, Douglas Ambrose, declare as follows:

1.    I am the Executive Vice President of Paloma Partners Management Company, the general partner of Sunrise Partners Limited Partnership. I submit this declaration in support of the Involuntary Chapter 11 Petition Against Paniolo Cable Company, LLC.

2.    I am over the age of 18 and have personal knowledge of the facts stated in this Declaration, each of which is true and correct.

3.    Sunrise Partners Limited Partnership is the owner and holder of $10,000,000 of Series A Senior First Lien Secured Notes (the "Sunrise Note") issued by Paniolo Cable Company, LLC under the Amended and Restated Note Purchase Agreement, dated as of October 1, 2007 among Paniolo Cable Company, LLC, as Issuer, Deutsche Bank AG, New York Branch, as Initial Purchaser, Deutsche Bank Trust Company Americas, as Purchasers' Agent, Registrar, Paying Agent, Collateral Agent and Securities Intermediary, and the purchasers party to the agreement from time to time. No valuation of the liens securing the Sunrise Note has been made. Effective as of September 25, 2015, Paniolo Cable Company, LLC acknowledged, confirmed and agreed that immediately prior to such date, Paniolo Cable Company, LLC was

indebted to the holders of the Series A first lien secured notes in the principal amount of $186,296,177.

4.     Sunrise Partners Limited Partnership acquired the Sunrise Note via unconditional transfer pursuant to the documents attached hereto as Sunrise Exhibit A, which set forth the consideration for and terms of the transfer.  The Sunrise Note was not transferred for the purpose of commencing the case.

5.     As of October 31, 2018, there was currently outstanding, past due and unpaid the sum of $10,000,000 under the Sunrise Note, plus accrued and unpaid interest, plus accrued and unpaid fees, costs and expenses.

6.     Neither Paniolo Cable Company, LLC or any other person has disputed Paniolo Cable Company,  LLC's liability for the Sunrise Note or the amount due thereunder.

7.     Sunrise Partners Limited Partnership has authorized Norton Rose Fulbright US LLP and Chun Kerr LLP to act as counsel in its capacity as a petitioning creditor.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November _13_, 2018 in New York, New York.

/s/ _Douglas Ambrose_
Douglas Ambrose

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November, 2018, a copy of the foregoing Declaration has been served upon the persons entitled to notice by either U.S. first class mail, postage prepaid or by electronic notification and as required under the Federal Rules of Bankruptcy Procedure.

*/s/ Toby L. Gerber*

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed 11/13/18   Page 64 of 73

## SUNRISE EXHIBIT A

TRADE CONFIRM

Trade Date: 10/13/2017
HSBC sold: 10mm Cusip: US698491AA54 @ [REDACTED].
Settlement: DTC (T+5)
HSBC contact: Tom Curran
Paloma Contact: John Silvetz
Note Purchase Agreement: Forthcoming from Kara Katz.

Trade Terms: HSBC has right of first refusal on Paloma piece and
Paloma has right of first refusal on HSBC piece in event either party
wishes to sell their piece.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 65 of 73

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

IN RE:                                    §
                                          §
**PANIOLO CABLE COMPANY, LLC,**           §          **CASE NO.** _____
                                          §          **(Involuntary Chapter 11)**
    **Alleged Debtor.**                 §
                                          §

---

## DECLARATION OF DEUTSCHE BANK TRUST COMPANY AMERICAS, AS AGENT, IN SUPPORT OF INVOLUNTARY CHAPTER 11 PETITION AGAINST PANIOLO CABLE COMPANY, LLC

I, Rodney Gaughan, declare as follows:

1.      I am an authorized officer acting on behalf of Deutsche Bank Trust Company Americas. I submit this declaration in support of the Involuntary Chapter 11 Petition Against Paniolo Cable Company, LLC.

2.      I am over the age of 18 and have personal knowledge of the facts stated in this Declaration, each of which is true and correct to my knowledge.

3.      Deutsche Bank Trust Company Americas is the Purchasers' Agent, Registrar, Paying Agent, Collateral Agent, and Securities Intermediary (collectively, the "Agent") under the Amended and Restated Note Purchase Agreement, dated as of October 1, 2007 among Paniolo Cable Company, LLC, as Issuer, Deutsche Bank AG, New York Branch, as Initial Purchaser, Deutsche Bank Trust Company Americas, as Purchasers' Agent, Registrar, Paying Agent, Collateral Agent and Securities Intermediary, and the purchasers party to the agreement from time to time (the "Note Agreement").

4.      Pursuant to the Note Agreement, Paniolo Cable Company, LLC is obligated to pay or reimburse Deutsche Bank Trust Company Americas, in such agency capacities, for all of the reasonable out-of-pocket costs, expenses, and fees of Deutsche Bank Trust Company

Americas accruing in performance of its duties under the Note Purchase Agreement and related agreements (the "DTBCA Fees and Expenses").

5.    "Exhibit A" and "Exhibit B" attached hereto are true and correct copies of the invoices due and owing to Deutsche Bank Trust Company Americas, as Agent, by Paniolo Cable Company LLC for the DTBCA Fees and Expenses. The information contained in the invoices and the invoices themselves are maintained by Deutsche Bank Trust Company Americas in the ordinary course of business.

6.    The invoices attached hereto as "Exhibit A" and "Exhibit B" are due and owing by Paniolo Cable Company, LLC, and the amounts reflected therein are to my knowledge true and correct.    A record of said amounts is maintained by Deutsche Bank Trust Company Americas, and the amounts are due and unpaid.  There have been no offsets, payments, or credits to the amounts reflected in the attached exhibits.

