# ASSET PURCHASE AGREEMENT

**by and between**

**MICHAEL KATZENSTEIN, as Seller**

**solely in his capacity as chapter 11 trustee for**

**the bankruptcy estate of**

**PANIOLO CABLE COMPANY, LLC, as Debtor**

**and HAWAIIAN TELCOM, INC., as Buyer**

**dated**

**November 30, 2020**

EXHIBIT "A"

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS .................................................................................. 1

     Section 1.1    Definitions.................................................................................. 1

     Section 1.2    Rules of Construction ............................................................... 7

ARTICLE II     PURCHASE AND SALE OF THE PURCHASED ASSETS .......................... 8

     Section 2.1    Purchase and Sale of the Purchased Assets; Assumption of
                            Liabilities ................................................................................ 8

     Section 2.2    Purchase Price ......................................................................... 11

     Section 2.3    Deliveries by Seller................................................................. 11

     Section 2.4    Deliveries by Buyer ................................................................ 12

     Section 2.5    Escrow Agreement for Earnest Money.................................... 12

     Section 2.6    Payment of Purchase Price; Delivery of Closing Documents;
                            Allocation of Purchase Price .................................................. 13

     Section 2.7    Closing .................................................................................... 13

     Section 2.8    As is, Where is Nature of Sale ................................................ 13

ARTICLE III     REPRESENTATIONS AND WARRANTIES OF SELLER .......................... 14

     Section 3.1    Authority; Execution and Delivery......................................... 14

     Section 3.2    Non-Contravention; Approvals and Consents ....................... 14

     Section 3.3    Title to the Purchased Assets .................................................. 15

     Section 3.4    No Subsidiaries ....................................................................... 15

     Section 3.5    Seller's Brokerage Agreements .............................................. 15

     Section 3.6    Litigation ................................................................................ 15

     Section 3.7    Assignable Contracts, Assigned Claims, Assigned Permits, and
                            Assigned Rights ..................................................................... 15

     Section 3.8    Real Estate .............................................................................. 16

ARTICLE IV     REPRESENTATIONS AND WARRANTIES OF BUYER .......................... 16

     Section 4.1    Organization and Good Standing............................................ 16

     Section 4.2    Authorization of Agreement; Execution and Delivery ........... 16

     Section 4.3    Non-Contravention; Approvals and Consents ....................... 16

     Section 4.4    Financial Ability ..................................................................... 16

     Section 4.5    Buyer's Brokerage Agreements .............................................. 17

     Section 4.6    No Affiliates of Debtor .......................................................... 17

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed   12/28/20   Page 2 of 248

# TABLE OF CONTENTS
(continued)

**Page**

Section 4.7    Adequate Assurances Regarding Assignable Contracts and Assigned Rights ................................................................. 17

ARTICLE V      COVENANTS ............................................................... 17

Section 5.1    Conduct of the Business ............................................. 17

Section 5.2    Risk of Loss; Duty to Repair ..................................... 17

Section 5.3    No Solicitation ......................................................... 17

Section 5.4    Pre-Closing Access ................................................... 17

Section 5.5    Notification ............................................................... 18

Section 5.6    Additional Agreements .............................................. 18

Section 5.7    Investigation and Agreement by Buyer ...................... 18

Section 5.8    Permits or Consents of Governmental Authorities ...... 19

Section 5.9    Injunctions ................................................................ 20

Section 5.10   Adequate Assurances Regarding Assignable Contracts and Assigned Rights ................................................................. 20

Section 5.11   Cure of Defaults ....................................................... 20

Section 5.12   Bankruptcy Covenants ............................................. 20

Section 5.13   Migration of Capacity .............................................. 20

ARTICLE VI     CONDITIONS TO THE CLOSING ................................ 21

Section 6.1    Conditions to Obligations of Each Party ................... 21

Section 6.2    Conditions to Obligation of Buyer ............................ 21

Section 6.3    Conditions to Obligation of Seller ............................ 22

ARTICLE VII    TERMINATION ............................................................ 23

Section 7.1    Termination ............................................................... 23

Section 7.2    Effect of Termination ................................................ 24

Section 7.3    Survival .................................................................... 24

ARTICLE VIII   OFFSET AMOUNTS ..................................................... 24

Section 8.1    Costs Relating to the Purchased Assets ..................... 24

Section 8.2    Limitations ............................................................... 24

Section 8.3    Claim Procedures ...................................................... 24

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 3 of 248

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE IX    MISCELLANEOUS ............................................................................ 24

    Section 9.1    Post-Closing Access ......................................................... 24

    Section 9.2    Public Announcements ...................................................... 24

    Section 9.3    Further Assurances ............................................................ 25

    Section 9.4    Expenses ........................................................................... 25

    Section 9.5    Notices .............................................................................. 25

    Section 9.6    Confidentiality .................................................................. 26

    Section 9.7    Entire Agreement; Amendment; Waiver ............................ 26

    Section 9.8    Severability ....................................................................... 26

    Section 9.9    Successors and Assigns; Third Party Beneficiaries ........... 27

    Section 9.10   Governing Law .................................................................. 27

    Section 9.11   Captions ............................................................................ 27

    Section 9.12   Counterparts ...................................................................... 27

    Section 9.13   Enforcement of Agreement ............................................... 27

    Section 9.14   Time of Essence; Specified Dates ..................................... 28

    Section 9.15   No Director or Affiliate Liability ...................................... 28

    Section 9.16   No Personal Liability ........................................................ 28

    Section 9.17   No Successor Liability ...................................................... 28

EXHIBITS
EXHIBIT A  -    Form of Sale Order
EXHIBIT B  -    Form of Assignment and Assumption Agreement
EXHIBIT C  -    Form of Bill of Sale
EXHIBIT D  -    Allocation of Purchase Price
EXHIBIT E  -    Form of Escrow Agreement
EXHIBIT F  -    Form of Credit Agreement
EXHIBIT G  -    Form of Security Agreement
EXHIBIT H  -    Form of Operational Support and Sales Services Agreement

SCHEDULES

1.1(a)    -    ASSIGNABLE CONTRACTS
1.1(b)    -    ASSIGNED PERMITS
1.1(c)    -    ASSIGNED RIGHTS

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed   12/28/20   Page 4 of 248

2.1(a)   -   DEBTOR ASSETS

<u>SELLER DISCLOSURE SCHEDULE</u>

3.3(a)   -   TITLE TO PURCHASED ASSETS
3.5       -   SELLER'S BROKERAGE AGREEMENTS

<u>BUYER DISCLOSURE SCHEDULE</u>

4.5       -   BUYER'S BROKERAGE AGREEMENTS
4.6       -   NO AFFILIATES OF DEBTOR

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 30, 2020 (the "Execution Date"), by and between Michael Katzenstein, solely in his capacity as chapter 11 trustee ("Seller") for the bankruptcy estate of Paniolo Cable Company, LLC, a limited liability company organized under the laws of the State of Delaware ("Debtor" or "Paniolo"), and Hawaiian Telcom, Inc., a Hawaii corporation ("Buyer").

### R E C I T A L S:

**WHEREAS**, Debtor owns and operates a submerged marine fiber and terrestrial fiber telecommunications cable network that connects the five principal islands in the State of Hawaii (the "Business").

**WHEREAS**, on November 13, 2018, certain creditors of Debtor filed an involuntary petition for relief against Debtor under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"), which case is being administered under Case No. 19-013139 (RJF) (the "Bankruptcy Case").

**WHEREAS**, on January 30, 2019, the Bankruptcy Court entered an Order for Relief against Debtor in the Bankruptcy Case.

**WHEREAS**, on February 11, 2019, the Bankruptcy Court appointed Seller as chapter 11 trustee for Debtor's bankruptcy estate (the "Estate").

**WHEREAS**, the Estate is the owner of the Purchased Assets (hereinafter defined).

**WHEREAS**, Buyer desires to purchase the Purchased Assets from Seller, and Seller desires to sell the Purchased Assets to Buyer, in consideration of the receipt of the Purchase Price (hereinafter defined) in the manner and subject to the terms and conditions set forth herein and in accordance with the Bankruptcy Code, including sections 363 and 365 thereof.

**WHEREAS**, the transactions contemplated herein shall be consummated pursuant to the terms and conditions of this Agreement and a Sale Order (hereinafter defined) to be entered by the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in reliance upon the mutual covenants and agreements hereinafter set forth and subject to the terms and conditions herein contained, the parties hereto agree as follows:

1

## ARTICLE I
## DEFINITIONS

Section 1.1  **Definitions**.  The following terms shall have the following meanings in this Agreement:

"A.1 Assets" shall mean the Debtor's Assets identified as part of Schedule A.1 as described in Schedule 2.1(a).

"A.2 Assets" shall have the Debtor's Assets identified as part of Scheduled A.2 as described in Schedule 2.1(a).

"Acquisition Proposal" shall have the meaning ascribed to such term in Section 5.2(b).

"Affiliate" shall, with respect to any Person, mean any other Person that controls, is controlled by or is under common control with the former, including all affiliates as that term is defined in 11 U.S.C. §101.

"Agreement" shall mean this Asset Purchase Agreement, and each Exhibit and Schedule hereto.

"Antitrust Agency" shall have the meaning ascribed to such term in Section 6.1(a).

"Antitrust Investigation" shall have the meaning ascribed to such term in Section 6.1(a).

"Assigned Claims" shall mean the Debtor's right, title and interest, if any, in claims, causes of action, warranty claims, insurance claims, or claims against third parties, or any proceeds or amounts receivable in connection therewith, whether sounding in contract, tort, equity or otherwise, to pursue recovery or equitable relief in connection with use of the Debtor Assets prior to the Closing, or for damages to the Debtor Assets.

"Assignable Contracts" shall mean the Contracts of Debtor relating to the Business that are identified on Schedule 1.1(a).

"Assigned Permits" shall mean the Debtor's interest, if any, in the Permits relating to the Business that are identified on Schedule 1.1(b), including, for the avoidance of doubt, the Entitlements.

"Assigned Rights" shall mean any of Debtor's rights granted by third parties, including without limitation any and all rights, licenses, vendor consents, rights-of-way, easements, wayleaves, colocations, leases and other approvals, that are necessary for the lawful ownership of the Purchased Assets or other lawful conduct of the Business as currently conducted, including, without limitation, those identified on Schedule 1.1(c).

"Assignment and Assumption Agreement" shall have the meaning ascribed to such term in Section 2.3(b).

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.1(c).

2

"Bankruptcy Case" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals hereof.

"Burdensome Condition" means any Remedy Action or Remedy Actions that, individually or in the aggregate (taken as a whole), would be reasonably likely to have a material adverse effect on Buyer and its Affiliates.

"Business" shall have the meaning ascribed to such term in the recitals hereof.

"Business Day" shall mean any day of the year other than (i) any Saturday or Sunday or (ii) any other day on which banks located in the State of Hawaii generally are closed for business other than the retail depository business.

"Buyer" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Buyer Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article IV.

"CAFP" means the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Section established by Executive Order 13913 (previously known as Team Telecom), and any of its member and advisor agencies, or a grouping thereof, acting in their CAFP capacities.

"Cash Payment" shall have the meaning ascribed to such term in Section 2.2.

"Cash Offset Amount(s)" shall mean any Repair Expenses arising out of or relating to a break in the Submarine Cable.

"CFIUS" means the Committee on Foreign Investment in the United States or any member agency thereof designated to act on behalf of CFIUS.

"CFIUS Clearance" means that any review or investigation by CFIUS under Section 721 of the transactions contemplated by this Agreement shall have been concluded and one of the following has occurred: (a) written notice has been received by Buyer and Seller (or their respective counsel) from CFIUS stating that the review or investigation of the transactions contemplated by this Agreement pursuant to Section 721 has been concluded and that CFIUS has made a determination that the transactions contemplated by this Agreement do not present any unresolved national security concerns, (b) CFIUS shall have concluded that the transactions contemplated by this Agreement are not subject to review under Section 721; or (c) the President of the United States shall not have acted pursuant to Section 721 to suspend or prohibit the consummation of the transactions contemplated by this Agreement and the applicable period of time for the President to take such action shall have expired.

"Claim" shall mean a right to (i) a payment, whether or not such right is reduced to

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 8 of 248

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured or unsecured.

"Closing" shall have the meaning ascribed to such term in Section 2.7.

"Closing Date" shall have the meaning ascribed to such term in Section 2.7.

"Closing Documents" shall mean, collectively, the documents delivered by Seller pursuant to Section 2.3 and the documents delivered by Buyer pursuant to Section 2.4.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended. All references to the Code, U.S. Treasury Regulations or other governmental pronouncements shall be deemed to include references to any applicable successor Regulations or amending pronouncement.

"Contracts" shall mean any agreements, contracts, commitments, understandings, binding arrangements, unexpired leases of real and personal property, licenses, purchase orders and all other legally binding arrangements, whether written or oral.

"Consent" shall mean any consent, approval, authorization, qualification, waiver or notification of a Governmental Authority that is necessary to be obtained prior to the consummation of the transactions contemplated by this Agreement in order to properly effectuate such transactions.

"Court" shall mean any court, federal, state, United States territorial or local, or arbitration tribunal.

"Cure Costs" shall have the meaning ascribed to such term in Section 2.1(d)(ii).

"Debtor" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Debtor Assets" shall mean the assets that are identified on Schedule 2.1(a), including the A.1 Assets and the A.2 Assets.

"Designated Contracts" shall mean those Assignable Contracts that are designated, pursuant to a written notice delivered by Buyer to Seller at least five (5) Business Days prior to the Closing Date, for assignment to Buyer at Closing.

"Effective Time" shall mean 12:01 a.m. (United States Central time) on the Closing Date.

"Entitlements" shall have the meaning ascribed to such term in Schedule 1.1(b).

"Escrow Agent" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Agreement" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Amount" shall have the meaning ascribed to such term in Section 2.5(a).

4

"Escrow Property" shall mean the Escrow Amount and any interest, income and earnings thereon.

"Estate" shall have the meaning ascribed to such term in the recitals hereof.

"Execution Date" shall have the meaning set forth in the preamble of this Agreement.

"FCC" shall mean the United States Federal Communications Commission.

"FCC Consent" shall mean the consent by the FCC to the assignment of the FCC Permit in connection with the consummation of the transactions contemplated hereby.

"FCC Permit" the Submarine Cable Landing License SCL-LIC-20070223-00003 issued by the FCC to Debtor.

"Final Order" shall mean an order of the Bankruptcy Court or other Court of competent jurisdiction (a) as to which no appeal, notice of appeal or motion for rehearing or new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon, (b) as to which the time for instituting an appeal or motion for rehearing or new trial shall have expired and (c) as to which no stay is in effect; provided, however, that (x) no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order; and (y) the Sale Order shall fail to be a Final Order if, and only if, a timely filed appeal, motion for rehearing or motion for new trial challenges the Bankruptcy Court's conclusion that Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

"Financing" shall have the meaning ascribed to such term in Section 2.2.

"Financing Documents" shall mean the Credit Agreement and Security Agreement, each substantially in the form attached hereto as Exhibit F and Exhibit G, respectively.

"Financing Offset Amount(s)" shall mean any Repair Expenses, Routine Maintenance Expenses or other amounts owed to Buyer under Article VIII hereof, but excluding any Cash Offset Amounts.

"Governmental Authority" shall mean any foreign, federal, state, county, municipal, United States territorial, local or other governmental department, authority, regulatory or administrative agency, body, authority, entity, commission, unit, subdivision or governmental authority, including Courts.

"HSBC" shall mean HSBC Securities (USA), Inc.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Incidental Rights" shall mean any and all rights of Debtor of any kind which are incidental to or arise out of the lawful ownership of any of the Purchased Assets, including, but not limited

to, the Assigned Rights and Assigned Permits.

"Knowledge" shall mean, with respect to Buyer, the actual knowledge of the directors and executive officers of such party. "Knowledge" shall mean, with respect to Seller, the actual knowledge of the Seller.

"Law" shall mean (a) all laws, statutes and ordinances of the United States, any foreign country, any domestic or foreign state or territory, or any political subdivision thereof, including all decisions of Courts having the effect of law in each such jurisdiction, and (b) all Regulations.

"Liens" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory, judicial or otherwise), security interest or other charge or encumbrance, any financing lease having substantially the same economic effect as any of the foregoing, any assignment of the right to receive income, any other type of preferential arrangement, or any right-of-way, easement, encroachment or encumbrance of any kind.

"Material Adverse Effect" shall mean any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Seller to consummate the sale of the Purchased Assets or (b) the ability of Buyer to operate the Business, taken as a whole, from and after the Closing.

"North American Zone Maintenance Authority Agreement" shall mean that certain multi-party agreement entered into by SIC on April 1, 2012, as amended on April 1, 2013, January 1, 2016 and January 1, 2019, and subsequently assigned to the Trustee.

"Offset Amount(s)" shall mean the Cash Offset Amount and Financing Offset Amount.

"Offset Claim" shall mean any claim for Offset Costs.

"Offset Costs" shall have the meaning ascribed to such term in Section 8.1.

"Outside Date" shall have the meaning ascribed to such term in Section 7.1(a)(iii).

"Permitted Liens" shall mean the following: (a) the agreements or conditions imposed on the issuance of land use permits, zoning, business licenses, use permits or other entitlements of various types issued by any Governmental Authority and necessary or beneficial to the continued use and occupancy of the Purchased Assets in connection with the Business; (b) zoning Regulations and restrictive covenants and easements of record that do not materially affect, impair or interfere with any property affected thereby or the use of the Purchased Assets; and (c) public utility easements of record, in customary form, to serve the Purchased Assets.

"Permits" shall mean all permits, approvals, franchises, licenses or other rights granted by any Governmental Authority and necessary for the lawful ownership of the assets of Debtor, or other lawful conduct of the Business as currently conducted.

"Person" shall mean an individual, partnership, limited liability company, corporation,

joint stock company, trust, estate, joint venture, association or unincorporated organization, Governmental Authority or any other form of business or professional entity.

"Purchased Assets" shall mean, collectively, the Debtor Assets, the Assigned Claims and the Designated Contracts.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.2.

"Real Property" shall mean all buildings, structures, improvements and fixtures, together with all rights of way, easements, privileges, and other appurtenances pertaining or belonging thereto, in which Seller has any interest, whether pursuant to a fee simple interest, leasehold interest, license, or any other agreement.

"Regulation" shall mean any rule or regulation of any Governmental Authority having the effect of law.

"Remedy Action" shall mean (i) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of businesses, product lines, assets or operations of Buyer or any of its Affiliates, (ii) conducting Buyer and its Affiliates' businesses in a specified manner, or proposing and agreeing or permitting to conduct any of such businesses in a specified manner, including by agreeing to undertakings required by a Governmental Entity that Buyer or any of its Affiliates will take, or refrain from taking, any action, including committing the Buyer or any of its Affiliates to invest specific dollar amounts in specific geographic markets, and (iii) otherwise taking or committing to take actions that after the Effective Time would limit Buyer or any of its Affiliates' ability to retain one or more of the businesses, product lines, assets or operations of the Buyer or any of its Affiliates, in each case, to the extent necessary to obtain any such clearance, resolve any such objections or avoid or eliminate any such impediments.

"Repair Expenses" means any amount paid or payable to third-parties or to Buyer, for labor, materials, replacements, or repairs to, any component of the Purchased Assets, including, for the avoidance of doubt, any Pre-existing Infrastructure Repair (as defined under the Services Agreement).

"Routine Maintenance Expenses" means any amount paid or payable to Buyer for labor related to the performance of routine maintenance activities on the Purchased Assets, as outlined in Schedule A of the Services Agreement.

"Sale Order" shall mean an order of the Bankruptcy Court that is acceptable to Seller and Buyer that authorizes the transactions contemplated hereunder, including authority to convey the Purchased Assets to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code and that contains a finding of fact that Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, substantially in the form of Exhibit A attached hereto.

"Section 721" means Section 721 of the Defense Production Act of 1950, codified as amended at 50 U.S.C. § 4565 (including provisions of the Foreign Investment Risk Review Modernization Act of 2018), and all rules and regulations thereunder, including those codified at 31 C.F.R. Parts 800 through 802.

7

"Seller" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Seller Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article III.

"Services Agreement" shall mean that certain Operational Support and Sales Services Agreement with respect to the Purchased Assets, to be entered into by Seller and Buyer following entry of the Sale Order (as defined herein).

"Settlement Agreement" shall have the meaning ascribed to such term in Schedule 1.1(a).

"SIC" shall have the meaning ascribed to such term in Schedule 1.1(a).

"Submarine Cable" shall have the meaning set forth in the Services Agreement.

"Subsidiary" shall mean any Person of which another specified Person owns directly or indirectly at least a majority of the outstanding capital stock (or other securities) entitled to vote generally or otherwise having the power to elect a majority of the board of directors (or similar governing body) of such Person.

"Superior Proposal" shall have the meaning ascribed to such term in Section 5.2(c).

"Taxes" shall mean all income taxes and all other taxes, charges, imposts, tariffs, fees, levies or other similar assessments or liabilities, including income taxes, ad valorem taxes, excise taxes, withholding taxes or other taxes of or with respect to gross receipts, premiums, real property, personal property, windfall profits, sales, use, transfers, licensing, employment, payroll and franchises imposed by or under any Law; and such terms shall include any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any such tax or any contest or dispute thereof.

"Tax Return" shall mean all returns, declarations, reports, estimates, information returns and statements required to be filed by or with respect to Debtor in respect of Taxes, including federal, state, United States territorial, local or foreign Income Tax returns filed on a consolidated, combined or unitary basis.

"Transaction Documents" shall mean this Agreement, the Services Agreement, the Closing Documents and any other agreements or documents the execution of which are contemplated by this Agreement.

### Section 1.2 Rules of Construction.

(a)     The inclusion of any information in the Seller Disclosure Schedule shall not be deemed an admission or acknowledgment, in and of itself and solely by virtue of the inclusion therein, that such information is required to be listed therein or that such information is material to Debtor, the Estate or the Business. The headings, if any, of the individual sections of the Seller Disclosure Schedule are inserted for convenience only and shall not be deemed to constitute a part thereof or a part of this Agreement. The Seller Disclosure Schedule is arranged in sections merely

for convenience, and the disclosure of an item in one section of the Seller Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such item, notwithstanding the presence or absence of an appropriate section of the Seller Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Seller Disclosure Schedule is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement.

(b)     Each of the parties hereto acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of such independent counsel. Each party and its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto shall be deemed the work product of the parties and may not be construed against any party by reason of its preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafts it is of no application and is hereby expressly waived.

(c)     All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.  Titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of such Articles, Sections, subsections or other subdivisions, and shall be disregarded in construing the language contained therein. The words "*this Agreement*," "*herein*," "*hereby*," "*hereunder*" and "*hereof*" and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  The words "*this Section*," "*this subsection*" and words of similar import refer only to the Sections or subsections hereof in which such words occur. The word "*including*" (in its various forms) means "*including, without limitation*." Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Unless the context otherwise requires, all defined terms contained herein shall include the singular and plural and the conjunctive and disjunctive forms of such defined terms. Any reference to "$" or "dollars" means the currency of the United States of America.

## ARTICLE II
## PURCHASE AND SALE OF THE PURCHASED ASSETS

**Section 2.1  Purchase and Sale of the Purchased Assets; Assumption of Liabilities**.

(a)  <u>Purchase and Sale of Purchased Assets</u>.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of the Estate's right, title and interest in and to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens other than Permitted Liens, in accordance with Sections 363 and 365 of the Bankruptcy Code and the Sale Order.

(b)  <u>Excluded Assets</u>.  The Purchased Assets shall not include the following properties and assets of the Estate, except to the extent expressly included in the Purchased Assets (collectively, the "<u>Excluded Assets</u>"):

(i)  All cash and cash equivalents and all marketable securities;

(ii)  All deposits, withholdings, prepayments, credits and refunds of Seller or the Estate not related to the Business;

(iii)  All Claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment relating to the Excluded Assets, and except with respect to the Assigned Claims, all rights and powers of a trustee and debtor-in-possession against any Person whatsoever, including all avoidance powers granted to Seller under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, except with respect to the Purchased Assets in each case;

(iv)  That certain judgment in favor of Seller entered by the Bankruptcy Court in Adversary Proceeding No. 19-90022, *Katzenstein, Trustee, v. Sandwich Isles Communications, Inc.;*

(v)  All capital stock or other equity interest of the Debtor;

(vi)  The assets listed on <u>Schedule 2.1(b)(vi)</u>;

(vii)  The articles of organization, seals, minute books, and stock transfer books of the Debtor; and

(viii)  All rights that accrue to Seller under this Agreement.

(c)  <u>Assumption of Liabilities</u>.  Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume, and Buyer shall thereafter pay, perform and discharge when due or payable, only the following liabilities and obligations (collectively, the "<u>Assumed Liabilities</u>"):

(i)  the liabilities and obligations under the Incidental Rights accruing from and after the Closing;

10

(ii)    all other liabilities and obligations relating to or arising from the ownership of the Purchased Assets after the Closing.

(d)    Assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights. The Sale Order shall provide for the assignment to Buyer of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights, effective upon the Closing, on the following terms and conditions:

(i)    On the Closing Date, Seller shall assign to Buyer, the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights. Seller shall provide timely and proper written notice of the motion to approve the sale filed with the Bankruptcy Court to all counterparties to the Assignable Contracts and any applicable Incidental Rights. The Assignable Contracts shall also be identified by the date of the Assignable Contract and the other party or parties to the Assignable Contract set forth on the Schedule 1.1(a) and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assignable Contracts. Similarly, the Assigned Rights shall also be identified by the date of the Assigned Right and the other party or parties to the Assigned Right set forth on the Schedule 1.1(c), and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assigned Rights.

(ii)    Seller shall be responsible for the payment of any and all liabilities and obligations of Seller or the Estate for all cure, compensation and reinstatement costs or expenses of or relating to the assumption and assignment of the Designated Contracts under Section 365 of the Bankruptcy Code (the "Cure Costs") as determined by the Bankruptcy Court.

(iii)    With respect to any Contract or Incidental Right not specifically identified on Schedule 1.1(a) or Schedule 1.1(c), and provided such Contract or Incidental Right has not been rejected by Seller pursuant to Section 365 of the Bankruptcy Code, upon reasonable written notice(s) from Buyer, Seller shall, at Buyer's sole cost and expense, including Buyer's payment of any and all liabilities and obligations of the Seller for all cure, compensation and reinstatement costs or expenses relating to the assumption and assignment of each such Contract and Incidental Right, take all actions reasonably necessary to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code any Contract(s) or Incidental Right(s) set forth in Buyer's notice(s). Seller acknowledges and agrees that Seller shall provide Buyer with reasonable advance notice of any motion(s) to reject any Contract. Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Incidental Right is assumed and assigned to Buyer pursuant to this Section 2.1(d)(iii), such Contract or Incidental Right shall be deemed an Assignable Contract or Assigned Right, as applicable, for all purposes under this Agreement. No increase in Purchase Price shall be made for the inclusion of any additional Contract or Incidental Right assigned hereunder.

(e)    Excluded Liabilities. Notwithstanding any other provision hereof or any Schedule or Exhibit hereto and regardless of any disclosure to Buyer, other than the Assumed Liabilities and liabilities under the Financing, Buyer shall not assume or be obligated or be responsible to pay, perform, satisfy or otherwise discharge any Liabilities whatsoever (collectively, the "Excluded Liabilities"). For clarity, the Excluded Liabilities shall specifically include any Liens in or to any Purchased Assets or proceeds therefrom.

11

**Section 2.2 <u>Purchase Price</u>**. The purchase price (the "<u>Purchase Price</u>") payable by Buyer to Seller in consideration for the sale of the Purchased Assets and Incidental Rights shall be (i) in consideration of only the A.2 Assets and any Incidental Rights related thereto, $500,000 cash; <u>plus</u> (ii) in consideration of all other Purchased Assets and Incidental Rights, (a) $24,500,000.00 cash, <u>less</u> the Cash Offset Amount, if any (collectively (i) and (ii)(a), the "<u>Cash Payment</u>") plus (b) $25,000,000.00 in financing on the terms set forth on <u>Exhibit F</u>, <u>less</u> (c) the Financing Offset Amount (the "<u>Financing</u>") plus (d) the assumption of the Assumed Liabilities. Payment of the Cash Payment shall be net of any Taxes Buyer shall be required under applicable Law to deduct or withhold from the Cash Payment. Buyer shall make such deductions and withholdings and shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

**Section 2.3 <u>Deliveries by Seller</u>**. At the Closing, Seller shall deliver to Buyer, the following:

(a)     Duly executed bills of sale for the assets, including a separate bill of sale for the A.2 Assets, to be conveyed to Buyer substantially in the form of <u>Exhibit C</u> hereto (each, a "<u>Bill of Sale</u>");

(b)     The duly executed assignment and assumption agreement providing for the assignment and assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights in substantially the form of <u>Exhibit B</u> hereto ("<u>Assignment and Assumption Agreement</u>");

(c)     The Financing Documents;

(d)     The certificate of Seller referred to in <u>Section 6.2</u> hereof; and

(e)     Such other documents as Buyer may reasonably request to effect the purchase and sale of the Purchased Assets and Incidental Rights and the assumption of the Assumed Liabilities as contemplated hereby.

**Section 2.4 <u>Deliveries by Buyer</u>**. At the Closing, Buyer shall deliver to Seller the following:

(a)     The Cash Payment, less the Escrow Amount and less any amounts owed to Buyer under the Services Agreement, in immediately available funds, pursuant to written wiring instructions delivered by Seller to Buyer a reasonable time prior to the Closing;

(b)     The Financing Documents;

(c)     The certificate of Buyer referred to in <u>Section 6.3</u> hereof;

(d)     The duly executed Assignment and Assumption Agreement; and

(e)     Such other documents as Seller may reasonably request to effect the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities as contemplated hereby.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 17 of 248

**Section 2.5  Escrow Agreement for Earnest Money**.

(a)     Prior to entry of the Sale Order, Buyer, Seller and PNC Bank, N.A., a national association, as escrow agent (the "Escrow Agent"), shall execute an escrow agreement in substantially the form attached hereto as Exhibit E (the "Escrow Agreement") pursuant to which Buyer will deposit five million dollars ($5,000,000) as earnest money into an escrow account to be governed by the terms of the Escrow Agreement and this Agreement.  At the Closing Date, the amount in escrow ("Escrow Amount") shall be paid to Seller as part of the Purchase Price in accordance with the Escrow Agreement and this Agreement.

(b)     If, prior to the Closing, Buyer should breach this Agreement in a manner that gives rise to a termination right pursuant to Section 7.1(a)(vi) on the part of Seller, then Seller shall have the right to terminate this Agreement pursuant to Section 7.1(a)(vi) and to recover damages for a breach of contract. The Escrow Agent shall hold the Escrow Amount pending either a final judicial determination of the amount of such damages payable to Seller or a settlement between the parties regarding the amount of such damage; provided that the Seller's sole and exclusive remedy shall be (i) a claim for damages against the escrow account in an amount not to exceed $2,500,000 and, in addition, (ii) Buyer, as Service Provider under the Services Agreement shall promptly waive and release all rights to payment for accrued and unpaid Fees (as such term is defined in the Services Agreement) owing by Trustee to Service Provider thereunder. The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer.  For the avoidance of doubt, notwithstanding Buyer's release of such rights to payment under the Services Agreement, Service Provider shall remain obligated to fulfill all its duties thereunder, including without limitation, indemnification of the Trustee.

(c)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(i), (a)(ii), (a)(iii), (a)(v), or (a)(vii) then the Escrow Agent shall return the Escrow Amount to Buyer as promptly as possible after the termination of this Agreement in accordance with the notice and other provisions of the Escrow Agreement.

(d)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(iv), then Seller shall be entitled to damages in the amount of $3,700,000.00.  The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer, provided that in the event Seller does not collect funds from the escrow account in an amount sufficient to pay such damages in full, Buyer shall pay Seller an amount equal to any such unpaid damages.

**Section 2.6  Payment of Purchase Price; Allocation of Purchase Price**.

(a)     At the Closing, Buyer and Seller shall deliver a joint written notice to the Escrow Agent directing the Escrow Agent to pay to Seller, by wire transfer of immediately available funds to an account or accounts designated by Seller, the Escrow Amount.

13

(b)     At the Closing, Buyer shall deliver to Seller, pursuant to Section 2.4(a), the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement), less the Escrow Amount.

(c)     At the Closing, Buyer shall execute and deliver the Financing Documents as provided therein, with the proceeds delivered to the Seller payable toward the Purchase Price.

(d)     For purposes of Section 1060 of the Code, Buyer and Seller hereby allocate the Purchase Price among the Purchased Assets and Assumed Liabilities pursuant to the allocation provisions set forth on Exhibit D hereto.

**Section 2.7  Closing**. The closing of the transactions contemplated hereby (the "Closing") shall take place remotely via the exchange of documents and signatures (or such other location or teleconference as mutually agreed upon by the parties hereto) on the second Business Day after the satisfaction of all conditions in Article VI other than those that by their nature are to be satisfied by deliveries by the parties at the Closing. The actual date on which the Closing takes place is referred to herein as the "Closing Date." The Closing shall be deemed to be effective as of the Effective Time.

**Section 2.8  AS IS, WHERE IS NATURE OF SALE**. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER, THE ESTATE AND DEBTOR MAKE NO (AND SELLER, THE ESTATE AND DEBTOR EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER WHATSOEVER, INCLUDING WITH RESPECT TO THE SALE OF THE PURCHASED ASSETS, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY UNDER SECTION 8-108 OF THE UNIFORM COMMERCIAL CODE, OR WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE BUSINESS, DEBTOR, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE BUSINESS, DEBTOR, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES AS BUYER HAS DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS PURCHASE OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS, INVESTIGATIONS AND EVALUATIONS. ACCORDINGLY, SUBJECT TO THE FOREGOING AND TO BUYER'S RIGHTS UNDER THIS AGREEMENT AND SELLER'S OBLIGATIONS HEREUNDER, AND EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, BUYER WILL PURCHASE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND WITHOUT RECOURSE AGAINST SELLER, THE ESTATE OR DEBTOR.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Buyer in a schedule attached hereto and made a part hereof (the "Seller Disclosure Schedule"), Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

**Section 3.1 Authority; Execution and Delivery**. Seller is the duly appointed chapter 11 bankruptcy trustee for the Estate. Subject to approval and entry of the Sale Order by the Bankruptcy Court, Seller has the requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Seller. Subject to the entry and effectiveness of the Sale Order, this Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Seller on behalf of the Estate, enforceable against Seller on behalf of the Estate in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws now or hereafter in effect relating to creditor's rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

**Section 3.2 Non-Contravention; Approvals and Consents**. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Seller on behalf of the Estate will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both), to the knowledge of Seller, under the provisions of any agreement entered into by the Seller.

**Section 3.3 Title to the Purchased Assets; Exclusive Ownership and Right to Use**. At the Closing, Seller will transfer to Buyer all of the Estate's right, title and interest to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens (other than Permitted Liens), in accordance with Section 363 and 365 of the Bankruptcy Code and as provided by the Sale Order. Except as otherwise provided by the Sale Order or as set forth in any Designated Agreement, at the Closing, Buyer will not be subject to any lease, sublease, indefeasible right of use, or right to use or occupy the Purchased Assets in favor of any third party.

**Section 3.4 No Subsidiaries**. Debtor has no Subsidiaries.

**Section 3.5 Seller's Brokerage Agreements**. Except as set forth on Seller Disclosure Schedule 3.5, Seller has not engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Debtor as a result of any action taken by Seller.

**Section 3.6 Assignable Contracts, Assigned Claims, Assigned Permits and Assigned Rights**. Other than in connection with the DIP Financing, neither Seller nor the Estate has assigned, transferred, pledged or otherwise conveyed its rights under any of the Assigned Claims,

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 366-1 Filed 12/28/20 Page 20 of 248

Assignable Contracts, Assigned Permits or Assigned Rights. Any pledge or encumbrance arising under the DIP Financing will be released at Closing.

Section 3.7 **Real Property**. Except for any portion of the Purchased Assets or Incidental Rights which may constitute Real Property as used in this Agreement, Debtor has no interest in any Real Property.

Section 3.8 **Antitrust.** Seller has determined that no premerger notifications are required under the HSR Act.

Section 3.9 **Settlement Agreement Matters**. Seller has executed and delivered to Buyer true, complete and correct copies of all of the "Definitive Documentation" (as that term is defined in the Settlement Agreement).

<div align="center">

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

</div>

Except as otherwise disclosed to Seller in a schedule attached hereto and made a part hereof (the "Buyer Disclosure Schedule"), Buyer represents and warrants to Seller as follows:

Section 4.1 **Organization and Good Standing**. Buyer is validly existing and in good standing under the Laws of the State of Delaware.

Section 4.2 **Authorization of Agreement; Execution and Delivery**. Buyer has all requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. The execution and delivery by Buyer of the Transaction Documents and the consummation of the transactions contemplated thereby have been duly and validly authorized by all requisite action on the part of Buyer. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Buyer. This Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to creditors' rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

Section 4.3 **Non-Contravention; Approvals and Consents**. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Buyer will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under (i) any provision of the certificate of incorporation or bylaws (or any similar organizational documents) of Buyer, (ii) the provisions of any agreement to which Buyer or any of its Affiliates is a party or (iii) applicable Law. Prior to the consummation of the transactions contemplated by this Agreement, no consent, approval, order or authorization of, or registration, declaration or filing with, notice to, or permit from, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of any of the Transaction

<div align="center">16</div>

Documents by Buyer or the consummation by Buyer of the transactions contemplated thereby, except for (1) the FCC Consent, and (2) the entry by the Bankruptcy Court of the Sale Order.

Section 4.4 **Financial Ability**. Buyer has sufficient funds available to pay the Cash Payment, assume and perform the Assumed Liabilities, consummate the transactions contemplated hereby and by the other Transaction Documents, and pay all fees and expenses related thereto. Other than with respect to the Financing, Buyer acknowledges that its obligations under this Agreement and the other Transaction Documents are not subject to any conditions regarding its ability to obtain financing for the transactions contemplated by this Agreement and the other Transaction Documents.

Section 4.5 **Buyer's Brokerage Agreements**. Except as set forth on Buyer Disclosure Schedule 4.5, none of Buyer or any of its Affiliates have engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Buyer or any of its Affiliates. Buyer or its Affiliates are exclusively responsible for the full payment and satisfaction of all fees or commissions associated with any such engagement by Buyer or its Affiliates set forth on Buyer Disclosure Schedule 4.5.

Section 4.6 **No Affiliates of Debtor**. Except as set forth on Buyer Disclosure Schedule 4.6, no current or former equity holder, director or officer (or similar executive level Person) of Debtor is affiliated with Buyer in any capacity, including but not limited to, an Affiliation in a capacity such as a holder of any equity interest in Buyer (and any of Buyer's non-public Affiliates), or an officer, director, employee, consultant, agent, member, partner or other representative of Buyer or any of its Affiliates. In addition, except as set forth on Buyer Disclosure Schedule 4.6, no current or former Affiliate of Debtor possesses the authority to, in any way, exercise effective control, including voting control, over Buyer or any of its non-public Affiliates.

Section 4.7 **Adequate Assurances Regarding Assignable Contracts**. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assignable Contracts.

Section 4.8 **CFIUS**. Buyer has determined that the filing of a voluntary notice or declaration with CFIUS for CFIUS Clearance is neither required nor necessary under Section 721.

Section 4.9 **Antitrust.** Buyer has determined that no premerger notifications are required under the HSR Act.

### ARTICLE V
### COVENANTS

Section 5.1 **Conduct of the Business**. During the period from the date hereof until the Closing Date, Seller covenants that (except as may be expressly permitted or required by this Agreement, consented to in writing by Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, or as required by the applicable provisions of the Bankruptcy Code or any orders of the Bankruptcy Court), Seller shall cause Debtor, to (i) maintain the Business in the ordinary course consistent with prudent business practices of an owner and operator of telecommunications infrastructure assets, including but not limited to, performing manufacturer

17

recommended maintenance activities as needed, and maintaining the North American Zone Maintenance Authority Agreement in good standing, and compliance with <u>Section 5.2</u>, (ii) not sell or dispose of any of the Purchased Assets and not create any Lien with respect to the Purchased Assets, (iii) continue all activities required pursuant to the terms of the Assigned Permits, including the payment of any fees due thereunder, (iv) not modify or amend any Assignable Contract or waive any right under any Assignable Contract, (v) pay, on a current basis, all liabilities under the Assignable Contracts, (vi) not terminate or amend any Assigned Permits, (vii) not terminate or amend any Assigned Rights, (viii) not cause to increase or accelerate any of the Assumed Liabilities, (ix) continue in force all policies of insurance on the Purchased Assets, including, for the avoidance of doubt, insurance required under the Services Agreement, and (x) not commit or agree, whether in writing or otherwise, to take any action prohibited by this <u>Section 5.1</u>. Notwithstanding the foregoing, Seller shall not be in breach of this Section 5.1 if its purported breach hereof is due to a breach by Buyer of a related obligation of Buyer under the Services Agreement.

       **Section 5.2**     <u>**Risk of Loss; Duty to Repair**</u>.  Seller shall bear all risk of loss with respect to the Business and the Purchased Assets prior to Closing.  Seller shall be responsible for Repair Expenses and Routine Maintenance Expenses, and Buyer shall be entitled to recover any such expenses either as Cash Offset Amounts or Financing Offset Amounts in accordance with this Agreement.

       **Section 5.3**     <u>**No Solicitation of Other Bids.**</u>

       (a)    Seller and HSBC shall not, and shall not authorize or permit any of their respective representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal except in accordance with <u>Section 5.3(c)</u>.  HSBC agrees that (i) it shall not assign or transfer its interest as a creditor to the Estate, or any rights in connection therewith, prior to either the Closing or termination of this Agreement, and (ii) it shall not exercise any right to credit bid in connection with the Bankruptcy Case.

       (b)    Except as may be required by <u>Section 5.3(c)</u>, Seller shall immediately cease and cause to be terminated all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "<u>Acquisition Proposal</u>" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning the purchase of the Purchased Assets or any other matter that is within the scope of this Agreement.

       (c)    In addition to the other obligations under this <u>Section 5.3</u>, Seller shall promptly (and in any event within two (2) Business Days after receipt thereof by Seller) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.  Notwithstanding anything to the contrary in this Agreement, in the event that, prior to the Bankruptcy Court's approval of the

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 23 of 248

Sale Order, Seller or HSBC receives an unsolicited bona fide written Acquisition Proposal that: (a) either (i) was not obtained or made as a direct or indirect result of a breach of (or in violation of) this Agreement or (ii) was received from a party which had previously submitted a bid to the Trustee or HSBC; and (b) is on terms and conditions that the Seller or HSBC determines in good faith and taking into account its fiduciary obligations, and following consultation with its outside legal counsel and outside financial advisors, if any, are more favorable, from a financial point of view, to the Estate, than the terms of this Agreement, and (c) provides for payment to Buyer of a fee of Three Million Seven Hundred Thousand Dollars ($3,700,000) (such proposal a "Superior Proposal"), and the Seller is required to consider such Superior Proposal in order to comply with its fiduciary obligations, Seller shall (i) within 48 hours of receipt, provide Buyer with a copy of any Superior Proposal, and (ii) shall provide Buyer with an opportunity to amend this Agreement to provide for at least equivalent financial terms to those included in the Superior Proposal. Seller and Buyer agree to negotiate in good faith in respect of any such amendment, and in the event that Buyer and Seller agree to amend this Agreement as provided above within five (5) Business Days of Buyer's receipt of the Superior Proposal, Seller shall not accept the Superior Proposal.

(d)     Notwithstanding anything to the contrary in this Section 5.3, nothing herein shall require Seller or the Estate to take any action or to refrain from taking any action in connection with this Section 5.3, to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law.

(e)     Seller agrees that the rights and remedies for noncompliance with this Section 5.3 shall include having such provision specifically enforced by the Bankruptcy Court, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 5.4     Pre-Closing Access**.

(a)     From the date of this Agreement until the Closing Date, Seller shall use commercially reasonable efforts, to the extent permitted under applicable Law, to give to Buyer and its representatives reasonable access, during normal business hours and upon reasonable notice, to the Estate's properties, books and records relating to the Business and to the Estate's properties, books and records relating to the Purchased Assets (including the Assignable Contracts, the Assigned Rights and the Assigned Permits) and the Assumed Liabilities.

(b)     Seller shall permit Buyer to review all Assignable Contracts to facilitate Buyer's assumption of such contracts at Closing.

(c)     Without limiting the obligations under Section 5.4(e) hereof, Seller shall use commercially reasonable efforts to provide Buyer with reasonable access, during normal business hours and upon reasonable notice, to enter and inspect all physical plants, central offices, or any other facility or infrastructure used in connection with the Business.

(d)     Nothing contained in this Section 5.4 shall obligate Seller or the Estate to (i) breach any duty of confidentiality owed to any Person whether such duty arises contractually, statutorily or otherwise or (ii) waive any attorney/client, work product or similar privilege.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 24 of 248

(e)     Seller agrees to cooperate, and when applicable, coordinate with SIC, to provide Buyer with access sufficient for Buyer to perform each of its obligations under the Services Agreement from and after the entry of the Sale Order.

**Section 5.5  Notification.**

(a)     Prior to the Closing, Seller shall notify Buyer, and Buyer shall notify Seller, of any litigation, arbitration, appeal or administrative proceeding pending, or, to its Knowledge, threatened against Seller, the Estate, Debtor or Buyer, as the case may be, that challenges the transactions contemplated hereby.

(b)     Seller shall give prompt written notice to Buyer of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Seller to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

(c)     Buyer shall give prompt written notice to Seller of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Buyer contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Buyer to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

**Section 5.6  Additional Agreements**. Subject to the terms and conditions of this Agreement, each of the parties hereto will use commercially reasonable efforts to do, or cause to be taken all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including, the fulfillment of the conditions set forth in Article VI to the extent that the fulfillment of such is within the control of such party.

**Section 5.7  Investigation and Agreement by Buyer**. Buyer acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Purchased Assets, the Assumed Liabilities, the Business and operations of Debtor, the information contained in the Confidential Information Memorandum prepared by Seller and dated February 14, 2020 and other information about the business strategies of Debtor. Buyer has also conducted its own independent review of all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case.

**Section 5.8  Permits or Consents of Governmental Authorities.**

(a)     Within ten (10) Business Days after the date that the Sale Order is entered by the Bankruptcy Court, the parties hereto shall prepare and file, or cause to be prepared and filed, applications seeking any applicable Permits or Consents of any Governmental Authority (including the FCC) required under Section 6.1(b). Each party shall provide the other party with all information required for any applications, notifications, or other filings to be made pursuant to any applicable Law in connection with the transaction contemplated by this Agreement. In

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 25 of 248

addition, the parties hereto shall reasonably cooperate to make any notice filings required in connection with this matter on a timely basis.

(b)    Buyer shall bear all filing fees in connection with the preparation and prosecution of any applications, notifications or other filings related to a Permit or Consent of a Governmental Authority. Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to assist and cooperate with each other to prepare and prosecute any required applications, notifications or other filings related to a Permit or Consent of a Governmental Authority (including, but not limited to, the FCC) in good faith and with due diligence before the applicable Governmental Authorities and in connection therewith shall take such actions as may be reasonably necessary or reasonably required in connection with any application (or other type of filing document) to the applicable Governmental Authorities, including responding as promptly as practicable to any requests of the FCC  for information and furnishing to any applicable Governmental Authorities any documents, materials or other information requested by such Governmental Authority in order to obtain any applicable Permit or Consent of a Governmental Authority as expeditiously as practicable, provided that neither party shall have an obligation to share with the other any confidential business information including to the extent such information is requested by a Governmental Authority.  In addition, to the extent practicable, the parties hereto shall use commercially reasonable efforts to (i) promptly notify each other of any communication to that party from any Governmental Authority with respect to a Permit or Consent of a Governmental Authority, (ii) permit a representative of the other party reasonably acceptable to the first party to attend and participate in meetings (telephonic or otherwise) with any Governmental Authority and (iii) permit the other party to review in advance, as reasonable, any proposed written communication to any Governmental Authority (provided that each party may designate certain information communications to the government as "Outside Counsel Only")  and consider in good faith all reasonable additions, deletions or changes suggested in connection with any submissions to any Governmental Authority, provided that Buyer shall determine the timing and strategy and be solely responsible for the final content of any substantive or oral communications with any applicable Governmental Authority. No party hereto shall knowingly take, or fail to take, any action if the intent or reasonably anticipated consequence of such action or failure to act is, or would be, to cause any Governmental Authority (including, but not limited to, the FCC) not to grant a Permit or Consent or materially delay the granting of any such Permit or Consent.

(c)    In the event that CFIUS should request the filing of a notice or declaration pursuant to Section 721 for CFIUS Clearance, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

(d)    In the event that a Governmental Authority should initiate an Antitrust Investigation, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

**Section 5.9  Injunctions**. Prior to the Closing, if any Governmental Authority issues or otherwise promulgates any injunction, stay, decree or similar order that prohibits the consummation of any of the transactions contemplated hereby, the parties, at Buyer's sole cost and expense, shall use commercially reasonable efforts to have such injunction dissolved or otherwise

21

eliminated as promptly as possible and, prior to or after the Closing, to pursue the underlying litigation diligently and in good faith.

**Section 5.10 <u>Adequate Assurances Regarding Designated Contracts and Assigned Rights</u>**. With respect to each Designated Contract and Assigned Right, to the extent required by the Bankruptcy Court, Seller or the counterparty to such Designated Contract or Assigned Right, Buyer shall provide the Bankruptcy Court, Seller or such counterparty, as the case may be, adequate assurance of the future performance of such Designated Contract or Assigned Right by Buyer. To the extent that Buyer's performance of any such Designated Contract or Assigned Right shall require the cooperation or performance of the Seller, including, without limitation, delivery of any additional instruments or filings by Seller in order to effectuate the complete assignment of any Designated Contract or Assigned Right, Seller covenants to provide such cooperation or performance; provided, however, that nothing in this <u>Section 5.9</u> shall (a) require Seller or the Estate to make any expenditure or incur any obligation on its own or on Buyer's behalf (unless Buyer agrees to promptly reimburse Seller and the Estate for such expenditure or Buyer agrees to fully indemnify Seller and the Estate for such obligation) or (b) prohibit Seller or the Estate from ceasing operations or winding up its affairs following the Closing.

**Section 5.11 <u>Cure of Defaults</u>**. Seller shall, on or prior to the Closing, pay all Cure Costs and otherwise cure any and all defaults under the Designated Contracts that are required to be cured under the Sale Order so that such Designated Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

**Section 5.12 <u>Bankruptcy Covenants</u>**. From and after the date hereof, Seller and/or Buyer, in each case as indicated below, covenant and agree as follows:

(a) Seller and Buyer each shall act promptly, diligently and in good faith, and use their respective best efforts, in pursuing entry of the Sale Order, and otherwise effectuating and consummating the transactions contemplated herein, including the sale of the Purchased Assets to Buyer, under the terms and conditions of this Agreement, in each case, as soon as practicable, but in any case within the applicable timeframes contemplated by this Agreement, including promptly, diligently and in good faith, and using their respective best efforts in (i) preparing and filing appropriate supporting papers, (ii) furnishing available supporting testimony or other evidence, (iii) contesting any applicable objections, (iv) responding to any applicable discovery requests and (v) contesting any applicable appeals or related relief.

(b) In the event an appeal is taken or a stay pending appeal is granted from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay order and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c) From and after the date hereof, Seller shall not take any action that is intended to or does result in, or fail to take any action the intent of which failure to act would or does result in, the reversal, voiding, modification or staying of the Sale Order.

(d)     Seller shall: (i) file the required notice of a sale hearing with the Bankruptcy Court within one (1) day of the date of this Agreement, and (ii) request that a sale hearing occur in the Bankruptcy Court not less than twenty one (21) days of filing such notice.

**Section 5.13  Migration of Capacity; Clearance of Paniolo Network**. Upon the completion of the Network Inventory (as defined in the Service Agreement) Seller and Buyer shall, subject to and in accordance with the terms and conditions of the Services Agreement, migrate existing SIC capacity and services onto the fibers designated for SIC, and Buyer and Seller shall jointly cooperate to ensure that no third parties other than SIC, Buyer or users who have contracted for capacity pursuant to the Services Agreement are utilizing capacity or services on the Paniolo Network, which cooperation may include, without limitation, the negotiation and execution of additional Designated Contracts acceptable to Seller and Buyer.

<div align="center">

**ARTICLE VI**
**CONDITIONS TO THE CLOSING**

</div>

**Section 6.1  Conditions to Obligations of Each Party**. The obligations of each party to this Agreement to effect the transactions contemplated hereby to occur on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)     No temporary restraining order, preliminary or permanent injunction, stay or other order issued by any Governmental Authority preventing the consummation of the transactions contemplated hereby to occur at the Closing Date shall be in effect, and (i) neither the Federal Trade Commission, Department of Justice, nor any state Attorney General (each an "Antitrust Agency") has opened an antitrust-related investigation, proceeding, or inquiry ("Antitrust Investigation") relating to the transactions contemplated hereby, or (ii) any Antitrust Agency that has opened any Antitrust Investigation has notified the parties that such Antitrust Investigation has been closed;

(b)     FCC Consent shall have been obtained by Buyer and Seller and shall not contain any terms, conditions, liabilities, obligations, commitments or sanctions, or any structural or remedial actions, that constitute, individually or in the aggregate, a Burdensome Condition;

(c)     In the event that the parties are required to file any notice or declaration with CFIUS pursuant to Section 5.8(c) of this Agreement, the parties shall have received CFIUS Clearance; and

(d)     The Bankruptcy Court shall have approved this Agreement and the transactions contemplated hereby by entry of the Sale Order and the Sale Order shall have become a Final Order.

**Section 6.2  Conditions to Obligation of Buyer**. The obligation of Buyer to effect the transactions contemplated hereby to occur at the Closing Date and to fund on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

<div align="center">

23

</div>

(a)     Each of the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Buyer shall have received a certificate signed by Seller to such effect;

(b)     Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Buyer shall have received a certificate signed by the Seller to such effect;

(c)     Seller shall have paid all Cure Costs and cured any defaults under the Designated Contracts;

(d)     Intentionally omitted;

(e)     Seller shall have delivered all entitlement documents and as-built drawings which are in Seller's possession;

(f)     The Designated Contracts and FCC Permit shall be in full force and effect with no defaults thereunder and shall not be subject to any further appeal by or before any Governmental Authority;

(g)     Seller shall have delivered to Buyer the Closing Documents referred to in <u>Section 2.3</u>; and

(h)     Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

**Section 6.3  <u>Conditions to Obligation of Seller</u>**. The obligation of Seller to effect the transactions contemplated hereby to occur at the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)     Each of the representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(b)     Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(c)     Buyer shall have delivered to Seller the Closing Documents referred to in <u>Section 2.4</u>;

(d)     Buyer shall have delivered the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement) less the  Escrow Amount; and

(e)     Buyer shall have delivered its written notice to the Escrow Agent, pursuant to <u>Section 2.6(a)</u>, directing the Escrow Agent to deliver to Seller the Escrow Amount and the Escrow Agent shall have delivered the Escrow Amount to Seller.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 29 of 248

## ARTICLE VII
## TERMINATION

**Section 7.1  Termination**.

(a)      This Agreement may be terminated at any time prior to the Closing:

(i)      by mutual consent of Buyer and Seller;

(ii)      by either Buyer or Seller if the Bankruptcy Court has not entered the Sale Order within thirty (30) days of the Execution Date; provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the Sale Order not being entered or before such date;

(iii)      by either Buyer or Seller if the Closing shall not have occurred within two hundred ten (210) days of the FCC issuing public notice of this Agreement and the transactions contemplated herein and hereby (the "Outside Date"); provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date;

(iv)      by either Buyer or Seller if a Governmental Authority shall have issued an order, decree, or ruling or taken any other action, in each case permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling, or other action shall have become a Final Order;

(v)      by Buyer, if it is not then in material breach of this Agreement, if Seller has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.2 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Seller by Buyer; and

(vi)      by Seller, if Seller is not then in material breach of this Agreement, if Buyer has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.3 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Buyer by Seller; and

(vii)      by Buyer, in the event of a Material Adverse Effect.

(b)      Notwithstanding the provisions of paragraph (a), if any of the conditions to Buyer's obligation to close are not satisfied, Buyer has the right to waive the unsatisfied conditions and proceed with the Closing, without prejudice to any rights Buyer may have with respect to any breach of representation, warranty or covenant by Seller.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 30 of 248

**Section 7.2    Effect of Termination**.  Upon termination of this Agreement pursuant to Section 7.1, the undertakings of the parties set forth herein shall forthwith be of no further force and effect; provided, however, that this Section 7.2 and Sections 9.2 (Public Announcements), 9.4 (Expenses), 9.5 (Notices), 9.6 (Confidentiality), 9.7 (Entire Agreement; Amendment; Waiver), 9.8 (Severability), 9.9 (Successors and Assigns; Third Party Beneficiaries), 9.10 (Governing Law), 9.11 (Captions), 9.15 (No Director or Affiliate Liability), and 9.16 (No Personal Liability), and the obligations thereunder and the rights and remedies for any breaches of this Agreement occurring prior to such termination, in each case, shall survive any such termination. In the event of termination, all amounts owed to Buyer under the Services Agreement or this Agreement shall be paid by Seller, and Seller shall agree to Buyer's request to the Bankruptcy Court for an administrative claim under the Bankruptcy Code with respect to such amounts.

**Section 7.3    Survival**. The representations and warranties of Seller and Buyer set forth in this Agreement, the other Transaction Documents, and any certificate delivered in connection with this Agreement or any of the other Transaction Documents shall not survive the Closing.  The covenants and other agreements of Seller and Buyer set forth in this Agreement and in the other Transaction Documents shall survive the Closing until fully performed.

**ARTICLE VIII**
**OFFSET AMOUNTS**

**Section 8.1    Costs Relating to the Purchased Assets**.  Subject to the terms, conditions and limitations of this Article VIII, Buyer shall be able to include in the Offset Amounts any costs arising from or in connection with its performance of the Services Agreement or items for which Seller is responsible hereunder or under the Services Agreement (such costs, or cost estimates for such items are collectively referred to herein as the "Offset Costs").

**Section 8.2    Limitations**.  Notwithstanding anything to the contrary set forth in this Agreement, Buyer's sole recourse with respect to any Offset Costs shall be to offset such costs against the Purchase Price in accordance with Section 2.2, provided that in the event this Agreement is terminated in accordance with Article VII hereof, Seller shall promptly reimburse such Offset Costs actually paid by Buyer, or the parties shall instruct the Escrow Agent to distribute such amount to Buyer from portion of the Escrow Amount that would otherwise be retained by Seller under Section 2.5.

**Section 8.3    Claim Procedures**.  Buyer shall promptly provide written notice of any Offset Claim upon discovery of any matter for which it is entitled to payment hereunder, with such notice to contain the information set forth in the following sentence. The Offset Claim shall specify in reasonable detail the amount of the Offset Costs, if known, and contain a reference to this Article VIII.  Failure to provide an Offset Claim shall not release the Seller from any obligations hereunder except to the extent Seller is materially prejudiced by such failure and shall not relieve Seller from obligations under this Article VIII. If the Seller does not notify the Buyer that it disputes such claim within fifteen (15) days following receipt of the Offset Claim, the claim specified therein shall be deemed an obligation of the Seller hereunder (subject to the limitations set forth in this Article VIII, as applicable). Buyer will reasonably cooperate and assist the Seller in determining the validity of any claim for payment by the Buyer and in otherwise resolving such matters. Such assistance and cooperation will include providing reasonable access, during normal business hours

26

and upon reasonable advance notice, to and copies of information, records and documents relating to such matters, providing access, during normal business hours and upon reasonable advance notice, to employees to assist in the investigation, defense and resolution of such matters.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1 <u>Post-Closing Access</u>**. Buyer shall preserve the financial records and other books and records, if any, relating to the Purchased Assets and Assumed Liabilities for a period of three years from the Closing Date. During such three-year period (as may be extended), Buyer shall keep such financial records and other books and records reasonably accessible and not destroy or dispose of such materials without the prior written consent of Debtor, and will permit Seller, Debtor and their respective authorized representatives reasonable access thereto, including making any copies at the Estate's expense. Such records may be sought under this <u>Section 9.1</u> for any reasonable purpose, including, without limitation, to the extent reasonably required in connection with the administration of the Bankruptcy Case or the audit, accounting, tax, litigation, United States federal or securities disclosure under other applicable Law or other similar needs of Seller, the Estate or Debtor. In the event that any Tax Return becomes the subject of any audit or investigation, Buyer shall provide access to such financial data and other books and records as may be necessary to enable Seller, the Estate or Debtor to defend any such audit or investigation. The access shall be pursuant to this <u>Section 9.1</u> and shall include access to any computerized information systems that contain the books and records referred hereto. Seller and Debtor shall promptly reimburse, or cause the Estate to reimburse, Buyer for Buyer's reasonable out-of-pocket expenses associated with requests made by Seller or Debtor under this <u>Section 9.1</u>, but no other charges shall be payable by Seller, the Estate or Debtor to Buyer in connection with such requests.

**Section 9.2 <u>Public Announcements</u>**. Prior to the entry of the Sale Order by the Bankruptcy Court, neither party will issue any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written approval of the other party, except as may be required by such party or its Affiliate under applicable Law or stock exchange rules or Regulations or as may be mutually agreed in advance in writing.

**Section 9.3 <u>Further Assurances</u>**. From and after the date of this Agreement, each party shall execute and deliver such instruments, documents, or other writings as the other party may reasonably request in order to confirm and carry out and to effectuate fully the intent and purposes of this Agreement. For the avoidance of doubt, if, notwithstanding any of the provisions of this Agreement or the Sale Order, Buyer is unable to use or enjoy any rights incidental to the ownership of the Purchased Assets, including the Incidental Rights, the parties shall cooperate, as may be required following the closing of the Estate and the Bankruptcy Case, to ensure that Buyer shall be able to enjoy such rights.

**Section 9.4 <u>Expenses</u>**. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the consummation of the transactions contemplated hereby shall be borne solely and entirely by the party that has incurred such expenses. In the event of a dispute between or among the parties in connection with this Agreement and the transactions contemplated hereby, each of the parties hereto hereby agrees that

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 32 of 248

the prevailing party shall be entitled to reimbursement by the other party or parties of reasonable expenses, including legal expenses, incurred in connection with any related action or proceeding. For the avoidance of doubt, any cost and expense associated with any filing required to provide public notice of the release of Liens with respect to Debtor shall be borne by the Seller.

**Section 9.5** **Notices.**

(a) All notices, requests, consents, waivers and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been given (i) if transmitted by facsimile, upon written confirmation of delivery, (ii) if personally delivered, upon delivery or refusal of delivery, (iii) if mailed by registered or certified United States mail, return receipt requested, postage prepaid, upon delivery or refusal of delivery, or (iv) if sent by an overnight delivery service nationally recognized in the United States, upon delivery or refusal of delivery. All notices, consents, waivers or other communications required or permitted to be given hereunder shall be addressed to the respective party to whom such notice, consent, waiver or other communication relates at the following addresses:

Notices to Seller:

Michael Katzenstein, Trustee,
Bankruptcy Estate of Paniolo Cable Company,
LLC c/o FTI Consulting, Inc.
Three Times Square, 9th Floor
New York, New York 10036
Fax: (212) 841-9350

with a copy to:

Goodsill Anderson Quinn & Stifel LLP
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Attention: Jonathan C. Bolton
Fax: (808) 547-5880

Notices to Buyer:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street
Attention: Mark Fahner
Fax: (513) 721-7358

with copies to:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 33 of 248

Attention:  Christopher J. Wilson, General Counsel
Fax: (513) 721-7358

and

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Attention:  Andrew M. Ray, Esq.
Fax: (202) 373-6001

(b)      Either party may at any time change its address for notice from time to time by giving notice to the other party in accordance with this Section 9.5.

**Section 9.6  Confidentiality**. Buyer and Seller each hereby affirms its respective obligations under the non-disclosure agreement, dated September 27, 2019, by and between Cincinnati Bell Inc. and Ducera Partners LLC and its affiliates in its capacity as an advisor to the Seller regarding the confidentiality of all information designated as such therein.

**Section 9.7  Entire Agreement; Amendment; Waiver**. This Agreement and the Exhibits and Schedules attached hereto constitute the entire understanding among the parties with respect to the subject matter hereof and supersede all other understandings and negotiations with respect thereto. This Agreement may be amended only in a writing signed by Seller and Buyer.  Any provision of this Agreement may be waived only in a writing signed by the party to be charged with such waiver. No course of dealing among the parties shall be effective to amend or waive any provision of this Agreement.

**Section 9.8  Severability**. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced under applicable Law, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated herein are not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated herein are consummated as originally contemplated to the fullest extent possible.

**Section 9.9  Successors and Assigns; Third Party Beneficiaries**. Nothing expressed or referred to in this Agreement is intended to or shall be construed to give or to confer upon any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its terms and provisions are for the sole and exclusive benefit of the parties to this Agreement and their permitted successors and assigns.  For the avoidance of doubt, notwithstanding the foregoing, the parties hereto agree and acknowledge that Sections 9.15 and 9.16 are intended to benefit such Persons that are set forth and are the subject of such Sections and, accordingly, such Persons shall be third party beneficiaries of this Agreement. In addition, the Persons that are set forth and are the subject of Sections 9.15 and 9.16 shall be entitled to enforce such Sections and pursue any

29

legal or equitable right, remedy, or claim under or with respect to such Sections in the event of a breach of such Sections by any party hereto.

**Section 9.10  Governing Law.**

(a)      This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York (without reference to its rules as to conflicts of law). For so long as Debtor is subject to the jurisdiction of the Bankruptcy Court, all parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, including matters arising in connection with the Assignable Contracts, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Debtor is no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal court sitting in the State of New York with respect to any action or proceeding arising out of or relating to this Agreement.

(b)      Each of the parties hereby waives trial by jury in any claim, action, suit, arbitration, inquiry, proceeding or investigation to which such party is a party involving, directly or indirectly, any matter in any way arising out of, related to or in connection with the transactions contemplated in this Agreement.

**Section 9.11  Captions**. The captions in this Agreement are for purposes of reference only and shall not limit or otherwise affect the interpretation hereof.

**Section 9.12  Counterparts**. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf, facsimile transmission or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered  shall  be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**Section 9.13  Enforcement of Agreement**. Subject to the restrictions contained herein, the parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached. It is accordingly agreed that the parties shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (i) during the Bankruptcy Case, in the sole and exclusive jurisdiction of the Bankruptcy Court and (ii) upon the closing, dismissal or conversion of the Bankruptcy Case, in any state or federal court in the State of New York, this being in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.14  Time of Essence: Specified Dates**. Time is of the essence for this Agreement and in the performance of the obligations and covenants to be performed or satisfied by the parties. Wherever a date specified in this Agreement falls on a day other than a Business Day, the date shall be extended to the next succeeding Business Day.

**Section 9.15  No Director or Affiliate Liability**. Except with respect to obligations of Seller provided in this Agreement or any of the Transaction Documents, neither any direct or

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 35 of 248

indirect holder of equity interests in Debtor, nor any past, present or future director, officer, employee, agent or Affiliate of Debtor or of any such holder, shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or any of the Transaction Documents, and Buyer hereby waives and releases all claims of any such liability or obligation.

Section 9.16 **No Personal Liability**. Notwithstanding anything in this Agreement or any other Transaction Document to the contrary, Buyer acknowledges and agrees that (i) Seller is acting hereunder solely in his capacity as the Bankruptcy Court appointed chapter 11 trustee of the Estate in the Bankruptcy Case and that Seller shall not have any personal liability to Buyer and Buyer shall not have any recourse against Seller, in his individual capacity; and (ii) the Buyer's sole recourse (if any) shall be against the Estate.

Section 9.17 **No Successor Liability**. Except where expressly prohibited under law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, to the fullest extent permitted by Law, Buyer shall not be deemed to (a) be the successor of the Seller, (b) have, de facto or otherwise, merged with or into the Seller, (c) be a mere continuation or substantial continuation of the Seller or the enterprise(s) of the Seller, or (d) be liable for any acts or omissions of the Seller other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, Buyer shall not be liable for any claims against the Seller or any of its predecessors or Affiliates, and except as provided in the Agreement, Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Seller arising on or prior to the Closing Date, including liabilities on account of any Taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of the Business on or prior to the Closing Date.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

**SELLER:**

_____

**MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**BUYER:**

**HAWAIIAN TELCOM, INC.**

By:_____
Name: Leigh Fox
Title:   Chief Executive Officer

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

**SELLER:**

**MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**BUYER:**

**HAWAIIAN TELCOM, INC.**

By:
_____

Name:
_____

Title:
_____

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be signed in its corporate name by its duly authorized officer, all as of the date first above written, solely to acknowledge its obligations pursuant to Section 5.3(a) of this Agreement.

**HSBC SECURITIES (USA), INC.**

By:    /s/ Thomas Curran
Name: Thomas Curran
Title:  Managing Director

**Form of Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Chapter 11 |
| PANIOLO CABLE COMPANY, LLC, | Case No. 18-01319 (RJF) |
| Debtor. | |

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE ASSET PURCHASE AGREEMENT, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, (D) APPROVING THE OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT, (E) APPROVING A BREAK-UP FEE, AND (F) GRANTING RELATED RELIEF; EXHIBITS "A" AND "B"**

i.          Following that certain Chapter 11 Involuntary Petition dated as of November 13, 2018, against Paniolo Cable Company, LLC (the above-captioned debtor and debtor-in-possession (collectively, the "Debtor")), on November 29, 2018, certain creditors of the Debtor filed a motion for entry of an order appointing a Chapter 11 trustee.  This Court subsequently issued an order, dated February 11, 2019,

approving the appointment of Michael Katzenstein, as Chapter 11 Trustee (the "<u>Trustee</u>") of the Debtor.

ii.　　　　In connection with that certain Adversary Proceeding No. 19-90022, *Katzenstein Trustee v. Sandwich Isles Communications, Inc.*, on March 4, 2020, certain assets and rights of the Transferred Equipment and Property Rights were marshalled, sold and otherwise transferred from Sandwich Isles Communications, Inc. ("<u>SIC</u>") to Debtor, free and clear of any continuing right, title, lien or encumbrance on the part of SIC or anyone claiming by and through SIC (the "<u>US Marshal Sale</u>") (excluding, for the avoidance of doubt, any pre-existing liens by the United States or any lien on the proceeds of any sale of assets), which US Marshal Sale was confirmed by this Court on March 16, 2020.

iii.　　　　Pursuant to this Court's order dated June 4, 2020, this Court, inter alia, approved that certain Settlement Agreement ("<u>Settlement Agreement</u>"), effective as of March 26, 2020, by and among the Paniolo Creditors, Paniolo Trustee, Ownership, SIC, and SIC Affiliates (each as defined therein) pursuant to Federal Rule of Bankruptcy Procedure 9019. As more fully set forth in the Settlement Agreement, the Settlement Parties made certain representations and warranties (the "<u>Settlement Agreement Representations</u>") and covenants (the "<u>Settlement Agreement Covenants</u>") which included, among other things, the duty to cooperate further with the Debtor with respect to the US Marshal Sale, the transfer of the Assets and rights transferred therein,

U.S. Bankruptcy Court - Hawaii　#18-01319　Dkt # 366-1　Filed 12/28/20　Page 41 of 248

and any proposed sale by Debtor to Buyer herein. Pursuant to the Settlement Agreement, all right title and interest of SIC, SIC Affiliates, or any person claiming by or through SIC or SIC Affiliates in Debtor's assets, including those transferred as part of the US Marshal Sale, were terminated.

     iv.        In connection with the Settlement Agreement, Debtor and SIC entered into that certain Master Relationship Agreement and its Schedules and Exhibits, as of March 6, 2020, the (collectively, the "MRA"), pursuant to which the Debtor and SIC rearranged their business affairs among themselves.

     v.        Upon consideration of the motion (the "Motion")[1] of the Trustee, dated November 30, 2020 for the entry of an order (this "Sale Order") (a) authorizing and approving the sale (the "Sale") of certain of the Debtor Assets, including the Schedule A.1 Assets, Schedule A.2 Assets, Assigned Claims, Assigned Contracts (each as defined in the APA and, collectively, the "Purchased Assets") and the transfer of the Incidental Rights, including the Assigned Rights and Assigned Permits (each as defined in the APA, and together with the Purchased Assets, the "Transferred Assets") and assumption of the Assumed Liabilities, but excluding the Excluded Assets and Excluded Liabilities, all as more fully set forth in the Asset Purchase Agreement attached hereto as **Exhibit A** (the "APA"), dated as of November 30, 2020, 2020

---

[1] Capitalized terms used but not otherwise defined herein are to be given the meanings ascribed to them in the Motion, the Bidding Procedures Order, or the APA, as applicable.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 42 of 248

between the Trustee, as seller (the "Seller") and Hawaiian Telecom, Inc., a Hawaii corporation, as buyer ("HTI" or the "Buyer"), free and clear of all liens, claims, interests and encumbrances, except the Permitted Liens and those expressly to be assumed by the Buyer under the APA; (b) approving the APA; (c) approving the Debtor's assumption and assignment of certain executory contracts and unexpired leases to the Buyer; (d) approving the Operational Support and Sales Services Agreement attached hereto as **Exhibit B** (the "Services Agreement"); (e) approving a Break-Up Fee in the event that the Court approves a higher and better Acquisition Proposal; and (f) granting related relief; and this Court having entered an *Order (I) Approving Bid and Auction Procedures, Including Stalking Horse Protections; (II) Authorizing and Scheduling an Auction for the Sale of Assets; (III) Approving the Sale of Assets; and (IV) Granting Related Relief* Docket No. 222, as extended by Docket No. 270 (the "Bidding Procedures Order"); and the Trustee having determined that the highest or otherwise best offer for the Transferred Assets was made by the Buyer pursuant to the APA; and this Court having conducted a hearing on December 21, 2020 (the "Sale Hearing"), at which time all parties in interest were provided an opportunity to be heard with respect to the Motion and to consider the approval of the Sale pursuant to the terms and conditions of the APA and the granting of all other relief sought in the Motion, and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334, the

- 4 -

Motion being a core proceeding in accordance with 28 U.S.C. § 157(b); and venue of this case being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409, the Court considered: (i) the Motion, the Statement [Dkt. no. 336] filed by the Office of the United States Trustee, the Objection [Dkt. no. 347] filed by the United States on behalf of the RUS (which was withdrawn at the Sale Hearing), the Statement [Dkt. no. 341] filed by the Department of Hawaiian Home Lands of Hawaii, and the Statement of Concerns [Dkt. no. 348] filed by SIC; (ii) the Sale and the other relief sought in the Motion; (iii) the arguments of counsel made, and evidence adduced, related thereto; and (iv) the record of the Sale Hearing; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA, the Sale, and the other transactions contemplated by the APA; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties-in-interest; and this Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[2]

## <u>Statutory Predicates; Final Order</u>

A.     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014.

B.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.  Venue of this Chapter 11 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases of the relief requested in the Motion are sections 105, 363, 365, 503, 506 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and Local Bankruptcy Rules 6004-1 and 9013-1.

D.     The Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

expressly finds that there is no just reason for delay in the implementation of the Sale Order and expressly directs entry of the Sale Order as set forth herein which shall not be subject to any stay.

### Notice

E.      This Court previously entered the Bidding Procedures Order approving, among other things, the Bidding Procedures, the proposed bid protections to a Stalking Horse Bidder, and the Assumption and Assignment Procedures (as defined in the Bidding Procedures Order).

F.      As evidenced by the certificates of service previously filed with this Court [Docket Nos. 324, 325, 326, 327, 330, 331 and 360], demonstrated by the evidence presented at, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale, and the Assumption and Assignment Procedures has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) all parties that have been identified by the Trustee in good faith prior to entry of the Bidding Procedures Order as having the interest and ability to acquire all or part of the Transferred Assets; (b) all entities known to have any right, authority over, lien, claim or encumbrance in or upon any of the Transferred Assets,

- 7 -

including without limitation the United States of America, or who may otherwise deprive Seller from transferring title to or Buyer from enjoying all rights to any of the Transferred Assets; (c) any entity to whom a duty is or may be owed, which may be a liability extinguished by the Sale Order; (d) all state, local and other governmental taxing authorities in the states in which the Trustee has tax liabilities, or for which taxing liability for the Transferred Assets may be established; (e) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Buyer; (f) the Office of the United States Trustee; (g) the Internal Revenue Service; (h) the Securities & Exchange Commission; (i) the Office of the Attorney General for the State of Hawaii; (j) the U.S. Department of Agriculture's Rural Utilities Service ("RUS"); (k) SIC; (l) the Department of Hawaiian Home Lands; (m) State of Hawaii Land Use Commission; (n) State of Hawaii Department of Land and Natural Resources; (o) the Delaware Department of State; and (p) all other persons and entities that have filed a request for service of filings in this Chapter 11 Case pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").  The notices described above, in the Motion, and Bidding Procedures Order were good, sufficient, and appropriate under the circumstances, and reasonably calculated to reach and apprise all known and unknown holders of rights, authority over, liens, claims, or encumbrances on the Transferred Assets, and rights which are or may constitute liabilities extinguished

- 8 -

by this Order, and no other or further notice of the Motion, the Sale, the Sale Hearing, the potential assumption and assignment of the Designated Contracts (as defined below) is, or shall be, required.

G. The notice provided of the Bidding Procedures, the Motion and the Sale Hearing provided all interested parties with timely and proper notice of the Sale, the Bid Deadline and the Sale Hearing. Further, a reasonable opportunity to object to and to be heard regarding the relief granted by the Sale Order has been afforded to parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

H. In accordance with the Bidding Procedures Order, and as evidenced by the certificates of service previously filed with this Court [Docket No. 274, 330], the Trustee filed and has served the *Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned in Connection with the Sale of the Debtor's Assets and the Proposed Cure Cost with Respect Thereto* [Docket No. 273] (the "Cure Notice") regarding the potential assumption and assignment of certain Contracts (as defined in the Cure Notice) and of the amount necessary to cure any defaults pursuant to section 365(b) of the Bankruptcy Code (all such amounts in connection with any Contract, the "Cure Amounts") upon the non-Debtor counterparties (each a "Non-Debtor Counterparty" and collectively, the "Non-Debtor Counterparties") to the Contracts. The service and provision of the Cure Notice was good, sufficient, and appropriate under the circumstances and no further

- 9 -

notice need be given in respect of assumption and assignment of certain contracts designated by the Buyer pursuant to the APA or subsequently entered into by Debtor after the date of this Sale Order (each an "Assumable Contract" and to the extent so designated by Buyer pursuant to the APA, the "Designated Contracts"), including with respect to adequate assurance of future performance or establishing a Cure Amount for the respective Contracts. All Non-Debtor Counterparties to each Assumable Contract set forth in the Cure Notice have had an adequate opportunity to object to assumption and assignment of the applicable Assumable Contract and the Cure Amount set forth in the Cure Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code). The deadline (the "Cure/Assignment Objection Deadline") to file an objection to the Cure Amount set forth in the Cure Notice and the assumption and assignment to the Buyer of any Assumable Contract (collectively, a "Cure/Assignment Objection") has expired, and to the extent any such entity timely filed a Cure/Assignment Objection, all such objections have been resolved, withdrawn or overruled. To the extent that any such party did not timely file a Cure/Assignment Objection by the Cure/Assignment Objection Deadline, such party shall be deemed to have consented to (i) the assumption and assignment of the

Assumable Contract, and (ii) the amount set forth in the Cure Notice shall be deemed the Cure Amount necessary to "cure" all "defaults", each within the meaning of section 365(b) of the Bankruptcy Code.

I.      On April 22, 2020, the Trustee filed *Michael Katzenstein, as Chapter 11 Trustee's Motion for Order Extending Bid and Auction Procedure Deadlines for the Sale of Substantially All of Debtor's Assets* [Docket No. 245]. On June 3, 2020, the Bidding Procedures were extended and modified by the Court's *Order Granting Michael Katzenstein, as Chapter 11 Trustee's Motion for Order Extending Bid and Auction Procedure Deadlines for the Sale of Substantially All of Debtor's Assets* [Docket No. 270] (the "Extension Order"). The Extension Order also established July 13, 2020, as the Bid Deadline for the submission of bids by Potential Bidders and July 31, 2020, as the date on which the Auction would take place if more than one Qualified Bid was received with regard to the Transferred Assets. After the expiration of the Bid Deadline, the Debtor did not receive any Qualified Bids.

J.      The Court hereby finds that the Trustee has complied with the notice provision of Section 16.3 of the MRA.

K.      No further or other notice beyond that described in the foregoing Paragraphs E through J is or shall be required in connection with the relief granted in the Sale Order.

- 11 -

## Highest or Otherwise Best Offer and Sound Business Purpose

L.     The Trustee conducted the sale process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order, as modified by the Extension Order and the terms of the Sale Order.  The Purchased Assets were adequately marketed by the Trustee and his advisors, and the sale process set forth in the Bidding Procedures Order, and otherwise conducted by the Trustee, afforded a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase the Purchased Assets.  The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arms' length negotiations, and were substantively and procedurally fair to all parties.

M.     In marketing the Purchased Assets, the Trustee negotiated allocations of the Purchase Price among the Purchased Assets in order to establish the highest and best offer for each.

N.     Throughout this case, the Trustee, on behalf of the bankruptcy estate, the creditors, and the Buyer have recognized the public importance of maintaining connectivity for certain telecommunications services to the Hawaiian Home Lands. Consistent with FCC regulations and Buyer's status as an incumbent local exchange carrier in Hawaii, the Purchased Assets will continue to be available to

- 12 -

telecommunications service providers that provide retail communications services on the Hawaiian Homelands, on a non-discriminatory basis.

O.    The terms contained in the APA constitute the highest and best offer for the Transferred Assets, including the allocation among the Purchased Assets, and provide fair and reasonable consideration to the Debtor's estate for the Transferred Assets and the assumption of the Assumed Liabilities and Permitted Liens, and the consideration provided by the Buyer under the APA constitutes reasonably equivalent value for each of the Purchased Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The Trustee's determination, in consultation with its advisors, that the consideration provided by the Buyer under the APA constitutes the highest or otherwise best offer for the Transferred Assets constitutes a valid and sound exercise of the Trustee's business judgment.

P.    Approval of the Motion and the APA, the consummation of the Sale contemplated thereby, entry into the Services Agreement, and entry into the Transaction Documents, are in the best interests of the Debtor, its creditors, its estate, and all parties-in-interest. The Trustee has demonstrated compelling circumstances and good, sufficient, and sound business reasons and justifications for entering into the APA, the Services Agreement and the Transaction Documents, and the performance of the Debtor's obligations under the APA and the Services Agreement,

- 13 -

and the granting of the Motion because, among other reasons: (a) the APA constitutes the highest or otherwise best offer for the Transferred Assets; (b) the APA and the Closing (as defined in the APA) thereon will present the best opportunity to realize the value of the Transferred Assets; (c) any other available transaction would not have yielded as favorable an economic result; (d) entry into the Services Agreement, and management by the Buyer, an experienced telecommunications network operator, represents the best opportunity to preserve the value of the Transferred Assets until the Closing of the Sale, and the best certainty to reach Closing; and (e) the public interest is served in that consistent with FCC regulations and its status as an incumbent local exchange carrier in Hawaii, the Purchaser will continue to make available the Purchased Assets to telecommunications service providers that provide retail communications services on the Hawaiian Homelands, on a non-discriminatory basis.

Q. Entry of the Sale Order and the approval of the APA, the Services Agreement and the Transaction Documents and all of the provisions thereof is a condition precedent to the Buyer's consummation of the Sale.

R. The Buyer is the highest and best bidder for the Transferred Assets. The Buyer has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the APA, and

- 14 -

the Sale and the APA likewise comply with the Bidding Procedures Order and any other applicable order of this Court.

## Sale and Transfer Free and Clear of Interests or Claims

S.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied and, upon entry of the Sale Order, other than Assumed Liabilities and Permitted Liens, subject to this Sale Order and the terms and conditions of the APA, the Trustee is authorized to transfer all of the Debtor's right, title and interest to the Transferred Assets free and clear of (i) any and all liens, encumbrances, claims, mortgages, restrictions, hypothecations, charges, instruments, collective bargaining agreements, leases or subleases, licenses, options, deeds of trust, security interests, other interests, conditional sale or other title retention agreements, pledges, other liens (including mechanic's, materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, easements, servitudes, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of first refusal, offsets, contracts, recoupment, rights of recovery, rights of use or possession, liability for unpaid sales, use, franchise, excise, or any other taxes, liability for unpaid federal or state universal service contributions, liability for any unpaid regulatory fees, assessments, contributions or other payments assessed by or otherwise owed to the FCC, any state commission or other governmental entity, and

- 15 -

charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, (ii) all claims as defined in Bankruptcy Code section 101(5), including all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, obligations, demands, restrictions, or liabilities relating to any act or omission of the Debtor, SIC, or any other person prior to the Closing, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, releases into the surface waters, ground waters, soil, subsurface strata and ambient air (collectively, the "Environment") of any substance, chemical, material, or waste now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "regulated substance," "contaminant," or "pollutant" (or words of similar import) within the meaning of or regulated or addressed under any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, consent decree or judgment relating to pollution or protection of the Environment (each an "Environmental Law"), any environmental claim or environmental notice, or taxes, assessments or imposts of any kind, decrees of any court or foreign or domestic governmental entity, consent rights, options, contract rights, covenants, indentures, loan agreements, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently

- 16 -

exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise, (iii) all debts, liabilities, obligations, contractual rights and claims, labor, employment and pension claims, and debts arising in any way in connection with any agreements, acts, or failures to act, including any pension liabilities, retiree medical benefit liabilities, liabilities arising under or related to the Internal Revenue Code, of the Debtor, SIC, SIC's Affiliates or any of the Debtor's, SIC's, or SIC's Affiliates, or SIC's predecessors or affiliates, claims, and (iv) the Excluded Liabilities as set forth in the APA, in each case with respect to items (i), (ii), (iii) and (iv), whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability ((i), (ii), (iii) and (iv) collectively, the "Interests or Claims").  The Buyer would not have entered into the APA if the transfer of the Transferred Assets was not free and clear of all Interests or Claims as set forth in the APA and the Sale Order, or if in the future the Buyer would or could be liable for any such Interests or Claims.

T.     Upon entry of the Sale Order, the Trustee is authorized to transfer all of the Debtor's right, title and interest in and to the Transferred Assets free and clear of all Interests or Claims (except as otherwise expressly assumed in, or permitted by, the APA or the Sale Order) because one or more of the provisions set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied, including that, except as otherwise expressly provided in the APA or the Sale Order, such Interests or Claims shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have against those particular Transferred Assets subject to such Interests or Claims, and subject to any claims and defenses the Debtor and the Trustee may possess with respect to such Interests or Claims.  Each entity with an Interest or Claim (other than an Assumed Liability or Permitted Lien) that is attached to the Transferred Assets to be transferred on the Closing Date:   (i) has, subject to the terms and conditions of the Sale Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such encumbrance; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.   Those holders of Interests or Claims against the Transferred Assets who did not object or who withdrew their objections to the APA or the Motion are deemed to have consented to the transactions contemplated thereby pursuant to section 363(f)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in

- 18 -

this Sale Order establishes any rights or interests in the Transferred Assets (other than the Debtor's rights and interests in such Transferred Assets and the Buyer's rights and interests in the Transferred Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds, if any, from the Sale of the Transferred Assets.[3]

U.     A sale of the Transferred Assets other than one free and clear of all Interests or Claims, and without entry of the Services Agreement, would yield substantially less value for the Debtor's estate, with less certainty, than the Sale as contemplated.  Therefore, the Sale contemplated by the APA and approved herein free and clear of all Interests or Claims, except for the Assumed Liabilities and Permitted Liens, and entry of the Services Agreement is in the best interests of the Debtor, its estate and creditors, and all other parties-in-interest.

## Assumption and Assignment of the Designated Contracts

V.     The Assumption and Assignment Procedures set forth in the Bidding Procedures Order are adequate, sufficient and appropriate under the circumstances.

W.     The assumption and assignment of the Designated Contracts pursuant to the Assumption and Assignment Procedures and the APA is in the best interests of the Debtor and its estate and represents the reasonable exercise of the Trustee's

---

[3] The Trustee intends to use the proceeds from the Sale to repay the amounts due to the Debtor's post-petition lender, HSBC Bank USA, National Association under the Senior Secured Superpriority Chapter 11 Debtor Credit Agreement, as amended.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 58 of 248

sound business judgment. The Designated Contracts being assigned to the Buyer are an integral part of the Transferred Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Designated Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtor's estate.

X.    The Debtor has met all requirements of section 365(b) of the Bankruptcy Code for each of the Designated Contracts. The Debtor or the Buyer will have (i) cured or provided adequate assurance of cure of any default existing prior to the consummation of the Sale pursuant to the APA under all of the Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any counterparty to Designed Contract for actual pecuniary loss to such entity resulting from a default prior to the Closing under any of the Designated Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The proposed Cure Amounts set forth on the Cure Notices or any other cure amount reached by agreement after any Cure/Assignment Objection are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code section 365(b), under each Designated Contract. The assignment of the Designated Contracts is free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Liens). No section of any of the Designated Contracts that would prohibit, restrict,

- 20 -

or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Designated Contracts in connection with the Sale shall have any force or effect, except as expressly permitted in the APA and the Sale Order.

Y.     The Buyer has demonstrated adequate assurance of future performance under the relevant Designated Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Buyer's promise to perform the obligations under the Designated Contracts arising after the Closing shall constitute adequate assurance of its future performance of and under the Designated Contracts, within the meaning of Bankruptcy Code sections 365(b)(1) and 365(f)(2). Pursuant to section 365(f) of the Bankruptcy Code, the Designated Contracts to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

Z.     No defaults exist in the Debtor's performance under any of the Designated Contracts as of the date of the Sale Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code. Any Cure/Assignment Objection that was heard at the Sale Hearing (to the extent not withdrawn), was considered by this Court, and is overruled on the merits with prejudice. This Court finds that, with respect to all Assumable Contracts, the

- 21 -

payment of the proposed Cure Amounts in accordance with the terms of the APA is appropriate and is deemed to fully satisfy the Debtor's obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of section 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtor to the Buyer of each of the Designated Contracts. To the extent any Assumable Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of the Sale Order that are applicable to the Transferred Assets.

## **Good Faith Finding**

AA.  The Buyer is not an "insider" or "affiliate" of the Debtor as those terms are defined in section 101 of the Bankruptcy Code.

BB.  The APA, including the Purchase Price and allocation among the Purchased Assets, was negotiated, proposed and entered into by the Debtor and the Buyer without collusion or fraud, in good faith and from arm's-length bargaining positions.

CC.  The APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. The Trustee and the Buyer and Buyer's agents, representatives and affiliates have not engaged in any conduct that would cause or permit the APA or the consummation of the transactions

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 61 of 248

contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. The Trustee and its professionals marketed the Purchased Assets and conducted the marketing and sale process in substantial compliance with the Bidding Procedures Order.

DD. The Buyer is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. In particular, (a) the Buyer recognized that the Trustee was free to deal with any other party interested in purchasing the Transferred Assets subject to the terms of the APA; (b) the Buyer in no way induced or caused the chapter 11 filing; (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors, officers, or controlling stakeholders exists between the Buyer and any of the Debtor; (e) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; and (f) the Buyer has not acted in a collusive manner with any person.

## No Fraudulent Transfer or Successor Liability

EE. The aggregate consideration from the Buyer for the Purchased Assets and the allocated consideration among the Purchased Asserts as set forth in the APA: (a) as such consideration relates to the Purchased Assets, constitutes fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 62 of 248

Transfer Act, the Uniform Fraudulent Conveyance Act and other similar state laws or laws of the United States; (b) is the best value obtainable for the Purchased Assets; (c) will provide a greater recovery to creditors than would be provided by any other available alternative; and (d) as such consideration relates to the Purchased Assets, constitutes reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code, and the laws of the United States; any state, tribe, territory, or possession of the United States; and the District of Columbia, as applicable).

FF.    Neither the Trustee, the Debtor nor Buyer entered into or has agreed to enter into the APA with any fraudulent or otherwise improper purpose, including, without limitation, the purpose of hindering, delaying or defrauding any creditors of the Debtor.

GG.    The transfer of the Transferred Assets, including the Assumed Liabilities and the Permitted Liens, by the Buyer, except as otherwise set forth in the APA, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtor's business prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting

- 24 -

antitrust, successor, transferee or vicarious liability. Pursuant to the APA, the Buyer is not purchasing all of the Debtor Assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities or any contract that is not included as a Designated Contract, and the Buyer is not holding itself out to the public as a continuation of the Debtor or related to SIC or any of SIC's Affiliates. The Buyer is not a mere continuation of or successor to the Debtor, SIC or any of SIC's Affiliates, or Debtor's estate in any respect. The APA does not amount to a consolidation, merger or *de facto* merger of the Buyer on the one hand, and any of the Debtor, SIC or SIC's Affiliates on the other hand, and there is no continuity of enterprise between any of the Debtor, SIC or SIC's Affiliates on the one hand, and the Buyer on the other hand. The Buyer would not have entered into the APA if the transfer of the Transferred Assets was not made free and clear of any successor liability whatsoever to the Buyer. None of the transactions contemplated by the APA, including, without limitation, the assumption and assignment of the Designated Contracts, is being undertaken for the purpose of escaping liability for any of the Debtor's debts or hindering, delaying, or defrauding any creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

- 25 -

## Validity of Transfer and Authorizations

HH.   The Transferred Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.  The Debtor has all right, title and interest in the Transferred Assets required to transfer and convey such Transferred Assets to the Buyer.  The Trustee has full corporate power and authority to execute and deliver the APA, and all other documents contemplated thereby, and has all corporate authority necessary to consummate the transactions contemplated by the APA.  No consents or approvals, other than those expressly provided for in the APA, are required for the Trustee to consummate the transactions contemplated by the APA on behalf of the Debtor.

II.   The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

## No *Sub Rosa* Plan

JJ.   Because time is of the essence, the Seller has good business reasons to sell the Transferred Assets prior to obtaining the Bankruptcy Court's confirmation of a plan of reorganization.  The Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation of the Debtor.  The Sale Order does not dictate or direct

- 26 -

the distribution of the cash proceeds of the Sale of the Purchased Assets. The Sale Order, the APA, and the transactions contemplated therein do not constitute a *sub-rosa* plan.

## Best Interest of Creditors

KK.   Given all of the circumstances of this Chapter 11 Case and the adequacy and fair value of the consideration provided by the Buyer under the APA, the Sale constitutes a reasonable and sound exercise of the Trustee's business judgment, is in the best interests of the Debtor, its bankruptcy estate, its creditors, and all other parties in interest in this Chapter 11 Case, and should be approved.

LL.   Time is of the essence in consummating the transactions contemplated by the APA. Cause has been shown as to why the Sale Order should not be subject to any stay provided by Bankruptcy Rule 6004(h).

**IT IS HEREBY ORDERED THAT:**

1.   The relief requested in the Motion, as implemented by the Bidding Procedures Order and the Sale of the Transferred Assets to the Buyer pursuant to the APA, is granted and approved as set forth herein.

2.   Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits. Any party who did not object or who withdrew its objection is deemed to have consented to the Sale under the

- 27 -

terms of the APA pursuant to section 363(f)(2) or section 365 of the Bankruptcy Code, or any other applicable provision of the Bankruptcy Code and pursuant to the Bidding Procedures Order. Notice of the Motion, the Sale Hearing, and the Sale was fair and equitable under the circumstances, and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

## **Approval of the APA**

3.    The APA, including all other ancillary documents, and all of the terms and conditions thereof, and the Sale contemplated thereby, is hereby approved as provided herein.

4.    Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtor is authorized to perform its obligations under and comply with the terms of the APA, pursuant to and in accordance with the terms and conditions of the APA and the Sale Order.

5.    The Trustee, the Debtor and its affiliates, officers, employees and agents, are authorized to execute and deliver, and empowered to perform under, consummate and implement, the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions and execute such other documents as may be (a) necessary or appropriate to the performance of the obligations contemplated by the APA, including, without limitation, making any state or local filings necessary or

- 28 -

advisable in connection with the Sale, and (b) as may be reasonably requested by the Buyer to implement the APA, in accordance with their terms thereof, without further order of this Court.

6.      The Sale Order and the APA shall be binding in all respects upon, and shall inure to the benefit of, the Trustee, the Debtor, the Debtor's bankruptcy estate, its affiliates, all creditors, all holders of equity interests in the Debtor, all holders of any Interests or Claims (whether known or unknown) against the Debtor, any holders of Interests or Claims against or on all or any portion of the Transferred Assets or against Debtor, SIC, or SIC's Affiliates, all counterparties to any executory contract or unexpired lease of the Debtor, Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in this Chapter 11 Case or upon a conversion of this Chapter 11 Case to chapter 7 under the Bankruptcy Code.  The terms and provisions of the APA and the Sale Order will inure to the benefit of the Trustee, the Debtor, its bankruptcy estate, and its creditors, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any other affected third parties, including all persons asserting any Interests or Claims in the Transferred Assets to be sold to the Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed 12/28/20   Page 68 of 248

Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise will be binding. In the event that Seller receives a Superior Proposal which is approved by this Court, payment of the break-fee is appropriate in light of the substantial legal, environmental and asset due diligence and other efforts expended by Buyer in connection with the proposed transaction, including negotiating the APA and Transaction Documents, all of which generated substantial value to the Estate.

### Sale and Transfer of the Transferred Assets

7.     Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, upon the Closing and pursuant to and except as otherwise set forth in the APA and this Sale Order, the Transferred Assets will be transferred to the Buyer free and clear of all Interests or Claims (other than Assumed Liabilities and Permitted Liens) that existed prior to the Closing of any person, including, without limitation, all such Interests or Claims specifically enumerated in the Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests or Claims to attach to the cash proceeds of the Sale, in the order of their relative priority, and with the same validity, force, and effect the holder of such Interests or Claims had against the Purchased Assets prior to the Closing, subject to any claims and defenses that the Debtor and

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed 12/28/20   Page 69 of 248

its bankruptcy estate may possess with respect thereto. For the avoidance of doubt, nothing in the Sale Order establishes any rights or interests in the Transferred Assets (other than the Debtor's rights and interests in such Transferred Assets and the Buyer's rights and interests in the Transferred Assets from and after the Closing), and nothing herein shall be construed to govern or affect the distributions of the cash proceeds from the Sale of the Purchased Assets.

8.     On the Closing Date, the Sale Order will be broadly construed, and will constitute for any and all purposes, a full and complete general assignment, conveyance, and transfer of all of the Transferred Assets or bills of sale transferring good and marketable title in such Transferred Assets to the Buyer, as is where is, free and clear of all Claims and Interests pursuant to the terms, conditions, and exceptions set forth in the Sale Order and the APA. For the avoidance of doubt, the Excluded Assets set forth in the APA are not included in the Transferred Assets and such Excluded Assets shall remain property of the Debtor's estate.

9.     Subject to the terms and conditions of the Sale Order, the transfer of Transferred Assets to the Buyer pursuant to the APA and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in the Sale Order and the APA, constitute a legal, valid, and effective transfer of the Transferred Assets, and will vest the Buyer with all of the Debtor's right, title, and interest in and to the Transferred Assets as set

forth in the Sale Order and the APA, as applicable, free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in, or permitted by, the APA and this Sale Order).

10.    Except to the extent expressly included in the Assumed Liabilities or Permitted Liens or to enforce the APA, or as provided in this Sale Order, upon the Closing, all entities or persons are permanently and forever prohibited, barred, estopped, and permanently enjoined from asserting against the Buyer, and its permitted successors, designees, and assigns, or property, or the Transferred Assets conveyed in accordance with the APA, any Interests or Claims of any kind or nature whatsoever arising prior to Closing, including, without limitation, under any theory of successor or transferee liability, *de facto* merger or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

11.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant included within or relating to the operation of the Transferred Assets sold, transferred, or conveyed to the Buyer solely on account of the filing or pendency of this Chapter 11 Case or the consummation of the transactions contemplated by the APA and the Sale Order.  Upon the Closing, the Buyer will be deemed to be

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed 12/28/20   Page 71 of 248

substituted nunc pro tunc for the Debtor as party to the applicable Incidental Rights, provided that Buyer shall not be deemed successor and, pursuant to Paragraph FF above and Paragraphs 30 through 33, below, Buyer shall have no successor liability thereto. Nothing in this paragraph shall limit a Governmental Unit's authority to deny, revoke, suspend, or refuse to renew any permit, license, or similar grant for reasons other than the filing or pendency of this Chapter 11 Case or the consummation of the transactions contemplated by the APA and the Sale Order.

12.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Designated Contracts are forever barred from raising or asserting against the Debtor and its estate or the Buyer any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts, existing as of the date that such Designated Contracts are assumed or arising by reason of or in connection with the Closing.

## Good Faith of the Buyer

13.    The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code. The Sale contemplated by the APA is undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale

- 33 -

shall not affect the validity of the Sale (including the assumption and assignment of the Designated Contracts), unless such authorization and consummation of the Sale are duly and properly stayed pending such appeal.

14. Neither the Trustee, the Debtor, the Buyer nor any affiliate or representative, agent, or advisor of either the Debtor or Buyer have engaged in any collusion with other bidders or other parties or have taken any other action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code or otherwise. The consideration provided by the Buyer for the Transferred Assets under the APA is fair and reasonable and is not less than the value of such assets, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

15. The Buyer is not an "insider" of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

## Assumption and Assignment of the Designated Contracts

16. The Seller has satisfied the requirements of Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

17. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, the Debtor's assumption and assignment to the Buyer, and the Buyer's assumption, on the terms set forth in the Sale Order and the APA of the Assumable Contracts, is hereby

approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

18.     The Seller is hereby authorized to enter into additional agreements in accordance with the APA and the Services Agreement, and upon agreement of Buyer, to include such additional agreements as Designated Contracts hereunder. The Seller is hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign to the Buyer, effective upon the Closing Date, the Designated Contracts free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise expressly assumed in, or permitted by, the APA or conditioned by the terms contained within this Sale Order) and execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Designated Contracts to the Buyer.

19.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer will be fully and irrevocably vested in all right, title, and interest of each Designated Contract and the Trustee and the estate will be relieved from any liability for any breach of a Designated Contract occurring after assignment to Buyer.

20.     The Designated Contracts will be transferred and assigned to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms pursuant to the APA, notwithstanding any provision in any such

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 74 of 248

Designated Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

21.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, at the Closing, the Cure Amounts (if any) relating to any Designated Contract will be paid in accordance with the APA.

22.     The payment of the applicable Cure Amounts (if any), or any other cure amount reached by agreement after any Cure/Assignment Objection, will effect a cure of all defaults and all other obligations or liabilities under any Designated Contract existing, occurring, arising, or accruing prior to the date that such executory contracts or unexpired leases are assumed and compensate for any actual pecuniary loss to such non-debtor counterparty resulting from such default.

23.     Upon the Closing, the Buyer will be assigned the Designated Contracts, and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor of such Designated Contracts will not be a default thereunder.  Other than the payment of the relevant Cure Amounts (if any) in accordance with the APA, neither the Debtor and its estate nor the Buyer will have any further liabilities to the non-debtor counterparties to the Designated Contracts, other than Buyer's obligations under the Designated Contracts that accrue or become due and payable on or after the date that such Designated Contracts are assumed.

24.     Except as otherwise agreed in writing between the Debtor and the non-debtor counterparties to the Designated Contracts, stated on the record of the Sale Hearing, set forth in the Sale Order, or determined by Court order, the Cure Amounts for the Designated Contracts in effect as of the date hereof are hereby fixed at the amounts set forth on Cure Notice, and the non-debtor counterparties to such Designated Contracts are forever bound by such Cure Amounts and, other than with respect to enforcement for payment of such Cure Amounts, are hereby enjoined from taking any action against the Trustee, the Debtor and its bankruptcy estate, the Buyer, and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, or the Transferred Assets with respect to any claim for cure under any Assumable Contract.

25.     The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Assumable Contract shall not be a waiver of such terms or conditions, or of the Trustee's, Debtor's and the Buyer's rights to enforce every term and condition of the Designated Contracts.

26.     Any provisions in any Designated Contract that prohibit or condition the assignment of such Designated Contract or allow the party to such Designated Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Designated Contract constitute unenforceable anti-assignment provisions that are void, and of

- 37 -

no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Designated Contracts have been satisfied.

27.     Any party having the right to consent to the assumption or assignment of any Assumable Contract that failed to object to such assumption or assignment is deemed to have waived any objections and consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

28.     Upon the Closing, the Buyer will be deemed to be substituted for the Debtor as a party to the each Designated Contract and the Trustee, the Debtor and its estate will be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Designated Contracts.

29.     The Buyer has provided adequate assurance of future performance under each relevant Designated Contract within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

## No Successor Liability

30.     Except as otherwise set forth in the APA or this Sale Order, neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Claim or Interest that arose or occurred prior to the Closing, or otherwise are able to be asserted against the Debtor, SIC or SIC's Affiliates, or is related to the Transferred Assets prior to the Closing. The Buyer is not and shall not

- 38 -

be deemed a "successor" to the Debtor, SIC or SIC's Affiliates, or Debtor's estate, have not, *de facto* or otherwise, merged with or into the Debtor, SIC or SIC's Affiliates, or be a mere continuation or substantial continuation of the Debtor, SIC or SIC's Affiliates, or the enterprise of the Debtor, SIC or SIC's Affiliates, under any theory of law or equity as a result of any action taken in connection with the APA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Transferred Assets.

31.    The Buyer is not a "successor" to the Debtor, SIC or SIC's Affiliates, or the Debtor's estate by reason of any theory of law or equity, and the Buyer shall not assume, or be deemed to assume, or in any way be responsible for any liability or obligation of the Debtor, SIC or SIC's Affiliates, and/or Debtor's estate, other than the Assumed Liabilities, with respect to the Transferred Assets or otherwise, including, but not limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability.  Except to the extent the Buyer assumes Assumed Liabilities and is ultimately permitted to assume the Assumed Liabilities pursuant to the APA, or as otherwise provided in this Sale Order, neither the purchase of the Transferred Assets by the Buyer nor the fact that the Buyer is using any of the Transferred Assets previously used by the Debtor, SIC, or SIC's Affiliates will cause the Buyer to be deemed a successor in any respect to the Debtor's, SIC's or SIC's Affiliates' business or incur any liability

- 39 -

derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor (including any WARN Act), employment, Environmental Law or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine. Pursuant to the APA, the Buyer is not purchasing all of the Debtor's assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as a continuation of the Debtor, SIC or SIC's Affiliates. The Buyer is not a mere continuation of or successor to the Debtor, SIC, or SIC's Affiliates or the Debtor's estate in any respect.

32. The Buyer has given substantial consideration under the APA, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer and which shall be deemed to have been given in favor of the Buyer by all holders of Claims or Interests in or against the Debtor, or the Transferred Assets. Upon consummation of the Sale Transaction, the Buyer shall not be deemed to (i) be the successor to the Debtor, SIC or SIC's Affiliates; (ii) have, de facto or otherwise, merged with or into the Debtor, SIC or SIC's Affiliates; or (iii) be a mere continuation, alter ego or substantial continuation of the Debtor, SIC or SIC's Affiliates.

- 40 -

33.     Except to the extent specifically agreed by the Buyer in the APA or this Sale Order, the Buyer shall not have any liability, responsibility or obligation for any Claims or Interests of the Debtor, SIC or SIC's Affiliates, or Debtor's estate, including any claims, liabilities or other obligations related to the Transferred Assets prior to Closing Date. The Buyer is not purchasing all of the Debtor's assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities. Under no circumstances shall the Buyer be deemed a successor of or to the Debtor for any encumbrances against, in or to the Debtor or the Transferred Assets. For the purposes of this section of this Sale Order, all references to the Buyer shall include the Buyer's affiliates, subsidiaries and shareholders.

## Additional Provisions

34.     In connection with the Closing, a certified copy of the Sale Order evidencing the release, cancelation and termination provided herein of any Interests or Claims of record on the Transferred Assets may be filed, recorded with or provided to the appropriate filing agents, filing officers, administrative agencies or units, governmental departments, secretaries of state, federal, state and local officials and all other persons, institutions, agencies and entities who may be required by operation of law, the duties of their office or contract, including, for the avoidance of doubt, the Department of Hawaiian Home Lands.

- 41 -

35.     The Closing of the Sale is contingent on certain regulatory approvals. The APA conditions the obligations of the Buyer to consummate the Sale upon the occurrence of certain conditions, including the regulatory approvals and the absence of certain material changes.

36.     As soon as practicable after the entry of this Order and prior to the Closing, the Debtor is hereby authorized to enter into the Services Agreement with the Buyer in substantially the form attached hereto as **Exhibit B**, with any changes as may be agreed to by the Parties thereto.

37.     As soon as practicable after the entry of this Order and prior to the Closing, the Debtor is hereby authorized to enter into the Transaction Documents with any changes as may be agreed to by the Parties thereto.

38.     Upon consummation of the Sale, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests or Claims against or in the Transferred Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Interests or Claims that the person or entity has with respect to the Transferred Assets (unless otherwise assumed in, or permitted by, the APA), or otherwise, then: (a) the Trustee is hereby authorized, on behalf of the Debtor, to execute and file such statements, instruments, releases and other

- 42 -

documents on behalf of the person or entity with respect to the Transferred Assets; and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of the Sale Order, which, once filed, registered or otherwise recorded, will constitute conclusive evidence of the release of all Interests or Claims in the Transferred Assets of any kind or nature (except as otherwise assumed in, or permitted by, the APA); *provided that*, notwithstanding anything in the Sale Order or the APA to the contrary, the provisions of the Sale Order will be self-executing, and neither the Trustee nor Buyer will be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of the Sale Order.  For the avoidance of doubt, upon consummation of the Sale, the Buyer is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to the Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of the Sale Order.  The Sale Order shall be binding upon and shall govern the acts

- 43 -

of all persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

39.     All persons or entities that are currently in possession of some or all of the Transferred Assets in contravention of the US Marshal Sale, the Settlement Agreement or MRA, including for the avoidance of doubt, SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates, are hereby directed to surrender possession of the Transferred Assets except as Debtor and Buyer may otherwise agree. All persons or entities that on the Closing may be, in possession of some or all of the Transferred Assets, including for the avoidance of doubt, SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates, are hereby directed to surrender possession of the Transferred Assets to the Buyer upon the Closing or on such earlier date as the Trustee may direct in order for Buyer to perform its obligations under the Services Agreement.

- 44 -

40. The Sale Order shall be effective as a determination that, upon the Closing, all Claims or Interests of any kind or nature whatsoever existing as to the Transferred Assets prior to the Closing (other than the Assumed Liabilities and Permitted Liens) have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected as set forth in the Sale Order, including, without limitation, any liability for accrued but unpaid taxes, fees, assessments or imposts.

41. The APA and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto in accordance with the terms thereof and the Sale Order without further order of this Court; *provided* that no such modification, amendment or supplement may be made without further order of this Court if it is materially adverse to the Debtor or the Debtor's estate. The Trustee and the Debtor are authorized to perform each of its covenants and undertakings as provided in the APA, Services Agreement and Transaction Documents prior to or after the Closing without further order of this Court.

42. The APA shall be of full force and effect, regardless of Debtor's lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 84 of 248

43.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Trustee or the Debtor any notice provided for in the APA, (b) to allow the Buyer to take any and all actions permitted by the APA and Services Agreement, and (c) to allow Debtor and Buyer to take any and all actions permitted under this Sale Order.

44.     No bulk sales law or any similar law of any state or other jurisdiction shall apply to the Debtor's conveyance of the Transferred Assets.

45.     Nothing in the Sale Order shall be deemed to waive, release, extinguish or estop the Trustee, the Debtor or its estate from asserting or otherwise impairing or diminishing any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Transferred Asset.

46.     The failure specifically to include or make reference to any particular provisions of the APA in the Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA as conditioned by this Sale Order is authorized and approved in its entirety.

47.     Absent a subsequent order of this Court to the contrary, the Sale Order shall be binding in all respects upon any other trustees, examiners, "responsible persons" or other fiduciaries appointed in this Chapter 11 Case or upon a conversion to chapter 7 under the Bankruptcy Code.

- 46 -

48.     Nothing in this Sale Order shall be deemed to modify the obligations of the Buyer under federal statutes and regulations designed to protect public health and safety, including but not limited to any Environmental Law, with respect to the Buyer's operation, maintenance, transfer, disposal, or abandonment of any Purchased Assets after Closing.

49.     Notwithstanding any other provision of this Order or any other Order of this Court, no sale, transfer or assignment of any rights and interests of the Debtor in any federal license or authorization issued by the Federal Communications Commission ("FCC") shall take place prior to the issuance of FCC regulatory approval for such sale, transfer or assignment pursuant to the Cable Landing License Act of 1921, Executive Order 10,530, and the rules and regulations promulgated under such statutes.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

50.     Notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is

hereby expressly waived and shall not apply. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal will be foreclosed as moot.

51.     In the event of any conflict between the Sale Order and the APA, the Sale Order shall control in all respects.

52.     This Court shall retain exclusive jurisdiction over any matters related to or arising from the Settlement Agreement and the implementation of the Sale Order, including without limitation, the enforcement of the US Marshal Sale, and Settlement Agreement Representations and Settlement Agreement Covenants.

<div align="center">

**END OF ORDER**

</div>

Submitted by:

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON      9650-0
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE   10001-0
  cstsure@goodsill.com
First Hawaiian Center, Suite 1600
999 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 87 of 248

**Form of Assignment and Assumption Agreement**

This Assignment and Assumption Agreement (this "**Agreement**") is made and entered into as of [●], 2021, by and between Michael Katzenstein, solely in his capacity as chapter 11 trustee ("**Seller**") for the bankruptcy estate of Paniolo Cable Company, LLC, a limited liability company organized under the laws of the State of Delaware ("**Debtor**"), and Hawaiian Telcom, Inc., a Hawaii corporation ("**Buyer**").

**RECITALS**

WHEREAS, Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of [●], 2020, by and between Seller and Buyer (as may be amended or modified from time to time, the "**Purchase Agreement**");

WHEREAS, this Agreement is being executed and delivered pursuant to Section 2.3(b) of the Purchase Agreement and the Sale Order; and

WHEREAS, all capitalized terms used but not otherwise defined herein shall have the meanings for such terms as set forth in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer, intending to be legally bound, hereby agree as follows:

1.      **Assignment of Designated Contracts, Assigned Permits, Assigned Rights, Assigned Claims, and Assumed Liabilities.**  Seller hereby sells, assigns, transfers and conveys to Buyer, without warranty,  all of Seller's and/or Debtor's right, title, benefit, privileges and interest, if any, in and to, and all of Seller's and or Debtor's burdens, obligations and liabilities in connection with (a) the Designated Contracts, (b) the Assigned Permits, (c) the Assigned Rights, (d) the Assigned Claims, and (e) the Assumed Liabilities (collectively, the "**Assumed Rights and Obligations**").

2.      **Assumption of Designated Contracts, Assigned Permits, Assigned Rights, Assigned Claims, and Assumed Liabilities.**  Upon the terms and subject to the conditions of the Sale Order, Buyer hereby accepts the assignment of all of the Assumed Rights and Obligations, and hereby assumes and agrees to pay, perform and discharge as and when due all obligations in connection with such Assumed Rights and Obligations.

3.      **Obligations and Liabilities Not Assumed.**  Nothing expressed or implied in this Agreement is, or shall be deemed to be, an assumption by Buyer or any of its Affiliates of any Excluded Liabilities of Seller or Debtor, and Seller and Buyer agree that all such Excluded Liabilities shall remain the sole responsibility of Seller and/or Debtor.

4.      **Purchase Agreement.**  Each of Seller and Buyer hereby acknowledges and agrees that:

(a)      The terms and provisions of the Purchase Agreement shall apply to this Agreement, and the terms and conditions of this Agreement shall be construed consistently therewith;

(b)    In the event that any provision of this Agreement is construed to conflict with a provision in the Purchase Agreement or the Sale Order, the provision in the Sale Order shall be deemed to be controlling; and

(c)    The representations, warranties, covenants and agreements under the Purchase Agreement shall not be deemed to have been enlarged, reduced, superseded or altered in any way by this Agreement, and this Agreement does not, and shall not, enlarge any rights of third parties with respect to any of the Assumed Obligations.

5.    **Further Assurances**.  Each of Seller and Buyer hereby agrees and covenants to deliver upon request of the other party all such additional assignments, assumptions and other documents which may be reasonably necessary to accomplish the purposes and intent of this Agreement. Without limiting the generality of the foregoing, Seller agrees to (i) execute and deliver, or use reasonable best efforts to execute and deliver, or cause to be executed and delivered, any and all instruments, conveyances and assurances and undertake any and all actions as may be necessary or desirable for Buyer to pursue the Assigned Claims and (ii) cooperate with Buyer in the pursuit of such Assigned Claims.

6.    **No Third Party Beneficiaries.**  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person, any legal or equitable right, benefit or remedy of any nature whatsoever.  The foregoing shall not be construed to permit Seller to delegate or otherwise be relieved of its obligations under this Agreement.

7.    **Severability.**  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties hereto further agree to replace any such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

8.    **Counterparts.**  This Agreement may be executed and delivered (including by facsimile or other similar electronic transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

9.    **Governing Law.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law rules.

10.   **Notices.**  Any notice, request, instruction or other document to be given hereunder by either party hereto to the other party hereto shall be made in accordance with the Purchase Agreement.

11.   **Effective Date.**  This Agreement shall be deemed effective for all purposes at and as of the consummation of the Closing on the Closing Date.

**[Signatures on Following Page]**

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

**SELLER:**

_____

**MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**BUYER:**

**HAWAIIAN TELCOM, INC.**

By:

_____

Name:

_____

Title:

_____

EXHIBIT C

**Form of Bill of Sale**

**BILL OF SALE**

THIS BILL OF SALE, made and entered into as of **[●]**, 2021, is hereby delivered by Michael Katzenstein, solely in his capacity as chapter 11 trustee ("Seller") for the bankruptcy estate of Paniolo Cable Company, LLC, a limited liability company organized under the laws of the State of Delaware, to Hawaiian Telcom, Inc., a Hawaii corporation (the "Buyer"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

**KNOW ALL MEN BY THESE PRESENTS,** that the Seller, for good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged, and in consideration of and pursuant to that certain Asset Purchase Agreement dated as of **[●]**, 2020 (the "Purchase Agreement"), by and between the Buyer and the Seller, and expressly subject to the terms and conditions of that certain order of the United States Bankruptcy Court for District of Hawaii, Case No. 19- 013139 (RJF) [Dkt. __] (the "Sale Order") does hereby give, grant, bargain, sell, assign, convey, transfer, deliver and set over unto the Buyer, its successors and assigns, as is where is and free and clear of all Liens other than the Permitted Liens, all of the Seller's right, title and interest in, to and under the assets described in Exhibit A hereto (the "_____ Assets").

**TO HAVE AND TO HOLD,** all and singular, the _____ Assets so given, granted, bargained, sold, assigned, conveyed, transferred, delivered and set over unto the Buyer and its successors and assigns to and for its uses forever.

The Seller from time to time, at the Buyer's request, shall execute, acknowledge and deliver to the Buyer such other instruments of conveyance and transfer and shall take such other actions and execute and deliver such other documents, certifications and further assurances as the Buyer may reasonably request in order to vest more effectively in the Buyer or to put the Buyer more fully in possession of any of the Purchased Assets.

The Seller is not hereby selling, assigning, conveying, transferring or delivering any of the Excluded Assets.

This Bill of Sale shall be binding upon and inure to the benefit of the respective successors, assigns, heirs and representatives of the Seller and the Buyer.

Nothing contained in this Bill of Sale, expressed or implied, shall be deemed to confer any rights or benefits upon any Person not a party to this Bill of Sale. This Bill of Sale shall not be deemed to defeat, limit, alter, impair, enhance or enlarge any right, obligation, liability, claim or remedy created by the Purchase Agreement.

This Bill of Sale shall be governed by and interpreted in accordance with the laws of the State of New York without reference to the conflicts of law principles of this or any other jurisdiction to the contrary.

38

    **IN WITNESS WHEREOF,** intending to be legally bound hereby, the Seller has caused this Bill of Sale to be executed and delivered on the date first above written.

                    **SELLER:**

                    _____

                    **MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**EXHIBIT D**

**Allocation of Purchase Price**

No later than one hundred and twenty (120) days after Closing, Buyer shall prepare and deliver to Seller a proposed tax allocation. Buyer and Seller shall work in good faith to resolve any disputes relating to such tax allocation, and in the event that Buyer and Seller are unable to resolve any such dispute within sixty (60) days of delivery of Seller's proposed tax allocation, Buyer and Seller may each allocate the Purchase Price in any manner they deem fit in their complete discretion.

**Form of Escrow Agreement**

**ESCROW AGREEMENT**

THIS ESCROW AGREEMENT (the "Escrow Agreement") is entered into and effective as of this [__] day of [_____], 2020, by and among PNC Bank, National Association, a national banking association (the "Escrow Agent"), Hawaiian Telcom, Inc, a Hawaii corporation ("HTI") and Michael Katzenstein, in his capacity as Chapter 11 Trustee (the "Trustee"), in *In re Paniolo Cable Company, LLC,* Case No. 18-10319, pending in the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Asset Purchase Agreement (as defined below).

WHEREAS, HTI, and the Trustee have entered into that certain Asset Purchase Agreement dated November 30, 2020 (the "Asset Purchase Agreement"), pursuant to which the Trustee proposes to sell, and HTI proposes to buy, certain assets of the estate of Paniolo Cable Company;

WHEREAS, on December __, 2020, the Bankruptcy Court entered its Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee, and (F) Granting Related Relief, at Docket ___ (the "Sale Order");

WHEREAS pursuant to the Asset Purchase Agreement and the Sale Order, HTI has agreed to deposit certain funds into an escrow account (the "Escrow Account") by wire transfer of immediately available cash funds, with such funds to be held, invested and disbursed by the Escrow Agent in accordance with the terms and conditions of this Escrow Agreement; and

WHEREAS, the parties desire to set forth their understandings with regard to the Escrow Account established by this Escrow Agreement.

NOW, THEREFORE, in consideration of the premises herein, the parties hereto agree as follows:

**I. Terms and Conditions**

1.1.   Appointment of and Acceptance by Escrow Agent.  HTI and the Trustee hereby appoint the Escrow Agent to serve as escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to perform its duties as provided herein.

1.2.   Establishment of Escrow.  In accordance with the Sale Order, HTI will deposit (or cause to be deposited) into the Escrow Account pursuant to the wire instructions set forth on Schedule A hereto, in immediately available funds, US$5,000,000, representing the Escrow Amount referred to in the Asset Purchase Agreement (together with all interest and earnings thereon, and less any disbursements hereunder, the "Escrow Funds"),

1.3.   Application of the Escrow Funds.  Subject to the terms, conditions and limitations contained herein and in the Asset Purchase Agreement and the Sale Order, the Escrow Funds shall be available to satisfy amounts owed to Trustee if any, in the event the transaction fails to close for specified reasons, or otherwise as partial payment of the Purchase Price, in each case in accordance with the Asset Purchase Agreement.

1.4.    <u>Disbursements of the Escrow Funds</u>.  The Escrow Agent shall only disburse amounts from the Escrow Funds as follows:

(a)    <u>Disbursement of the Escrow Funds</u>.

i.    If HTI and the Trustee deliver a Joint Written Direction stating the amount of the Escrow Funds to be paid to Trustee, and the amount of Escrow Funds to be paid to HTI, as applicable. "<u>Joint Written Direction</u>" shall mean a written notification, in the form of <u>Exhibit B</u> hereto, delivered to the Escrow Agent and signed by an authorized representative of each of HTI and the Trustee (a list of whom are provided in <u>Exhibit A-1</u> and <u>Exhibit A-2</u>).

ii.    Notwithstanding the provisions of Section 1.4(a)(i), in the event that the Escrow Agent receives a copy of a final, non-appealable award or order of a court of competent jurisdiction or arbitrator or arbitration panel forwarded by either HTI or the Trustee, which award or order specifies the specific dollar amounts to be paid out of the Escrow Funds to HTI and/or the Trustee, and to which such copy HTI or the Trustee shall attach payment instructions (an "<u>Demand Notice</u>"), the Escrow Agent shall distribute (I) to Trustee, out of the Escrow Funds, any amounts payable to Trustee as set forth in the order or award and (II) to HTI any remaining amounts out of the Escrow Funds, provided that the party delivering the Demand Notice to the Escrow Agent shall simultaneously provide a copy of such Demand Notice to the other party pursuant to Section 4.4 below.

(b)    Any final, non-appealable award or order of a court of competent jurisdiction or arbitrator or arbitration panel delivered under Section 1.4(a) or (b) shall be accompanied by a certificate of the presenting party that such order is final and non-appealable and from a court of competent jurisdiction or arbitrator or arbitration panel, upon which opinion the Escrow Agent shall be entitled to conclusively rely without further investigation.  Any party requesting the disbursement of funds from the Escrow Account pursuant to a Demand Notice with respect to such an award or order shall include with its delivery of such Demand Notice to the Escrow Agent wire instructions to which the Escrow Agent is instructed to release the funds.

(c)    Notwithstanding anything to the contrary in this Escrow Agreement, if any amount to be released at any time or under any circumstances exceeds the balance in the Escrow Account, the Escrow Agent shall release the balance in the Escrow Account and shall have no liability or responsibility to any party for any deficiency.

(d)    The Escrow Agent will disburse any amounts from the Escrow Funds as required by this Section 1.4 within two (2) Business Days (as defined below) or as soon as commercially reasonable thereafter from the date of the Escrow Agent's receipt of a Joint Written Direction or Demand Notice, as applicable.

**II. Provisions as to the Escrow Agent**

2.1.    <u>Limited Duties of Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth in this Escrow Agreement that shall be deemed purely ministerial in nature.  Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any party or any other person under this Escrow Agreement.  This Escrow Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Escrow Agreement against the Escrow Agent.  The Escrow Agent shall not be bound by, deemed to have knowledge of, or have any obligation to determine, make inquiry into or consider, any term or provision of any agreement between the Trustee, the Indemnifying Parties, HTI and/or any other third

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 95 of 248

party or as to which the escrow relationship created by this Escrow Agreement relates, including without limitation the Asset Purchase Agreement or any other documents referenced in this Escrow Agreement.

2.2.   Limitations on Liability of Escrow Agent.

(a)   In performing its duties under this Escrow Agreement, or upon the claimed failure to perform its duties, the Escrow Agent shall have no liability except for the Escrow Agent's willful misconduct or gross negligence.  In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(b)   Except in cases of the Escrow Agent's willful misconduct, bad faith or gross negligence, the Escrow Agent shall be fully protected (i) in acting in reliance upon any certificate, statement, request, notice, advice, instruction, direction, other agreement or instrument or signature reasonably and in good faith provided by the Trustee or HTI with respect to such party's information and believed by the Escrow Agent to be genuine, (ii) in assuming that any person purporting to give the Escrow Agent any of the foregoing in connection with either this Escrow Agreement or the Escrow Agent's duties has been duly authorized to do so and (iii) in acting or failing to act in good faith in accordance with the terms of this Escrow Agreement on the advice of outside counsel retained by the Escrow Agent.

(c)   The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Escrow Agreement.  The Escrow Agent shall be entitled to rely upon all bank and account information provided to the Escrow Agent by the applicable authorized representative of each of HTI and the Trustee set forth on Exhibit A-1 and Exhibit A-2.  The Escrow Agent shall have no duty to verify or otherwise confirm any written wire transfer instructions except as set forth in Section 2.3 below, but it may do so in its discretion on any occasion without incurring any liability to any party for failing to do so on any other occasion.  The Escrow Agent shall process all wire transfers based on bank identification and account numbers rather than the names of the intended recipient of the funds, even if such numbers pertain to a recipient other than the recipient identified in the payment instructions.  The Escrow Agent shall have no duty to detect any such inconsistencies and shall resolve any such inconsistencies by using the account number.  In connection with any payments that the Escrow Agent is instructed to make by wire transfer, the Escrow Agent shall not be liable for the acts or omissions of (i) the Trustee, HTI or other person providing such instructions, including without limitation errors as to the amount, bank information or bank account number; or (ii) any other person or entity, including without limitation any Federal Reserve Bank, any transmission or communications facility, any funds transfer system, any receiver or receiving depository financial institution, and no such person or entity shall be deemed to be an agent of the Escrow Agent.  Any wire transfers of funds made by the Escrow Agent pursuant to this Escrow Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time.

(d)   No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

2.3.   Security Procedure For Funds Transfers.  The Escrow Agent shall confirm each funds transfer instruction received in the name of a party by telephone call-back to an Authorize Representative specified on Exhibit A-1 or Exhibit A-2 at the telephone number specified for such authorized person on

Exhibit A-1 or Exhibit A-2, as applicable ("Authorized Representative"). Once delivered to the Escrow Agent, Exhibit A-1 or Exhibit A-2 may be revised or rescinded only by a writing signed by an Authorized Representative of the applicable party. Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent a reasonable opportunity to act on it. If a revised Exhibit A-1 or Exhibit A-2 or a rescission of an existing Exhibit A-1 or Exhibit A-2 is delivered to the Escrow Agent by an entity that is a successor-in-interest to such party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the applicable authorized representative of each of HTI and the Trustee under this Escrow Agreement. HTI and the Trustee understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the above security procedure may result in a delay in accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

2.4.    Depository Role.  The Escrow Agent acts hereunder as a depository only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or of any person executing or depositing such subject matter.

2.5.    No Duty to Notify.  The Escrow Agent shall in no way be responsible for nor shall it be its duty to notify any party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited therewith unless such notice is explicitly provided for in this Escrow Agreement.

2.6.    Other Relationships.  The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. The Escrow Agent and its affiliates, and any of their respective directors, officers or employees may become pecuniarily interested in any transaction in which any of the other parties hereto may be interested and may contract and lend money to any such party and otherwise act as fully and freely as though it were not escrow agent under this Escrow Agreement. Nothing herein shall preclude the Escrow Agent or its affiliates from acting in any other capacity for any such party.

2.7.    Disputes.

(a)    In the event of any disagreement between HTI and the Trustee, or between either of them and any other party, resulting in adverse claims or demands being made in connection with the matters covered by this Escrow Agreement, or in the event that the Escrow Agent, in good faith, be in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to refrain from acting until directed by (i) an order of a court of competent jurisdiction, or (ii) directed otherwise a Joint Written Direction. Notwithstanding the preceding, the Escrow Agent may in its discretion obey the order, judgment, decree or levy of any court, whether with or without jurisdiction, or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision thereof, and the Escrow Agent is hereby authorized in its sole discretion, to comply with and obey any such orders, judgments, decrees or levies. The Escrow Agent shall be under no duty to institute or defend any legal proceedings, although the Escrow Agent may, in its discretion and at the expense of HTI and the Trustee as provided in the immediately following paragraph, institute or defend such proceedings. The rights of the Escrow Agent under this sub-paragraph are cumulative of all other rights which it may have by law or otherwise.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 97 of 248

(b)     In the event of any disagreement or doubt, as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the election of the Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all funds, equity and property held under this Escrow Agreement, and the Escrow Agent shall have the right to take such other legal action as may be appropriate or necessary, in the sole discretion of the Escrow Agent. Upon such tender, HTI and the Trustee agree that the Escrow Agent shall be discharged from all further duties under this Escrow Agreement.

2.8.     <u>Indemnification</u>.  HTI and the Trustee (solely in his capacity as Trustee, and not in his individual capacity) jointly and severally agree to defend, indemnify and hold harmless the Escrow Agent and each of the Escrow Agent's officers, directors, agents and employees (the "<u>Escrow Indemnified Parties</u>") from and against any and all losses, liabilities, claims, damages, expenses and costs (including, without limitation, attorneys' fees and expenses) of every nature whatsoever (collectively, "<u>Escrow Agent Losses</u>") which any such Escrow Indemnified Party may incur and which arise directly or indirectly from this Escrow Agreement or which arise directly or indirectly by virtue of the Escrow Agent's undertaking to serve as the Escrow Agent hereunder; *provided*, *however*, that no Escrow Indemnified Party shall be entitled to indemnity with respect to Escrow Agent Losses that have been finally adjudicated by a court of competent jurisdiction to have been caused by such Escrow Indemnified Party's gross negligence, bad faith or willful misconduct. HTI and the Trustee agree solely between themselves, and without affecting any Escrow Indemnified Party's right to indemnification hereunder, that HTI and Trustee (solely on behalf of the Indemnifying Parties and in its capacity as the Trustee, not in his individual capacity)  shall each be responsible for fifty percent (50%) of such indemnification obligations and shall have a right of contribution against the other to the extent that they pay more than their fifty percent (50%) share of such indemnification obligations. The provisions of this section shall survive the termination of this Escrow Agreement and any resignation or removal of the Escrow Agent.

2.9.     <u>Mergers, Consolidations, Etc</u>.  Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business of the Escrow Agent may be transferred, shall be the successor Escrow Agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, in each case without the execution or filing of any instrument or paper or the performance of any further act (other than due notice to HTI and the Trustee).

2.10.     <u>Resignation; Removal</u>.

(a)     The Escrow Agent may resign and be discharged from it duties and obligations at any time under this Escrow Agreement by providing written notice to HTI and the Trustee. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished.  Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds to a successor escrow agent.  HTI and the Trustee shall promptly appoint a successor escrow agent.  The Escrow Agent shall refrain from taking any action until it shall receive a Joint Written Direction designating the successor escrow agent.  However, in the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

(b)     HTI and the Trustee acting together shall have the right to terminate the appointment of the Escrow Agent upon thirty (30) days' joint written notice to the Escrow Agent specifying the date upon which such termination shall take effect.  Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 98 of 248

to a successor escrow agent. The Escrow Agent shall refrain from taking any action until it shall receive a Joint Written Direction designating the successor escrow agent. However, in the event no successor escrow agent has been appointed on or prior to the date such termination is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

(c)     In the case of a resignation or removal of the Escrow Agent, the Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder. The successor escrow agent appointed by HTI and the Trustee shall execute, acknowledge and deliver to the Escrow Agent and the other parties an instrument in writing accepting its appointment hereunder, and thereafter, the Escrow Agent shall deliver all of the then-remaining balance of the Escrow Funds, less any fees and expenses then incurred by and unpaid to the Escrow Agent, to such successor escrow agent in accordance with the Joint Written Direction of HTI and the Trustee and upon receipt of the Escrow Funds, the successor escrow agent shall be bound by all of the provisions of this Escrow Agreement.

2.11.     <u>Compensation of the Escrow Agent</u>. The parties agree that upon the execution of this Escrow Agreement, HTI and the Trustee will pay the Escrow Agent as stated in the fee schedule attached hereto as <u>Schedule B</u>.

## III. Tax Matters

3.1.     <u>Tax Matters</u>.

(a)     On or before the execution and delivery of this Escrow Agreement, each of HTI and the Trustee shall provide to the Escrow Agent a completed IRS Form W-9 or Form W-8 (or, in each case, any successor form), as applicable, and shall promptly update any such form to the extent such form becomes obsolete or inaccurate in any respect. The Escrow Agent shall have the right to request from any party to this Escrow Agreement, or any other person or entity entitled to payment hereunder, any additional forms, documentation or other information as may be reasonably necessary for the Escrow Agent to satisfy its reporting and withholding obligations under the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") and applicable state and local income tax law. To the extent any such forms to be delivered under this Section 3.4(a) are not provided prior to the date hereof or by the time the related payment is required to be made or are determined by the Escrow Agent to be incomplete and/or inaccurate in any respect, the Escrow Agent  shall be entitled to withhold (without liability) a portion of any interest or other income earned on the investment of the Escrow Funds or on any such payments hereunder to the extent withholding is required under Chapters 3, 4, or 61 of the Code, and shall have no obligation to gross up any such payment. The Escrow Agent shall have the sole right to make the determination as to which payments hereunder are "reportable payments" or "withholdable payments" under the Code.

(b)     HTI and the Trustee agree that, subject to the terms and conditions of this Escrow Agreement, the owner of the funds held in the Escrow Account is HTI for all tax purposes and the Escrow Agent shall report to the Internal Revenue Service ("<u>IRS</u>"), as of each calendar year-end, all income earned from the investment of any sum held in the Escrow Account as the income of HTI for purposes of the Code and applicable state and local income tax law. The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Funds in accordance with the IRS Form W-9 or W-8 provided to the Escrow Agent by HTI. HTI shall report all interest or other income, if any, that is earned on the Escrow Funds as income of HTI in the taxable year or years in which such income is properly includable in HTI's gross income and shall pay any and all taxes attributable thereto.

(c)     Notwithstanding anything to the contrary herein provided, except for the delivery of IRS Form 1099 to the extent applicable, the Escrow Agent shall have no duty to prepare or file any Federal or state tax report or return (including, without limitation IRS Forms 1099-B) with respect to any funds or equity held pursuant to this Escrow Agreement or any income earned thereon other than such information reports as the Escrow Agent is required to prepare and file as required by applicable law.  The Escrow Agent shall have no responsibility to report any payments from the Escrow Fund other than the interest earned on the Escrow Fund as set forth in this Section 3.1.

(d)     HTI shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the funds and equity held under this Escrow Agreement or any earnings or interest thereon, unless such tax, late payment, interest, penalty or other cost or expense was finally adjudicated by a court of competent jurisdiction to have been directly caused by the gross negligence, bad faith or willful misconduct of the Escrow Agent. The indemnification provided in this section is in addition to the indemnification provided to the Escrow Agent elsewhere in this Escrow Agreement. The indemnification provided in this section is in addition to the indemnification provided in <u>Section 2.8</u> and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

## IV.  Miscellaneous

4.1.     <u>Disbursements</u>.  The Escrow Agent shall make no disbursement, investment or other use of funds until and unless it has collected funds. The Escrow Agent shall not be liable for collection items until such proceeds have been received or the Federal Reserve has given the Escrow Agent credit for the funds.

4.2.     <u>Permitted Investments</u>.  The Escrow Agent shall hold the Escrow Funds in a PNC Non-Interest Bearing Deposit Account.

4.3.     <u>Accounting</u>.  The Escrow Agent shall provide monthly reports of transactions and holdings to HTI and the Trustee as of the end of each month, at the address provided by HTI and the Trustee.

4.4.     <u>Notices</u>.  Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when delivered by electronic mail to the e-mail address given below, provided that written confirmation of receipt is obtained promptly from the recipient after completion of the electronic mail transmission.

If to the Escrow Agent:

PNC Bank, National Association
Attn: James Baughman
IDS Building
80 South Eighth Street, Suite 3715
Minneapolis, Minnesota 55402
Phone: 412-768-7010
E-mail: i) pncpaidadmin@pnc.com
         ii) james.baughman@pnc.com


If to HTI:

Hawaiian Telcom
c/o Cincinnati Bell Inc.

221 E. Fourth Street
Cincinnati, OH 45202
Email: Joshua.duckworth@cinbell.com
Attn: Joshua T. Duckworth

with copies to (which shall not constitute notice) to:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street
Cincinnati, OH 45202
Email: Christopher.wilson@cinbell.com
Attention: Christopher J. Wilson

and

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Attention: Andrew M. Ray, Esq.
Email: Andrew.ray@morganlewis.com
Attention: Andrew Ray

If to the Trustee:

Michael Katzenstein, Trustee,
Bankruptcy Estate of Paniolo Cable Company, LLC
  c/o FTI Consulting, Inc.
Three Times Square, 9th Floor
New York, New York 10036
Email: mike.katzenstein@fticonsulting.com

with a copy (which shall not constitute notice) to:

Goodsill Anderson Quinn & Stifel LLP
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Email: jbolton@goodsill.com
Attention: Jonathan C. Bolton

And

Norton Rose Fulbright US LLP
Attention: Toby L. Gerber
2200 Ross Avenue – Suite 3600
Dallas, TX 75201
Email: toby.gerber@nortonrosefulbright.com

101524459.1

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party. In all cases, the Escrow Agent shall be entitled to rely on a copy or electronic transmission of any document with the same legal effect as if it were the original of such document. "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which banking institutions located in Pennsylvania are authorized or obligated by law or executive order to close. The parties acknowledges that there are certain security, corruption, transmission error and access availability risks associated with using open networks such as the internet and parties assumes such risks and acknowledges that the security procedures set forth herein are commercially reasonable.

4.5. <u>Governing Law</u>. This Escrow Agreement shall be governed by and construed according to the laws of the State of Delaware, without regard to principles of conflicts of law. The parties hereto consent to the exclusive jurisdiction of the state and federal courts sitting in the state of Delaware and consent to personal jurisdiction of and venue in such courts with respect to any and all matters or disputes arising out of this Escrow Agreement.

4.6. <u>Waiver of Jury Trial</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS ESCROW AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 4.6 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

4.7. <u>Assignment; Binding Effect</u>. Except as permitted in <u>Section 2.9</u>, neither this Escrow Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other parties hereto. This Escrow Agreement shall inure to and be binding upon the parties hereto and their respective successors, heirs and permitted assigns.

4.8. <u>Amendment and Waiver</u>. The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion.

4.9. <u>Severability</u>. If any provision of this Escrow Agreement shall be held or deemed to be or shall in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

4.10. <u>Further Assurances</u>. If at any time the Escrow Agent shall determine or be advised that any further agreements, assurances or other documents are reasonably necessary or desirable to carry out the provisions of this Escrow Agreement and the transactions contemplated by this Escrow Agreement, the parties shall execute and deliver any and all such agreements or other documents and do all things reasonably necessary or appropriate to carry out fully the provisions of this Escrow Agreement.

101524459.1

4.11.    No Third Party Beneficiaries.  This Escrow Agreement is for the sole benefit of the parties hereto, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement. Additionally, any permitted assignee must also satisfy the Escrow Agent's requirements set forth in Section 2.9.

4.12.    Force Majeure.  No party to this Escrow Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, interruption or malfunctions of communications or power supplies, labor difficulties, actions of public authorities or other similar causes reasonably beyond its control.

4.13.    Termination.  This Escrow Agreement shall terminate upon the distribution by the Escrow Agent in accordance with this Escrow Agreement of all funds, equity and property held under this Escrow Agreement or upon the earlier Joint Written Direction.

4.14.    Titles and Headings.  All titles and headings in this Escrow Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.15.    Counterparts; Facsimile Execution.  This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Delivery of an executed signature page to this Escrow Agreement and agreements, certificates, instruments and documents entered into in connection herewith by facsimile or other electronic transmission (including Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Escrow Agreement or such agreements, certificates, instruments and documents.

4.16.    Entire Agreement; Effect of Asset Purchase Agreement.  This Escrow Agreement constitutes the entire agreement between the Escrow Agent and HTI and the Trustee in connection with the subject matter of this Escrow Agreement, and no other agreement entered into between HTI and the Trustee, or either of them, including, without limitation, and the Asset Purchase Agreement, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof. The parties hereto acknowledge and agree that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under the Asset Purchase Agreement, that all references in this Escrow Agreement to the Asset Purchase Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement.

4.17.    Procedures for Opening a New Account.  IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT: To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. When a party opens an account, the Escrow Agent must obtain each party's name, address, date of birth (as applicable), taxpayer or other government identification number or other appropriate information that will allow the Escrow Agent to identify such party.  The Escrow Agent may also ask to see each party's driver's license, passport or other identifying documents.  For parties that are business or other legal entities, the Escrow Agent may require such documents as it deems necessary to confirm the legal existence of the entity.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

PNC BANK, NATIONAL ASSOCIATION, as the Escrow Agent

By: _____
Name: _____
Title: _____

HAWAIIAN TELCOM, INC.

By: _____
Joshua T. Duckworth
Vice President of Treasury, Corporate Finance and Investor Relations

MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE, ON BEHALF OF THE BANKRUPTCY ESTATE OF PANIOLO CABLE COMPANY

By: _____
Michael Katzenstein

101524459.1

11

*Final form*

**SCHEDULE A**

**Escrow Agent**
**Wire Instructions**

PNC Bank, National Association
ABA: [_____]
Account: [_____]
Account Name: [Escrow Services]
Reference: [                                    ]
Attention: [_____]

101524459.1

**SCHEDULE B**

**Escrow Agent Fee**

[To Be Provided]

101524459.1

**EXHIBIT A-1**

**Certificate of Incumbency**
**(List of Authorized Representatives of HTI)**

Client Name: Hawaiian Telcom, Inc.

As an Authorized Officer of the above referenced entity, I hereby certify that each person listed below is an authorized signor for such entity and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entity, and that the title, signature and contact number appearing beside each name is true and correct.

| Name | Title | Email Address | Signature | Contact Number |
|------|-------|---------------|-----------|----------------|
|      |       |               |           |                |
|      |       |               |           |                |
|      |       |               |           |                |
|      |       |               |           |                |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____
            Date


_____
By: Christopher J. Wilson
Its: Vice President & General Counsel

101524459.1

**EXHIBIT A-2**

**Certificate of Incumbency**
**(List of Authorized Representatives of Trustee)**

Client Name: Paniolo Cable Company, LLC

As Trustee of the above referenced entity, I hereby certify that each person listed below is an authorized signor for such entity and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entity, and that the title, signature and contact number appearing beside each name is true and correct.

| **Name** | **Title** | **Email Address** | **Signature** | **Contact Number** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

IN WITNESS WHEREOF, this certificate has been executed by Trustee on:

_____
Date

By:_____
Michael Katzenstein

101524459.1

# EXHIBIT B

## JOINT WRITTEN DIRECTION

**[INSERT DATE]**

Pursuant to that certain Escrow Agreement dated as of [●], 20[__], by and among [_____] ("<u>HTI</u>"), [_____] (the "<u>Trustee</u>"), and PNC Bank, National Association, a national banking association (the "<u>Escrow Agent</u>"), HTI and the Trustee hereby instruct the Escrow Agent to release funds from the Escrow Fund in accordance with the following instructions:

| $ [_____] to HTI: | $ [_____] to Party 2: |
|---|---|
| Wire Instructions: | Wire Instructions: |
| Account Name: _____ | Account Name: _____ |
| Account Number: _____ | Account Number: _____ |
| Bank Name: _____ | Bank Name: _____ |
| Bank ABA Number: _____ | Bank ABA Number: _____ |
| Bank Address: _____ | Bank Address: _____ |
| For credit to: _____ | For credit to: _____ |
| Special Instructions: _____ | Special Instructions: _____ |
| Bank Check: | Bank Check: |
| Payee Name: _____ | Payee Name: _____ |
| Mailing Address: _____ | Mailing Address: _____ |

IN WITNESS WHEREOF, the parties hereto have caused this Joint Written Direction to be executed as of the date first above written.

| HAWAIIAN TELCOM, INC. | TRUSTEE |
|---|---|
| | By: _____ |
| By: _____ | Name: _____ |
| Name: _____ | Title: _____ |
| Title: _____ | |

101524459.1

**Form of Credit Agreement**

CREDIT AGREEMENT

dated as of

[_____], 2020

among

HAWAIIAN TELCOM, INC.,
as Borrower,

CINCINNATI BELL INC.,
as Loan Guarantor,
and

HSBC BANK USA, N.A.,
as Lender

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...................................................................................................... 1
    SECTION 1.01    Defined Terms ............................................................................ 1
    SECTION 1.02    Terms Generally ...................................................................... 17

ARTICLE II THE CREDITS ................................................................................................... 17
    SECTION 2.01    Commitment ............................................................................ 17
    SECTION 2.02    Loans and Borrowings............................................................ 18
    SECTION 2.03    Requests for Borrowings ........................................................ 18
    SECTION 2.04    Funding of Borrowings ........................................................... 18
    SECTION 2.05    Termination of Commitment ................................................... 18
    SECTION 2.06    [Reserved]. .............................................................................. 18
    SECTION 2.07    Repayment. ............................................................................. 18
    SECTION 2.08    Prepayment of Loans. ............................................................. 19
    SECTION 2.09    [Reserved]. .............................................................................. 19
    SECTION 2.10    Interest.................................................................................... 19
    SECTION 2.11    Increased Costs ....................................................................... 20
    SECTION 2.12    Break Funding Payments......................................................... 21
    SECTION 2.13    Taxes. ..................................................................................... 22
    SECTION 2.14    Payments Generally; Allocation of Proceeds; Sharing of Set-offs.......................24
    SECTION 2.15    Mitigation Obligations ........................................................... 24
    SECTION 2.16    [Reserved]. .............................................................................. 25
    SECTION 2.17    Returned Payments ................................................................. 25
    SECTION 2.18    Collateral ................................................................................ 25
    SECTION 2.19    Regulatory Change and Effect................................................. 25
    SECTION 2.20    Inability to Determine Rates ................................................... 26

ARTICLE III REPRESENTATIONS AND WARRANTIES ................................................. 27
    SECTION 3.01    Organization; Powers ............................................................. 27
    SECTION 3.02    Authorization; Enforceability.................................................. 27
    SECTION 3.03    Governmental Approvals; No Conflicts................................... 27
    SECTION 3.04    Investment Company Status .................................................... 28
    SECTION 3.05    Full Disclosure ....................................................................... 28
    SECTION 3.06    [Reserved] ............................................................................... 28
    SECTION 3.07    Security Interest in Collateral ................................................. 28
    SECTION 3.08    Federal Reserve Regulations .................................................. 28
    SECTION 3.09    Use of Proceeds ...................................................................... 28
    SECTION 3.10    Anti-Corruption Laws and Sanctions ..................................... 28
    SECTION 3.11    No Material Adverse Effect..................................................... 29
    SECTION 3.12    [Reserved] ............................................................................... 29
    SECTION 3.13    [Reserved] ............................................................................... 29
    SECTION 3.14    Ownership of Collateral ......................................................... 29
    SECTION 3.15    [Reserved] ............................................................................... 29
    SECTION 3.16    [Reserved] ............................................................................... 29
    SECTION 3.17    Place of Business ................................................................... 29
    SECTION 3.18    [Reserved] ............................................................................... 29

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 111 of 248

| SECTION 3.19 | [Reserved] | 29 |
|---|---|---|
| SECTION 3.20 | [Reserved] | 29 |
| SECTION 3.21 | Solvency | 29 |
| SECTION 3.22 | Telecommunications Regulatory Matters | 29 |

ARTICLE IV CONDITIONS .......................................................................... 30

| SECTION 4.01 | Conditions to Initial Loan | 30 |
|---|---|---|

ARTICLE V AFFIRMATIVE COVENANTS ................................................ 31

| SECTION 5.01 | Periodic Reporting | 32 |
|---|---|---|
| SECTION 5.02 | Use of Proceeds | 33 |
| SECTION 5.03 | Books and Records | 33 |
| SECTION 5.04 | Insurance | 33 |
| SECTION 5.05 | Environmental Compliance | 33 |
| SECTION 5.06 | License, Permits, etc. | 34 |
| SECTION 5.07 | Compliance with Law | 34 |
| SECTION 5.08 | Further Assurances | 34 |
| SECTION 5.09 | [Reserved] | 34 |
| SECTION 5.10 | Taxes | 34 |

ARTICLE VI NEGATIVE COVENANTS ..................................................... 34

| SECTION 6.01 | [Reserved] | 34 |
|---|---|---|
| SECTION 6.02 | Liens | 34 |
| SECTION 6.03 | [Reserved]. | 34 |
| SECTION 6.04 | [Reserved] | 35 |
| SECTION 6.05 | Asset Sales | 35 |
| SECTION 6.06 | [Reserved]. | 35 |
| SECTION 6.07 | [Reserved] | 35 |
| SECTION 6.08 | Restrictive Agreements | 35 |
| SECTION 6.09 | Amendment of Material Documents | 35 |
| SECTION 6.10 | [Reserved] | 35 |
| SECTION 6.11 | [Reserved] | 35 |
| SECTION 6.12 | [Reserved] | 35 |
| SECTION 6.13 | [Reserved] | 35 |
| SECTION 6.14 | [Reserved] | 35 |
| SECTION 6.15 | Use of Proceeds | 35 |

ARTICLE VII EVENTS OF DEFAULT ......................................................... 35

| SECTION 7.01 | Events of Default | 35 |
|---|---|---|
| SECTION 7.02 | Optional Acceleration of Maturity | 37 |
| SECTION 7.03 | Automatic Acceleration of Maturity | 37 |
| SECTION 7.04 | Remedies Cumulative; No Waiver | 37 |
| SECTION 7.05 | Application of Payments | 38 |
| SECTION 7.06 | Lender May File Proof of Claim | 38 |

ARTICLE VIII [RESERVED] ........................................................................ 39

ARTICLE IX MISCELLANEOUS ................................................................ 39

| SECTION 9.01 | Notices | 39 |
|---|---|---|

- ii -

SECTION 9.02 Waivers; Amendments. ................................................................40
SECTION 9.03 Expenses; Indemnity; Damage Waiver. ......................................41
SECTION 9.04 Successors and Assigns; Participants ..........................................42
SECTION 9.05 Survival .......................................................................................42
SECTION 9.06 Counterparts; Integration; Effectiveness; Electronic Execution .....43
SECTION 9.07 Severability ..................................................................................43
SECTION 9.08 Right of Setoff ..............................................................................43
SECTION 9.09 Governing Law; Jurisdiction; Consent to Service of Process. .......43
SECTION 9.10 WAIVER OF JURY TRIAL .........................................................44
SECTION 9.11 Headings .......................................................................................44
SECTION 9.12 Nonreliance; Violation of Law .....................................................44
SECTION 9.13 USA PATRIOT Act .......................................................................45
SECTION 9.14 Collateral Matters ........................................................................45
SECTION 9.15 [Reserved] ....................................................................................45
SECTION 9.16 Interest Rate Limitation ...............................................................45
SECTION 9.17 No Advisory or Fiduciary Responsibility ....................................45
SECTION 9.18 Acknowledgement and Consent to Bail-In ..................................46
SECTION 9.19 Treatment of Certain Information; Confidentiality. .....................46

ARTICLE X LOAN GUARANTY ........................................................................47

SECTION 10.01 Guaranty .....................................................................................47
SECTION 10.02 Guaranty of Payment ..................................................................47
SECTION 10.03 No Discharge or Diminishment of Loan Guaranty .....................47
SECTION 10.04 Defenses Waived ..........................................................................48
SECTION 10.05 Rights of Subrogation ..................................................................48
SECTION 10.06 Reinstatement; Stay of Acceleration ...........................................48
SECTION 10.07 Information ...................................................................................48
SECTION 10.08 [Reserved] ....................................................................................49
SECTION 10.09 [Reserved] ....................................................................................49
SECTION 10.10 Maximum Liability ......................................................................49

SCHEDULES:

Schedule 3.17 – Place of Business
Schedule 6.02 – Liens

EXHIBITS:

Exhibit A  - Form of Note
Exhibit B  - Form of Compliance Certificate
Exhibit C  - Form of Assignment and Assumption

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 113 of 248

This CREDIT AGREEMENT dated as of [_____], 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is among HAWAIIAN TELCOM, INC., a Hawaii corporation ("Borrower"), CINCINNATI BELL INC., an Ohio corporation, as Loan Guarantor (the "Loan Guarantor"), and HSBC BANK USA, N.A., a national banking association ("Lender").

RECITALS

WHEREAS, Borrower has requested that Lender enter into this Agreement and provide loans subject to the terms and conditions of this Agreement; and

WHEREAS, Lender has agreed to make such loans subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained and of the loans and commitments hereinafter referred to, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Acceptable Security Interest" means a security interest which (a) exists in favor of the Collateral Agent for the benefit of the other Secured Parties, (b) is superior to all other security interests (other than Permitted Encumbrances and Liens that are subject to a subordination agreement in form reasonably satisfactory to the Collateral Agent contractually subordinating such Liens to such security interest (including, for the avoidance of doubt, Liens subject to the Subordination Agreement)), (c) secures the Obligations, and (d) is perfected and enforceable against the Loan Party which created such security interest (except to the extent such security interest is required to be perfected by control under the UCC).

"Acquisition" means the acquisition by Borrower of the Purchased Assets (as defined in the Acquisition Agreement) from Trustee in consideration of the receipt of the Purchase Price (as defined in the Acquisition Agreement) in the manner and subject to the terms and conditions set forth in the Acquisition Documents, in accordance with the provisions of the Bankruptcy Code, including Sections 105, 363 and 365, and pursuant to the terms and conditions of the Sale Order (as defined in the Acquisition Agreement).

"Acquisition Agreement" means that certain Asset Purchase Agreement dated as of November 30, 2020 by and among the Trustee, as seller, the Estate, as debtor, and Borrower, as buyer, with respect to the acquisition by Borrower of the Purchased Assets (as defined therein).

"Acquisition Documents" means (a) the Acquisition Agreement and (b) all assignments, bills of sale, side letters and other material agreements, documents and certificates executed and delivered in connection with the Acquisition, in the case of each of clauses (a) and (b), as the same may be amended, supplemented or otherwise modified from time to time to the extent permitted under Section 6.10.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

- 1 -

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Agreement" has the meaning assigned to such term in the first paragraph hereof.

"Applicable Spread" means (a) with respect to any LIBOR Loan, 3.00%, and (b) with respect to any Variable Rate Loan, 2.00%.

"Assignment and Assumption" has the meaning assigned to such term in Section 9.04.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.20(d).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other Law applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Case" means the involuntary petition for relief under Chapter 11 of the Bankruptcy Code, filed on November 13, 2018, in the Bankruptcy Court naming Debtor as a debtor, which case is being administered under Case No. 18-01319 (RJF).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Hawaii.

"Benchmark" means, initially, the LIBOR Rate; provided that if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to the LIBOR Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.20(a).

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by Lender for the applicable Benchmark Replacement Date:

(1)     the sum of: (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;

(2)     the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 115 of 248

(3) the sum of: (a) the alternate benchmark rate that has been selected by Lender as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated or bilateral credit facilities at such time and (b) the related Benchmark Replacement Adjustment;

provided that, in the case of clause (1), such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion. If the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(1) for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by Lender:

(a) the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b) the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(2) for purposes of clause (3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Lender for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated or bilateral credit facilities;

provided that, in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by Lender in its reasonable discretion.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Variable Rate," the definition of "Prime Rate", the definition of "Business Day," the definition of

- 3 -

"Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that Lender decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2)    in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

(3)    in the case of an Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to Borrower, so long as Lender has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to Borrower, written notice of objection to such Early Opt-in Election from Borrower.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 117 of 248

authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.20 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.20.

"Board" means the Board of Governors of the Federal Reserve System of the U.S.

"Borrower" has the meaning assigned to such term in the first paragraph hereof.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by Borrower for a Borrowing in accordance with Section 2.03.

"Business" means Borrower's ownership and operation of the Paniolo System that connects the five principal islands in the State of Hawaii.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are required by law to close; provided that, when used in connection with a LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for international business (including dealings in U.S. dollar deposits) in London, England and New York, New York.

"CERCLA" means the Comprehensive, Environmental Response, Compensation and Liability Act of 1980, Section 42 U.S.C. Section 9601(22), as amended from time to time, and the regulations promulgated thereunder.

"Change in Control" means Cincinnati Bell ceasing to beneficially own and control, directly or indirectly, Equity Interests in Borrower representing (a) 100% of the aggregate ordinary voting power and (b) 100% of the economic interests, in each case represented by the issued and outstanding Equity Interests in Borrower.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 118 of 248

"Change in Law" means the occurrence after the Effective Date of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) compliance by Lender (or, for purposes of Section 2.11(b), by any lending office of Lender or by Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, promulgated, issued or implemented.

"Charges" has the meaning assigned to such term in Section 9.16.

"Cincinnati Bell" means Cincinnati Bell Inc., an Ohio corporation.

"Cincinnati Bell Credit Agreement" means that certain Credit Agreement dated as of October 2, 2017, among Cincinnati Bell, as borrower, certain Subsidiaries of Cincinnati Bell party thereto from time to time, as guarantors, Morgan Stanley Senior Funding, Inc., as administrative agent, collateral agent, swingline lender and l/c issuer, PNC Bank, National Association, as swingline lender, and the other lenders party thereto, as amended by Amendment No. 1 to Credit Agreement, dated as of April 5, 2018, and Amendment No. 2 to Credit Agreement, dated as of April 5, 2018, and as may be amended, restated, supplemented or otherwise modified from time to time.

"Cincinnati Bell Credit Agreement Agent" means Morgan Stanley Senior Funding, Inc., in its capacity as administrative agent and collateral agent under the Cincinnati Bell Credit Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned by Borrower and subject to a Lien in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Obligations pursuant to one or more of the Collateral Documents.

"Collateral Agent" means HSBC, in its capacity as collateral agent for the Secured Parties.

"Collateral Documents" means the Security Agreement and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Obligations whether now or hereafter executed by any Loan Party and delivered to Lender.

"Commitment" means $25,000,000.00.

"Comparable Rate" means a floating interest rate per annum equal to a comparable or successor rate to the quotations of interest rates for the relevant deposits referred to in the definition of "LIBOR Rate", as determined and approved by Lender in consultation with Borrower as a substitute to such otherwise applicable rate, and applied in a manner consistent with market practice; provided that, to the extent such market practice is not administratively feasible for Lender, such approved rate shall be applied in a manner as otherwise reasonably determined by Lender, in each such case, as adjusted from time to time in Lender's sole discretion for reserve requirements, deposit insurance assessment rates and

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 119 of 248

other regulatory costs. If the Comparable Rate shall be less than zero (0), such rate will be deemed zero (0).

"Compliance Certificate" means a compliance certificate executed by a Financial Officer of Borrower in substantially the same form as Exhibit B.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by Lender in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if Lender decides that any such convention is not administratively feasible for Lender, then Lender may establish another convention in its reasonable discretion.

"Debtor" means Paniolo Cable Company, LLC, as a debtor in the Bankruptcy Case.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Disposal" means the intentional or unintentional abandonment, discharge, deposit, injection, dumping, spilling, leaking, storing, burning, thermal destruction or placing of any substance so that it or any of its constituents may enter the Environment.

"Disposition" means any sale, lease, sub-lease, transfer, assignment, conveyance, release, loss or other disposition of any interest in Collateral in any transaction or event or series of transactions or events, and "Dispose" has the correlative meaning thereto.

"dollars" or "$" refers to lawful money of the U.S.

"Early Opt-in Election" means, if the then-current Benchmark is the LIBOR Rate, the occurrence of:

(1) a determination by the Lender that at least five currently outstanding U.S. dollar-denominated syndicated or bilateral credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such credit facilities are identified in the notice to Borrower described in clause (2) below and are publicly available for review), and

(2) the election by Lender to trigger a fallback from the LIBOR Rate and the provision by Lender of written notice of such election to Borrower.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Electronic Signature" means an electronic sound, symbol or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Environment" means any water including but not limited to surface water and ground water or water vapor, any land including land surface or subsurface, stream sediments, air, fish, wildlife, plants and all other natural resources.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the Environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any hazardous or toxic material or, as relates to any new exposure to such material, to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Borrower or a Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"Estate" means the Debtor's bankruptcy estate in the Bankruptcy Case.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 121 of 248

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of a Recipient being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.13, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to a Recipient's failure to comply with Section 2.13(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"FCC" means United States Federal Communications Commission.

"FCPA" has the meaning assigned to such term in Section 3.10(b).

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of Borrower or Cincinnati Bell.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the LIBOR Rate.

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guaranteed Obligations" has the meaning assigned to such term in Section 10.01.

"Hazardous Materials" means:  (a) any substance, material or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste" or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and (c) any substance, material or waste that is petroleum, petroleum-related or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide or any other agricultural chemical.

"HSBC" means HSBC Bank USA, N.A., its successors and assigns.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 122 of 248

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Interest Payment Date" means the last Business Day of each calendar quarter and the Maturity Date.

"Interest Period" means the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is three (3) months thereafter; but not longer than the remaining term of the Loans, provided that (i) if any Interest Period would otherwise end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period which commences on the last Business Day of a calendar month (or a day on which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period, (iii) any Interest Period that would otherwise extend beyond demand for payment of any amount shall end on the date of such demand and (iv) the Interest Period of any Borrowing made on the Effective Date may end on the last Business Day of the calendar quarter in which the Effective Date occurs.

"IRS" means the United States Internal Revenue Service.

"IRU" means an indefeasible right of use of a designated quantity of fiber strands indicated between demarcation points within the Paniolo Network.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"Lender" has the meaning set forth in the first paragraph hereof and includes any other Person that shall have become Lender hereunder (including pursuant to an Assignment and Assumption), other than any such Person that ceases to be Lender hereunder.

"LIBOR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the LIBOR Rate.

"LIBOR Rate" means, with respect to any LIBOR Borrowing for any Interest Period, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any successor thereto which takes over the administration of such rate for U.S. Dollars for a period equal in length to such Interest Period) appearing on the applicable Bloomberg page (or on any successor or substitute page or service, as determined by Lender from time to time, for purposes of providing quotations of interest rates applicable to U.S. Dollar deposits in the London interbank market comparable to those currently provided on such page) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for U.S. Dollar deposits with a maturity comparable to such Interest Period, provided that in the event that such offered rate shall be less than zero, the LIBOR Rate shall be deemed to be zero for the purposes of this Agreement.  In the event that no such rate is available to Lender, the applicable LIBOR Rate for the relevant Interest Period shall be the rate determined by Lender

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 123 of 248

to be the arithmetic average of the rate per annum at which deposits in U.S. Dollars in minimum amounts of at least $5,000,000 would be offered by first class banks in the London interbank market to Lender at approximately 11:00 a.m., London time, two Business Days prior to the first day of such Interest Period for a period equal to such Interest Period; provided that if such determination by Lender shall be less than zero, the LIBOR Rate shall be deemed to be zero for the purposes of this Agreement.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Loan" means a loan made pursuant to Section 2.01.

"Loan Documents" means, collectively, this Agreement, any promissory note issued pursuant to this Agreement, including the Note, and each Collateral Document and each other agreement, instrument, document and certificate whether heretofore, now or hereafter executed by or on behalf of any Loan Party and delivered to Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guarantor" has the meaning assigned to such term in the first paragraph hereof.

"Loan Guaranty" means Article X of this Agreement.

"Loan Parties" means, collectively, Borrower and the Loan Guarantor and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, operations, properties, liabilities (actual or contingent) or condition (financial or otherwise) of Cincinnati Bell and its Subsidiaries, taken as a whole, (b) a material adverse impairment of the ability of the Loan Parties, taken as a whole, to perform their material obligations under the Loan Documents and (c) a material adverse effect upon the rights of or benefits available to Lender, taken as a whole, under the Loan Documents.

"Maturity Date" means the earlier to occur of (i) the date that is five (5) years after the Effective Date or (ii) the date of acceleration of the Loans hereunder in accordance with the terms of the Loan Documents.

"Maximum Rate" has the meaning assigned to such term in Section 9.16.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event,

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 124 of 248

(ii) in the case of a Disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"Note" has the meaning assigned to such term in Section 2.07(e).

"Obligated Party" has the meaning assigned to such term in Section 10.02.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing at any post-default rate and interest accruing after the filing of any proceeding under any Debtor Relief Law, relating to any Loan Party, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of Borrower to Lender or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or other instruments at any time evidencing any thereof.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Paniolo Network" means, together with the Paniolo System, those certain assets to which Borrower has received an indefeasible right to access, occupy, and use for the purpose of operating and maintaining the Paniolo System.

"Paniolo System" means a submerged marine fiber and terrestrial fiber telecommunications cable network.

"parent" means, with respect to Lender, any Person as to which Lender is, directly or indirectly, a subsidiary.

"Participant" has the meaning assigned to such term in Section 9.04.

"Participant Register" has the meaning assigned to such term in Section 9.04.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 125 of 248

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from the FCC, any State PUC or any other Governmental Authority.

"Permitted Encumbrances" means:

(a)     Liens securing the payment of any Obligations pursuant to the Collateral Documents;

(b)     Liens imposed by law for Taxes, assessments or governmental charges or levies that are not overdue by more than thirty (30) days or are being contested in good faith by appropriate proceedings;

(c)     statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's and other like Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business and securing obligations that are not overdue by more than sixty (60) days (or, if overdue by more than sixty (60) days, are unfiled and no other action has been taken to enforce the same) or are being contested in good faith by appropriate proceedings;

(d)     Liens, pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security laws or regulations;

(e)     Liens, pledges or deposits to secure the performance of bids, tenders, trade contracts, leases, public or statutory obligations, surety, stay or appeal bonds, indemnity or performance bonds and other obligations of a like nature, in each case in the ordinary course of business; and Liens, pledges or deposits in lieu of such bonds or obligations or to secure letters of credit in lieu of or supporting the payment of such bonds or obligations;

(f)     survey exceptions, encumbrances, rights of way, easements or reservations of, or rights of others for, licenses, rights of way, servitudes, sewers, electric lines, telegraph and telephone and cable television lines, zoning, building code or other restrictions and encumbrances (including minor defects or irregularities in title and similar charges and encumbrances) affecting real property, and defects in title which in the aggregate do not materially interfere with the ordinary conduct of business of any Loan Party;

(g)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 7.01(l) and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings;

(h)     leases, sub-leases, licenses or sub-licenses of real or personal property granted to other Persons, including intellectual property and other general intangibles, entered into in the ordinary course of business;

(i)     liens, leases and grants of indefeasible rights of use, rights of use and similar rights in respect of capacity, dark fiber and similar assets of any Loan Party in the ordinary course of business; and

(j)     Liens listed on Schedule 6.02 and any renewals or extensions thereof; provided that (i) such Liens shall not apply to any other property of the Loan Parties other than after-acquired property and proceeds and (ii) the maximum amount secured or benefited thereby is not increased.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 126 of 248

"Prime Rate" means the rate per annum from time to time established by HSBC as its prime rate and made available by HSBC at its main office, it being understood that such rate is a reference rate and is not necessarily the lowest or best rate actually charged to any customer. HSBC may make commercial loans or other loans at rates of interest at, above or below the Prime Rate. Any change in the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"Principal Payment Date" means the date that is the last Business Day of each calendar quarter and the Maturity Date.

"Recipient" means Lender.

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is the LIBOR Rate, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, and (2) if such Benchmark is not the LIBOR Rate, the time determined by Lender in its reasonable discretion.

"Register" has the meaning assigned to such term in Section 9.04.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Relevant Governmental Body" means the Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board or the Federal Reserve Bank of New York, or any successor thereto.

"Release" has the same meaning as given to that term in Section 101(22) of CERCLA.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means, as to any Person, the Chief Executive Officer, the President, any Financial Officer or any Vice President of such Person (or in the case of any Person that is a partnership of such Person's general partner). Unless otherwise specified, all references to a Responsible Officer herein means a Responsible Officer of Borrower.

"Sanctioned Person" has the mean assigned to such term in Section 3.10(a).

"Sanctions" has the mean assigned to such term in Section 3.10(a).

"SEC" means the United States Securities and Exchange Commission.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed 12/28/20  Page 127 of 248

"Secured Parties" means (a) Lender, (b) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Documents and (c) the successors and assigns of Lender.

"Security Agreement" means the Security Agreement of even date herewith between Borrower and the Collateral Agent.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website at approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Solvent" means, with respect to any Person or any group of Persons as of any date, that (a) the fair value of the assets of such Person or group is, on the date of determination, greater than the total amount of liabilities (including contingent and unliquidated liabilities) of such Person or group as of such date, (b) the present fair saleable value of the assets of such Person or group is, on the date of determination, not less than the amount that will be required to pay the probable liability of such Person or group on its debts as they become absolute and matured, (c) as of such date, such Person or group is able to pay all liabilities of such Person or group as such liabilities mature in the ordinary course of business, and (d) as of such date, such Person or group does not have unreasonably small capital given the nature of its business. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"State PUC" means any state Governmental Authority having utility or communications regulatory authority over Borrower or any of its Subsidiaries, or any applicable successor agency.

"Statements" has the meaning assigned to such term in Section 2.14(c).

"Subordination Agreement" means a customary subordination agreement reasonably acceptable to Borrower, the Cincinnati Bell Credit Agreement Agent and the Collateral Agent, executed by the Cincinnati Bell Credit Agreement Agent, subordinating the Liens on the Collateral granted to the Cincinnati Bell Credit Agreement Agent under any Loan Document (as defined in the Cincinnati Bell Credit Agreement) to the Liens granted to the Collateral Agent for the benefit of the Secured Parties pursuant to one or more of the Collateral Documents.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity, the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 128 of 248

"Subsidiary" means any direct or indirect subsidiary of Borrower or Cincinnati Bell, as applicable.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest additions to tax or penalties applicable thereto.

"Term SOFR" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Transactions" means the execution, delivery and performance by the Loan Parties of this Agreement and the other Loan Documents to which such Loan Party is party, the borrowing of Loans and the use of the proceeds thereof.

"Trustee" means Michael Katzenstein, as appointed by the Bankruptcy Court as Chapter 11 Trustee for the Estate in the Bankruptcy Case.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the LIBOR Rate or the Prime Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or in any other state, the laws of which are required to be applied in connection with the issue of perfection of security interests.

"UK Bribery Act" has the meaning assigned to such term in Section 3.10(b).

"UK Financial Institutions" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unliquidated Obligations" means, at any time, any Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Obligation that is: (i) any other obligation (including any guarantee) that is contingent in nature at such time; or (ii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S." means the United States of America.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 129 of 248

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"Variable Rate", when used in reference to any Loan or Borrower, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Prime Rate.

"Write-Down and Conversion Powers" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

ARTICLE II

The Credits

SECTION 2.01    Commitment.  Subject to the terms and conditions set forth herein, Lender agrees to make Loans in dollars to Borrower on the Effective Date in an aggregate principal

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 130 of 248

amount of up to Lender's Commitment. Loans repaid or prepaid hereunder may not be reborrowed. Upon disbursement of each Loan by Lender on the Effective Date, the amount of Lender's Commitment shall be reduced by the amount of such Loan so disbursed. Nothing herein shall be deemed to obligate Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by Lender that it has obtained or will obtain its Loan in any particular place or manner.

SECTION 2.02    Loans and Borrowings.

(a)    Subject to Sections 2.10(f), 2.19 and 2.20, each Borrowing shall be comprised entirely of LIBOR Loans. Lender at its option may make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of Borrower to repay such Loan in accordance with the terms of this Agreement.

(b)    Notwithstanding any other provision of this Agreement, Borrower shall not be entitled to request, or to elect to continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03    Requests for Borrowings. Borrower may request a Loan by submitting a Borrowing Request to Lender in writing in a form approved by Lender and signed by Borrower not later than noon, Eastern time, three (3) Business Days before the Effective Date (or such later time as may be acceptable to Lender). The Borrowing Request shall specify the following information:

(a)    the aggregate amount of the requested Borrowing;

(b)    the date of such Borrowing, which shall be a Business Day; and

(c)    the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period".

If no Interest Period is specified with respect to any requested LIBOR Borrowing, then Borrower shall be deemed to have selected an Interest Period of three (3) month's duration.

SECTION 2.04    Funding of Borrowings. Subject to the satisfaction (or waiver in accordance with Section 9.02) of the conditions set forth in Section 4.01, Lender shall make each Loan to be made hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., Eastern time, to an account specified by Borrower.

SECTION 2.05    Termination of Commitment. Unless previously terminated, the Commitments shall terminate at 5:00 p.m., Eastern time on the Effective Date.

SECTION 2.06    [Reserved].

SECTION 2.07    Repayment.

(a)    Beginning on the first Principal Payment Date following the Effective Date and continuing until the Loans and all accrued interest thereon is paid in full, Borrower shall pay to Lender on each Principal Payment Date an aggregate principal amount equal to $125,000.00.

(b)    Notwithstanding anything contained herein to the contrary, the aggregate outstanding principal balance of the Loans and all accrued and unpaid interest thereon and all other

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 131 of 248

Obligations (other than contingent obligations for which no claim has been made) are due and payable, and Borrower promises to pay to Lender the aggregate outstanding principal balance of the Loans and all accrued and unpaid interest thereon and all other Obligations, on the Maturity Date.

(c)     Lender shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to Lender hereunder and (iii) the amount of any sum received by Lender hereunder.

(d)     The entries made in the accounts maintained pursuant to paragraph (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)     The Loans shall be evidenced by a promissory note in substantially the form of Exhibit A attached hereto with its blanks duly completed (the "Note"). Borrower shall execute and deliver to Lender the Note pursuant to Section 4.01 at the time of the making of the initial Loan.

SECTION 2.08     Prepayment of Loans.

(a)     Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part without premium, penalty or fee, but with accrued interest on the amount prepaid and subject to any payments required by Section 2.12. Any such prepayment shall be applied to reduce the remaining scheduled amortization installments to be made pursuant to Section 2.07(a) as directed by Borrower or, in the absence of any such direction by Borrower, in direct order of maturity.

(b)     Borrower shall notify Lender by telephone (confirmed by telecopy) of any prepayment hereunder not later than 11:00 a.m., Eastern time, three (3) Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid. Each partial prepayment of any Borrowing shall be in an amount that is an integral multiple of $100,000. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.14.

(c)     In the event and on each occasion that any Net Proceeds in excess of $1,000,000, individually or in the aggregate, are received by or on behalf of any Loan Party in respect of any Disposition of Collateral (other than a Disposition permitted pursuant to Sections 6.05(a), (b) or (c)), Borrower shall, promptly after such Net Proceeds are received by any Loan Party, prepay the Obligations as set forth in Section 2.14 below in an aggregate amount equal to 100% of such Net Proceeds; provided that, if Borrower shall deliver to Lender a certificate of a Financial Officer to the effect that the Loan Parties intend to apply such Net Proceeds (or a portion thereof specified in such certificate), within one hundred eighty (180) days after receipt of such Net Proceeds, to acquire (or replace or rebuild) equipment or other tangible assets (excluding inventory) to be used in the Business, and certifying that no Event of Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds specified in such certificate.

SECTION 2.09     [Reserved].

SECTION 2.10     Interest.

(a)     The Loans comprising each LIBOR Borrowing shall bear interest at an annual rate equal to the lesser of (i) the LIBOR Rate for the Interest Period in effect for such Borrowing plus the Applicable Spread and (ii) the Maximum Rate.  Unless such Borrowing is repaid as provided herein, such Borrowing shall continue at the end of the then current Interest Period as a LIBOR Borrowing with an Interest Period of three (3) month's duration.

(b)     Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default all Loans and other obligations shall bear interest at 2% plus the rate otherwise applicable thereto; provided, however, that in no event shall the rate of interest with respect to any Loan exceed the Maximum Rate.

(c)     All interest hereunder shall be computed on the basis of a year of 360 days and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(d)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Maturity Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any LIBOR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall continue to accrue until the principal balance is paid in full.  Each change in the LIBOR Rate, the Prime Rate or the Maximum Rate is effective as of the date of such change without notice to Borrower or any other Person.  The applicable Prime Rate or LIBOR Rate shall be determined by Lender, and such determination shall be conclusive absent manifest error.

(f)     Subject to Sections 2.19 and 2.20, each Loan shall be a LIBOR Loan unless LIBOR is unavailable.  If LIBOR is temporarily unavailable, each Loan shall (subject to Sections 2.19 and 2.20) be immediately converted into and shall be outstanding as a Variable Rate Loan accruing interest at the sum of the Prime Rate plus the Applicable Spread, until the LIBOR Rate once again becomes available, at which time such Loan shall be automatically converted into a LIBOR Loan.

SECTION 2.11     Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, Lender; or

(ii)     impose on Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Loans made by Lender; or

(iii)     subject Lender to any Taxes (other than (A) Indemnified Taxes and (B) Excluded Taxes) on its loans, loan principal, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 133 of 248

and the result of any of the foregoing shall be to increase the cost to Lender of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or otherwise), then Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered, in each case upon receipt of a written request of Lender showing the computation of such amount in reasonable detail and certifying that it is the general practice of Lender to charge such amount to its borrowers.  Notwithstanding the foregoing, Lender shall not be entitled to request compensation for any increased cost relating to items described in paragraph (a)(ii) of this Section if it shall not be the general policy and practice of Lender to seek compensation in similar circumstances under similar provisions in comparable credit facilities.

(b)     If Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on Lender capital or on the capital of Lender's holding company, if any, as a consequence of this Agreement, the Commitment or the Loans made by Lender, to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender policies and the policies of Lender's holding company with respect to capital adequacy and liquidity), then from time to time Borrower will pay to Lender such additional amount or amounts as will compensate Lender or Lender's holding company for any such reduction suffered, in each case upon receipt of a written request of Lender showing the computation of such amount in reasonable detail and certifying that it is the general practice of Lender to charge such amount to its borrowers.

(c)     A certificate of Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section, showing the computation of such amount or amounts in reasonable detail and delivered to Borrower, shall be conclusive absent manifest error.  Borrower shall pay Lender the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.

(d)     Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of Lender's right to demand such compensation; provided that Borrower shall not be required to compensate Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that Lender  notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor; provided, however, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.12     Break Funding Payments.  In the event of (a) any payment of any LIBOR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or upon demand of Lender), (b) the conversion of any LIBOR Loan other than on the last day of the Interest Period applicable thereto or (c) the failure (for a reason other than the failure of Lender to make a Loan) to borrow, convert, continue or prepay any LIBOR Loan on the date specified in any notice delivered pursuant hereto, then, in any such event, Borrower shall compensate Lender for the loss, cost and expense attributable to such event in an amount determined by Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such LIBOR Loan had such event not occurred, at the interest rate that would have been applicable to such LIBOR Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such LIBOR Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which Lender would bid were it to bid, at the commencement of such period, for U.S. dollar deposits of a comparable amount and period from other banks in the London inter-

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 134 of 248

bank eurodollar market. A certificate of Lender delivered to Borrower setting forth in reasonable detail any amount or amounts that Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate upon demand.

SECTION 2.13    Taxes.

(a)    Withholding Taxes; Gross-Up; Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. To the extent that withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.13), the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Lender timely reimburse it for, Other Taxes.

(c)    Evidence of Payment. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.13, such Loan Party shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to Lender.

(d)    Indemnification by Loan Parties. The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.13) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any related interest, penalties and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes or liabilities were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Loan Party by Lender shall be conclusive absent manifest error.

(e)    Indemnification by Lender. Lender shall indemnify the Loan Parties, within ten (10) days after demand therefor, for (i) any Taxes attributable to Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register and (ii) any Excluded Taxes attributable to Lender, in each case that are payable or paid by the Loan Parties in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Lender by any Loan Party shall be conclusive absent manifest error. Lender hereby authorizes the Loan Parties to set off and apply any and all amounts at any time owing to Lender under any Loan Document or otherwise payable by the Loan Parties to Lender from any other source against any amount due to the Loan Parties under this Section 2.13(e).

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 135 of 248

(f)     Status of Lenders; Tax Documentation.

(i)     If Lender is entitled to an exemption from or reduction of U.S. Federal withholding Tax, or any applicable treaty, with respect to payments under any Loan Document, then Lender shall deliver to Borrower, at the time or times prescribed by applicable law or reasonably requested by Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, Lender, if requested by Borrower, shall deliver such other documentation prescribed by any applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.  Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.13 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.  Notwithstanding anything in the foregoing to the contrary, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.13(f)(ii) and (f)(iii) below) shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of Lender.

(ii)     Without limiting the generality of the foregoing, HSBC shall deliver to Borrower on or prior to the date of this Agreement (and from time to time thereafter upon the reasonable request of Borrower) an executed original IRS Form W-9 to certify HSBC's entitlement to full exemption from U.S. Federal withholding Tax.

(iii)     If a payment made to Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.13 (including by the payment of additional amounts pursuant to this Section 2.13), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.13 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.13(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.13(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.13(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than such indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 136 of 248

the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.13(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

          (h)      Survival.  Each party's obligations under this Section 2.13 shall survive the termination of the Commitment and the repayment, satisfaction or discharge of all obligations under any Loan Document.

          (i)      Defined Terms.  For purposes of this Section 2.13, the term "applicable law" includes FATCA.

          SECTION 2.14      Payments Generally; Allocation of Proceeds; Sharing of Set-offs.

          (a)      Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under Sections 2.12 or 2.13, or otherwise) prior to 2:00 p.m., Eastern time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to Lender at its offices at 452 Fifth Avenue, New York, New York 10018, except that payments pursuant to Section 9.03 shall be made directly to the Persons entitled thereto.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

          (b)      Any proceeds of Collateral received by Lender or Net Proceeds received pursuant to Section 2.08(c) shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements then due to Lender, second, to pay interest then due and payable on the Loans ratably, third, to prepay principal on the Loans ratably and fourth, to the payment of any other Obligation due to Lender from Borrower or any other Loan Party.

          (c)      Lender may from time to time provide Borrower with account statements or invoices with respect to any of the Obligations (the "Statements").  Lender is under no duty or obligation to provide Statements, which, if provided, will be solely for Borrower's convenience.  Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Obligations.  If Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided that acceptance by Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of Lender's right to receive payment in full at another time.

          SECTION 2.15      Mitigation Obligations.  If Lender requests compensation under Section 2.11, or if Borrower is required to pay any Indemnified Taxes or additional amounts to Lender or any Governmental Authority for the account of Lender pursuant to Section 2.13, or if any Lender gives notice pursuant to Section 2.20, then Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Sections 2.11 or 2.13, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 2.20, as applicable, and (ii) would not subject Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous in any

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 137 of 248

significant respect to Lender. Borrower hereby agrees to pay all reasonable costs and expenses incurred by Lender in connection with any such designation or assignment.

SECTION 2.16     [Reserved].

SECTION 2.17     Returned Payments. If, after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by Lender. The provisions of this Section 2.17 shall be and remain effective notwithstanding any contrary action which may have been taken by Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.17 shall survive the termination of this Agreement.

SECTION 2.18     Collateral. Except as otherwise contemplated hereby or under any other Loan Documents, the performance and payment of the Obligations shall, upon the execution and delivery of the Collateral Documents to be entered into in connection with this Agreement by all parties thereto and the filing of financing statements (and amendments to financing statements, if any) referred to in the last sentence of this Section, and at all times thereafter, be secured by an Acceptable Security Interest in the Collateral. Liens contemplated by this Section and otherwise securing the Obligations shall be in favor of the Collateral Agent for the benefit of the Secured Parties. Without limiting the generality of any of the foregoing, the Loan Parties shall, promptly upon request by Collateral Agent, execute and deliver to Lender (for recordation or filing, as appropriate) such security and perfection instruments, and Collateral Agent is hereby authorized to file such financing statements (and amendments to existing financing statements, if any) and other instruments and documents, as Collateral Agent may deem reasonably advisable to evidence, secure and perfect this Agreement and all Liens securing this Agreement.

SECTION 2.19     Regulatory Change and Effect. Notwithstanding the foregoing, and subject to Section 2.20, if at any time Lender determines (which determination shall be conclusive absent manifest error) that (i) that adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any requested Interest Period and such circumstances are unlikely to be temporary, or (ii) such circumstances have not arisen but the supervisor or the administrator of quotations of interest rates for the relevant deposits referred to in the definition of "LIBOR Rate", or a Governmental Authority having jurisdiction over Lender, has made a public statement identifying a specific date after which quotations of interest rates for the relevant deposits referred to in the definition of "LIBOR Rate" shall no longer be used for determining interest rates for loans, provided that, in each case, no Benchmark Transition Event shall have occurred at such time, then the Comparable Rate shall be used with respect to any Loans in lieu of the otherwise applicable LIBOR Rate and Borrower, Lender and all other parties hereto shall enter into an amendment to this Agreement, to reflect such Comparable Rate and such other related changes as may be applicable. Until a Comparable Rate shall be determined in accordance with this Section (but, in the case of the circumstances described in clause (ii) of the first sentence of this Section, only to the extent quotations of interest rates for the relevant deposits and such Interest Period are not available or published at such time on a current basis), with respect to any request for a disbursement of LIBOR Loans, such disbursement shall bear interest at the Prime Rate plus the Applicable Spread. After the determination of (i) or (ii) set forth above in this Section, Lender shall have no obligation to make Loans at the LIBOR Rate plus the Applicable Spread or maintain outstanding Loans at the LIBOR Rate plus the Applicable

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 138 of 248

Spread and Borrower shall not have the right to request any Loan at the LIBOR Rate plus the Applicable Spread.

SECTION 2.20    Inability to Determine Rates.

(a)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then, (x) if a Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to Borrower without any amendment to this Agreement or any other Loan Document, or further action or consent of Borrower, so long as Lender has not received, by such time, written notice of objection to such Benchmark Replacement from Borrower.

(b)    Benchmark Replacement Conforming Changes.  In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of Borrower.

(c)    Notices; Standards for Decisions and Determinations.  Lender will promptly notify Borrower of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (d) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Lender pursuant to this Section 2.20, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from Borrower, except, in each case, as expressly required pursuant to this Section 2.20.

(d)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or the LIBOR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then Lender may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 139 of 248

announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then Lender may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     Benchmark Unavailability Period.  Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrower may revoke any request for a Eurodollar Borrowing of, conversion to or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Variable Rate Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Variable Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Variable Rate.

ARTICLE III

Representations and Warranties

Each Loan Party represents and warrants to Lender (and where applicable, agrees) that:

SECTION 3.01     Organization; Powers.  Each Loan Party (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to own the Collateral and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except, in each case referred to in clause (b) or (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, .

SECTION 3.02     Authorization; Enforceability.  The Transactions are within each Loan Party's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03     Governmental Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party, (c) will not violate or result in a default under the Acquisition Documents, any indenture, agreement or other instrument binding upon any Loan Party or the assets of any Loan Party, or give rise to a right thereunder to require any payment to be made by any Loan Party, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party, except Liens created pursuant to the Loan Documents, in each case, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (x) all Permits required for each Loan Party to conduct the Business as currently conducted or for the ownership and use of the Collateral have been obtained and are valid and in full force and effect, (y) all fees and charges with respect to such Permits as of the date hereof have been paid in full and (z) no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any such Permit.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 140 of 248

SECTION 3.04    Investment Company Status.  No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.05    Full Disclosure.  All written information (other than projected financial information, forward-looking information and general economic or industry-specific information) heretofore or contemporaneously herewith furnished in writing by the Loan Parties to Lender for purposes of or in connection with this Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of the Loan Parties to Lender pursuant hereto or in connection herewith will be, correct in all material respects, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in any material respect in light of the circumstances under which made, in each case on the date as of which such information is dated or certified, giving effect to all supplements and updates provided thereto from time to time, and taken together with the information disclosed in Cincinnati Bell's public filings with the SEC, as such information is supplemented or updated by other information so disclosed; provided that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions that were believed by the Loan Parties to be reasonable at the time made and at the time such projected financial information was made available to Lender (it being recognized by Lender that (a) such projected financial information is as to future events and is not to be viewed as facts, (b) such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, (c) no assurance can be given that any particular projected financial information will be realized and (d) actual results during the period or periods covered by any such projected financial information may differ significantly from the projected results and such differences may be material).

SECTION 3.06    [Reserved].

SECTION 3.07    Security Interest in Collateral.  Except as otherwise contemplated hereby or under any other Loan Documents, the Collateral Documents to be entered into in connection with this Agreement, upon execution and delivery by all parties thereto, are effective to create, in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral and the proceeds thereof.  Each Loan Party has authorized, or hereby authorizes, the filing of financing statements (and amendments to existing financing statements, if any) sufficient when filed to perfect (and maintain the perfection of) the Liens created by the Collateral Documents. When such financing statements and amendments to existing financing statements, if any, are filed in the offices noted therein, Lender will have a valid and perfected security interest in all Collateral that is capable of being perfected by filing financing statements under Article 9 of the UCC.

SECTION 3.08    Federal Reserve Regulations.  No part of the proceeds of any Loan has been used or will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.  No Loan Party is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.09    Use of Proceeds.  The proceeds of the Loans will be used as set forth in Section 5.02.

SECTION 3.10    Anti-Corruption Laws and Sanctions.

(a)    No Loan Party or, to the knowledge of any Responsible Officer of the Loan Parties, any director, officer, employee or agent of the Loan Parties, is an individual entity ("Controlled Person") that is, or is owned or controlled by Controlled Persons that are, (i) the subject of any sanctions

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 141 of 248

administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasure or the Hong Kong Monetary Authority (collectively, "Sanctions"), or (ii) organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (which includes, at the time of this Agreement, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria) (any such Person, a "Sanctioned Person"). Each Loan Party has instituted and maintains policies and procedures reasonably designed to prevent the violation of any Sanctions. The Transactions will not violate any applicable Sanctions.

(b)     To the extent applicable, each Loan Party and, to the knowledge of any Responsible Officer of the Loan Parties, any director, officer, employee or agent of the Loan Parties, in connection with the business of such Person, are in compliance, in all material respects, with all applicable anti-bribery laws, including but not limited to, the United Kingdom Bribery Act of 2010 (the "UK Bribery Act") and the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA") and have conducted their businesses in compliance, in all material respects, with the UK Bribery Act, the FCPA and similar laws, rules or regulations. Each Loan Party has instituted and maintain policies and procedures reasonably designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

SECTION 3.11     No Material Adverse Effect. Since December 31, 2019, there has not occurred any event or circumstance that could reasonably be expected to have a Material Adverse Effect.

SECTION 3.12     [Reserved].

SECTION 3.13     [Reserved].

SECTION 3.14     Ownership of Collateral.   Upon the consummation of the Acquisition, Borrower will have good title to, or valid leasehold interests in, or other applicable rights in, all Collateral material to the ordinary conduct of its business, except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.15     [Reserved].

SECTION 3.16     [Reserved].

SECTION 3.17     Place of Business. As of the Effective Date, the location of the principal executive office of Borrower is set out on Schedule 3.17.

SECTION 3.18     [Reserved].

SECTION 3.19     [Reserved].

SECTION 3.20     [Reserved].

SECTION 3.21     Solvency. Cincinnati Bell and its Subsidiaries, taken as a whole, are Solvent prior to, and after giving effect to, the transactions contemplated hereby. No transfer of property is being made and no obligation is being incurred in connection with such transactions with actual intent to hinder, delay or defraud any present or future creditors of Borrower.

SECTION 3.22     Telecommunications Regulatory Matters. There are no proceedings pending or, to the knowledge of any Responsible Officer of the Loan Parties, threatened from or before

the FCC, a State PUC or any other Governmental Authority responsible for telecommunications matters naming any Loan Party, that either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

<div align="center">ARTICLE IV</div>

<div align="center">Conditions</div>

SECTION 4.01    Conditions to Initial Loan.  The obligations of Lender to make Loans hereunder up to the amount of its Commitment shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    Execution and delivery of this Agreement, the Security Agreement and the Note.

(b)    [Reserved].

(c)    The Cincinnati Bell Credit Agreement Agent shall have executed and delivered to Lender the Subordination Agreement, and the Subordination Agreement shall be in full force and effect.

(d)    The Collateral Agent, for the benefit of the Secured Parties, shall have a perfected security interest in the Collateral as and to the extent provided pursuant to Section 2.18, with only such exceptions as are referred to herein or permitted in the Loan Documents or otherwise acceptable to Lender in its sole discretion.

(e)    [Reserved].

(f)    Lender shall have received a certificate of the Secretary, an Assistant Secretary or a Responsible Officer of each Loan Party setting forth (i) resolutions of its board of directors with respect to the authorization of such Loan Party to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of such Loan Party (A) who are authorized to sign the Loan Documents to which such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as such Loan Party's representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement, the other Loan Documents and the Transactions contemplated hereby and thereby, (iii) specimen signatures of such authorized officers, (iv) certificates of the appropriate state agencies with respect to the existence, qualification and good standing of each Loan Party in its jurisdiction of formation and (v) the certificate or articles of incorporation and the bylaws of such Loan Party, certified as being true and complete. The Collateral Agent and Lender may conclusively rely on such certificate until Lender receives notice in writing from such Loan Party to the contrary.

(g)    Lender shall have received a Compliance Certificate substantially in the form of Exhibit B, duly and properly executed by a Financial Officer of Borrower and dated as of the Effective Date certifying, among other things, (i) that the representations and warranties of each Loan Party contained in Article III of this Agreement and in the other Loan Documents are true and correct in all material respects on and as of the Effective Date, except (A) to the extent such representations and warranties are expressly limited to an earlier date, in which case such representations and warranties are true and correct in all material respects as of such earlier date, and (B) to the extent that any such representations and warranties that are qualified by "material" or "Material Adverse Effect" references therein, such representations and warranties are true and correct on and as of the Effective Date (or, to the extent any such representation or warranty is expressly limited to an earlier date, such representation and

<div align="center">- 30 -</div>

warranty, to such extent, is true and correct as of such specified earlier date), (ii) as to true and complete copies of the Acquisition Documents, (iii) that the Acquisition has been or will substantially concurrently with the Effective Date be consummated by Borrower, substantially in accordance with the terms and conditions of the Acquisition Documents (without waiver or amendment of any material term or condition thereof not otherwise acceptable to Lender) and a Sale Order (as defined in the Acquisition Documents) and that, promptly after the funding of the Loans on the Effective Date, Borrower will acquire all of the Purchased Assets (as defined in the Acquisition Documents) as contemplated by the Acquisition Documents, (iv) that, at the time of and immediately after giving effect to the Borrowing on the Effective Date, no Default has occurred and is continuing and (v) that, as of the Effective Date, there exists no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality which relates to this Agreement or the transactions contemplated hereby, other than the Bankruptcy Case.

(h)     Lender shall have opinions of (i) Cravath, Swaine & Moore LLP, special New York counsel to the Loan Parties, (ii) BosseLaw, PLLC, special Ohio counsel to the Loan Parties, and (iii) [     ], special Hawaii counsel to the Loan Parties, in each case in form and substance reasonably satisfactory to Lender.

(i)     Lender shall have received and be reasonably satisfied with copies of the Acquisition Documents, including, without limitation, evidence that the Assigned Contracts (as defined in the Acquisition Documents) have been properly assigned to Borrower.

(j)     [Reserved].

(k)     Certificates of all insurance policies covering the Collateral described in Section 5.04 shall be delivered by Borrower to Lender.  All such certificates of insurance shall set forth the coverage, the limits of liability, the name of the carrier, the policy number and the period of coverage.

(l)     No proceeding under any Debtor Relief Law shall be pending or threatened in respect of any Loan Party, its debts or a substantial part of its assets.

(m)     Each document (including any Uniform Commercial Code financing statement) required by this Agreement or under law or reasonably requested by Lender to be filed, registered or recorded in order to create in favor of Lender, for the benefit of the Secured Parties, a first priority perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than Permitted Encumbrances), shall be in proper form for filing, registration or recordation.

(n)     Lender shall have received from the Loan Parties, to the extent requested by Lender, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(o)     Lender shall have received such other documents as Lender or its counsel may have reasonably requested.

ARTICLE V

Affirmative Covenants

Until the Commitment shall have expired or been terminated and all Obligations (other than Unliquidated Obligations) shall have been paid in full, each Loan Party executing this Agreement

covenants and agrees, jointly and severally with all of the other Loan Parties, that it shall perform each of the following for the benefit of Lender:

SECTION 5.01     Periodic Reporting. Borrower will furnish, or will cause to be furnished, to Lender:

(a)     Annual Financial Reports. As soon as available, but in any event within one hundred and twenty (120) days after the end of each fiscal year of Cincinnati Bell (commencing with the fiscal year ending December 31, 2020), a consolidated balance sheet of Cincinnati Bell and its consolidated Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than any such qualification or exception that is expressed solely with respect to, or resulting solely from, (i) a maturity date in respect of any indebtedness that is scheduled to occur within one year from the date of delivery of such opinion or (ii) any inability or potential inability to satisfy a financial covenant under any agreement or instrument governing or evidencing indebtedness).

(b)     Quarterly Financials. As soon as available, but in any event within sixty (60) days after the end of each of the first three (3) fiscal quarters of each fiscal year of Cincinnati Bell (commencing with the fiscal quarter ended March 31, 2021), a consolidated balance sheet of Cincinnati Bell and its consolidated Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations for such fiscal quarter and for the portion of Cincinnati Bell's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, such consolidated statements to be certified by a Financial Officer of Cincinnati Bell as fairly presenting in all material respects the financial position and results of operations of Cincinnati Bell and its consolidated Subsidiaries in accordance with GAAP, subject only to the absence of footnotes and to year-end audit adjustments.

(c)     [Reserved].

(d)     [Reserved].

(e)     [Reserved].

(f)     [Reserved].

(g)     [Reserved].

(h)     Defaults. Promptly, but in any event within five (5) Business Days after the occurrence thereof, a notice of each Default or Event of Default known to any Loan Party, together with a statement of an officer of Borrower setting forth the details of such Default or Event of Default and the actions which the Loan Parties have taken and propose to take with respect thereto.

(i)     Litigation. Promptly after the commencement thereof, notice of all actions, suits and proceedings between any Governmental Authority, on the one hand, and any Loan Party or any of their respective Subsidiaries, on the other hand, that has had or could reasonably be expected to have a Material Adverse Effect.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed 12/28/20   Page 145 of 248

(j)     Environmental Notices.  Promptly after the receipt thereof, or the acquisition of knowledge thereof, by any Loan Party, a copy of any form of request, claim, complaint, order, notice, summons or citation received from any Governmental Authority or any other Person, (i) concerning violations or alleged violations of Environmental Laws, (ii) concerning any action or omission on the part of any of the Loan Parties or any of their former Subsidiaries in connection with Hazardous Materials or requiring that action be taken to respond to or clean up a Release of Hazardous Materials into the environment, including without limitation any information request related to, or notice of, potential responsibility under CERCLA, or (iii) concerning the filing of a Lien arising under Environmental Law upon, against or in connection with Borrower, any Subsidiary, or any of their respective former Subsidiaries, or any of their leased or owned property, wherever located, in each case of clauses (i) through (iii) that has had or could reasonably be expected to have a Material Adverse Effect.

(k)     [Reserved].

(l)     Other Information.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of this Agreement, as Lender may reasonably request.

SECTION 5.02     Use of Proceeds.  The proceeds of the Loans will be used, in each case in a manner consistent with the terms of the Loan Documents, solely (i) to pay fees and expenses in connection with the Transactions and (ii) to pay or refinance a portion of the consideration required to consummate the Acquisition.

SECTION 5.03     Books and Records.  Each Loan Party shall maintain books, records and accounts necessary to prepare the financial statements required by Section 5.01.

SECTION 5.04     Insurance.  In respect of the Collateral, Borrower shall maintain in full force and effect insurance in such amounts, covering such risks and liabilities and with such deductibles or self-insurance retentions, as are in accordance with normal industry practice (it being understood that, to the extent consistent with prudent business practices of a Person carrying on a similar business in a similar location as Borrower, a program of self-insurance may be utilized).

SECTION 5.05     Environmental Compliance.

(a)     In respect of the Collateral, Borrower shall comply in all material respects with all Environmental Laws except where the failure to so comply would not be reasonably expected to have a Material Adverse Effect.

(b)     In respect of the Collateral, Borrower shall not suffer, cause or permit the Disposal of Hazardous Materials at any property owned, leased or operated by it, except in compliance with all applicable Environmental Laws and except as could not be reasonably expected to have a Material Adverse Effect.

(c)     Borrower shall promptly notify Lender in the event of the Disposal of any Hazardous Materials at any property owned, leased or operated by Borrower or any of its Subsidiaries in respect of the Collateral, or in the event of any Release, or threatened Release, of a Hazardous Material, from any such property except if the Disposal, Release or threatened Release of a Hazardous Material could not be reasonably expected to have a Material Adverse Effect.

(d)     Borrower shall deliver promptly to Lender the following documents relating to any matter which could reasonably be expected to result in a Material Adverse Effect:  (i) copies of any

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 146 of 248

document received from the United States Environmental Protection Agency or any state, county or municipal environmental or health agency concerning operations of any Loan Party or any of its Subsidiaries, as applicable; and (ii) copies of any material documents submitted by any Loan Party or any of its Subsidiaries to the United States Environmental Protection Agency or any state, county or municipal environmental or health agency concerning its operations.

SECTION 5.06    License, Permits, etc.  Borrower shall maintain all of its grants, Permits, easements, consents and orders that are material to the business of Borrower, if any, in full force and effect until their respective expiration dates except where the failure to maintain such licenses would not be reasonably expected to have a Material Adverse Effect.

SECTION 5.07    Compliance with Law.    Comply with all applicable laws and governmental rules and regulations relating to the ownership and use of the Collateral, except where the failure to comply with such laws, rules and regulations could not be reasonably expected to have a Material Adverse Effect.

SECTION 5.08    Further Assurances.  Each Loan Party shall, from time to time upon the written request of Lender, take such action as Lender may reasonably request in order to fully effect the purposes of this Agreement, including executing and delivering additional instruments or documents. Because the Loan Parties agree that Lender's remedies at law for failure of the Loan Parties to comply with the provisions of this section would be inadequate and that failure would not be adequately compensable in damages, the Loan Parties agree that the covenants of this Section 5.08 may be specifically enforced.

SECTION 5.09    [Reserved].

SECTION 5.10    Taxes.  Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, each Loan Party will pay and discharge as the same shall become due and payable, all its Tax obligations and liabilities, unless the same are being contested in good faith by appropriate proceedings and adequate reserves in accordance with GAAP are being maintained by such Loan Party or a Subsidiary, as applicable.

ARTICLE VI

Negative Covenants

Until the Commitment shall have expired or been terminated and all Obligations (other than Unliquidated Obligations) shall have been paid in full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, to Lender that:

SECTION 6.01    [Reserved].

SECTION 6.02    Liens.  No Loan Party will create, incur, assume or permit to exist any Lien on any Collateral, except for (i) Liens securing the Obligations, (ii) Permitted Encumbrances and (iii) Liens that are subject to a subordination agreement in form reasonably satisfactory to the Collateral Agent contractually subordinating such Liens to the Liens granted to the Collateral Agent for the benefit of the Secured Parties pursuant to one or more of the Collateral Documents (including, for the avoidance of doubt, Liens subject to the Subordination Agreement).

SECTION 6.03    [Reserved].

- 34 -

SECTION 6.04    [Reserved].

SECTION 6.05    Asset Sales.  No Loan Party will Dispose of any portion of the Collateral, except (a) Dispositions in the ordinary course of business, (b) Dispositions, for fair value, of worn-out and obsolete equipment not necessary or useful to the conduct of business, (c) Dispositions of IRUs in the ordinary course of business, and (d) Dispositions subject to prepayment of the Obligations pursuant to Section 2.08(c) hereof.

SECTION 6.06    [Reserved].

SECTION 6.07    [Reserved].

SECTION 6.08    Restrictive Agreements.  No Loan Party will directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of such Loan Party to create, incur or permit to exist any Lien upon any of the Collateral; provided that the foregoing shall not apply to (i)  restrictions and conditions imposed by any Requirement of Law or by any Loan Document and (ii) customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.09    Amendment of Material Documents.  No Loan Party will take any of the following actions if such action could be materially adverse to Lender: (a) amend, supplement or otherwise modify (or permit to be amended, supplemented or modified) any Acquisition Document or (b) waive any of its rights of material value under any Acquisition Document.

SECTION 6.10    [Reserved].

SECTION 6.11    [Reserved].

SECTION 6.12    [Reserved].

SECTION 6.13    [Reserved].

SECTION 6.14    [Reserved].

SECTION 6.15    Use of Proceeds.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, use the proceeds of the Loans for any purposes other than as permitted by Section 5.02 hereof.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, use any part of the proceeds of Loans for any purpose which violates, or is inconsistent with, Regulations T, U, or X.  No part of the proceeds of any Borrowing will be used by any Loan Party or any of its Subsidiaries to make any payments (i) to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA, or (ii) for the purpose of financing the activities of a Sanctioned Person.

ARTICLE VII

Events of Default

SECTION 7.01    Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under this Agreement and any other Loan Document:

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 148 of 248

(a)     Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)     any Loan Party shall fail to observe or perform (i) any covenant, condition or agreement contained Section 5.01(h) or Article VI or (ii) any other covenant, condition or agreement contained herein or in any other Loan Document and, in the case of this clause (ii), such failure continues for thirty (30) days after notice thereof from Lender to Borrower;

(e)     the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken by a Loan Party to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or the Loan Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty, or the Loan Guarantor shall deny that it has any further liability under the Loan Guaranty, or shall give notice to such effect;

(f)     [Reserved];

(g)     any Collateral Document shall fail to remain in full force or effect or any action shall be taken by a Loan Party to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(h)     except as permitted by the terms of this Agreement or any Collateral Document, any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any material provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(i)     [Reserved];

(j)     any default occurs that results in any indebtedness under the Cincinnati Bell Credit Agreement becoming due prior to its scheduled maturity; provided that this clause (j) shall not apply to (A) secured indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such indebtedness or (B) any indebtedness that becomes due as a result of a refinancing thereof (including in connection with any "change of control");

(k)     (i) Borrower or any other Loan Party shall terminate its existence or dissolve (except in accordance with a transaction otherwise permitted under this Agreement) or (ii) any Loan Party (A) admits in writing its inability to pay its debts generally as they become due; makes an assignment for

the benefit of its creditors; consents to or acquiesces in the appointment of a receiver, liquidator, fiscal agent or trustee of itself or any of its property; files a petition under bankruptcy or other laws for the relief of debtors; or consents to any reorganization, arrangement, workout, liquidation, dissolution or similar relief or (B) shall have had, without its consent: any court enter an order appointing a receiver, liquidator, fiscal agent or trustee of itself or any of its property; any petition filed against it seeking reorganization, arrangement, workout, liquidation, dissolution or similar relief under bankruptcy or other laws for the relief of debtors and such petition shall not be dismissed, stayed or set aside for an aggregate of sixty (60) days, whether or not consecutive;

(l)    Borrower or any other Loan Party suffers final judgments against any of them since the date of this Agreement in an aggregate amount, less any insurance proceeds covering such judgments which are received or as to which the insurance carriers admit liability, greater than $35,000,000 and either (i) enforcement proceedings shall have been lawfully commenced by any creditor upon such judgments or (ii) there shall be any period of sixty (60) consecutive days during which such judgment is unpaid and a stay of enforcement of such judgments, by reason of a pending appeal or otherwise, shall not be in effect;

(m)    All or substantially all of the Collateral is demolished, destroyed or damaged and the cost or the repair or restoration of such loss, damage or destruction is reasonably anticipated to exceed the value or economic utility of such Collateral as existed immediately prior to the occurrence of such loss, damage or destruction, or all or substantially all of the Paniolo System is taken or threatened to be taken by eminent domain;

(n)    [Reserved]; or

(o)    the occurrence of a Change in Control.

SECTION 7.02    Optional Acceleration of Maturity.  If any Event of Default (other than an Event of Default pursuant to Section 7.01(k)) shall have occurred and be continuing, then, and in every such event, and at any time thereafter during the continuance of such event, Lender may, by notice to Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitment, whereupon the Commitment shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of Borrower accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower, and (iii) exercise, and direct the Collateral Agent to exercise, any rights and remedies provided to Lender or the Collateral Agent, as the case may be, under the Loan Documents or at law or equity, including all remedies provided under the UCC.

SECTION 7.03    Automatic Acceleration of Maturity.  If any Event of Default pursuant to Section 7.01(k) shall occur, (a) the Loans, including all principal and interest on the Loans, and all other amounts payable under this Agreement shall immediately and automatically become and be due and payable in full, without presentment, demand, protest or any notice of any kind (including, without limitation, any notice of intent to accelerate or notice of acceleration), all of which are hereby expressly waived by each of the Loan Parties, and (b) Lender may proceed to enforce, and direct the Collateral Agent to enforce, their respective rights and remedies under the Loan Guaranty or any other Loan Document for the ratable benefit of the Secured Parties by appropriate proceedings.

SECTION 7.04    Remedies Cumulative; No Waiver.  No right, power or remedy conferred to Lender in this Agreement or the Loan Documents, or now or hereafter existing at law, in equity, by

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 150 of 248

statute or otherwise shall be exclusive, and each such right, power or remedy shall to the full extent permitted by law be cumulative and in addition to every other such right, power or remedy. No course of dealing and no delay in exercising any right, power or remedy conferred to Lender in this Agreement and the Loan Documents or now or hereafter existing at law, in equity, by statute or otherwise shall operate as a waiver of or otherwise prejudice any such right, power or remedy. No notice to or demand upon Borrower or any other Loan Party shall entitle Borrower or any other Loan Party to similar notices or demands in the future.

SECTION 7.05    Application of Payments.    Prior to an Event of Default, all payments made hereunder shall be applied by Lender as directed by Borrower, but subject to the terms of this Agreement, including the application of prepayments according to Section 2.08 and 2.14. During the existence of an Event of Default, all payments and collections received by Lender shall be applied to the Obligations in accordance with Section 2.08 and 2.14 and otherwise in such manner as determined by Lender provided that in the event that the Obligations have been accelerated pursuant to Section 7.02 or Section 7.03 or Lender or the Collateral Agent has exercised any remedy set forth in this Agreement or any other Loan Document, all payments received on account of the Obligations and all net proceeds from the enforcement of the Obligations shall be applied by Lender as follows:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest), including attorney fees, payable to Lender in its capacity as such;

Second, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans;

Third, to payment of all other Obligations; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to Borrower or as otherwise required by applicable law.

SECTION 7.06    Lender May File Proof of Claim.    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, Lender (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Lender shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Lender (including any claim for the reasonable compensation, expenses, disbursements and advances of Lender and their respective agents and counsel and all other amounts due to Lender) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by Lender to make such payments to Lender.

ARTICLE VIII

[Reserved]

ARTICLE IX

Miscellaneous

SECTION 9.01          Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or electronic mail, as follows:

(i)     if to Borrower, at:

Hawaiian Telcom, Inc.
_____
_____
_____
Attention:  _____
Telephone:  _____
Email:  _____

With a copy to:

_____
_____
_____
_____
Attention:  _____
Telephone:  _____
Email:  _____

if to Lender, to HSBC Bank USA, N.A., at:

HSBC Bank USA, N.A.
_____
_____
_____
Attention:  _____
Telephone:  _____
Email:  _____

and

Attention:  _____
Telephone:  _____
Email:  _____

- 39 -

With a copy to:

Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Attention:  Toby L. Gerber
Telephone:  (214) 855-7171
Email:  toby.gerber@nortonrosefulbright.com

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail shall be deemed to have been given when received, (ii) sent by fax shall be deemed to have been given when sent, provided that if not sent during normal business hours for the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient and (iii) sent by electronic mail shall be deemed to have been given as set forth in paragraph (b) below.

(b)     Unless the recipient otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause, of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)     Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

SECTION 9.02     Waivers; Amendments.

(a)     No failure or delay by Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be effected in accordance with paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Lender and the Loan Party or Loan Parties that are parties thereto.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 153 of 248

SECTION 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Loan Parties, jointly and severally, shall pay all reasonable and documented out-of-pocket expenses incurred by Lender, the Collateral Agent and their respective Affiliates (limited, in the case of counsel, to the fees, charges and disbursements of a single counsel for Lender, the Collateral Agent and their respective Affiliates and, if necessary, a single local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions)) in connection with (i) the administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents and (ii) the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    The Loan Parties, jointly and severally, shall indemnify Lender, the Collateral Agent and each Related Party of the foregoing (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable and documented expenses (limited, in the case of counsel, to the reasonable and documented fees, charges and disbursements of a single counsel for all such Indemnitees, taken as a whole, and, if necessary, a single local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions) for all such Indemnitees, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict informs Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee and, if necessary, of a single firm of local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions) for such affected Indemnitee)), whether incurred before or after the Effective Date, for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee (or its Related Parties) or (B) result from a proceeding that does not involve an act or omission by any Loan Party or any of their respective Affiliates (as determined by a court of competent jurisdiction by final and nonappealable judgment) and that is brought by an Indemnitee against any other Indemnitee (other than claims against the Collateral Agent in its capacity or in fulfilling its role as Collateral Agent hereunder). This Section 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)    [Reserved.]

(d)    To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final and nonappealable judgment, or (ii) on any theory of liability, for special,

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 154 of 248

indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof; provided that, nothing in this paragraph (d) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)     All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 9.04     Successors and Assigns; Participants.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender (and any attempted assignment or transfer by Borrower without such consent shall be null and void).  The consent of Borrower (not to be unreasonably withheld, conditioned or delayed) shall be required for Lender to assign its rights and obligations hereunder to any Person or for any successor or assign of Lender to assign its rights and obligations hereunder to any Person, and any such assignment shall be of all, and not part, of such Person's rights and obligations hereunder.  Any such assignment shall be in a minimum amount of $1,000,000 pursuant to an Assignment and Assumption in substantially the form of Exhibit C attached hereto ("Assignment and Assumption") and, to the extent that any such Assignment and Assumption shall result in more than one Lender, Borrower and Lender shall enter into an amendment to this Agreement on mutually agreeable terms and conditions to provide for HSBC to act as administrative agent and such other changes as are necessary to account for more than one Lender.  Borrower shall maintain a copy of each Assignment and Assumption delivered to it and records of the name and address of Lender, and the principal amount (and stated interest) of the Loans owing to Lender pursuant to the terms hereof from time to time (the "Register).  The entries in the Register shall be conclusive absent manifest error, and Borrower and Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  No consent of Borrower or any other Person shall be required for Lender to grant participations in all or any part of its rights and obligations hereunder to any Person or for any successor or assign of Lender to grant participations in all or any part of its rights and obligations hereunder to any Person (each such Person granted a participation, a "Participant").  In the event Lender grants a participation, Lender shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

SECTION 9.05     Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Default or

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 155 of 248

incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitment has not expired or terminated. The provisions of Sections 2.11, 2.12 and 9.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

SECTION 9.06    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Article IV, this Agreement shall become effective when it shall have been executed by Lender and when Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07    Severability. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08    Right of Setoff. If an Event of Default shall have occurred and be continuing, Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by Lender or Affiliate to or for the credit or the account of any Loan Party against any of and all the Obligations held by Lender, irrespective of whether or not Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured. The rights of Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which Lender may have.

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 156 of 248

(a)     The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of New York.

(b)     Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court sitting in New York, in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such state court or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any other jurisdiction.

(c)     Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each of the parties hereto irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by law.

SECTION 9.10     WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11     Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12     Nonreliance; Violation of Law.  Lender hereby represents that it is not relying on or looking to any margin stock (as defined in Regulation U of the Board) for the repayment of the Borrowings provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, Lender shall not be obligated to extend credit to Borrower in violation of any Requirement of Law.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 157 of 248

SECTION 9.13     USA PATRIOT Act.  Lender hereby notifies each Loan Party that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 9.14     Collateral Matters.  Lender shall cause the Collateral Agent to:

(a)     release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon payment in full of all Obligations (other than Unliquidated Obligations), or (ii) that is disposed of or to be sold or otherwise disposed of not in violation of the provisions of this Agreement or the other Loan Documents; and

(b)     subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02.

SECTION 9.15     [Reserved].

SECTION 9.16     Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by Lender, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Prime Rate to the date of repayment, shall have been received by Lender.

SECTION 9.17     No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by Lender are arm's-length commercial transactions between Borrower and its Affiliates, on the one hand, and Lender and its Affiliates, on the other hand, (B) Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and (C) Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of Lender and its Affiliates is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrower or any of its Affiliates, or any other Person, and (B) neither Lender nor any of its Affiliates has any obligation to Borrower or any of its Affiliates with respect to the transactions contemplated hereby except, in the case of Lender, those obligations expressly set forth herein and in the other Loan Documents; and (iii) each of Lender and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Borrower and its Affiliates, and neither Lender nor any of its Affiliates has any obligation to disclose any of such interests to Borrower or its Affiliates.  To the fullest extent permitted by law, Borrower hereby waives and releases any claims that it may have against each of Lender and its Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 158 of 248

SECTION 9.18    Acknowledgement and Consent to Bail-In.  Notwithstanding anything to the contrary in this Agreement or in any other agreement, arrangement or understanding between the parties hereto, each party hereto acknowledges that any liability of Lender as an Affected Financial Institution arising under this Agreement, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of any applicable Resolution Authority and each party hereto agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in Lender, its parent undertaking or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of an applicable Resolution Authority.

SECTION 9.19    Treatment of Certain Information; Confidentiality.

(a)    Each of the Collateral Agent and Lender agrees to maintain the confidentiality of the Information (as defined in paragraph (b) below), except that Information may be disclosed (i) to its Affiliates and to its Related Parties and their accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority); (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (iv) to any other party hereto; (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (vi) subject to an agreement containing provisions substantially the same as those of this Section 9.19, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (vii) with the consent of Borrower or (viii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.19 or (y) becomes available to the Collateral Agent, Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Loan Guarantor or Borrower.

(b)    For purposes of this Section 9.19, "Information" means all information received from the Loan Guarantor, Borrower or any Subsidiary relating to the Loan Guarantor, Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the Collateral Agent or Lender on a nonconfidential basis prior to disclosure by the Loan Guarantor, Borrower or any Subsidiary; provided that, in the case of information received from the Loan Guarantor, Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.19 shall be considered to have complied with its obligation to do so if such Person has

- 46 -

exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(c)     EACH OF THE COLLATERAL AGENT AND LENDER ACKNOWLEDGES THAT (i) THE INFORMATION MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE LOAN GUARANTOR, BORROWER OR A SUBSIDIARY, AS THE CASE MAY BE; (ii) IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION; AND (iii) IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH APPLICABLE LAW, INCLUDING U.S. FEDERAL AND STATE SECURITIES LAWS.

ARTICLE X

Loan Guaranty

SECTION 10.01     Guaranty.  The Loan Guarantor hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all fees and expenses payable pursuant to Section 9.03 (such fees and expenses, together with the Obligations, collectively the "Guaranteed Obligations").  The Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of Lender that extended any portion of the Guaranteed Obligations.

SECTION 10.02     Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection.  The Loan Guarantor waives any right to require Lender to sue Borrower, or any other guarantor of, or any other Person obligated for, all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 10.03     No Discharge or Diminishment of Loan Guaranty.     (a) Except as otherwise provided for herein, the obligations of the Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party or their assets, or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which the Loan Guarantor may have at any time against any Obligated Party, Lender or any other Person, whether in connection herewith or in any unrelated transactions.

(b)     The obligations of the Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

- 47 -

(c)     Further, the obligations of the Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of Lender or the Collateral Agent to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by Lender or the Collateral Agent with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of the Loan Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 10.04     Defenses Waived.  To the fullest extent permitted by applicable law, the Loan Guarantor hereby waives any defense based on or arising out of any defense of Borrower or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of Borrower or any other Obligated Party, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, the Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party or any other Person.  The Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. Lender may, at its election, direct the Collateral Agent to foreclose on any Collateral pursuant to the terms of the Security Agreement, without affecting or impairing in any way the liability of the Loan Guarantor under this Loan Guaranty, except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, the Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Loan Guarantor against any Obligated Party or any security.

SECTION 10.05     Rights of Subrogation.  The Loan Guarantor will not assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification, that it has against any Obligated Party or any Collateral, until Borrower and the Loan Guarantor have fully performed all their obligations (other than Unliquidated Obligations) to Lender.

SECTION 10.06     Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded, or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), the Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not Lender is in possession of this Loan Guaranty.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantor forthwith on demand by Lender.

SECTION 10.07     Information.  The Loan Guarantor assumes all responsibility for being and keeping itself informed of Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that the Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that Lender

- 48 -

shall not have any duty to advise the Loan Guarantor of information known to it regarding those circumstances or risks.

       SECTION 10.08      [Reserved].

       SECTION 10.09      [Reserved].

       SECTION 10.10      Maximum Liability.  Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by the Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.  In determining the limitations, if any, on the amount of the Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which the Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law, shall be taken into account.

       [Signature Page Follows]

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 162 of 248

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<div align="center">

BORROWER:

HAWAIIAN TELCOM, INC.

</div>

By:       _____
Name:
Title:

LOAN GUARANTOR:

CINCINNATI BELL INC.

By: _____
Name:
Title:

LENDER:


HSBC BANK USA, N.A.,
as Lender


By: _____
Name:
Title:

**Schedule 3.17**
**Place of Business**

**Schedule 6.02**
**Liens**

-

**Exhibit A**

FORM OF NOTE

**$25,000,000.00**                                                             _____, 202[ ]

   **FOR VALUE RECEIVED**, the undersigned, HAWAIIAN TELCOM, INC., with an address of [*ADDRESS*] (the "Borrower"), hereby promises to pay to the order of HSBC BANK USA, N.A. (together with its successors and assigns, the "Lender"), at its office located at 452 Fifth Avenue, New York, New York 10018, or, at the holder's option, at such other place as may be designated in writing from time to time by the holder, in lawful money of the United States of America, the principal sum of TWENTY-FIVE MILLION AND 00/100 DOLLARS ($25,000,000.00) or so much thereof as may be disbursed and outstanding under this Note (this "Note") from time to time, together with interest thereon as set forth below, payable on the Maturity Date in an amount equal to the unpaid principal of and interest on this Note.

   This Note is being executed in connection with the Agreement (as hereinafter defined), to which reference is made hereby with respect to, among other things, collateral, payments, prepayment and rights of acceleration of the principal hereof on the occurrence of certain events.

   The Borrower promises to pay interest on the principal amount hereof from time to time unpaid until maturity, whether by acceleration or otherwise, at the rates and on the dates set forth in the Agreement.  Interest shall be computed in accordance with the Agreement.  "Agreement" means the Credit Agreement dated as of even date herewith, among the Borrower, the Loan Guarantor party thereto and the Lender, as the same may from time to time be amended, restated, supplemented or otherwise modified.  All capitalized terms used but not defined in this Note shall have the meanings set forth in the Agreement.

   The Lender may keep a record of all Loans and all payments of principal made on this Note.  No failure by the Lender to make, and no error by the Lender in making, any such entry shall affect the undersigned's obligation to repay the full principal amount advanced by the Lender to or for the account of the Borrower, or the Borrower's obligation to pay interest thereon at the agreed upon rate.

   No failure by the holder hereof to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the holder of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the holder as herein specified are cumulative and not exclusive of any other rights or remedies which such holder may otherwise have.

   No modification, rescission, waiver, release or amendment of any provision of this Note shall be made, except by a written agreement subscribed by duly authorized officers or agents of the undersigned and the holder hereof.

   The Borrower hereby waives diligence, presentment, protest and demand, and also notice of protest, demand, dishonor and nonpayment of this Note.

   The Borrower agrees to pay on demand all reasonable and documented costs and expenses incurred by the holder hereof in enforcing and collecting the indebtedness evidenced by this Note, or in

realizing upon or protecting any collateral securing same, in each case, in accordance with <u>Section 9.03</u> of the Agreement.

       This Note shall be construed under, and governed by, the internal laws of the State of New York (without regard to principles of conflicts of laws).

<div align="center">[Signature Page Follows]</div>

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 169 of 248

Borrower:

HAWAIIAN TELCOM, INC.


By:_____
Name:
Title:

**Exhibit B**

FORM OF
COMPLIANCE CERTIFICATE

**[_____], 20[__]**

I, [_____], a Financial Officer of Hawaiian Telcom, Inc., a Hawaiian corporation ("Borrower"), hereby certify (in such capacity and not in my individual capacity) that, with respect to that certain Credit Agreement dated as of the date hereof (together with all amendments, restatements, supplements or other modifications, if any, from time to time made thereto, the "Credit Agreement"), among Borrower, the Loan Guarantor party thereto and HSBC Bank USA, N.A. (together with its successors and assigns, "Lender") (unless otherwise defined herein, each capitalized term used herein has the meaning assigned to it in the Credit Agreement):

(a)      The representations and warranties of each Loan Party contained in Article III of the Credit Agreement and in the other Loan Documents are true and correct in all material respects on and as of the date hereof, except (i) to the extent such representations and warranties are expressly limited to an earlier date, in which case such representations and warranties are true and correct in all material respects as of such earlier date, and (ii) to the extent that any such representations and warranties that are qualified by "material" or "Material Adverse Effect" references therein, such representations and warranties are true and correct on and as of the date hereof (or, to the extent any such representation or warranty is expressly limited to an earlier date, such representation and warranty, to such extent, is true and correct as of such specified earlier date).

(b)      At the time of and immediately after giving effect to any Borrowing on the date hereof, no Default has occurred and is continuing.

(c)      The Acquisition has been or will substantially concurrently with the Effective Date be consummated by Borrower, substantially in accordance with the terms and conditions of the Acquisition Documents (without waiver or amendment of any material term or condition thereof not otherwise acceptable to Lender) and a Sale Order (as defined in the Acquisition Documents) and that, promptly after the funding of the Loans on the Effective Date, the Borrower will acquire all of the Purchased Assets (as defined in the Acquisition Documents) as contemplated by the Acquisition Documents, true and correct copies of which are attached hereto.

(d)      As of the Effective Date, there exists no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality which relates to this Agreement or the transactions contemplated hereby, other than the Bankruptcy Case.

[Signature Page Follows]

EXECUTED AND DELIVERED as of the date first written above.

**HAWAIIAN TELCOM, INC.**

By: ___

Name: _____

Title: _____

**Exhibit C**

FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between the Assignor and the Assignee identified below. Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in **Annex 1** attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date below, all of the Assignee's rights and obligations in its capacity as the Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the percentage interest and amount identified below of all of such outstanding rights and obligations of the Assignor thereunder (including, without limitation, the Loans) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in the Standard Terms and Conditions, without representation or warranty by the Assignor.

1.      Assignor:

2.      Assignee:

3.      Borrower:          HAWAIIAN TELCOM, INC.

4.      Credit Agreement:  Credit Agreement, dated as of [_____], 2020, among Borrower, the Loan Guarantor party thereto and HSBC Bank USA, N.A., as Lender

5.      Assigned Interest:

| Facility Assigned | Amount of Loans Assigned | Percentage Assigned of Loans |
|---|---|---|
| Loans | $ | % |

6.      Effective Date:          [_____]¹

*[Signature page follows]*

---

¹ To be completed by Assignor inserting the Business Day immediately following the Business Day on which Assignor delivers this Assignment and Assumption to Assignee.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR:

**HSBC BANK USA, N.A.**

By: _____
     Name:
     Title:

ASSIGNEE:

[_____]

By: _____
     Name:
     Title:

Consented to:

**HAWAIIAN TELECOM, INC.**

By: _____
     Name:
     Title:

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.     Representations and Warranties.

1.1     Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is not in default in respect of its obligations under the Credit Agreement; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 9.04 of the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest and (vi) it has, independently and without reliance upon any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; and (b) agrees that it will (i) independently and without reliance on the Assignor, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.     Payments.  From and after the Effective Date, all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) shall be made to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date.

3.     General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this

Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**Form of Security Agreement**

---

SECURITY AGREEMENT

Dated as of [_____], 2020

between

HAWAIIAN TELCOM, INC.,
as Grantor,

and

HSBC BANK USA, N.A.
as Collateral Agent

---

# TABLE OF CONTENTS

This Table of Contents is not part of the Agreement to which it is attached but is inserted for convenience only.

Page

Section 1      DEFINITIONS, ETC. ...................................................................................1

    1.01    Certain Uniform Commercial Code Terms.......................................... 1
    1.02    Certain Definitions and Principles of Construction and Interpretation ................. 1
    1.03    Additional Definitions .................................................................... 1

Section 2      REPRESENTATIONS AND WARRANTIES...................................................3

    2.01    Organizational Matters; Enforceability; Etc ........................................ 3
    2.02    Title ....................................................................................... 3
    2.03    Names, Etc ............................................................................... 4
    2.04    Changes in Circumstances ............................................................. 4
    2.05    Reserved.................................................................................. 4
    2.06    Reserved.................................................................................. 4
    2.07    Intellectual Property.................................................................... 4

Section 3      COLLATERAL .................................................................................4

Section 4      [RESERVED] ..................................................................................5

Section 5      FURTHER ASSURANCES: REMEDIES ......................................................5

    5.01    Delivery and Other Perfection ....................................................... 5
    5.02    [Reserved]................................................................................ 5
    5.03    Preservation of Rights ................................................................. 5
    5.04    Special Provisions Relating to Certain Collateral............................... 5
    5.05    Remedies.................................................................................. 6
    5.06    Deficiency ................................................................................ 7
    5.07    Locations: Names, Etc ................................................................. 8
    5.08    Private Sale .............................................................................. 8
    5.09    Application of Proceeds................................................................ 8
    5.10    Attorney in Fact ........................................................................ 8
    5.11    Perfection and Recordation........................................................... 8
    5.12    Termination.............................................................................. 9
    5.13    Further Assurances..................................................................... 9

Section 6      MISCELLANEOUS ...........................................................................9

    6.01    Waiver .................................................................................... 9
    6.02    Notices ................................................................................... 9
    6.03    Fees and Expenses ..................................................................... 9

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 179 of 248

6.04    Amendments, Etc ................................................................................ 9
6.05    Successors and Assigns.................................................................... 10
6.06    Marshalling ...................................................................................... 10
6.07    Survival ............................................................................................ 10
6.08    Captions ........................................................................................... 10
6.09    Counterparts: Integration: Effectiveness; Electronic Execution.......... 10
6.10    Governing Law; Jurisdiction; Consent to Service of Process; Waiver of
        Jury Trial. ......................................................................................... 11
6.11    Agents and Attorneys in Fact ........................................................... 11
6.12    Severability ...................................................................................... 11
6.13    Patriot Act ........................................................................................ 11
6.14    HSBC Credit Agreement .................................................................. 11

[[5543375]]
U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 180 of
248

ANNEXES AND SCHEDULES

ANNEX A     -     Filing Details

Schedule 1.03 -     Specified Collateral

[[5543375]]

This SECURITY AGREEMENT dated as of [_____], 2020 (as it may be amended or modified from time to time, this "Agreement"), is between Hawaiian Telcom, Inc., a Hawaii corporation (the "Grantor"), and HSBC Bank USA, N.A., a national banking association ("HSBC"), as collateral agent for the Secured Parties (together with its successors and assigns in such capacity, the "Collateral Agent"). Terms used herein but not otherwise defined herein shall have the meaning assigned to them in the HSBC Credit Agreement (as defined below).

RECITALS

WHEREAS, reference is made to that certain Credit Agreement, dated as of the date hereof, by and among the Grantor, the Loan Guarantor (as defined therein) and HSBC (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "HSBC Credit Agreement"); and

WHEREAS, to induce HSBC to enter into the HSBC Credit Agreement and to provide loans thereunder, the Grantor has agreed to grant a security interest in the Collateral (as hereinafter defined) to the Collateral Agent, for the benefit of the Secured Parties, as security for the Secured Obligations (as hereinafter defined).

NOW, THEREFORE, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1       DEFINITIONS, ETC.

1.01    Certain Uniform Commercial Code Terms. As used herein, the terms "Chattel Paper", "Instrument" and "Proceeds" have the respective meanings set forth in Article 9 of the NYUCC.

1.02    Certain Definitions and Principles of Construction and Interpretation. Each term defined in the HSBC Credit Agreement and used herein without definition has the meaning assigned to such term in the HSBC Credit Agreement. The principles of construction and interpretation set forth in Section 1.02 of the HSBC Credit Agreement shall apply to, and are hereby incorporated by reference in, this Agreement.

1.03    Additional Definitions. In addition, as used herein, the following terms will have the meanings assigned below:

"Collateral" has the meaning assigned to such term in Section 3.

"Contingent Secured Obligations" means obligations of the Grantor in respect of any claim that may be payable to the Secured Parties by the Grantor under any Loan Document that is not yet due and payable.

"Copyright Collateral" means all Copyrights of the Grantor included in the Specified Assets and owned by the Grantor as of the date hereof.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 182 of 248

"Copyrights" means all copyrights, copyright registrations and applications for copyright registrations, including all renewals thereof, all rights to recover for past or present infringements thereof and all other rights whatsoever pertaining thereto.

"Excluded Collateral" means:

(a)     any Property to the extent (and only to the extent) that the grant of a security interest therein would (i) constitute a violation of a restriction in favor of, or requires a consent not obtained prior to the date hereof, a third party on such grant, (ii) give any other party to any contract, instrument, license, license agreement or other document the right to terminate its obligations thereunder or (iii) violate any law or require the consent, not obtained prior to the date hereof, of any Governmental Authority; provided that the limitation set forth in this clause (a) above shall not affect, limit, restrict or impair the grant by the Grantor of a security interest pursuant to this Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective by any applicable law, including the NYUCC; and

(b)     any application to register any trademark or service mark prior to the filing under applicable law of a verified statement of use (or the equivalent) for such trademark or service mark to the extent the creation of a security interest therein would void or invalidate such trademark or service mark.

"Intellectual Property" means, collectively, all Copyright Collateral, all Patent Collateral and all Trademark Collateral.

"NYUCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"Patent Collateral" means all Patents of the Grantor included in the Specified Assets and owned by the Grantor as of the date hereof.

"Patents" means all patents and patent applications, including the inventions and improvements described and claimed therein together with the reissues, divisions, continuations, renewals, extensions and continuations in part thereof, all income, royalties, damages and payments now due and/or payable with respect thereto, all damages and payments for past or present infringements thereof and rights to sue therefor, and all rights corresponding thereto throughout the world.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Secured Obligations" means all obligations (monetary or otherwise) of the Grantor under the HSBC Credit Agreement, any other Loan Document or any instrument executed in connection therewith, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including any interest or expenses accruing or arising after the commencement of any case with respect to the Grantor under the Bankruptcy Code or any other bankruptcy or insolvency law (whether or not such interest or expenses are allowed or allowable as a claim in whole or in part in such case).

- 2 -

"Specified Assets" means the assets that are identified on Schedule 1.03.[1]

"Trademark Collateral" means all Trademarks of the Grantor included in the Specified Assets and owned by the Grantor as of the date hereof. Notwithstanding the foregoing, the Trademark Collateral does not and shall not include any Trademark that would be rendered invalid, abandoned, void or unenforceable by reason of its being included as part of the Trademark Collateral.

"Trademarks" means all trade names, trademarks and service marks, logos, trademark and service mark registrations, and applications for trademark and service mark registrations, including all renewals of trademark and service mark registrations, all rights to recover for past and present infringements thereof and all rights to sue therefor, and all rights corresponding thereto throughout the world.

Section 2    REPRESENTATIONS AND WARRANTIES. The Grantor represents and warrants that:

2.01    Organizational Matters; Enforceability; Etc. The Grantor is duly organized, validly existing and in good standing under the laws of the state of its organization. The execution, delivery and performance of this Agreement, and the grant of the security interests pursuant hereto, (a) are within the Grantor's powers and have been duly authorized by all necessary corporate action on the part of the Grantor, (b) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the security interests created pursuant hereto and (iii) any approval, consent, exemption, authorization, action, notice or filing, the failure to so obtain or make which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (c) will not violate any Requirement of Law applicable to the Grantor, (d) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Grantor or any of its Property, or give rise to a right thereunder to require any payment to be made by the Grantor, and (e) except for the security interests created pursuant hereto, will not result in the creation or imposition of any Lien on any portion of the Collateral of the Grantor; except, in each case referred to in clause (c), (d) or (e), to the extent that such conflict, breach, contravention, Lien, payment or violation, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

This Agreement has been duly executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor, enforceable against the Grantor in accordance with its terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights and (b) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

2.02    Title. The Grantor is the sole beneficial owner of the Collateral and no Lien exists upon the Collateral (and no right or option to acquire the same exists in favor of any other Person) other than (a) the security interest created or provided for herein, which security interest

---

[1] NTD: Schedule 1.03 will conform to the schedule of assets acquired pursuant to the Acquisition Agreement.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 184 of 248

constitutes a valid first priority perfected lien on the Collateral prior to all other Liens (other than Permitted Encumbrances), (b) other Permitted Encumbrances and (c) Liens that are subject to a subordination agreement in form reasonably satisfactory to the Collateral Agent contractually subordinating such Liens to the security interest created or provided for herein (including, for the avoidance of doubt, Liens subject to the Subordination Agreement).

        2.03    <u>Names, Etc</u>. The full and correct legal name, type of organization, jurisdiction of organization, organizational ID number (if applicable) and mailing address of the Grantor as of the date hereof are correctly set forth in <u>Annex A</u>. Said <u>Annex A</u> correctly specifies as of the date hereof the place of business of the Grantor or, if the Grantor has more than one place of business, the location of the chief executive office of the Grantor.

        2.04    <u>Changes in Circumstances</u>. The Grantor has not (a) within the period of four months prior to the date hereof, changed its location (as defined in Section 9-307 of the NYUCC) or (b) except as specified in <u>Annex A,</u> heretofore changed its name.

        2.05    <u>Reserved</u>.

        2.06    <u>Reserved</u>.

        2.07    <u>Intellectual Property</u>. To the Grantor's knowledge, there is no violation (a) by others of any right of the Grantor or (b) by the Grantor of any right of others, in each case, with respect to any Copyright Collateral, Patent Collateral or Trademark Collateral.

        Section 3    <u>COLLATERAL</u>. As collateral security for the payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, the Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a first priority security interest in and to all of the Grantor's right, title and interest in, to and under, the following, in each case whether tangible or intangible and wherever located (all of the property described in this <u>Section 3</u> being collectively referred to herein as "<u>Collateral</u>"):

        (i)     all Specified Assets; and

        (ii)    all Proceeds of any of the Specified Assets and, to the extent related to any Collateral and included in the Specified Assets, all books, correspondence, credit files, records, invoices and other papers;

        IT BEING UNDERSTOOD, HOWEVER, that in no event shall the security interest granted under this Section 3 attach to any lease, license, contract, property right or agreement to which the Grantor is a party (or to any of its rights or interests thereunder) if the grant of such security interest would constitute or result in either (i) the abandonment, invalidation or unenforceability of any right, title or interest of the Grantor therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property right or agreement (other than to the extent that any such term would be rendered ineffective by Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code as in effect in the relevant jurisdiction); <u>provided</u>, <u>further</u>, that any such security interest and Lien shall attach immediately and automatically after any such disqualifying condition specified in clauses (i) and (ii) of this paragraph shall cease to exist.

- 4 -

Notwithstanding anything to the contrary contained in this Section 3, in no event shall the Collateral (or any component term thereof) include or be deemed to include any Excluded Collateral; provided, however, that any Proceeds received by any Grantor from the sale, transfer or other disposition of Excluded Collateral shall constitute Collateral unless the conditions in effect which qualify such Property as Excluded Collateral apply with respect to such Proceeds.

Section 4        [RESERVED].

Section 5        FURTHER ASSURANCES: REMEDIES. In furtherance of the grant of the security interest pursuant to Section 3, the Grantor hereby agrees with the Secured Parties as follows:

5.01    Delivery and Other Perfection. The Grantor shall promptly from time to time give, execute, deliver, file, record, authorize or obtain all such financing statements, continuation statements, notices, instruments, documents, agreements or consents or other papers as may be necessary to create, preserve, perfect, maintain the perfection of or validate the security interest granted pursuant hereto or to enable the Collateral Agent to exercise and enforce its rights hereunder with respect to such security interest, and without limiting the foregoing, shall:

(a)    promptly from time to time deliver to the Collateral Agent any and all Instruments constituting part of the Collateral, endorsed and/or accompanied by such instruments of assignment and transfer in such form and substance as the Collateral Agent may reasonably request; provided that so long as no Event of Default shall have occurred and be continuing, such Grantor may retain for collection in the ordinary course any Instruments received by such Grantor in the ordinary course of business and the Collateral Agent shall, promptly upon request of such Grantor, make appropriate arrangements for making any Instrument delivered by such Grantor available to such Grantor for purposes of presentation, collection or renewal (any such arrangement to be effected, to the extent requested by the Collateral Agent, against trust receipt or like document); and

(b)    keep full and accurate books and records relating to the Collateral.

5.02    [Reserved].

5.03    Preservation of Rights. Neither the Collateral Agent nor the Secured Parties shall be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

5.04    Special Provisions Relating to Certain Collateral.

(a)    Intellectual Property.

(i)    For the purpose of enabling the Collateral Agent to exercise rights and remedies under Section 5.06 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, the Grantor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Grantor) to use, assign, license or sublicense any of the Intellectual Property included in the Collateral,

- 5 -

wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

(ii) Notwithstanding anything contained herein to the contrary, but subject to any provision of the Loan Documents that limit the rights of the Grantor to dispose of its property, the Grantor will be permitted to exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property included in the Collateral. In furtherance of the foregoing, so long as no Event of Default shall have occurred and be continuing, the Collateral Agent shall from time to time, upon the request of the Grantor, execute and deliver any instruments, certificates or other documents, in the form so requested, that the Grantor shall determine to be appropriate in its judgment to allow it to take any action permitted above (including relinquishment of the license provided pursuant to clause (i) immediately above as to any specific Intellectual Property). Further, upon the payment in full of all of the Secured Obligations (other than Contingent Secured Obligations) or earlier expiration of this Agreement or release of the Collateral, the Collateral Agent at the written direction of the Grantor shall grant back to the Grantor the license granted pursuant to clause (i) immediately above. The exercise of rights and remedies under Section 5.06 by the Collateral Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by the Grantor in accordance with the first sentence of this clause (ii).

(b) Chattel Paper. If an Event of Default shall have occurred and is continuing, the Grantor will (i) deliver to the Collateral Agent each original of each item of Chattel Paper at any time constituting part of the Collateral and (ii) cause each such original and each copy thereof to bear a conspicuous legend, in form and substance reasonably satisfactory to the Collateral Agent, indicating that such Chattel Paper is subject to the security interest granted hereby and that purchase of such Chattel Paper by a Person other than the Collateral Agent without the consent of the Collateral Agent would violate the rights of the Collateral Agent.

5.05 Remedies.

(a) Rights and Remedies Generally upon Default. If an Event of Default shall have occurred and is continuing, the Collateral Agent shall have all of the rights and remedies with respect to the Collateral of a secured party under the NYUCC (whether or not the Uniform Commercial Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by law, to exercise all powers of ownership pertaining to the Collateral as if the Collateral Agent were the sole and absolute owner thereof (and the Grantor agrees to take all such reasonable actions as may be appropriate to give effect to such right); and without limiting the foregoing:

(i) the Collateral Agent in its discretion may, in its name or in the name of the Grantor or otherwise, demand, sue for, collect or receive any money or other property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so;

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 366-1  Filed  12/28/20  Page 187 of 248

(ii)    the Collateral Agent may make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

(iii)   the Collateral Agent may require the Grantor to assemble the Collateral at such place or places, reasonably convenient to the Collateral Agent and the Grantor, as the Collateral Agent may direct, in each case to the extent commercially reasonable;

(iv)    [reserved];

(v)     [reserved]; and

(vi)    the Collateral Agent may sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Collateral Agent deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required by applicable statute and cannot be waived), and the Collateral Agent or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of the Grantor, any such demand, notice and right or equity being hereby expressly waived and released. In the event of any sale, assignment, or other disposition of any of the Trademark Collateral, the goodwill connected with and symbolized by the Trademark Collateral subject to such disposition shall be included. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.

The Proceeds of each collection, sale or other disposition under this Section 5.06, including by virtue of the exercise of any license granted to the Collateral Agent in Section 5.05(a), shall be applied in accordance with Section 5.10.

(b)     [Reserved].

(c)     Notice. The Grantor agrees that, to the extent the Collateral Agent is required by applicable law to give reasonable prior notice of any sale or other disposition of any Collateral, ten (10) Business Days' notice shall be deemed to constitute reasonable prior notice.

5.06    Deficiency. If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to Section 5.06 are insufficient to cover the costs and expenses of such realization and the payment in full of the Secured Obligations, the Grantor shall remain liable for any deficiency.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 188 of 248

5.07    Locations: Names, Etc. The Grantor shall not (i) change its location (as defined in Section 9-307 of the NYUCC) or (ii) change its name from the name shown as its current legal name on Annex A, in each case, without notice to the Collateral Agent not later than a reasonable period of time thereafter, and in any case within 90 days after the occurrence thereof.

5.08    Private Sale. The Collateral Agent shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any public or private sale pursuant to Section 5.06 conducted in a commercially reasonable manner. The Grantor hereby waives any claims against the Collateral Agent arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale, if conducted in a commercially reasonable manner, was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree.

5.09    Application of Proceeds. Except as otherwise herein expressly provided and except as provided below in this Section 5.10, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by the Collateral Agent under this Section 5, shall be applied by the Collateral Agent:

First,    to the payment of the costs and expenses of such collection, sale or other realization, including reasonable out-of-pocket costs and expenses of the Collateral Agent and the fees and expenses of its agents and counsel, and all expenses incurred and advances made by the Secured Parties in connection therewith;

Second, to the payment in full of the Secured Obligations (other than any Contingent Secured Obligations); and

Finally, to the payment to the Grantor, or its successors or assigns, or as a court of competent jurisdiction may direct, to the extent of any surplus then remaining.

5.10    Attorney in Fact. Without limiting any rights or powers granted by this Agreement to the Collateral Agent while no Event of Default has occurred and is continuing, upon the occurrence and during the continuance of any Event of Default, the Collateral Agent is hereby appointed the attorney in fact of the Grantor for the purpose of carrying out the provisions of this Section 5 and taking any action and executing any instruments that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney in fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, so long as the Collateral Agent shall be entitled under this Section 5 to make collections in respect of the Collateral, the Collateral Agent shall have the right and power to receive, endorse and collect all checks made payable to the order of the Grantor representing any payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

5.11    Perfection and Recordation. Each Grantor authorizes the Collateral Agent to file Uniform Commercial Code financing statements describing the Collateral in the manner as described herein and on Schedule 1.03 (provided that no such description shall be deemed to modify the description of Collateral set forth in Section 3).

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 189 of 248

5.12 <u>Termination</u>. When all Secured Obligations (other than any Contingent Secured Obligations) shall have been paid in full this Agreement shall terminate, and the Collateral Agent at the written direction and expense of the Grantor shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of the Grantor and to be released and canceled all licenses and rights referred to in <u>Section 5.05(a)</u>. The Collateral Agent shall also, at the expense of the Grantor, execute and deliver to the Grantor upon such termination such Uniform Commercial Code termination statements and such other documentation as shall be reasonably requested by the Grantor to effect the termination and release of the liens on the Collateral as required by this <u>Section 5.13</u>.

5.13 <u>Further Assurances</u>. The Grantor agrees that, from time to time upon the written request of the Collateral Agent, the Grantor will execute and deliver such further documents and do such other acts and things as the Collateral Agent may reasonably request in order fully to effect the purposes of this Agreement. The Collateral Agent shall release at the time of disposition any lien covering any asset that has been or will be disposed of and not prohibited by the provisions of the Loan Documents.

Section 6        <u>MISCELLANEOUS</u>.

6.01 <u>Waiver</u>. No failure on the part of any Secured Party or the Collateral Agent to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement or any other Loan Document shall operate as a waiver of such right, remedy, power or privilege, and no single or partial exercise of any right, power or privilege under this Agreement or any other Loan Document shall preclude any other or further exercise of such right, remedy, power or privilege, or the exercise of any other right, power or privilege. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.

6.02 <u>Notices</u>. All notices, requests and other communications provided for in this Agreement (including any modifications of, or waivers or consents under, this Agreement) shall be given or made in writing (including by telecopy) delivered to the intended recipient at the address set forth in <u>Section 9.01(a)</u> of the HSBC Credit Agreement or, as to any party, at such other address as shall be designated by such party in a notice to each other party. Except as otherwise provided in this Agreement, the determination as to when any such communication shall be deemed to have been duly given shall be made as set forth in <u>Section 9.01</u> of the HSBC Credit Agreement.

6.03 <u>Fees and Expenses</u>. The Grantor agrees to pay or reimburse the Collateral Agent for all reasonable and documented fees, costs and expenses of the Collateral Agent to the extent and as required by <u>Section 9.03</u> of the HSBC Credit Agreement. All such costs and expenses shall be Secured Obligations entitled to the benefits of the collateral security provided pursuant to <u>Section 3</u>.

6.04 <u>Amendments, Etc</u>. Except as otherwise expressly provided by this Agreement, any provision of this Agreement may be amended, modified or waived only in accordance with <u>Section 9.02</u> of the HSBC Credit Agreement.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed   12/28/20   Page 190 of 248

6.05     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns (provided that the Grantor shall not assign or transfer its rights or obligations hereunder without the prior written consent of the Collateral Agent).

6.06     Marshalling. Neither the Collateral Agent nor any Secured Party shall be under any obligation to marshal any assets in favor of the Grantor or any other party or against or in payment of any or all of the Secured Obligations.

6.07     Survival.  The obligations of each Grantor under Section 6.03 shall survive after the Maturity Date. Each representation and warranty made in this Agreement or pursuant to this Agreement shall survive the making of such representation and warranty, and no Secured Party shall be deemed to have waived, by reason of making any extension of credit under the HSBC Credit Agreement, any Default which may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that such Secured Party may have had reason to believe that such representation or warranty was false or misleading at the time such extension of credit was made.

6.08     Captions. The table of contents and captions and Section headings appearing in this Agreement are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

6.09     Counterparts: Integration: Effectiveness; Electronic Execution.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Collateral Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Collateral Agent and when the Collateral Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

6.10 <u>Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of New York. The other provisions of <u>Sections 9.09</u> and <u>9.10</u> of the HSBC Credit Agreement are incorporated into this Agreement, *mutatis mutandis*, as if set forth herein.

6.11 <u>Agents and Attorneys in Fact</u>. The Collateral Agent may employ agents and attorneys in fact in connection herewith and shall not be responsible for the negligence or misconduct of any such agents or attorneys in fact selected by it in good faith.

6.12 <u>Severability</u>. If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Collateral Agent in order to carry out the intentions of the parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

6.13 <u>Patriot Act</u>. The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, HSBC Bank USA, N.A., like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify and record information that identifies each person or legal entity that establishes a relationship or opens an account. The parties to this Agreement agree that they will provide HSBC Bank USA, N.A. with such information as it may reasonably request in order for HSBC Bank USA, N.A. to satisfy the requirements of the USA Patriot Act.

6.14 <u>HSBC Credit Agreement</u>. The provisions of <u>Sections 9.17</u> of the HSBC Credit Agreement are incorporated into this Agreement, *mutatis mutandis*, as if set forth herein.

**[Remainder of the page left intentionally blank]**

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 366-1 Filed 12/28/20 Page 192 of 248

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

<u>**GRANTOR**</u>:

HAWAIIAN TELCOM, INC.,
a Hawaii corporation

By: _____
    Name:
    Title:

**COLLATERAL AGENT**:

HSBC BANK USA, N.A.,


By: _____
     Name:
     Title:

**Item A-1.**      **Exact Name and Location of Grantor for purposes of UCC.**

**Item A-2.**      **Grantor's place of business or principal office.**

**Item A-3.**      **Taxpayer ID number.**

**Item A-4.**      **Locations of Collateral.**

    (a)      <u>Properties Owned by Grantors</u>:

| Property Description | Address | City | County / Parish / Province | State / Country |
|---|---|---|---|---|
|  |  |  |  |  |

    (b)      <u>Properties Leased by Grantors</u> (include Landlord's legal name):

| Property Description | Address | City | County / Parish / Province | State / Country | Landlord |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

**Item A-5.**      **Trade Names/Prior Names.**

**Item B.**      **Merger or other corporate reorganization.**

**<u>Schedule 1.03</u>**

<u>Specified Collateral</u>

**AMENDED AND RESTATED
OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT**

This Amended and Restated Operational Support and Sales Services Agreement (this "Agreement") is entered into as of December 21, 2020, but effective only as of the Effective Date (as defined below), by and between Michael Katzenstein, Chapter 11 Trustee for the Bankruptcy Estate of Paniolo Cable Company, LLC, a Delaware limited liability company ("Trustee") and Hawaiian Telcom, Inc., a Hawaii corporation ("HT" or "Service Provider"). The Trustee and HT are each referred to as a "Party" and are collectively referred to as the "Parties".

**RECITALS:**

A.    WHEREAS, the Parties have entered into that certain Asset Purchase Agreement dated November 30, 2020 ("APA") pursuant to which the Trustee will sell to HT, and HT will buy from the Trustee, the Purchased Assets as defined in the APA (referred to herein as "the Paniolo Network") that are currently owned by Paniolo Cable Company, LLC ("Debtor"), which transaction ("Proposed Transaction") requires the prior consent of the Federal Communications Commission ("FCC Consent");

B.    WHEREAS, Service Provider is a provider of telecommunications services, with experience in operating and maintaining telecommunications networks, including submarine cables;

C.    WHEREAS, prior to receiving FCC Consent, the Trustee wishes to secure from Service Provider, and Service Provider wishes to provide to the Trustee, certain operational support and sales services in connection with the Trustee's operation of the Paniolo Network;

D.    WHEREAS, the Parties had previously entered into that certain Operational Support and Sales Services dated November 30, 2020, and desire to amend and restate such agreement in its entirety.

NOW THEREFORE, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE 1
DEFINITIONS**

1.1.    "Affiliate" means any entity that now or in the future, directly or indirectly controls, is controlled with or by, or is under common control with a Party. For purposes of the foregoing, "control" means the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors (or the equivalent thereof, *i.e.,* limited liability company members or managers) of such entity, or such lesser percentage interest if coupled with the power to direct the management of such entity.

1.2.    "Agreement" is defined in the Preamble.

1.3.     "APA" is defined in Recital A.

1.4.     "Bankruptcy Event" means any proceeding (other than the Paniolo Bankruptcy Proceeding) instituted by a Party voluntarily or involuntarily commenced against any Party (and such proceeding is not dismissed or permanently stayed within thirty (30) days): (a) seeking an order for relief with respect to such Party under any bankruptcy, insolvency, reorganizations or similar law, including the Bankruptcy Code; (b) seeking to appoint a receiver, trustee, custodian, or other similar official for such Party or for any or all of a Party's assets or property; or (c) making an assignment for the benefit of that Party's creditors.

1.5.     "Business Day" means any official working day other than a legal or bank holiday in the State of New York.  Unless otherwise specifically indicated as a "Business Day" the word "days" as used in this Agreement means calendar days.

1.6.     "Capacity" means a designated unit of available network bandwidth including, but not limited to, TDM, Ethernet or optical networking services that the Paniolo Network equipment is capable of providing without incremental capital investment, between Demarcation Points within the Paniolo Network.

1.7.     "Capacity Contracts" means agreements for the provision of Capacity and related services pursuant to terms and conditions agreed to between the Service Provider and a Customer and approved by the Trustee.  For the avoidance of doubt, the Trustee is expressly prohibited from entering into any Capacity Contracts without the prior approval of the Service Provider.

1.8.     "Claims" is defined in Section 6.2.

1.9.     "Confidential Information" means information disclosed by one Party to the other Party under this Agreement that is marked as confidential or would normally under the circumstances be considered the confidential information of the disclosing Party.  Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another Party.

1.10.     "Customer" means a potential customer that is introduced by Service Provider or Service Provider Affiliate to Trustee and that enters a Capacity Contract with Trustee for Capacity on the Paniolo Network.

1.11.     "Debtor" is defined in Recital A.

1.12.     "Default" is defined in Section 10.

1.13.     "Effective Date" means the latter of:  (a) the date on which this Agreement is fully executed; and (b) the date on which it is approved by the Presiding Judge in the Paniolo Bankruptcy Proceeding.

1.14.     "FCC Consent" is defined in Recital A.

1.15.     "Fiber Strand" means a single strand of fiber on the Paniolo Network.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 198 of 248

1.16. "Force Majeure Event" is defined in Article 11.

1.17. "HT" is defined in the preamble and includes its successors and permitted assigns.

1.18. "Indemnified Parties" is defined in Section 6.1.

1.19. "Indemnifying Party" is defined in Section 6.1.

1.20. "Intellectual Property" means any and all intellectual property (and rights thereto, whether registered or unregistered) and including, technology, patents, rights to inventions, trademarks, service marks, registered designs, copyrights and related rights, database rights, design rights, domain names, trade dress and other intellectual property, and all registrations, applications for registrations, continuations, continuations-in-part, divisional applications, renewals or extensions of, and rights to claim priority from, those rights, and any similar right recognized from time to time in any jurisdiction, together with all rights of action in relation to the infringement of any of the above.

1.21. "Law" means any national, regional, state or local law, statute, rule, regulation, code, ordinance, administrative ruling, judgment, decree, order or directive of any jurisdiction applicable to this Agreement.

1.22. "Leased SIC Fiber" means the Paniolo Network Fiber Pairs, leased to SIC by Paniolo pursuant to Section 3.1 and Schedule 1 of the Master Relationship Agreement (as defined below).

1.23. "Master Relationship Agreement" means that certain Master Relationship Agreement, dated as of March 6, 2020, by and between Sandwich Isles Communications and Debtor.

1.24. "Network Inventory" is defined in Section 3.5.

1.25. "Network Inventory Cap" is defined in Schedule B.

1.26. "Network Inventory Fees" means the fees payable to Service Provider for provision of the Network Inventory as set forth in Section D of Schedule A attached hereto, excluding Service Provider Expenses.

1.27. "Network Migration Cap" is defined in Schedule B.

1.28. "Network Migrations Fees" means the fees payable to Service Provider for the provision of Network Migration Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.29. "Network Migration Services" is defined in Section 3.6.

1.30. "Network Operations Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section A of Schedule A attached hereto, excluding Service Provider Expenses.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 199 of 248

1.31. "Network Operations Support Services" is defined in Section 3.1.

1.32. "NOC" is defined in Section 3.1.

1.33. "North American Zone Maintenance Authority Agreement" or "NAZ Agreement" means that certain multi-party agreement entered into by Sandwich Isles Communications on April 1, 2012, as amended on January 1, 2019, and subsequently assumed by the Trustee.

1.34. "On-site Technical Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.35. "On-site Technical Support Services" is defined in Section 3.2.

1.36. "On-site Technical Support Services Cap" is defined in Schedule B.

1.37. "Paniolo Bankruptcy Proceeding" means *In re Paniolo Cable Company, LLC*, Debtor, Case No. 18-01319 in the United States Bankruptcy Court for the District of Hawaii.

1.38. "Paniolo Network" is defined in Recital A.

1.39. "Party" refers to each of the Trustee and Service Provider, and their respective permitted successors and assigns.

1.40. "Pre-existing Infrastructure Repair" is defined in Section 3.2(b).

1.41. "Pre-existing Infrastructure Repair Estimate" is defined in Section 3.2(b).

1.42. "Pre-existing Infrastructure Repair Cap" is defined in Section 3.2(b).

1.43. "Proposed Transaction" is defined in Recital A.

1.44. "Sales Agent Services" is defined in Section 3.4.

1.45. "Sales Agent Fees" means the fees payable to Service Provider for the provision of Sales Agent Services as set forth in Section E of Schedule A attached hereto.

1.46. "Sandwich Isles Communications" means Sandwich Isles Communications, Inc., a Hawaii corporation, and its successors and permitted assigns.

1.47. "Service Provider Expenses" means all of Service Provider's non-labor expenses, such as vehicle costs, tools, business insurance, and other expenses.

1.48. "Settlement Agreement" means that certain Rule 9019 Settlement Agreement entered into by SIC and Debtor on March 3, 2020.

1.49. "SIC" mean Sandwich Isles Communications and its Affiliates.

1.50. "Submarine Cable" mean the fiber-optic cable extending underwater between the beach manholes for those cable segments connecting Kauai to Oahu, Oahu to Molokai, Molokai to Maui, and Maui to Hawaii.

1.51. "Submarine Cable Repair Expenses" mean the expenses payable to third-parties to repair the Submarine Cable pursuant to Sections 3.3 and Schedule A.

1.52. "Submarine Cable Storage Agreement" means that certain Agreement for the Storage of Spare Plant for the Paniolo Cable System, dated October 22, 2008, by and between Transoceanic Cable Ship Company, Inc. and its successors and assigns, and Sandwich Isles Communications.

1.53. "Submarine Cable Support Services" is defined in Section 3.3.

1.54. "Submarine Cable Support Fees" means the fees payable to Service Provider for the provision of Submarine Cable Support Services as set forth in Section C of Schedule A attached hereto, excluding Service Provider Expenses.

1.55. "Taxes" means any and all applicable federal, state, local, and foreign sales, use, excise, utility, gross receipts, value added, and other taxes, tax-like charges and other assessments and surcharges imposed on a Party.

1.56. "Term" is defined in Section 2.1.

1.57. "Transport Services" means DS1, DS3, OC3, OC12, and OC48 circuits provided to Sandwich Isles Communications in connection with the SIC Fiber, pursuant to Section 3.1 of the Master Relationship Agreement.

1.58. "Trustee" is defined in the Preamble.

## ARTICLE 2
## TERM

2.1. Term. This Agreement is effective as of the Effective Date and shall remain in force until terminated pursuant to Section 2.2 ("Term").

2.2. Termination. This Agreement may be terminated by either Party upon the Default of the other Party and will terminate automatically (a) upon the closing of the Proposed Transaction or (b) upon termination pursuant to Section 7.1 of the Asset Purchase Agreement.

2.3. Effect of Termination. Termination of this Agreement shall not affect the rights or obligations of either Party that have accrued before the date of termination or expiration, and all terms that by their nature should survive expiration or termination of this Agreement shall remain in effect.

5

## ARTICLE 3
## OPERATIONAL SUPPORT AND SALES SERVICES

3.1.    Network Operations Support Services.

(a)    Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide operational support services, including network operational center ("NOC") services, network monitoring and management services, provisioning and configuration services, facility security services, and customer support services, as detailed on Schedule A ("Network Operations Support Services"). Service Provider may provide such Network Operations Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

(b)    The Trustee shall use commercially reasonable efforts to provide Service Provider with electronic and physical access to the Paniolo Network facilities and equipment from the parties who are currently managing the Paniolo Network, including but not limited to, consultants to the Trustee and SIC, as well as all physical plants, central offices, or any other facility or infrastructure used in connection with the Paniolo Network (which shall include enforcing the provisions of the Settlement Agreement).

3.2.    On-site Technical Support Services. Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide routine on-site technical support services requiring and involving the dispatch of a qualified technician, including site access and escort services, network equipment troubleshooting services, and fiber splicing and repair services, and other routine maintenance as necessary and as detailed in Schedule A ("On-site Technical Support Services"). Service Provider may provide such On-site Technical Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

3.3.    Submarine Cable Support Services.    Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide submarine cable support services as necessary and detailed in Schedule A, including the coordination and facilitation of any required submarine cable repairs using the NAZ Agreement and the inventory of spare cable held under the Submarine Cable Storage Agreement ("Submarine Cable Support Services"). For the avoidance of doubt, the Trustee shall be responsible for all Submarine Cable Repair Expenses, including any and all repairs arising out of pre-existing conditions of the Submarine Cable(s), as outlined under Article V of the APA.

3.4.    Sales Agent Services.    Subject to the terms, conditions, and restrictions of this Agreement, and as set forth in Schedule A, Service Provider is authorized to market Capacity on Trustee's behalf through such reasonable means, as appropriate, including advertising, participation in trade shows, and responses to inquiries ("Sales Agent Services"). Service Provider shall have the right to designate any agreement signed by Trustee as an Assigned Contract under Section 2.1(d)(iv) of the APA.

3.5.    Network Inventory.    Subject to the terms, conditions, and restrictions of this Agreement and the scope and responsibilities as set forth in Schedule A, the Service Provider shall

6

document the utilization of Paniolo Network fiber and conduits and prepare an inventory of provisioned circuits in use on the Paniolo Network ("Network Inventory"). The Parties agree that an accurate Network Inventory is required to provide the Network Operations Support Services, Submarine Cable Support Services, On-site Technical Support Services, and Sales Agent Support Services. The Parties further acknowledge and agree that the Network Inventory is necessary for the timely and proper grooming and migration of SIC's consumption of network assets to align with the Settlement Agreement and Master Relationship Agreement between the Trustee and SIC. Trustee shall use commercially reasonable efforts (which shall include enforcing the terms of the Settlement Agreement) in support of Service Provider's preparation of the Network Inventory.

3.6.  Network Migration Services.

(a)  Subject to the terms, conditions, and restrictions of this Agreement, and using information provided by the Trustee and the Network Inventory prepared by the Service Provider under this Agreement, the Service Provider shall perform the migration of existing Fiber Strand and network circuits consumed by SIC onto the SIC Fiber and Transport Services in connection with the SIC Fiber in accordance with the provisions of the Settlement Agreement and Master Relationship Agreement. The Service Provider will develop a network plan, engineering designs, applicable work orders, circuit designs, network inventory, and implementation plan or method of procedure, to complete the migration. Work shall be performed in accordance with industry best practices in maintenance windows coordinated by the Service Provider, acting on behalf of the Trustee. In the event SIC does not have the equipment necessary to interface with the SIC Fiber and related Transport Services, Service Provider and Trustee shall cooperate to determine an appropriate migration scope to achieve the necessary interface, prior to the closing of the Proposed Transaction.

(b)  Network Migration Services Fees shall be billed to the Trustee on a time and material basis using the labor rates set forth on Schedule A, and payable as set forth in Schedule B hereof.

3.7.  Assigned Claims. Pursuant to the Asset Purchase Agreement, Trustee agreed to assign to Buyer all Assigned Claims (as defined in the Asset Purchase Agreement). During the term hereof, Service Provider shall have the right, on behalf of Trustee, to pursue such Assigned Claims, and Trustee shall reasonably cooperate with Service Provider in Service Provider's pursuit of such Assigned Claims.

3.8.  Communications.  Service Provider shall ensure that all communications to Customers, including marketing and sales materials or statements, clearly identify Trustee as the provider of Capacity. No Customer communication shall state or imply that Service Provider owns or controls the Paniolo Network.

3.9.  Other Services. Service Provider will provide other services requested by Trustee from time to time as agreed upon by the Parties.

3.10.  Performance Standard.  In addition to any specific performance standards set forth in Schedule A, Service Provider shall perform all Services in a professional manner consistent with industry standards and best practices.

7

3.11.   Service Provider Expenses.  Service Provider is solely responsible for all Service Provider Expenses.

3.12.   <u>Facilities and Personnel</u>.  Services Provider represents that it has and shall maintain adequate facilities, resources, and personnel to perform its obligations hereunder.

3.13.   <u>Records</u>. Service Provider shall keep reasonable books and records of all Services provided under this Agreement and shall make such books and records available to Trustee upon reasonable notice and during normal business hours.

3.14.   <u>Network Access; Information Access</u>.  Trustee shall use commercially reasonable efforts provide Service Provider with access to the Paniolo Network and any information relating to the Paniolo Network as reasonably requested by and necessary for Service Provider to provide Services hereunder.  Service Provider shall not be liable for any impairment in service caused by its not receiving information or access as required hereunder.

3.15.   <u>No Transfer of Control</u>.  Nothing in this Agreement is intended to transfer *de facto* or *de jure* control (as those terms are construed by the U.S. Federal Communications Commission) of the Paniolo Network.  Service Provider acknowledges and agrees that it provides all Services hereunder at the direction of the Trustee, and that the Trustee shall retain ownership and control of the Paniolo Network until consummation of the Proposed Transaction.

3.16.   <u>Relationship</u>.  The relationship between Trustee and Service Provider established by this Agreement is that of independent contractors, and nothing herein shall be construed as creating a relationship of employer and employee, partners, joint venturers, franchisor and franchisee, co-owners, or contractor and subcontractor.

**ARTICLE 4**
**FEES; TAXES**

4.1.   <u>Service Fees</u>.   In exchange for providing services, Trustee shall pay Service Provider the fees in US dollars, excluding applicable taxes, as detailed in Schedule A.

4.2.   <u>Invoicing</u>.  Service Provider shall invoice Trustee upon the Effective Date and at one (1) month intervals thereafter throughout the Term unless otherwise indicated in Schedule B herein.

4.3.   <u>Payment Terms</u>.  Payment shall be made for the services as detailed in Schedule B.

4.4.   <u>Taxes</u>.  From and after the Effective Date, each Party is responsible, as required under applicable Law, for identifying and paying all Taxes (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this Agreement.   The Parties shall cooperate to minimize adverse tax consequences.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 204 of 248

**ARTICLE 5**
**LIMITED WARRANTY; LIMITATION OF LIABILITY; EQUITABLE REMEDIES**

5.1.     LIMITED WARRANTY.  EXCEPT AS SET FORTH ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

5.2.     Limitation on Liability.  Subject to Section 5.3, no Party shall be liable under this Agreement, whether in contract, tort (including negligence and strict liability) or otherwise for any special, indirect, punitive, reliance, or consequential damages (whether or not such losses were within the contemplation of the Parties) suffered or incurred by the other Party.

5.3.     Limitation on Liability Not Applicable.  Nothing in this Agreement shall exclude or limit any Party's liability:

(a)     For death or personal injury resulting from the negligence or willful misconduct of a Party or their servants, other agents or employees;

(b)     For fraud and/or fraudulent misrepresentation;

(c)     For misuse of Confidential Information;

(d)     Under Article 7 (Indemnification);

(e)     For payment of sums properly due and owing to the other in the course of normal performance; or

(f)     For matters which cannot be excluded under applicable Law.

5.4.     Subject to Section 5.2 and Section 5.3, each Party's maximum liability under or in connection with this Agreement shall be limited to direct damages proven.

5.5.     The Parties acknowledge and agree that a breach or threatened breach of a material term or condition of this Agreement may cause the non-breaching Party irreparable harm, and accordingly such Party shall be entitled to seek equitable relief.

**ARTICLE 6**
**INDEMNIFICATION**

6.1.     Each Party (as "Indemnifying Party") shall indemnify, defend and hold harmless the other Party, its employees, officers, directors, members, subcontractors and agents (the "Indemnified Parties") as provided herein.

6.2.     Trustee shall indemnify Service Provider Indemnified Parties from and against all third-party liability, loss, cost, damage, expense, or cause of action of any nature whatsoever (including the infringement of any third-party Intellectual Property, environmental damages,

9

property damage, and personal injury (including death), together with expenses (including reasonable attorneys' fees and court costs through appeal) (collectively, "Claims"), arising from Trustee's gross negligence or willful misconduct in connection with performance by Trustee of its obligations (or breach thereof).

6.3.    Service Provider shall indemnify Trustee Indemnified Parties from and against all Claims (including, for the avoidance of doubt, Customer Claims), arising from Service Provider's performance of its obligations (or breach thereof) hereunder or from Service Provider's statements, representations, assumption of obligations, or other communications or commitments made by Service Provider to a Customer without the approval of Trustee.

6.4.    In connection with the indemnification provided pursuant to this Article 6, the Indemnified Party shall:  (a) promptly notify the Indemnifying Party in writing of any Claim and grant the Indemnifying Party control of the defense and all related settlement negotiations; and (b) cooperate with the Indemnifying Party, at its expense, in defending or settling such Claim; provided that if any settlement results in any ongoing liability to, or prejudices or detrimentally impacts the Indemnified Party, and such obligation, liability, prejudice, or impact can reasonably be expected to be material, then such settlement shall require the Indemnified Party's written consent.  In connection with any Claim, the Indemnified Party may have its own counsel in attendance at all public interactions and substantive negotiations at its own cost and expense.

## ARTICLE 7
## INSURANCE

7.1    During the Term, each Party, at its sole costs and expense, will obtain and maintain with financially reputable insurers that are licensed to do business in all jurisdictions where any work is performed and that hold a current rating of not less than A-, (according to A.M. Best), not less than the following insurance coverages, which may be satisfied through a combination of primary and excess (umbrella policies):

(a)    Workers' Compensation, as provided for under any Worker's compensation or similar Law in the jurisdiction where any work is performed with an Employer's Liability limit of not less than $500,000 for each incident;

(b)    Commercial General Liability, including coverage for Contractual Liability and Products/Completed Operations Liability, with a limit of not less than $1,000,000 per occurrence for bodily injury, personal injury and property damage liability;

(c)    "All Risk" Property Insurance covering not less than the full replacement cost of a Party's personal property while on the other Party's site;

(d)    Business Auto Insurance covering the ownership, maintenance or use of any owned, non-owned or hired automobile with a limit of not less than $1,000,000 combined single limit per accident for bodily injury and property damage liability;

(e)    "All Risk or Special Form" Property Insurance covering not less than the full replacement cost of a Party's property including business interruption; and

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 206 of 248

(f)     Umbrella form excess liability insurance with limits of not less than $5,000,000.

7.2     Each insurance policy, except Workers' Compensation and Property Insurance, will include each Party as an additional insured and loss payee for their acts or omissions under the Agreement.


7.3     Each insurance policy shall contain a waiver of subrogation in favor of the other Party.

7.4     Each insurance policy shall be endorsed to give the other Party at least thirty (30) calendar days' prior written notice of cancellation.

7.5     Each Party's insurance will be primary for their own acts or omissions.

7.6     Nothing contained herein limits either Party's liability to the other Party to the limits of insurance certified or carried.

7.7     Each Party shall provide proof of insurance either in the form of a Certificate of Insurance (ACORD form 25 or equivalent).  Such proof shall be provided within fifteen (15) calendar days of the Effective Date, and again within fifteen (15) calendar days of the renewal or replacement of each policy.

## ARTICLE 8
## NOTICES

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by a reputable overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Article 9).  Deliveries made after normal business hours or on non-Business Day shall be deemed delivered on the next Business Day.

If to the Trustee:          Michael Katzenstein, Trustee
                            Bankruptcy Estate of Paniolo Cable Company, LLC
                            c/o FTI Consulting, Inc.
                            Three Times Square, 9th Floor
                            New York, New York 10036

        With a copy to:     Goodsill Anderson Quinn & Stifel LLP
                            999 Bishop Street, Suite 1600
                            Honolulu, Hawaii 96813
                            Attn:  Johnathan C. Bolton

If to Service Provider:     Cincinnati Bell Inc.
                            221 East Fourth Street

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 207 of 248

Cincinnati, Ohio 45202
Attn: Mark J. Fahner

With a copy to: Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Attn: Andrew M. Ray

A Party may change its address and point of contact by notifying the other Party in writing in accordance with this Article.

## ARTICLE 9
## CONFIDENTIALITY

9.1.    Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own Confidential Information, but in no event less than a reasonable standard of care shall be used.  A Party shall not disclose the other Party's Confidential Information without the prior written consent of the disclosing Party, except that each Party may disclosure the other Party's Confidential Information to its employees with a need to know for purposes of performance and to its professional advisors; provided that such employees and professional advisors are under an obligation of confidentiality consistent with this Section 9.1.  A receiving Party may also disclose certain Confidential Information of the disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other governmental body having jurisdiction, *provided that* the receiving Party provides the disclosing Party with reasonable prior written notice of such disclosure (if legal to do so) and, if requested by the disclosing Party, assists such Party in obtaining a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

(a)    Nothing herein shall be construed as granting any right or license under any Intellectual Property now or hereafter owned, licensed or controlled by a Party to the other Party.

(b)    The receiving Party shall not, without first obtaining written consent of the disclosing Party, use any service mark, logo, trademark, trade name, or other Intellectual Property of the disclosing Party or refer to the other Party in any promotional activity except as authorized in this Agreement.  For the avoidance of doubt, a breach of this provision shall be a material breach of this Agreement, entitling the non-breaching Party to exercise all rights available under this Agreement or applicable Law.  Notwithstanding the foregoing, Service Provider shall have a license to use the trade names and trademarks of the Trustee in order to perform its rights and duties hereunder.

9.2.    The provisions of this Article 10 shall survive expiration or other termination of this Agreement.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 208 of 248

**ARTICLE 10**
**DEFAULT**

10.1.    A "<u>Default</u>" shall be deemed to have occurred under this Agreement if a Party:

(a)    violates any applicable Law with respect to its rights and obligations under this Agreement;

(b)    fails to perform any of its material obligations under this Agreement or the APA; or

(c)    undergoes a Bankruptcy Event.

10.2.    In the event of any Default hereunder, the non-Defaulting Party may terminate this Agreement upon written notice to the Defaulting Party; provided, however, that the non-Defaulting party must first provide the Defaulting Party with a default notice specifying in reasonable detail the nature of such breach, and such breach shall have continued without cure for a period of thirty (30) days after the Defaulting Party's receipt of such written notice of breach. For the avoidance of doubt, a Party's failure to make any payment that has not been disputed in good faith in writing within thirty (30) days of receiving a notice of payment due or an invoice, when due hereunder, shall be deemed a material breach of this Agreement.

10.3.    The non-Defaulting Party may (subject to Article 6) pursue any legal remedies it may have under this Agreement, applicable Law, or principles of equity.

10.4.    A waiver by either Party at any time of any of its rights as to anything herein contained shall not be deemed to be a waiver of any breach of covenant or other matter subsequently occurring.

**ARTICLE 11**
**FORCE MAJEURE**

Solely with respect to the matters governed by this Agreement, and without effecting any other agreements between the Parties, in no event shall a Party have any claim or right against the other for any failure of performance (other than a failure to pay any amount due) due to causes beyond its control (a "<u>Force Majeure Event</u>") including:  acts of God, fire, explosion, vandalism, adverse weather conditions, flood or other similar occurrences; any change in Law; national emergencies; pandemic; insurrections; riots; wars; terrorism; strikes, lock-outs, work stoppages, or other labor difficulties (other than those of a Party's own workforce); or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected Party.

**ARTICLE 12**
**GOVERNING LAW; DISPUTE RESOLUTION**

12.1.    This Agreement is governed by the laws of the State of New York, without regard to conflict of laws principles.

13

12.2.    The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions between authorized senior representatives with the power to resolve the dispute.  All negotiations conducted by such representatives shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations.  If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the written notice, either such Party may initiate legal action as set forth below.

12.3.    Failing resolution of a dispute in accordance with Section 12.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any disputes arising out of this Agreement shall be adjudicated in the Paniolo Bankruptcy Proceeding, and each Party hereby agrees to the personal and exclusive jurisdiction of such court.  The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

## ARTICLE 13
## REPRESENTATIONS, WARRANTIES AND FURTHER OBLIGATIONS

13.1.    Each Party represents and warrants that as of the Effective Date:

(a)    it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

(b)    this Agreement constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms, subject to bankruptcy, insolvency, creditors' rights and general equitable principles; and

(c)    its execution of and performance under this Agreement does not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

13.2.    During the Term, each Party shall secure and maintain all necessary permits, licenses, and other authorizations required to perform its obligations and enjoy its rights as provided under this Agreement.

13.3.    During the Term, each Party shall comply with all applicable Laws including the U.S. Foreign Corrupt Practices Act of 1977, all export control regulations, and the rules and regulations of the Federal Communications Commission.

## ARTICLE 14
## GENERAL PROVISIONS

14.1.    <u>Binding Agreement</u>.  This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective permitted successors and assigns.

14.2.    <u>Waiver</u>. A Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered or made available by

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 210 of 248

the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of a Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

14.3. <u>Assignment</u>. Neither Party may assign this Agreement without the prior written consent of the other Party. Any purported assignment in contravention of this Section 14.3 shall be void.

14.4. <u>Interpretation</u>. In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a) the headings in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(b) whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(c) the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, all tenses, and both noun and verb forms, as context dictates; and

(d) when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day.

14.5. <u>Joint Participation</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

14.6. <u>Entire Agreement</u>. This Agreement, together with the Asset Purchase Agreement, constitutes the entire and final agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreement relating to the subject matter hereof, which are of no further force or effect.

14.7. <u>Amendment</u>. This Agreement may not be amended or modified except by an instrument in writing signed by both Parties.

14.8. <u>Invalidity</u>. If any term, obligation or other provision of this Agreement is invalid, illegal or incapable of being enforced due to any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 366-1   Filed  12/28/20   Page 211 of 248

in any manner materially adverse to either of the Parties.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent.

14.9.  <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided, nothing in this Agreement expressly or impliedly provided any third party with any remedy, claim, liability, reimbursement, cause of action or other right or privilege.

14.10.  <u>Further Actions</u>.  The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of this Agreement.

14.11.  <u>Counterparts and Electronic Signatures</u>.  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one-and-the-same agreement.

[***The rest of this page is left intentionally blank***]

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____

Date: _____


HAWAIIAN TELCOM, INC.

By: _____

Title: _____

Date: _____

**SCHEDULE A:**

**OPERATIONAL SUPPORT AND SALES SERVICES SCOPE AND FEES**

In relation to operation of the Paniolo Network, Service Provider shall, subject to the control of the Trustee:

    A.  <u>Network Operations Support Services</u>

        a.  Service Provider will, on a best-efforts basis, provide the following:

            i.  Maintain and operate a network operations center;

           ii.  24x7x365 network monitoring and management of Submarine and Terrestrial Network

          iii.  Establish and administer a network monitoring and performance tool to provide a timely record of network events impacting service.

          iv.  Establish and administer a trouble ticket system.

           v.  If, applicable, manage the Element Management System Server and Equipment administrative tasks, such as server backups, login-administration, security audits, trouble ticket administrations, etc.

          vi.  Monitor performance of the Paniolo Network and coordinate resolution of any incident management issues with appropriate personnel.

         vii.  Routinely monitor the network performance, collect performance data and analyze the performance data and trends in performance to ensure compliance with any existing Trustee contract.

        viii.  Manage Equipment Spare Inventory, if any.

          ix.  Dispatch and coordinate On-site Support Services Technicians as necessary to support scheduled installation and maintenance activities as well as emergency restoration activities.

           x.  Tier 1-3 technical support for network incidents.  When applicable, calls to the equipment vendor for support will be made by the Service Provider as long as the Trustee has a current maintenance support agreement with the

equipment vendor.

    xi.  Facility systems monitoring (e.g. fire, smoke and environmental alarms)

    xii.  Circuit provisioning and configuration services;

       1.  Service Provider shall receive, process, coordinate and manage all requests from authorized customers requesting circuit provisioning, amendment, redirection, and interconnection service in any Paniolo Network for new original orders.

       2.  After checking and confirming feasibility, the NOC should dispatch order within 24 hours upon receipt of said request with specifications of expected completion date.

    xiii.  Facility security services

       1.  Service Provider shall provide remote 24x7x365 monitoring of external facility security as mutually agreed by the Parties.

       2.  Remote access to secure facilities where available.

    xiv.  Provide customer support services for fault-reporting and which operates the "trouble ticket" system for customers.

b.  Network Operations Support Services to be provided on a fixed fee, monthly recurring retainer basis as follows:

    i.  Ten thousand dollars ($10,000.00) per month.

c.  To facilitate the implementation of the Network Operations Support Services, the Trustee shall use commercially reasonable efforts to provide, and if necessary compel SIC to provide:

    i.  Manufacturer support agreements covering network equipment, generators, power and HVAC systems.

    ii.  all circuit IDs with customer name for all circuits,

    iii.  secure, remote access to the appropriate network element management systems,

iv. Cleared access to the terminal building and central office facilities, including any gate keys, door keys, combination codes, and access clearances required to enter the exterior facilities, gain access to interior rooms in the facilities, and access to generators and HVAC equipment,

v. Other information as may be reasonably required and requested by Service Provider.

B. <u>On-site Technical Support Services</u>:

a. Service Provider will advise Trustee of the need for any routine and emergency repair and maintenance activities and shall dispatch qualified technicians and engineers to perform such activities, in response to network outage or performance degradation events, manufacturer suggested maintenance schedules, and as directed by the Trustee including but not limited to:

i. Installation activity including but not limited to, test and turn-up of the circuits, installing cross-connects to customer equipment, installing circuit packs and interfaces.

ii. Perform emergency equipment maintenance as needed, including equipment troubleshooting, repair and replacements using available Trustee-owned maintenance spare equipment and manufacturer support agreements held by the Trustee.

iii. Perform routine equipment repair and maintenance of facilities, network assets and power systems, all consistent with manufacturer guidelines and service provider industry practice, as mutually agreed by both parties.

iv. Perform software patches and updates on network equipment as required to meet the obligations of Services in this Agreement subject to coverage and availability under network equipment maintenance support agreements held by the Trustee.

v. Perform emergency outside plant fiber troubleshooting, splicing and repair as needed.

vi. Facility access and escort services to allow SIC and third-party colocation

b. On-site Technical Support Services and Network Migration Services to be provided in on a travel, time and material basis, invoiced in arrears (but paid pursuant to Schedule B of the Agreement), as follows:

i. Standard labor rates (normal business hours Monday through Friday 8am to

5pm local Hawaii time.

    a. Central Office Technician, OSP Fiber Technician, Splicing and Fiber Placing Technician, and Building Services Technician: $98.00 per hour, 2-hour minimum

    b. Planner, Engineer, Equipment Installer, and Project Manager: $123.00 per hour, 2-hour minimum

    c. Tier 2/3 Network Engineer: $170.00 per hour, 2-hour minimum

  ii. Labor rates for evenings (after 5pm to 8am Hawaii time) and weekends (after 5pm on Friday to 8am on Monday local Hawaii time) will be 2.0x the standard technical labor rates.

  iii. Costs for materials and equipment provided by the Service Provider to be documented and passed through at cost.

  iv. Pass-through of flight and hotel expenses for travel as approved by the Trustee and documented. Applicable hourly rates will be also charged for travel time.

C. <u>Submarine Cable Support Services</u>:

  a. Service Provider to provide:

    i. Operations and maintenance of the Paniolo Network Submarine Cable segments as follows:

      1. The Service Provider shall use reasonable efforts to maintain the Submarine Cable segments in efficient working order, with an objective of achieving effective and timely repairs when necessary.

      2. The Service Provider, acting as the maintenance authority on the Trustee's behalf, will provide coordination, facilitation and project management of Submarine Cable segment repairs using the NAZ Agreement, and if necessary, the spare cable owned by the Trustee and held in storage pursuant to the Submarine Cable Storage Agreement.

      3. Service Provider to utilize any existing detailed procedures for Operations and Maintenance of the Submarine Cable provided by Trustee.

    4. Issuance of planned maintenance notifications and Wet Plant repair status to customers with service on the Paniolo Network.

    5. For major system failure, abnormality, repair or modification that requires use of the NAZ Agreement repair provider, provide daily or ad-hoc as required, progress report to all parties until completion. After completion, provide a full report to Trustee and all impacted customers.

b. Services to be provided by Service Provider on a time and material basis, and any charges for the Submarine Cable repair and NAZ Agreement maintenance authority representation will be borne by the Trustee. For the avoidance of doubt, the labor rates for the Submarine Cable Support Services will match that of the On-site Technical Support Services labor rates, and any time incurred by observers placed by Service Provider on a repair vessel starts when observer boards the vessel and ends when observer departs at port.

c. Trustee is responsible for notification to the NAZ Agreement repair provider that the Service Provider has assumed the maintenance authority responsibilities for the Submarine Cable.

D. <u>Network Inventory</u>:

    a. In preparing the Network Inventory, the Service Provider will:

        i. Use commercially reasonable efforts to provide login via remote connectivity to each Paniolo Network device and obtain established virtual cross-connects.

        ii. Physically (if necessary) trace cabling from each Paniolo Network device to the cross-connect termination point (e.g., fiber distribution panel, DSX panel) to the SIC or customer's demarcation point.

        iii. Add all information into the Service Provider's respective inventory and engineering system(s) as required (including CLLI codes, part number or equivalent of equipment, cross-connects)

        iv. Label equipment and fiber cross-connect panels according to industry standard protocols.

        v. Provide as-built information back to the Trustee in a table format.

b. Network Inventory services to be provided on a time and material basis according to the On-site Technical Services labor rate schedule, not to exceed fifty-thousand dollars ($50,000.00), which will be invoiced upon completion.

c. To facilitate the development of the Network Inventory, the Trustee shall use commercially reasonable efforts to provide, and if necessary, compel SIC to provide:

    i. provide all circuit IDs with customer name for all circuits, circuit layout records (CLR), design layout records (DLR), network or schematic drawings, third-party leased components, and other applicable circuit information,

    ii. secure, remote access to the appropriate network element management systems,

    iii. Cleared access to the terminal building and central office facilities, including any gate keys, door keys, combination codes, and access clearances required to enter the exterior facilities, gain access to interior rooms in the facilities, and access to generators and HVAC equipment,

    iv. Other information as may be reasonably required and requested by Service Provider.

d. Service Provider shall deliver a copy of the Network Inventory to Trustee.

E. <u>Sales Agent Services</u>:

a. Capacity Contracts sold by the Service Provider on behalf of the Trustee must be reviewed and approved by the Service Provider and the Trustee, and no Capacity Contract will be valid unless executed by the Trustee.

    i. Each Capacity Contract shall provide that if requested by Service Provider, such Capacity Contract will be deemed assigned to and assumed by the Service Provider upon consummation of the Proposed Transaction, notice thereof which will be provided to Customers by the Service Provider.

b. Commissions to be paid to the Service Provider on an accrued revenue share basis of 40% of the total pre-tax charges due and payable under a Capacity Contract until the closing of the Proposed Transaction.

    i. Commissions to be paid to the Service Provider on a monthly basis on a schedule mutually agreeable to both parties. Any partial month applicable due to the timing of Proposed Transaction closing shall be prorated.

c. Except as previously granted under service arrangements between Service Provider and SIC, Service Provider shall not use the Paniolo Network to support its own existing network and customers prior to closing of the Proposed Transaction without the prior written consent of Trustee.

**SCHEDULE B**

**PAYMENT TERMS**

(a)  **Network Operations Support Services**:

    (i)    Fifty percent (50%) of the monthly Network Operations Support Fees shall be invoiced monthly in advance and payable on Net 30 terms; and

    (ii)    the remaining amount of the monthly Network Operations Support Fees will be deferred to the closing of the Proposed Transaction and treated as a Financing Offset Amount as set forth in the APA; provided that:

    (iii)    in the event that the Proposed Transaction is terminated due to a Default by the Service Provider or pursuant to APA Section 7.1(a)(iv), the Service Provider shall forfeit the deferred amounts; and

    (iv)    in the event the Proposed Transaction is terminated by either Party for any other reason pursuant to Section 2.2 or by Service Provider pursuant to Article 10 herein, one hundred percent (100%) of the unpaid Network Operations Support Fees, including any outstanding invoiced Network Operations Support Fees, accrued but not yet invoiced Network Operations Support Fees, and deferred Network Operations Support Fees, become immediately payable.

(b)  **On-Site Technical Support Services**:

    (i)    All On-site Technical Support Fees shall be invoiced monthly (with details of the worked performed) in arrears;

    (ii)    All On-site Technical Support Fees shall be capped at $200,000.00 (the "On-site Technical Support Services Cap");

    (iii)    The On-site Technical Support Services Cap (or, if lower, the actual invoiced amount of On-site Technical Support Fees), will be deferred to the closing of the Proposed Transaction and treated as a Financing Offset Amount as set forth in the APA, provided that;

    (iv)    in the event that the Proposed Transaction is terminated by either Party, subject to the On-site Technical Support Services Cap, one hundred percent (100%) of the On-site Technical Support Fees, including any outstanding invoiced On-site Technical Support Fees, accrued but not yet invoiced On-site Technical Support Fees, and deferred On-site Technical Support Fees become immediately payable

(v)     For repair and maintenance necessitated by any pre-existing condition of (i) terrestrial fiber, conduit, and related underground infrastructure, (ii) remediation to comply with environmental Laws, building, landscaping and property cleanup and disposal, and (iii) building infrastructure components including HVAC, power, batteries, generators, above-ground storage tanks, security systems, roofing and gutter systems, and septic tanks, ("Pre-existing Infrastructure Repair"), the material and labor costs for this work will not be included in the On-site Technical Support Services Cap. Fees for such Pre-existing Infrastructure Repairs will be based on a commercially reasonable estimate for each project to be delivered by the Service Provider to the Trustee ("Pre-existing Infrastructure Repair Estimate") up to a cap of one million two hundred thousand dollars ($1,650,000) ("Pre-existing Infrastructure Repair Cap"). Each Pre-existing Infrastructure Repair Estimate will be treated as a Financing Offset Amount as set forth in the APA

(c)     **Submarine Cable Support Services**

(i)     Submarine Cable Support Fees shall be invoiced when incurred, and will be deferred until the closing of the Proposed Transaction and treated as a Financing Offset Amount as set forth in the APA; provided that:

(ii)    In the event that the Proposed Transaction is terminated by either Party, one hundred percent (100%) of the applicable Submarine Cable Support Fees, including any outstanding invoiced Submarine Cable Support Fees, accrued but not yet invoiced Submarine Cable Support Fees, and deferred Submarine Cable Support Fees become immediately payable.

(iii)   For the avoidance of doubt, Trustee shall be directly responsible for all Submarine Cable Repair Expenses under the NAZ Agreement and the Submarine Cable Storage Agreement.

(d)     **Network Inventory**:

(i)     The Network Inventory Fees shall be capped at fifty thousand dollars ($50,000) ("Network Inventory Cap"). Network Inventory Fees will be invoiced upon completion and will be deferred until the closing of the Proposed Transaction and treated as a Financing Offset Amount as set forth in the APA, provided that:

(ii)    in the event that the Proposed Transaction is terminated by either Party, one hundred percent (100%) of the applicable Network Inventory Fees, subject to the Network Inventory Cap, including any outstanding invoiced Network Inventory Fees, accrued but not yet

invoiced Network Inventory Fees, and deferred Network Inventory Fees become immediately payable.

(e) **Network Migration Services**:

(i)     All Network Migration Fees shall be capped at one hundred thousand dollars ($100,000.00) ("Network Migration Cap"). Network Migration Fees shall be invoiced upon completion. Subject to the Network Migration Cap, any Network Migration Fees for material and equipment shall be invoiced and payable on Net 30 terms and any labor, material and equipment amounts will be deferred until the closing of the Proposed Transaction and treated as a Financing Offset Amount as set forth in the APA, provided that:

(ii)    in the event that the Proposed Transaction is terminated by either Party, hundred percent (100%) of the applicable Network Migration Fees, subject to the Network Migration Cap, including any outstanding invoiced Network Migration Fees, accrued but not yet invoiced Network Migration Fees, and deferred Network Migration Fees become immediately payable.

**SCHEDULE 1.1(a)**

**Assignable Contracts**

1. Rule 9019 Settlement Agreement (the "Settlement Agreement") effective March 6, 2020 by and among (i) the Paniolo Creditors (therein defined) by and through the acknowledgement of Deutsche Bank Trust Company Americas, as Purchasers Agent and Collateral Agent, which is not a Party as such term is defined herein in such capacity; (ii) Michael Katzenstein, Chapter 11 Trustee of Paniolo Cable Company, LLC; (iii) Waimana Enterprises, Inc. and SIC Affiliates (therein defined); and (iv) Sandwich Isles Communications, Inc. ("SIC"), including the Schedule A.1 Acknowledgment and other instruments constituting the Definitive Documentation referred to in the Settlement Agreement.

2. Master Relationship Agreement effective March 6, 2020 by and between Sandwich Isles Communications, Inc. and Paniolo Cable Company, LLC, including the following agreements attached as schedules thereto:

    i. SIC Lease dated March 6, 2020 by and between Sandwich Isles Communications, Inc. and Paniolo Cable Company, LLC; and

    ii. Assets IRU dated March 6, 2020 by and between Sandwich Isles Communications, Inc. and Paniolo Cable Company, LLC.

3. North American Zone Maintenance Authority Agreement dated April 1, 2012 between and among the Parties signatory to the agreement "Maintenance Authorities" and as amended on April 1, 2013 (First Amendment), further amended and extended on January 1, 2016 (Second Amendment), and further amended and extended on January 1, 2019 (Third Amendment)

4. Agreement for the Storage of Spare Plant for the Paniolo Cable System dated October 22, 2008 by and between Transoceanic Cable Ship Company, Inc. and its successors and assigns and Sandwich Isles Communications, Inc.

5. Any third party contracts for use of the Paniolo Network.

## SCHEDULE 1.1(b)

### Assigned Permits

All the Permits of Debtor relating to the Business, including Permits authorized by any Governmental Authority or private party but not yet issued, whether recorded or unrecorded, including, without limitation, the following:

1.  Submarine Cable Landing License, FCC File No. SCL-LIC-20070223-00003, issued by the FCC to Debtor.

2.  All easements, rights-of-way, and other property and real estate access rights granted to SIC in connection with and pertaining to the assets listed in Schedule 2.1(a); including, without limitation, the following entitlements (collectively, the "Entitlements"):

    Existing Entitlements:

    Federal

    1.      Permit issued under Section 10 of the River and Harbors Act of 1899, October 11, 2006 – Dept. of Army.

    State

    2.      Conservation District Use Permit (all sites except Sandy Beach) ST 05-3176, July 16, 2004 – Dept. of Land and Natural Resources (DLNR), Office of Conservation and Coastal Lands.

        2.1.      Extension to Conservation District Use Permit (all sites except Sandy Beach), ST 05- 3176, June 23, 2005 - DLNR, Office of Conservation and Coastal Lands.

    3.      Conservation District Use Permit (Sandy Beach), OA-3360, August 2, 2006 – DLNR, Office of Conservation and Coastal Lands.

    4.      DLNR Right-of-Entry Permit to Sandwich Isles Communications, Inc. to Enter Upon State-Owned Lands, June 25, 2007.

    5.      Dept. of Health, Notice of General Permit Coverage (NPDES) permits have been completed for each of the terrestrial routes to the landing sites and for the landing sites:
        •    Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, September 12, 2002 (File No. HI R10B320).
        •    Termination of Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, August 8, 2006 (File No. HI R10B320).

- Notice of General Permit Coverage (NGPC) Nanakuli to Kili Drive Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C084).
- Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C127).
- Letter dated June 5, 2006, re Compliance with Conditions 9.b., c., e., f., g., and h. of the Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project Phase 6 (File No. HI R10C127).
- Authorization to Discharge Under the National Pollutant Discharge Elimination System (NPDES) Kalanianaole to Waimanalo Fiber Optics Ductline Project, June 9, 2006 (Permit No. HI S000061).
- Notice of General Permit Coverage (NGPC) Kalamaula to Alii Fish Pond Fiber Optics Ductline Project, December 3, 2004 (File No. HI R10B984).
- Notice of General Permit Coverage (NGPC) Puunene to Makena Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C133).
- Notice of General Permit Coverage (NGPC) Honokowai to Waiko Road Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C132).
- Notice of General Permit Coverage (NGPC) Kawaihae to Upolu Fiber Optics Ductline Project, November 23, 2004 (File No. HI R10B890).
- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Lahaina and Kula, Maui, Hawaii, July 20, 2007 (File No. HI R10C888).
- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Waiane and Honolulu, Oahu, Hawaii, July 23, 2007 (File No. HI R10C880).

Kauai

6.     Special Management Area (SMA) exemption letter, June 30, 2004 – County of Kauai Planning Dept.

7.     Hanamaulu to Kekaha Fiber Optic Duct Line (Akiohala Road (Kekaha)) Conditional Letter – Dated 9/19/02 and Executed 9/24/02 and construction plan approval.

8.     Memorandum of Agreement (MOA) between USDA, RUS, Hawaii SHPO, and SIC regarding SIC's Kauai Fiber Optic Duct Lines Project - Dated October 10, 2001.

Oahu

9.      SMA (2004/SMA-67) and SSV (2004/SV-18), Makaha (Kili Drive)
        December 13, 2004 – City & County of Honolulu, Dept. of Planning
        and Permitting.

10.     Nanakuli to Kili Drive Fiber Optic Duct Line (Kili Drive (Makaha))
        Conditional Letter – Dated 6/23/05 and Executed 6/28/05 and
        construction plan approval.

        10.     MOA regarding SIC's Oahu Rural Fiber Optic Duct Lines
        Project - Dated October 10, 2001.

11.     SMA (2004/SMA-58), Sandy Beach Park, December 27, 2004 – City &
        County of Honolulu, Dept. of Planning and Permitting.

12.     Kalanianaole to Waimanalo Fiber Optic Duct Line (Sandy Beach to
        Waimanalo) Conditional Letter – Dated 11/28/06 and Executed
        12/6/06 and construction plan approval.

13.     SSV (2004/SV-17), November 30, 2004 – City & County of
        Honolulu, Dept. of Planning and Permitting.

Molokai

14.     SMA exemption letter for Onealii landing site, Molokai, December 10,
        2004 – County of Maui, Dept. of Planning.

15.     Kalamaula to Alii Fish Pond (Onealii Homestead (Kalamaula))
        Conditional Letter – Dated 10/20/04 and Executed 11/1/04 and
        construction plan approval.

16.     MOA regarding SIC's Molokai Rural Fiber Optics Duct Lines Project -
        Dated October 10, 2001.

Maui

17.     SMA (SM2 2004/0075) and Shoreline Setback Approval (SSA
        2004/0016), Poolenalena Park, July 22, 2004 – County of Maui, Dept.
        of Planning.

        17.1. Extension to SMA (SM2 2004/0075) and SSA (SSA
              2004/0016), Poolenalena Park, February 1, 2005 – County of
              Maui, Dept. of Planning.

        17.2. Extension to SMA (SM2 2004/0075) and SSA (SSA
              2004/0016), Poolenalena Park, February 8, 2006 – County of
              Maui, Dept. of Planning.

18.  Puunene to Makena Fiber Optic Duct Line Poolenalena Park (Makena) Conditional Letter – Dated 3/5/07 and Executed 3/7/07 and construction plan approval.

19.  First Amended MOA between USDA, RUS, Hawaii HPO, and SIC with Concurrence by the Maui/Lanai Islands Burial Counsel – Dated April 2004.

20.  DLNR right of entry for archaeological site work at Poolenalena landing site:
     • Right of Entry Permit dated January 8, 2003, issued by DLNR (Ref. PSF 02OD-417).
     • Right of Entry Permit dated January 23, 2004, issued by DLNR (Ref. PSF 02OD-417).
     • Extension of Right of Entry Permit dated March 9, 2007, issued by DLNR (Ref. PSF 02OD-417).

21.  SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, July 22, 2004 – County of Maui Dept. of Planning.

     21.1. Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 1, 2005 – County of Maui Dept. of Planning.

     21.2. Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 8, 2006 – County of Maui Dept. of Planning.

22.  Honokowai to Waiko Fiber Optic Duct Line (Wahikuli (Lahaina)) Conditional Letter – Dated 3/23/07 and Executed 3/27/07 and construction plan approval.

23.  Decision and Order and Findings of Fact and Conclusions of Law each dated June 6, 2007 (Docket No. 07-NR-VN-14, V-462) issued by State Department of Health (noise variance for nighttime work obtained with Henkels & McCoy as contractor along Wahikuli route; HDD only).

24.  State DLNR, Division of Boating and Ocean Recreation (DOBOR) letter of no objection to laying of Undersea fiber optic within the Kaanapali Water.

25.  Maui County Dept. of Parks and Recreation letters of no objection to submarine fiber optic cable at Poolenalena Beach Park and Wahikuli Wayside Park dated Feb. 13, 2007.

26.  Maui County Dept. of Parks and Recreation letter of no objection to relocated alignment of submarine fiber optic cable at Poolenalena Beach Park dated Feb. 23, 2007.

Hawaii

27.   SMA Permit No. 152, April 13, 2004 – County of Hawaii, Planning Dept.

    27.1. Extension to SMA Permit No. 152, July 14, 2005 – County of Hawaii, Planning Dept.

    27.2. Extension of SMA Permit No. 152, June 27, 2007 – County of Hawaii, Planning Dept.

28.   Kawaihae to Maluokalani (Kaewa Place (Kawaihae)) Conditional Letter – Dated 6/23/05 and Executed 7/13/05 and construction plan approval.

29.   MOA regarding SIC's Hawaii Rural Fiber Optic Duct Lines Project – Dated October 10, 2001 DHHL.

30.   Construction Plan Approval by Dept. of Hawaiian Home Lands (DHHL) pursuant to License Agreement No. 372 for (i) temporary construction site for Kekaha landing site, (ii) Molokai landing at Onealii, and (iii) construction on DHHL lands at Kaewa, Kawaihae.

Pending Entitlements:

State

1.   Extension to CDUP, ST 05-3176 for all marine landing sites, except Sandy Beach (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR).

2.   Extension to CDUP, ST 04-3360, for Sandy Beach landing site (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR).

3.   SDOT conditional letters and approval of plans for landing sites.

Kauai

4.   Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Kekaha.

5.   Easement for Kekaha Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007).

Oahu

6.    City & County Easement for use of City Parks (Sandy Beach and Makaha landing sites) Molokai.

7.    DHHL easement for Molokai landing at Onealii.

<u>Maui</u>

8.    Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Poolenalena.

9.    Easement for Poolenalena Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007).

10.   County of Maui Parks Department approval of plans for Wahikuli.

11.   Archaeological inventory survey of the proposed area to be bored at Poolenalena.

12.   Easement from County of Maui for marine fiber running under Wahikuli Wayside Park (to be obtained after completion of construction).

<u>Hawaii</u>

13.   DHHL easement for use of DHHL lands at Kaewa, Kawaihae.

## SCHEDULE 1.1(c)

### Assigned Rights

Any and all rights of Seller or Debtor arising under or in connection with the Purchased Assets, the Assignable Contracts, Assigned Claims, and the Assigned Permits (including the rights of Seller or Debtor to obtain any authorized but unissued Permit, any warranty rights in favor of Seller or Debtor).

## SCHEDULE 2.1(a)

## Debtor Assets

**(i)   The following assets owned by Paniolo free and clear of the claims and liens of any other person ("Schedule A.1"):**

**A.   Kaua'i**.  The table below identifies the assets for Kaua'i that are owned by Paniolo.

| Assets | Description |
|---|---|
| Marine Fiber | 122 Miles of 48-strand fiber cable extending from the Kekaha beach manhole to the Makaha beach manhole on Oahu. |
| Terrestrial Structure | 55 Feet of Subduct (three corrugated subducts) extending from the beach manhole towards SIC structure. |
| Cable Sheath | 122 Miles of marine cable sheath, including any armoring extending from Kauai to Oahu. |
| Beach Manhole | Underground structure providing the terminal point for the marine fiber at Akialoa Road in Kekaha, Hawaii and the splice point to the terrestrial fiber extending to the terminal building.  Contains three innerducts extending from the ocean per construction documentation. |
| Beach Manhole Conduit | Three conduits in total extending from the water into the Beach Manhole |
| Fiber Cable | 3,680 Feet of Fiber extending from near the Kekaha Beach Manhole to the Kekaha terminal building. |
| Kekaha Terminal Building | Terminal building located in Kekaha, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kekaha Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kekaha Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kekaha Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kekaha Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kekaha Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kekaha Terminal Building. |
| Fujitsu 4500 | Multiservice Provisioning Platforms in the Kekaha Terminal Building delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platforms and transmitter platforms in the Kekaha Terminal Building for fiber terminations that works with the Fujitsu 4500 to provide optical services. |

| | |
|---|---|
| Fujitsu 9500 | Dense Wave Division Platforms and transmitter platforms in the Kekaha Terminal Building for fiber terminations. |
| Spares | All spares and combustibles for equipment described in this Segment. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

**B. Oahu**. The table below identifies the assets for Oahu - Nanakuli that are owned by Paniolo.

| Assets | Description |
|---|---|
| Marine Fiber | 122 Miles of 48-strand fiber cable extending from the Makaha Beach Manhole to the Kekaha Beach Manhole on Kauai. |
| | |
| Cable Sheath | 122 Miles of marine cable sheath, including any armoring extending from Oahu to Kauai |
| Beach Manhole | Underground structure providing the terminal point for the marine fiber at Kili Road in Makaha, Hawaii and the splice point to the terrestrial fiber extending to the terminal building. Contains three innerducts extending from the ocean per construction documentation. |
| Beach Manhole Conduit | Three conduits in total extending from the water into the Beach Manhole |
| Terrestrial Structure | 36,282 Feet of Subduct (three corrugated subducts for most of the route and four corrugated subducts for a portion per construction documentation) extending from the Makaha Beach Manhole to the Nanakuli Terminal Building. Unknown quantity of Manholes provided by Paniolo. |
| Fiber Cable | 45,482 Feet of Fiber extending from the Makaha Beach Manhole to the Nanakuli Terminal Building |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500 | Multiservice Provisioning Platforms delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platforms and transmitter platforms for fiber terminations that works with the Fujitsu 4500 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platforms and transmitter platforms for fiber terminations. |
| Spares | All spares and combustibles for equipment described in this Segment. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

The table below identifies the assets for Oahu - Waimanalo that are owned by Paniolo.

| Assets | Description |
|---|---|
| Marine Fiber | 56 Miles of 48-strand fiber cable extending from the Sandy Beach-Beach Manhole to the Kalamaula beach manhole on Molokai. |

| | |
|---|---|
| Cable Sheath | 56 Miles of marine cable sheath, including any armoring extending from Oahu to Molokao |
| Beach Manhole | Underground structure providing the terminal point for the marine fiber at Sandy Beach near Waimanalo, Hawaii and the splice point to the terrestrial fiber extending to the terminal building.  Contains three innerducts extending from the ocean per construction documentation. |
| Beach Manhole Conduit | Three conduits in total extending from the water into the Beach Manhole |
| Terrestrial Structure | 26,526 Feet of Subduct (three corrugated subjects per construction documentation) extending from the Sandy Beach-Beach Manhole to the Waimanalo Terminal Building. Unknown quantity of Manholes provided by Paniolo. |
| Fiber Cable | 28,686 Feet of Fiber extending from the Sandy Beach-Beach Manhole to the Waimanalo Terminal Building |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500 | Multiservice Provisioning Platforms delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192.  Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platforms and transmitter platforms for fiber terminations that works with the Fujitsu 4500 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platforms and transmitter platforms for fiber terminations. |
| Spares | All spares and combustibles for equipment described in this Segment. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

**C.    Molokai.**  The table below identifies the assets for Molokai that are owned by Paniolo.

| Assets | Description |
|---|---|
| Marine Fiber | 56 Miles of 48-strand fiber cable extending from the Kalamaula Beach Manhole to the Sandy Beach-Beach Manhole on Oahu. |
| Cable Sheath | 56 Miles of marine cable sheath, including any armoring, extending from Molokai to Oahu |
| Marine Fiber | 27 Miles of 48-strand fiber cable extending from the Kalamaula Beach Manhole to the Wahikuli beach manhole on Maui. |
| Cable Sheath | 27 Miles of marine cable sheath, including any armoring, extending from Molokai to Maui |
| Beach Manhole | Underground structure providing the terminal point for the marine fiber at Kalamaula near Oneali'i Beach, Kalamaula, Hawaii and the splice point to the terrestrial fiber extending to the terminal building.  Contains three innerducts extending from the ocean per construction documentation. |
| Beach Manhole Conduit | Four conduits in total extending from the water into the Beach Manhole |
| Terrestrial Structure | 21,043 Feet of Subduct (three corrugated subducts per construction documentation) extending from the Oneali'i Beach Manhole towards the Kalamaula Terminal Building. Unknown quantity of Manholes provided by Paniolo. |
| Fiber Cable | 22,043 Feet of two cables of 48-Strand Fiber extending from the Kalamaula Beach Manhole to the Kalamaula Terminal Building. |

| | |
|---|---|
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Spares | All spares and combustibles for equipment described in this Segment. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

**D.** **Maui**. The table below identifies the assets for Maui that are owned by Paniolo.

| Assets | Description |
|---|---|
| Marine Fiber | 27 Miles of 48-strand fiber cable extending from the Wahikuli beach manhole to the Kalamaula Beach Manhole on Molokai. |
| Cable Sheath | 27 Miles of marine cable sheath, including any armoring, extending from Maui to Molokai |
| Beach Manhole | Underground structure providing the terminal point for the marine fiber at Leialii Parkway in Lahaina, Hawaii and the splice point to the terrestrial fiber extending to the terminal building. Contains three innerducts extending from the ocean per construction documentation. |
| Beach Manhole Conduit | Three conduits in total extending from the water into the Beach Manhole |
| Terrestrial Structure | 108,644 Feet of Subduct (three corrugated subducts per construction documentation) extending from the Wahikuli Beach Manhole towards the Puunene Terminal Building. Unknown quantity of Manholes provided by Paniolo. |
| Fiber Cable | 122,444 Feet of 48-Strand Fiber extending from the Wahikuli Beach Manhole to the Puunene Terminal Building. |
| Marine Fiber | 70 Miles of 48-strand fiber cable extending from the Poolenalena beach manhole to the Kawaihae beach manhole on Hawaii. |
| Beach Manhole | Underground structure providing the terminal point for the marine fiber at Poolenalena in Wailea-Makena, Hawaii and the splice point to the terrestrial fiber extending to the terminal building. Contains three innerducts extending from the ocean per construction documentation. |
| Beach Manhole Conduit | Three conduits in total extending from the water into the Beach Manhole |
| Terrestrial Structure | 67,710 Feet of Subduct (three corrugated subducts per construction documentation) extending from the Poolenalena Beach Manhole to the Puunene Terminal Building. Unknown quantity of Manholes provided by Paniolo. |
| Fiber Cable | 67,710 Feet of 48-Strand Fiber extending from the Poolenalena Beach Manhole to the Puunene Terminal Building. |
| Puunene Terminal Building | Terminal building located on Mehameha Loop in Puunene, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Puunene Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Puunene Terminal Building. |

| | |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Puunene Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Puunene Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Puunene Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Puunene Terminal Building. |
| Fujitsu 4500 | Multiservice Provisioning Platforms in the Puunene Terminal Building delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platforms and transmitter platforms for fiber terminations in the Puunene Terminal Building that works with the Fujitsu 4500 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platforms and transmitter platforms in the Puunene Terminal Building for fiber terminations. |
| Spares | All spares and combustibles for equipment described in this Segment. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

E.   **Hawaii.**  The table below identifies the assets for Hawaii that are owned by Paniolo.

| Assets | Description |
|---|---|
| Marine Fiber | 70 Miles of 48-strand fiber cable extending from the Kawaihae beach manhole to the Poolenalena beach manhole on Maui. |
| Cable Sheath | 70 Miles of marine cable sheath, including any armoring, extending from Hawaii to Maui |
| Beach Manhole | Underground structure providing the terminal point for the marine fiber at Kawaihae near Kaewa Place in Kawaihae, Hawaii and the splice point to the terrestrial fiber extending to the terminal building.  Contains three innerducts extending from the ocean per construction documentation. |
| Beach Manhole Conduit | Three conduits in total extending from the water into the Beach Manhole |
| Terrestrial Structure | 15,673 Feet of Subduct (three corrugated subducts per construction documentation) extending from the Kawaihae Beach Manhole towards the Puukapu Terminal Building.  Unknown quantity of Manholes provided by Paniolo. |
| Fiber Cable | 86,948 Feet of Fiber extending from the Kawaihae Beach Manhole to the Puukapu Terminal Building. |
| Puukapu Terminal Building | Terminal building located on Hiiaka Street in Puukapu, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Puukapu Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Puukapu Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Puukapu Terminal Building. |

| | |
|---|---|
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Puukapu Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Puukapu Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Puukapu Terminal Building. |
| Fujitsu 4500 | Multiservice Provisioning Platforms in the Puukapu Terminal Building delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platforms and transmitter platforms in the Puukapu Terminal Building for fiber terminations that works with the Fujitsu 4500 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platforms and transmitter platforms in the Puukapu Terminal Building for fiber terminations. |
| Spares | All spares and combustibles for equipment described in this Segment. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

**(ii)    The following assets and rights obtained by the Trustee from SIC in the Marshal Sale held March 6, 2020, free and clear of the claims and liens of any other person ("Schedule A.2").**

1. The Transferred Equipment and Property Rights (as defined in the Settlement Agreement) transferred by SIC in conjunction with the US Marshal Sale, and generally consisting of all assets spanning from and including the points of presence (central offices) to the subsea cable connections (cable stations), which for the avoidance of doubt includes but is not limited to all buildings currently performing as cable landing stations, central offices, real estate (including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access) conduits, manholes, handholes, rights of way, easements, fiber optic and telecommunication cables, fiber optic transmission, multiplexing, circuit switching, circuit transport equipment, IP routing & switching equipment, and related supporting assets such as towers, test equipment, power systems, cooling systems, security systems, network management systems, cross connects and cross connect panels, vehicles, trailers and tools, including all relevant manuals, maintenance records, warranties and the like, but for the avoidance of doubt, excluding the Mililani Property (as defined in the Settlement Agreement) for a stand-alone commercial operation and use of the Paniolo Cable System.

## A.    Kaua'i

| Assets | Description |
| --- | --- |
| Terrestrial Structure | 3,625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platforms in the Anahola Central Office delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building to the Anahola Central Office, including lateral Subducts to Lihue and Hanapepe. Unknown Manholes. |
| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building to the Anahola Central Office, including lateral Fiber to Lihue and Hanapepe. |

## B.  Oahu

### Oahu – Nanakuli

| Assets | Description |
| --- | --- |
| Terrestrial Structure | 9,200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo System. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

### Oahu – Waimanalo

| Assets | Description |
| --- | --- |
| Terrestrial Structure | 2,160 Feet of Subduct extending from near the Waimanalo terminal building to the manhole near Kalanianaole Highway where it meets the Paniolo System. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |

| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
|---|---|
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platforms delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platforms and transmitter platforms for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platforms and transmitter platforms for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

## C.    Molokai

Molokai – Kalamaula

| Assets | Description |
|---|---|
| Terrestrial Structure | 1,000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo System. |
| Kalamaula Terminal Building | Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |

| | |
|---|---|
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platforms delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platforms and transmitter platforms for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platforms and transmitter platforms for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

## Molokai – Hoolehua

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building to the Hoolehua Airport DLC and Hoolehua East DLC locations. Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building to the Hoolehua Airport DLC and Hoolehua East DLC locations. |

## D.    Maui

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo System. Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |

| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
|---|---|
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4500/4300/4100 | Multiservice Provisioning Platforms in the Waiehu Central Office delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway to the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building to the Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

## E.    Hawaii

Hawaii – Laiopua

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo System. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |

| | |
|---|---|
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platforms delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo System to the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building to the Laiopua central office. |

## Hawaii – Hilo

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platforms delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office to the Waiakea Area and Akolea Area. Unknown Manholes. |
|---|---|
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office to the Waiakea Area and Akolea Area. Unknown Manholes. |

**Other Related Assets –** With respect to assets listed on Schedule A.1 or Schedule A.2:

| Assets | Description |
|---|---|
| Information and Records | - Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>- Asset listing of all infrastructure and equipment indicated in Schedule A.1 and Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>- All contracts associated with the network and maintenance of the network, including marine maintenance agreements<br>- Wet and dry maintenance records and maintenance agreements<br>- Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>All inspection reports of the network (wet, dry, facilities, batteries, generators, etc.)<br>- Operating agreements for the monitoring and maintenance of the network<br>- Existing agreements and related materials for leasing capacity to third parties<br>- Detailed logical and physical inventory of the network linked to the asset list by item – to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>- Inventory of all electronics equipment used to provide circuits on the Paniolo Network including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>- All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.1 and Schedule A.2<br>- All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.1 and Schedule A.2<br>- All land user permits and certificates of compliance with land use permits<br>- List of major suppliers, with copies of supply and support agreements<br>- All third party agreements that are utilized to provide maintenance to the Schedule A.1 and Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |
| Operating Systems | - Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>- IT system vendors and maintenance agreements<br>- Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data in a standard GIS format showing the location of all fiber infrastructure (MapInfo, ArcGIS, Google Earth, etc.) |

| Access Keys | - | All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices |
|---|---|---|
| Inventory of spare submarine and terrestrial fiber | - | 39.36 kilometers of fiber in storage in Subcom's Honolulu depot to be used to repair submarine and terrestrial fiber segments per information provided in the data room. |

**SELLER DISCLOSURE SCHEDULE 3.5**

**Seller's Brokerage Agreements**

1.      The Order Granting Amended Application for Order Authorizing Employment and Retention of Ducera Partners LLC and Ducera Securities LLC as Investment Bankers to the Chapter 11 Trustee Pursuant to Section 327(a) and 328(a) of the Bankruptcy Code Nunc Pro Tunc to March 11, 2019 entered by the Bankruptcy Court on May 7, 2020

**BUYER DISCLOSURE SCHEDULE 4.5**

**Buyer's Brokerage Agreements**

Buyer has engaged investment bank Stephens, Inc., in connection with transactions contemplated by this agreement.

# BUYER DISCLOSURE SCHEDULE 4.6

## No Affiliates of Debtor

None.