Before the
Federal Communications Commission
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Connect America Fund | ) WC Docket No. 10-90 |
| | ) |
| Sandwich Isles Communications, Inc. | ) |
| | ) |
| Petition for Waiver of the Definition of "Study | ) CC Docket No. 96-45 |
| Area" Contained in Part 36, Appendix-Glossary | ) |
| and Sections 36.611 and 69.2(hh) of the | ) |
| Commission's Rules | |

## MEMORANDUM OPINION AND ORDER

**Adopted: June 30, 2017**             **Released: July 3, 2017**

By the Commission: Commissioner Clyburn issuing a statement.

1.      Congress has directed that if a State or local legal requirement effectively prohibits competitors from providing telecommunication service, we *must* override that requirement. Today, we carry out that mandate to remove barriers to entry and ensure the benefits of competition by preempting an exclusive license that effectively bars telecommunications competition on the Hawaiian home lands. Specifically, in this Memorandum Opinion and Order, we find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands (DHHL or Department) to Waimana Enterprises, Inc. (Waimana) and then assigned to its subsidiary, Sandwich Isles Communications, Inc. (Sandwich Isles) (hereinafter Exclusive License),[1] violates Section 253(a) of the Communications Act, as amended (the Act).[2] Because we find that the Exclusive License is not subject to the exceptions in Section 253(b) or (c),[3] we preempt enforcement of its exclusivity provision pursuant to Section 253(d) of the Act.[4]

### I. BACKGROUND

2.      DHHL is responsible for managing the Hawaiian home lands for the benefit of native Hawaiians under the Hawaiian Homes Commission Act of 1920, as amended (HHCA).[5] Thousands of families reside on the Hawaiian home lands, which are comprised of approximately 203,000 acres of

---

[1] State of Hawaii, Department of Hawaiian Home Lands License Agreement No. 372, at 2 (May 9, 1995) (Exclusive License), attached as Exhibit One to Sandwich Isles Reply Comments, WC Docket No. 10-90, WT Docket No. 10-208 (filed Feb. 24, 2012) (Sandwich Isles Feb. 24, 2012 Reply Comments).

[2] 47 U.S.C. § 253(a).

[3] *Id.* § 253(b), (c).

[4] *Id.* § 253(d).

[5] Letter from Jobie M.K. Masagatani, Chairman, Hawaiian Homes Commission, on behalf of the Department of Hawaiian Home Lands, State of Hawaii, to Ajit Pai, Chairman, FCC, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 3, 2017) (DHHL Letter).

Federal Communications Commission     FCC 17-85

State land.[6] Pursuant to the HHCA, DHHL has authority over access to and uses of the Hawaiian home lands,[7] including authority "'to grant licenses as easements for . . . telephone lines.'"[8] However, DHHL "does not have regulatory authority over telecommunications carriers."[9] In 1995, "DHHL granted an 'exclusive' license 'in perpetuity' to Waimana Enterprises, Inc., the parent company of Sandwich Isles, to provide telecommunications services to the Hawaiian home lands."[10] Specifically, the Exclusive License grants Waimana and its legal successors and assigns "the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [sic] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL] . . . ."[11] The terms of the Exclusive License provide that "broad band [sic] telecommunication services" includes, among other services, "intrastate and interstate telephone services."[12] In 1996, DHHL granted a partial assignment of the Exclusive License to Sandwich Isles.[13]

3.     In December 2016, following an investigation by the Universal Service Administrative Company, the Commission concluded that Sandwich Isles improperly received payments of more than $27 million in universal service high-cost support through repeated violations of the Commission's rules.[14] In light of the Commission's findings, the Commission directed the Wireline Competition Bureau (Bureau) to seek comment on whether the Commission should terminate a previously granted study area

---

[6] Comments of Hawaiian Telcom, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 20, 2017) (Hawaiian Telcom Comments), Attachment, Opposition of Hawaiian Telcom, Inc. to Petition for Expedited Study Area Waiver, CC Docket No. 96-45, at 4 (filed Mar. 4, 2013).

[7] DHHL Letter at 2, n.2.

[8] Hawaiian Telcom Comments, Attachment, at 18 (quoting HHCA § 207(c)(1)).

[9] DHHL Letter at 2, n.2.

[10] *Id.* at 2.

[11] Exclusive License at 2.

[12] *Id.* at 1.

[13] DHHL Letter at 2; *see also* Sandwich Isles Feb. 24, 2012 Reply Comments at 5-6 (explaining that the Exclusive License "was subsequently assigned in part to [Sandwich Isles], a wholly-owned subsidiary of Waimana, for purposes of the wireline voice requirements of the License").