7.    As of August 7, 2018, there was currently outstanding, past due, and unpaid the sum of $24,557 under the invoices in "DBTCA Exhibits A and B."  No payments have been received with respect to the invoices since that date.

8.    To my knowledge, neither Paniolo Cable Company, LLC or any other person has disputed Paniolo Cable Company, LLC's liability for the invoices in "Exhibits A and B" or the amount due thereunder.

9.    No payments have been made by Paniolo Cable Company, LLC on any of the Notes issued under the Note Purchase Agreement since May 20, 2013.

10.    Effective as of September 25, 2015, Paniolo Cable Company, LLC acknowledged, confirmed and agreed that immediately prior to such date, Paniolo Cable Company, LLC was indebted to the Agent and the holders of the notes under the Note

Agreement in the following amounts: (i) to the holders of the Series A first lien secured notes in the principal amount of  $186,296,177, (ii) to the holders of the Series B second lien secured notes in the principal amount of $22,204,327, and (iii) to the holders of the Series C subordinated unsecured notes in the principal amount of $643,416, in each case plus accrued interest thereon plus accrued and unpaid fees, costs and expenses due under the Note Agreement.

11.     Deutsche Bank Trust Company Americas, as Agent, has authorized Norton Rose Fulbright US LLP and Chun Kerr LLP to act as counsel in its capacity as a petitioning creditor.

[REMAINING PORTION OF THIS PAGE IS BLANK]

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 68 of 73

I declare under penalty of perjury that to my knowledge the foregoing is true and correct.

Executed on November 13, 2018 in Jersey City, New Jersey.

Deutsche Bank Trust Company Americas, as Agent
By: Deutsche Bank National Trust Company

/s/      _Rodney Gaughan_
Rodney Gaughan
Vice President

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of November, 2018, a copy of the foregoing Declaration has been served upon the persons entitled to notice by either U.S. first class mail, postage prepaid or by electronic notification and as required under the Federal Rules of Bankruptcy Procedure.

*<u>/s/ Toby L. Gerber</u>*

**DBTCA EXHIBITS A & B**

73634425.5

-6-

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 1   Filed  11/13/18   Page 71 of 73


Deutsche Bank

August 7, 2018

Paniolo Cable Company, LLC
c/o Kobayashi, Sugita & Goida
999 Bishop Street, 26th Fl.
Honolulu, HI 96813
Attn: Lex R. Smith, Esq.

Ladies and Gentlemen,

Payment of our fees for services rendered in connection with the below charges are now due.
Feel free to contact Rodney Gaughan at (201) 593-4016 with any questions regarding this
invoice.

For Extraordinary Services* rendered by Deutsche Bank Trust Company Americas as
Purchasers' Agent, Securities Intermediary and Collateral Agent, for the period of
January 1, 2018 through July 31, 2018:

**USD 10,382.00**

Please credit:

Deutsche Bank Trust Company Americas
Corporate Trust and Agency Services
SWIFT: [REDACTED]
ABA#: [REDACTED]
Account Name: NYLTD Funds Control-NY
Account Number: [REDACTED]
Ref. Paniolo Cable Company LLC – Extraordinary Services
Attn: Jennifer Vandyne / M50E

Sincerely,

Rodney Gaughan
Vice President

<div style="border:1px solid black; text-align:center;">

**EXHIBIT**

**A**

</div>

*Extraordinary Services refers to services we have provided as a result of the defaults under the NPA. We
have a team of dedicated default and distressed transaction specialists who handle the additional work
which is above and beyond our normal agent duties.



JANEEN-ANN A. OLDS
PANIOLO CABLE COMPANY, LLC
999 BISHOP STREET, SUITE 2600
HONOLULU, HAWAII 96813

## INVOICE

### PANIOLO CABLE COMPANY, LLC

| Invoice #: M50EIG | Invoice Date: 08/07/2018 | Invoice Currency: USD | Due Date: Upon Receipt | |
|---|---|---|---|---|
| Purchaser's, Reg. & Paying Agent - Tranche A (August 2018 - July 2019) | | | $ | 2,500.00 |
| Purchaser's, Reg. & Paying Agent - Tranche B (August 2018 - July 2019) | | | $ | 2,500.00 |
| Purchaser's, Reg. & Paying Agent - Tranche C (August 2018 - July 2019) | | | $ | 1,500.00 |
| Collateral & Escrow Agent Administration Fee (August 2018 - July 2019) | | | $ | 7,500.00 |
| Wire Transfers - Per Item (August 2017 - July 2018) | | | $ | 175.00 |
| 7 @ 25.00 Each | | | | |

| Total Amount Due: | USD | 14,175.00 |
|---|---|---|

If paying by wire, please remit funds to:

Deutsche Bank Trust Company - Americas
Corporate Trust and Agency Services
SWIFT: [REDACTED]
ABA# [REDACTED]
Account# [REDACTED]
Ref: M50EIG
Attention: FBU/Shamarri Hartzog

If you have any questions regarding this Invoice, please contact CTAS Fee Billing at 904-271-2541 or email to CTAS.Fee-Billing@db.com

If paying by check, please return bottom portion with payment.
Make checks payable to DB Trust Co. Americas

| Invoice ID Number | Invoice Date: | Due Date: | Total Amount Due |
|---|---|---|---|
| M50EIG | 8/7/2018 | Upon Receipt | 14,175.00 |

Mail Payment To:
Deutsche Bank Trust Co. Americas
Corporate Trust & Agency Services
P.O. Box 1757 - Church Street Station
New York, NY 10008

JANEEN-ANN A. OLDS
PANIOLO CABLE COMPANY, LLC
999 BISHOP STREET, SUITE 2600
HONOLULU, HAWAII 96813

☐ Check here if address correction has been requested on reverse of this form.

EXHIBIT
B