[14] *See generally Sandwich Isles Communications, Inc.*, Order, WC Docket No. 10-90, 31 FCC Rcd 12999 (2016) (*Sandwich Isles Improper Payments Order*). The Commission also proposed a forfeiture of more than $49 million on Sandwich Isles, Waimana, and its controlling owner, Albert Hee, for apparent violations of the Commission's rules by, among other things, submitting and falsely certifying inaccurate data contained in cost studies from 2002 to 2013 that were used to calculate high-cost support. *See generally Sandwich Isles Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee*, Notice of Apparently Liability for Forfeiture and Order, File No. EB-IHD-15-00019603, 31 FCC Rcd 12947 (2016) (*Sandwich Isles NAL* or *NAL*). In the *NAL*, the Commission ordered Sandwich Isles to submit a report explaining why the Commission should not initiate proceedings against Sandwich Isles to revoke its Commission authorizations, including but not limited to, its Section 214 authorizations. *Id.* at 12974, para. 84. The Commission also directed the Bureau to issue a Public Notice seeking comment from interested stakeholders on this issue. *Id.*; *see also Wireline Competition Bureau Seeks Comment on Initiating Proceedings to Revoke Sandwich Isles Communications, Inc.'s Commission Authorizations*, Public Notice, WC Docket No. 16-405, DA 17-168 (2017). Sandwich Isles submitted its response to the *NAL* on February 3, 2017. *See* Sandwich Isles Communications, Inc.'s Comments and Response to Notice of Apparent Liability and Forfeiture Order, WC Docket No. 10-90 (filed Feb. 3, 2017).

2

U.S. Bankruptcy Court - Hawaii    #18-01319    Dkt # 432-3    Filed 08/08/21    Page 2 of 13

boundary waiver providing Sandwich Isles the status of an incumbent local exchange carrier for purposes of receiving high-cost support, and thereby render Sandwich Isles ineligible to receive such support.[15]

4. In response to the Bureau's Public Notice,[16] on February 3, 2017, DHHL filed a letter requesting guidance on whether the terms of the Exclusive License granted to Waimana and partially assigned to Sandwich Isles[17] "may implicate Section 253(a) . . . and act as a potential barrier to entry by another provider capable of reasonably utilizing [universal service] support" to provide service to the Hawaiian home lands.[18] On February 6, 2017, the Bureau issued a Public Notice seeking comment on DHHL's request for guidance.[19] In response, Hawaiian Telcom argues that the Exclusive License violates Section 253(a)[20] and Crown Castle contends that any interpretation of the Exclusive License to exclude the provision of CMRS by entities other than Sandwich Isles would violate Section 253(a).[21] In their reply comments, Waimana and Sandwich Isles contend that the Exclusive License does not violate Section 253(a).[22]

5. Section 253(a) provides that:

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.[23]

6. Section 253(b) creates an exception to Section 253(a), providing that:

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.[24]

---

[15] *Sandwich Isles Improper Payments Order*, 31 FCC Rcd at 13016-17, para. 58. This order does not resolve any issues related to Sandwich Isles' study area waiver or potential revocation of Sandwich Isles' Commission authorizations.

[16] *Wireline Competition Bureau Seeks Comment on the 2005 Waiver That Allows Sandwich Isles to Be Treated as an Incumbent Local Exchange Carrier for Purposes of Receiving High-Cost Universal Service Support*, Public Notice, WC Docket No. 10-90, CC Docket No. 96-45, 31 FCC Rcd 13326 (Dec. 20, 2016).

[17] *See* DHHL Letter at 2 ("Pursuant to a partial assignment of that license in January 1996, Sandwich Isles provides telecommunications services to the home lands.").

[18] *Id.* at 2.

[19] *Wireline Competition Bureau Seeks Comment on the Department of Hawaiian Home Lands' Request for Guidance on Whether Sandwich Isles, Inc.'s Exclusive License to Serve the Hawaiian Home Lands Conflicts with Section 253(a) of the Communications Act*, Public Notice, WC Docket. No. 10-90, CC Docket. No. 96-45, 32 FCC Rcd 1117 (Feb. 6, 2017) (*Section 253 Public Notice*).

[20] *See generally* Hawaiian Telcom Comments.

[21] *See* Comments of Crown Castle USA Inc., WC Docket No. 10-90, CC Docket No. 96-45, at 2 (filed Feb. 20, 2017) (Crown Castle Comments).

[22] *See generally* Reply Comments of Sandwich Isles Communications, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Mar. 9, 2017) (Sandwich Reply Comments); Reply of Waimana Enterprises Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb 27, 2017) (Waimana Reply Comments); *see also* Letter from Albert Hee, Founder, Waimana Enterprises Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 27, 2017) (Hee Reply Comments).

[23] 47 U.S.C. § 253(a).

[24] *Id.* § 253(b).

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 432-3 Filed 08/08/21 Page 3 of 13

7.      Section 253(c) also preserves State authority, saying that:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed.[25]

8.      Section 253(d) requires the Commission to preempt the enforcement of State or local requirements that are contrary to Sections 253(a) or (b) "to the extent necessary to correct such violation or inconsistency."[26]

## II.    DISCUSSION

9.      The Exclusive License violates Section 253(a) because it constitutes a State legal requirement that prohibits or has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide intrastate or interstate telecommunications services. Because the Exclusive License does not satisfy the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision pursuant to Section 253(d).

### A.    Section 253(a) Analysis

10.     *Section 253(a) Applies.* Despite Waimana's and Sandwich Isles' arguments to the contrary, we find that the Exclusive License falls within the scope of Section 253(a). First, Waimana argues that Section 253(a) does not apply because the "DHHL is not the State,"[27] but rather an entity akin to a tribal government that has sovereignty over the Hawaiian home lands.[28] We disagree and find that the DHHL is a "State" agency to which Section 253(a) applies. As the Ninth Circuit and the Hawaii Supreme Court have explained, the Hawaiian home lands are managed by State officials.[29] Indeed, in rejecting Waimana's argument that the Hawaiian home lands are not "state lands" for purposes of a Hawaii environmental statute, the Hawaii Supreme Court found that while "the State has assumed a trust obligation regarding Hawaiian home lands and must manage and dispose of these lands in a manner consistent with its fiduciary duty to the beneficiaries," Waimana had "overlook[ed] the significant role of the State in relation to these lands."[30] Specifically, "both legal title and management responsibilities over the land are still in the hands of the State."[31] And DHHL, the State agency that has those management responsibilities, was established pursuant to Section 202 of the HHCA,[32] which is State law.[33] Further,

---

[25] *Id.* § 253(c).

[26] *Id.* § 253(d).

[27] Waimana Reply Comments at 11.

[28] *Id.* at 8-9, 11-12; *see also* Sandwich Isles Reply Comments at 3. We note that the Commission has previously declined to act under Section 253 "to preempt Native American power over tribal lands." *AB Fillins*, Memorandum Opinion and Order, 12 FCC Rcd 11755, para. 18 (1997).

[29] *See Kepo'o v. Watson*, 952 P.2d 379, 385-87 (Haw. 1998); *see also Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n,* 588 F.2d 1216, 1226-27 (9th Cir. 1978) (explaining that upon admission of Hawaii into the Union, the "United States conveyed its interest in the home lands . . . to the state and these lands are now administered by state officials").

[30] *Kepo'o*, 952 P.2d at 385.

[31] *Id.*; *see also id.* at 386-87 (holding that the "Hawaiian home lands are certainly unique 'state lands,' with special duties attached to them, but they are 'state lands' nevertheless").

[32] HHCA § 202(a).

[33] *See Kepo'o*, 952 P.2d at 386-87 (Hawaii 1998) (holding that while the HHCA was originally enacted by Congress, it was subsequently adopted as part of the Hawaii constitution as a condition of statehood, and is therefore "a matter of state constitutional law and does not constitute federal law") (citing *Keaukaha-Panaewa Community Ass'n*, 588 F.2d at 1226-27). In fact, although Waimana and Sandwich suggest that the Commission cannot preempt here

(continued....)

4

DHHL is headed by an executive board (the Hawaiian Homes Commission) whose members are appointed by the Governor with the advice and consent of the State Senate.[34] It is therefore not surprising that the Exclusive License expressly states that it was granted by the "*State of Hawaii*, Department of Hawaiian Home Lands,"[35] and that it was granted pursuant to DHHL's authority under the HHCA as well as the "State of Hawaii . . . Administrative Rules."[36] In fact, Waimana concedes that DHHL is a State agency[37] and Sandwich Isles has repeatedly made the same statement in filings with the Commission.[38]

        11.     Moreover, DHHL's own statements in this proceeding belie Waimana's claim that DHHL has sovereignty over the Hawaiian home lands. For instance, although it is a form of authority that a sovereign would typically possess, DHHL expressly states that it "does not have regulatory authority over telecommunications carriers" on the Hawaiian home lands.[39] Additionally, as one commenter explains, while DHHL has statutory control over access to the Hawaiian home lands, no provision of the HHCA authorizes DHHL to establish a telecommunications monopoly on those lands.[40]

        12.     Further, we disagree with Waimana and Sandwich Isles' argument that DHHL is analogous to a sovereign tribal government. It is true that Section 54.5 of the Commission's rules includes the Hawaiian home lands within the definition of "Tribal lands."[41] That rule defines "Tribal lands" to include the Hawaiian home lands "[f]or purposes of high-cost support."[42] But the existence of the rule does not mean that DHHL is akin to a sovereign Tribal government to which Section 253(a) does not apply. Indeed, as the Commission has previously noted, "we do not have the same government-to-government relationship with Hawaiian Home Lands as we do with Tribal lands."[43]

        13.     We also find—and neither Waimana nor Sandwich Isles disputes—that the Exclusive License is a "legal requirement" under Section 253(a). In the *Minnesota Order*, the Commission found

---

(Continued from previous page)

because the HHCA is longstanding federal law (*see* Waimana Reply Comments at 12; Sandwich Isles Reply Comments at 4), Sandwich Isles itself has previously acknowledged that the HHCA is considered State law. *See* Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, n.21 (filed Dec. 27, 2004).

[34] *See* HHCA § 202(a) (citing Haw. Rev. Stat. § 26-34).

[35] Exclusive License at 1 (emphasis added).

[36] *See id.* (citing HHCA § 207(c)(1) and Haw. Admin. Rules §§ 10-4-21, 10-4-22).

[37] Waimana Reply Comments at 8; *id.*, Exhibit F, at 1 (attaching letter from "the Department of Hawaiian Home Lands *of the State of Hawaii*") (emphasis added); *see also id.* at 12 (arguing that the Exclusive License does not violate Section 253(a) because that provision "does not prohibit *state and local governments*, as landowners, from . . . . bargaining with the land rights they own") (emphasis added).

[38] *See, e.g.*, Letter from Janeen Olds, CEO and President, Sandwich Isles Communications, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 4 (filed Mar. 6, 2014) ("DHHL is a State agency . . . ."); *id.* at 1 ("[Sandwich Isles] provides these services through an exclusive license granted by the Department of Hawaiian Home Lands (DHHL), the managing state agency of HHL, to provide all telecommunications within HHL."); Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, at v (filed Dec. 27, 2004) ("Sandwich Isles' parent received a license to serve the entire Hawaiian Home Lands . . . from the Department of Hawaiian Home Lands, the state agency administering the trust lands.").

[39] DHHL Letter at 2.

[40] Hawaiian Telcom Comments, Attachment, at 17-18.

[41] Waimana Reply Comments at 8-9; Sandwich Isles Reply Comments at 3-4.

[42] 47 CFR § 54.5.

[43] *Improving Communications Services for Native Nations*, Notice of Inquiry, 26 FCC Rcd 2672, n.2 (2011); *see also Procedures for Reestablishing a Formal Government-to-Government Relationship with the Native Hawaiian Community*, 80 Fed. Reg. 59113, 59116-17 (Oct. 1, 2015) ("[T]he Federal Government does not maintain a formal government-to-government relationship with the Native Hawaiian community as an organized, sovereign entity.").

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 432-3   Filed 08/09/21   Page 6 of 13

that a contract entered into by the State that granted one entity exclusive access to its freeway rights-of-way for the development of telecommunications transmission capacity created a "legal requirement" under Section 253(a) because it "legally [bound] the State to deny other entities permits for access to these freeway rights-of-way."[44] The Commission held that it "will look at the effect of the state or local government's action to determine whether [S]ection 253 is applicable," and it found that the agreement had "the potential to adversely affect competitors that do not have similar access" to the freeway rights-of-way.[45] Similarly, here, the Exclusive License is a contractual agreement[46] entered into by the State that grants one entity "the exclusive right . . . to build, construct, repair, maintain and operate a . . . . telecommunications network"[47] on the Hawaiian home lands. It thus legally binds the State to deny other competitors the right to do the same, and it consequently adversely affects those competitors. Specifically, entities other than Sandwich Isles cannot build or operate network facilities to reach and provide telecommunications services to the residents living on the more than 200,000 acres of land that comprise the Hawaiian home lands. For these reasons, we find that the Exclusive License creates a "legal requirement" to which Section 253(a) applies. Such a conclusion is entirely consistent with congressional intent. As the Commission has previously explained, the "fact that Congress included the term 'other legal requirements' within the scope of section 253(a) recognizes that State and local barriers to entry could come from sources other than statutes and regulations," and interpreting the term "legal requirement" broadly best fulfills Congress' desire to ensure that States and localities do not impede the development of competition.[48]

      14. Additionally, we are not persuaded by Waimana's argument that Section 253(a) is inapplicable where it would affect the State's ability to "deal[] with its real estate interests . . . as it sees fit," such as by granting access to "rights-of-way over land that it owns."[49] In fact, the Commission applied Section 253(a) to just such an instance in the *Minnesota Order*. There, Minnesota had granted one entity exclusive physical access to State-owned land (*i.e.*, State freeway rights-of-way) in exchange for the development of telecommunications transmission capacity.[50] The Commission held that Section 253(a) applied because the agreement at issue had the potential to adversely affect competitors that lacked similar access.[51] As the Commission emphasized there, the relevant inquiry in determining whether Section 253(a) applies is the legal requirement's "effect on the provision of telecommunications service," not how the requirement could be characterized or "the purported subject matter" of the requirement.[52] Thus, contrary to Waimana's assertion, the fact that the State was "bargaining with the land" that it owns[53] when granting the Exclusive License does not render Section 253(a) inapplicable here.

---

[44] *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, Memorandum Opinion and Order, 14 FCC Rcd 21697, 21707, para. 17 (1999) (*Minnesota Order*).

[45] *Id.* at 21707, para. 19. The Commission thus found the situation at hand to be "very different from a traditional government procurement of telecommunications facilities or services" to which Section 253 would not apply. *Id.*

[46] The Exclusive License is a contract in which DHHL granted Waimana the exclusive right to build, maintain, and operate a telecommunications network on the Hawaiian home lands "in consideration of the services to be provided by [Waimana]," including the construction and installation of telecommunications infrastructure on DHHL's lands at Waimana's cost. *See* Exclusive License at 1-2.

[47] *Id.* at 2.

[48] *Minnesota Order*, 14 FCC Rcd at 21707, para. 18.

[49] Waimana Reply Comments at 11-12.

[50] *See generally Minnesota Order*.

[51] *Id.* at 21708, para. 19.

[52] *Id.* at 21705-06, 21707, paras. 14-15, 19.

[53] Waimana Reply Comments at 12.

6

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 432-3   Filed 08/09/21   Page 6 of 13

15.  *The Exclusive License Violates Section 253(a).*  Having found that the Exclusive License falls within the scope of Section 253(a), we conclude that it prohibits or has the effect of prohibiting the ability of entities other than Waimana and Sandwich Isles from providing telecommunications services in contravention of the statute.[54]  Sandwich Isles argues that the Exclusive License does not violate Section 253(a) because it grants exclusivity only as to the construction of telecommunications "infrastructure" and therefore does not preclude competitors from providing "service" to the Hawaiian home lands.[55]  We reject this argument.  DHHL itself characterizes the Exclusive License as granting the exclusive right "to provide telecommunications *services* to the Hawaiian home lands"[56] (although it is not clear that DHHL has such authority).  More importantly, for purposes of Section 253(a), it is a legal requirement's "effect on the provision of telecommunications service that is critical, not whether [the requirement] could be characterized as dealing with infrastructure development."[57]

16.  The legal requirement at issue in this proceeding grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.[58]  The Exclusive License thus represents exactly the type of prohibition on entry that Section 253(a) was intended to prevent.[59]  As the Commission has held, "[S]ection 253(a), at the very least, proscribes State and local legal requirements that prohibit all but one entity from providing telecommunications services in a particular State or locality."[60]  And the State's action here, "granting an exclusive license to [an entity], appears fundamentally inconsistent with the primary goal of the Telecommunications Act of 1996, to replace exclusivity with competition."[61]

17.  Waimana argues that the Exclusive License does not violate Section 253(a) because several other carriers have been authorized to provide telecommunications services on the Hawaiian home lands, including by operating cellular towers on those lands.[62]  However, this fact does not render the Exclusive License lawful.  On its face, the Exclusive License binds DHHL to prohibit the construction or

---

[54] 47 U.S.C. § 253(a).

[55] Sandwich Isles Reply Comments at 2-3.

[56] DHHL Letter at 2 (emphasis added).

[57] *Minnesota Order*, 14 FCC Rcd at 21705, para. 14; *see also Public Utility Commission of Texas et al. Petitions for Declaratory Ruling and/or Preemption of Certain Provisions of the Texas Public Utility Regulatory Act of 1995*, Memorandum Opinion and Order, 13 FCC Rcd 3460, 3480, para. 41 (1997) (*Texas Order*) (concluding that the mandate under Section 253 "requires us to preempt not only express restrictions on entry, but also restrictions that indirectly produce that result").

[58] *See, e.g., Minnesota Order*, 14 FCC Rcd at 21708, para. 21 (finding that a State requirement that prevents other facilities-based providers from providing telecommunications services would contravene Section 253(a)) (citing *Texas Order*, 13 FCC Rcd at 3496-97, paras. 74-75).

[59] *See, e.g., N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that exclusive area-wide franchise to provide payphones in public rights-of-way is a "deliberate creation of scarcity" in violation of 253(a)); *id.* at 247 (explaining that a requirement that permits a government entity to "choose one service provider . . . to the exclusion of all others based on criteria determined by it rather than the market" violates Section 253(a)); *Classic Telephone, Inc., Petition for Preemption, Declaratory Ruling and Injunctive Relief*, Memorandum Opinion and Order, 11 FCC Rcd 13082, 13096, paras. 26-27 (1996) (*Classic Telephone*) (concluding that city's decision not to grant a local franchise to a second telecommunications carrier in order to prevent competition violates Section 253); *New England Public Communications Council, Petition for Preemption Pursuant to Section 253*, Memorandum Opinion and Order, 11 FCC Rcd 19713, 19721, para. 18 (1996) (*New England Order*) (preempting state commission decision precluding independent payphone providers from offering services).

[60] *Classic Telephone*, 11 FCC Rcd at 13095, para. 25.

[61] *Minnesota Order*, 14 FCC Rcd at 21700, para. 3.

[62] Waimana Reply Comments at 13-14; *see also* Hee Reply Comments at 1.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 432-3   Filed 08/09/21   Page 7 of 13

operation of a telecommunications network by any entity other than Sandwich Isles for the provision of telecommunications services on the Hawaiian home lands. And selective enforcement of the Exclusive License does not obviate its effect of prohibiting competition. Indeed, the record demonstrates that the Exclusive License has the effect of prohibiting the ability of an entity to continue to provide telecommunications services to the Hawaiian home lands. Specifically, Crown Castle states that when it notified DHHL of its intention to extend the term of its non-exclusive license to operate a cellular tower on the Hawaiian home lands, "DHHL notified Crown Castle of [DHHL's] contract with Sandwich Isles" giving exclusive rights with respect to DHHL properties.[63] As a result, Crown Castle has been unable to extend its license to operate the tower, which is used to provide CMRS on the Hawaiian home lands.[64]

18. Waimana also suggests that the Exclusive License does not prohibit competition because other telecommunications carriers could lease access to elements of Sandwich Isles' network.[65] The Exclusive License, however, prohibits any other entity from even "operat[ing] a . . . telecommunications network" on the Hawaiian home lands.[66] In any event, under Commission precedent, Section 253(a) bars State or local requirements that prevent competitors from "utiliz[ing] their own facilities to provide service."[67]

### B. Section 253(b) Analysis

19. We conclude that the Exclusive License is not protected by Section 253(b). That provision preserves from preemption certain State or local requirements that are "competitively neutral" and "necessary" to achieve the public interest objectives enumerated therein, even if the requirements violate Section 253(a).[68]

20. Consistent with Commission precedent, we find that the Exclusive License is not competitively neutral. The "proper inquiry" under Section 253(b) is "whether the effect of the [State or local legal requirement] will be competitively neutral."[69] In the *New England Order* and *Texas Order*, the Commission found that the State legal requirements at issue were not competitively neutral because they singled out a class of entities and imposed a disadvantage on them that significantly affected or even eliminated their ability to compete in the provision of certain telecommunications services.[70] Similarly, in the *Minnesota Order*, the Commission concluded that the agreement at issue was not competitively neutral because it granted a single entity exclusive physical access to valuable freeway rights-of-way for a period of ten years with an option to renew for another ten years and thereby disadvantaged facilities-based competitors.[71] Likewise, here, the Exclusive License expressly grants a single entity the exclusive right, in perpetuity, to construct and operate a telecommunications network on the Hawaiian home lands and thus effectively prohibits the provision of telecommunications services by competitors.

21. Our conclusion that the Exclusive License is not competitively neutral is dispositive on the question of whether the Section 253(b) exception applies. Even if that were not the case, however, we find no basis for concluding that the Exclusive License is "necessary" to advance universal service or any of the other public interest objectives listed in Section 253(b). The burden of proving that the State or

---

[63] Crown Castle Comments at 2.

[64] *Id.*

[65] Waimana Reply Comments at 15-16; *see also* Hee Reply Comments at 1.

[66] Exclusive License at 2.

[67] *Texas Order*, 14 FCC Rcd at 21708, para. 21.

[68] 47 U.S.C. § 253(b); *see also Minnesota Order*, 14 FCC Rcd at 21724, para. 50.

[69] *Minnesota Order*, 14 FCC Rcd at 21724-25, para. 51.

[70] *See New England Order*, 11 FCC Rcd at 19721-22, para. 20; *Texas Order*, 13 FCC Rcd at 3500, para. 82.

[71] *Minnesota Order*, 14 FCC Rcd at 21725, para. 52.

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 432-3 Filed 08/09/21 Page 8 of 13

local requirement comes within the exceptions of Section 253 falls on the party claiming that the exemption applies.[72] Here, Sandwich Isles asserts that the public interest objectives in Section 253(b) "are exactly the basis on which the [Exclusive License] was based."[73] However, Sandwich Isles does not elaborate on or provide any support for this claim, let alone demonstrate that the Exclusive License is "necessary" to achieve those public interest objectives.[74] And Waimana does not even reference Section 253(b) in its reply comments.

### C. Section 253(c) Analysis

22. Waimana suggests that the Exclusive License is protected from preemption under Section 253(c).[75] That provision states that "[n]othing in this section affects the authority of the State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[76] However, Waimana fails to demonstrate how or why the Exclusive License constitutes "manage[ment of] rights-of-way" by DHHL. Instead, Waimana merely quotes language from a federal district court case regarding the purpose of Section 253(c).[77] In fact, the district court there expressly distinguished the exclusive franchise to operate payphones on city sidewalks at issue in that case with a "restriction[] on the building of networks through the rights of way to serve the broader community,"[78] which is precisely the type of restriction at issue here.

23. While the Act does not define "manage[ment of] rights-of-way," the Commission has previously recognized in the context of Section 253(c) that "[l]ocal governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, [and] to manage gas, water, cable . . . and telephone facilities that crisscross the streets and public rights-of-way."[79] The Commission in turn has described the "types of activities that fall within the sphere of appropriate rights-of-way management" as including "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of various systems using the rights-of-way to prevent interference between them."[80] By contrast, here, the Exclusive License does much more than simply enable DHHL to engage in these or similar types of activities. Rather, as discussed above, the Exclusive License grants one entity the exclusive right to "operate a . . . telecommunications network" for the provision of telecommunication services on the Hawaiian home lands,[81] and it thus has the effect of precluding any other entity from providing telecommunications services to the residents of those lands. Finding that such a restriction falls within Section 253(c) would

---

[72] *Id.* at 21704, n.26.

[73] Sandwich Isles Reply Comments at 4-5.

[74] *Id.* at 4.

[75] Waimana Reply Comments at 12.

[76] 47 U.S.C. § 253(c).

[77] *See* Waimana Reply Comments at 12 (quoting *Telebeam Telecomms. Corp. v. City of New York*, 194 F.Supp.3d 178, 187 (E.D.N.Y. 2016)).

[78] *Telebeam Telecomms.*, 194 F.Supp.3d at 188.

[79] *TCI Cablevision of Oakland County, Inc.*, Memorandum Opinion and Order, 12 FCC Rcd 21396, 21441, para. 103 (1997).

[80] *Id.*; *see also Minnesota Order*, 14 FCC Rcd at 21729, n.129.

[81] Exclusive License at 2.

U.S. Bankruptcy Court - Hawaii  #18-00133  Dkt # 432-3  Filed 08/09/21  Page 10 of 14

allow the rights-of-way management exception to "swallow whole the broad congressional preemption"[82] under Section 253(a) and render that statutory provision meaningless.

24. Moreover, even assuming that the Exclusive License constituted rights-of-way management, such management must be "competitively neutral" and "nondiscriminatory" to receive protection under Section 253(c).[83] Again, "the burden of proving that a statute, regulation, or legal requirement comes within the exemptions found in [S]ections 253(b) and (c) falls on the party claiming that exception applies."[84] Here, however, Waimana does not even acknowledge that a State's rights-of-way management must be both "competitively neutral" and "nondiscriminatory" under Section 253(c), let alone demonstrate that the Exclusive License meets these two requirements.

### D. Preemption Under Section 253(d)

25. Because the Exclusive License violates Section 253(a) and is not saved by the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision under Section 253(d).[85] That statutory provision requires the Commission to "preempt the enforcement" of "a State or local legal requirement that violates Section 253(a) or 253(b) "to the extent necessary to correct such violation or inconsistency."[86] We therefore preempt enforcement of the exclusivity provision of the Exclusive License[87] because it has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide telecommunications services on the Hawaiian home lands. We note that the Exclusive License also contains a provision which states that "[a]fter LICENSEE activates the existing and/or new telecommunications infrastructure, [DHHL] agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on [DHHL's] lands."[88] We also find it necessary to preempt enforcement of this provision to the extent that it acts as a restatement or extension of the exclusivity provision.

### E. Waimana's and Sandwich Isles' Remaining Arguments

26. None of Waimana's remaining arguments alter our conclusion that we must preempt enforcement of the exclusivity provision of the Exclusive License. First, the fact that a State legal requirement prohibiting competition in the provision of telecommunications services may have benefitted the State or some of its residents[89] does not render it lawful.[90] Second, Waimana argues that the Exclusive License "was required by the Rural Utilities Service ('RUS') as a condition" of obtaining an RUS loan.[91] Waimana, however, fails to cite any support for this claim. Nor are we aware of any RUS requirement

---

[82] *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1180 (9th Cir. 2001), *overruled on other grounds by Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc).

[83] 47 U.S.C. § 253(c); *see also Minnesota Order*, 14 FCC Rcd at 21729, para. 61.

[84] *Minnesota Order*, 14 FCC Rcd at 21704, n.26.

[85] 47 U.S.C. § 253(d).

[86] *Id.*

[87] *See* Exclusive License at 2 (granting "[Waimana], and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [*sic*] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL]").

[88] *Id.* at 3.

[89] Waimana Reply Comments at 9-10.

[90] *See Minnesota Order*, 14 FCC Rcd at 21716, para. 35 (finding that the State's "extraction of benefits in exchange for exclusive physical access to rights-of-way is fundamentally inconsistent with the 1996 Act, which endeavors to replace exclusive monopoly rights with open competition").

[91] Waimana Reply Comments at 10; *see also* Hee Reply Comments at 1.

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 432-3 Filed 08/09/21 Page 10 of 13

that an entity obtain an exclusive license from the State in order to receive financing. And even if RUS imposed such a condition, Waimana makes no showing as to why a condition imposed by RUS could act to effectively preempt or nullify Section 253 of the Act. Third, the Commission's knowledge of the Exclusive License's existence prior to DHHL's request for guidance[92] is irrelevant to the Section 253 analysis. The Commission has never examined the issue of whether the Exclusive License comports with Section 253(a),[93] let alone "signed off on" or "approved" it as Waimana asserts.[94]

27.	Finally, we reject Sandwich Isles' claims of "procedural irregularities" in this proceeding.[95] In particular, Sandwich Isles complains that the issue of whether the Exclusive License conflicts with Section 253(a) was not raised in either the *Sandwich Isles Improper Payments Order* or *Sandwich Isles NAL* issued in December 2016.[96] The Commission did not receive DHHL's request for guidance on this issue,[97] however, until after those items were released and there is no procedural bar to taking action at this time pursuant to Section 253(a). We also disagree with Sandwich Isles' contention that the Public Notice seeking comment on DHHL's request was framed in a manner that would not result in examination of all of the relevant issues.[98] The language used in the Public Notice does not presume a violation but instead asks "whether [the Exclusive License] conflicts with Section 253(a)."[99] In response to the Public Notice, the Commission has received comments highlighting factors relevant to this inquiry, suggesting that the notice provided therein was sufficient. And as this Order makes clear, we have carefully considered whether the Exclusive License falls within the scope of Section 253(a), whether it violates Section 253(a), and whether it is protected from preemption by Section 253(b) or (c), and we find that we are obligated to preempt enforcement of the exclusivity provision in the Exclusive License under Section 253(d).

---

[92] Waimana Reply Comments at 11-12.

[93] In a 2005 order granting Sandwich Isles a study area waiver, the Wireline Competition Bureau declined to address Hawaiian Telcom's argument that the Exclusive License may pose a barrier to entry in violation of Section 253 on the basis that the issue was "better addressed in the context of a [S]ection 253 proceeding." *Sandwich Isles Communications, Inc., Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*, Order, 20 FCC Rcd 8999, para. 23 (WCB 2005).

[94] Waimana Reply Comments at 11.

[95] Sandwich Isles Reply Comments at 1-2. Among other issues, Sandwich Isles complains that the Commission did not address its request to extend the deadline for reply comments on the *Section 253 Public Notice* from February 27, 2017 to March 10, 2017. Sandwich Isles Reply Comments at 2; *see also* Sandwich Isles Request for Extension of Time, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 23, 2017). In any event, Sandwich Isles filed reply comments on March 9, 2017, and we consider those reply comments herein. Therefore, we deem Sandwich Isles' argument moot.

[96] Sandwich Isles Reply Comments at 1.

[97] *See generally* DHHL Letter.

[98] Sandwich Isles Reply Comments at 1, 4-5.

[99] *Section 253 Public Notice* at 1.

## III. ORDERING CLAUSES

28. Accordingly, IT IS ORDERED, pursuant to Section 253 of the Communications Act of 1934, as amended, 47 U.S.C. § 253, that the enforcement of the exclusivity provision in the Exclusive License IS PREEMPTED.

29. IT IS FURTHER ORDERED that this Order and the obligations set forth herein ARE EFFECTIVE upon release of this Order.

FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch
Secretary

U.S. Bankruptcy Court - Hawaii #18-01319 Dkt # 432-3 Filed 08/09/21 Page 12 of 13

### STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

Re: *Connect America Fund et al.*, WC Docket No. 10-90 et al.

This Order highlights the importance of—and the Commission's commitment to—removing barriers to competitive entry. It preempts the Department of Hawaiian Home Lands' grant of an exclusive license to Waimana Enterprises, the parent company of Sandwich Isles. I am hopeful that our limited preemption will result in better service for consumers living on the Hawaiian Home Lands.

It also highlights the importance of section 253 of the Communications Act in enabling competition. And how useless it will likely be in a broadband-only world, if the Commission's majority moves forward with its plan to reclassify broadband as an information service. Breaking down barriers to infrastructure deployment without Title II is about as effective demolishing a wall by staring at it. Without a Title II telecommunications service at issue, today's Order would not have been possible.