UNITED STATES BANKRUPTCY COURT
DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 18-01319 |
|  | ) | (Chapter 11) |
|  | ) |  |
| PANIOLO CABLE COMPANY, LLC | ) | November 1, 2021 |
|  | ) | 2:02 p.m. |
|  | ) |  |
| Debtor. | ) |  |
|  | ) | U.S. Bankruptcy Court |
|  | ) | 1132 Bishop Street, Suite 250 |
| _____ | ) | Honolulu, HI 96813 |

TRANSCRIPT OF HEARING ON MOTION TO APPROVE DISCLOSURE STATEMENT,
MOTION TO ENFORCE SALE ORDER, AMENDED OBJECTION TO CLAIM NO. 5,
AND MOTION TO ESTIMATE CLAIM NO. 5
BEFORE THE HONORABLE ROBERT J. FARIS
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES:</u>

| | |
|---|---|
| For Sandwich Isles<br>Communications, Inc: | Lex R. Smith, Esq.<br>Kobayashi, Sugita & Goda<br>999 Bishop Street, Suite 2600<br>Honolulu, HI 96813 |
| For Trustee Michael<br>Katzenstein: | Johnathan Bolton, Esq.<br>Goodsill Anderson Quinn & Stifel<br>999 Bishop Street, Suite 1600<br>Honolulu, HI 96813 |
| For Petitioning Creditors: | Toby L. Gerber, Esq.<br>Norton Rose Fullbright US LLP<br>2200 Ross Avenue, Suite 3600<br>Dallas, TX 75201 |
| For Department of Hawaiian<br>Home Lands: | Kevin Herring, Esq.<br>Ashford & Wriston<br>999 Bishop Street, 14th Floor<br>Honolulu, HI 96813 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES: (Continued)

For Office of the U.S.          Neil J. Verbrugge, Esq.
Trustee:                        Office of the U.S. Trustee
                                1132 Bishop Street, Suite 602
                                Honolulu, HI  96813


For Hawaiian Telcom, Inc.:      Theodore D.C. Young, Esq.
                                C. Michael Heihre, Esq.
                                Cades Schutte, LLP
                                1000 Bishop Street, Suite 1200
                                Honolulu, HI  96813


For U.S. Rural Utilities        Shane Huang, Esq.
Service:                        U.S. Department of Justice
                                P.O. Box 875
                                Washington, D.C.  20044


For Pau Loa Ventures, Inc:      Addison D. Bonner, Esq.
                                Tamashiro Sogi & Bonner, ALC
                                705 S. King Street, Suite 105
                                Honolulu, HI  96813


Transcription Service:          Jessica B. Cahill, CER/CET-708
                                Maukele Transcribers, LLC
                                467 Maukele Place
                                Wailuku, Maui, HI  96793
                                Telephone: (808)244-0776

NOVEMBER 1, 2021                                    2:02 P.M.

1

2          THE COURT:  All right.  Madam Clerk, let's go ahead,

3     please.

4          THE CLERK:  The United States Bankruptcy Court for the

5     District of Hawaii is now in session.  The Honorable Robert J.

6     Faris presiding.

7          Calling case 18-01319, Paniolo Cable Company, LLC.

8     This case is called for various matters on the calendar.  Mr.

9     Smith, please state your appearance.

10          MR. SMITH:  Lex Smith appearing for Sandwich Isles

11     Communications.

12          THE CLERK:  Mr. Bolton, please state your appearance.

13          MR. BOLTON:  Good afternoon, Your Honor.  For the

14     record, Johnathan Bolton appearing on behalf of Trustee Michael

15     Katzenstein, who is also present, along with Steven Turner of

16     FTI.

17          THE CLERK:  Mr. Gerber, please state your appearance.

18          MR. GERBER:  Good afternoon, Your Honor.  Toby Gerber,

19     Norton Roes Fulbright on behalf of the Petitioning Creditors.

20          THE CLERK:  Mr. Herring, please state your appearance.

21          MR. HERRING:  Good afternoon, Your Honor.  Kevin

22     Herring appearing on behalf of the Department of Hawaiian Home

23     Lands.

24          THE CLERK:  Mr. Huang, please state your appearance.

25          MR. HUANG:  Yes, this is Shane Huang for the United

1  States.

2          THE CLERK:  Mr. Verbrugge, please state your

3  appearance.

4          MR. VERBRUGGE:  Good afternoon, Your Honor.  Neil

5  Verbrugge for the U.S. Trustee.

6          THE CLERK:  Mr. Young, please state your appearance.

7          MR. YOUNG:  Good afternoon, Your Honor.  Theodore Young

8  and Michael Heihre for Hawaiian Telcom, Inc.

9          THE CLERK:  And, Mr. Bonner, please state your

10  appearance.

11          MR. BONNER:  Good afternoon, Your Honor.  Addison

12  Bonner here for interested party Pau Loa Ventures, Inc.

13          THE COURT:  Okay.  Thank you all very much.  I want to

14  begin with the objection to the Sandwich Isles claim and the

15  motion to estimate the Sandwich Isles claim.  I think those are

16  related enough we could take them together.  Then I want to go to

17  the disclosure statement and finish up with Hawaiian Tel's motion

18  to enforce the sale order.

19          So on the objection and motion to estimate, I've read

20  all the papers very carefully.  Mr. Bolton, anything you would

21  like to add?

22          MR. BOLTON:  Your Honor, nothing to add to the papers.

23  I think pretty much everything is covered in the motion to

24  estimate the claim.  We believe that the claim lacks any legal or

25  factual basis.  That's why we have asked the Court to estimate

1  the claim.  As the Court is aware, we have the objection, but,

2  with the plan pending, we want to make sure that we've taken care

3  of any administrative claims so we can actually confirm a plan,

4  because as the Court knows we would have to pay any

5  administrative claims -- allowed claims in full, in cash, on the

6  effective date.  So that was the reason for doing both the

7  objection and the motion to estimate, Your Honor.  But nothing to

8  add to the papers.

9        THE COURT:  Okay.  Thank you.  Okay.  Mr. Smith, let me

10  start by asking you some questions, then I'll give you a chance

11  to say whatever else you would like to say.

12        One issue is when the sale to Hawaiian Tel was supposed

13  to close.  Let's put that on the side, and I'll come back to

14  that.  But let's for the moment take your date and say it was

15  supposed to close -- I believe it's September 2020.  What's the

16  legal basis on which this Debtor Paniolo or the Trustee was

17  liable to Sandwich Isles prior to that date for the expenses

18  you're claiming?

19        MR. SMITH:  Prior to September 2020?

20        THE COURT:  Right.

21        MR. SMITH:  The legal basis would be that we were

22  making expenditures to take care of Paniolo's assets that -- and

23  those expenditures were necessary in order to preserve the value

24  of Paniolo's assets.

25        THE COURT:  Is there any contract that required

1   Sandwich Isles to incur those expenses to do those things?

2          MR. SMITH:  Not expressly, Your Honor.

3          THE COURT:  Okay.  Okay.  Let's turn next to that date,

4   the September 2020 date.  You say -- somewhere in one of the

5   papers it was said that the Trustee promised Sandwich Isles to

6   close by the September 2020 date.  What's the basis on which you

7   say the Trustee made that promise to Sandwich Isles?  I mean, I

8   know it's in the Trustee's moving papers and in the proposed

9   orders and so forth, but I'm looking at a more specific

10  contractual promise to Sandwich Isles.

11         MR. SMITH:  It's in the settlement agreement between

12  Sandwich Isles and the Trustee.  It expressly says the Trustee is

13  going to conduct a Section 363 sale within the deadlines set by

14  the Court.  And I wish --

15         THE COURT:  I remember that provision.  I do remember

16  that provision, so that's okay.

17         MR. SMITH:  Okay.

18         THE COURT:  Next question.  Well, let me look next at

19  Mr. Hee's declaration.  This is the one that was filed in

20  response to the objection to claim.

21         MR. SMITH:  Right.

22         THE COURT:  Why is it that the Hawaiian Home Lands

23  lease expenses are being included in these charges?  What's the

24  basis for that?

25         MR. SMITH:  As I understand it, those are included

1  because they are part of the cost of maintaining the license.

2  And the license is necessary in order for Paniolo's -- in order

3  to maintain Paniolo's assets.

4      THE COURT:  When you say the license, is there one

5  license that covers all of the Hawaiian Home Lands property that

6  Sandwich Isles is using or is there a separate license for the

7  part that's connected to the sub C system, for example, the

8  stations where the cables come on land and so forth, or is there

9  one big license?

10      MR. SMITH:  There's one license for all of the Hawaiian

11  Home Lands.

12      THE COURT:  Okay.  So the claim includes the entire

13  license fee for the entire license?

14      MR. SMITH:  It's not a license fee.  I believe it's

15  expenses that SIC incurred in complying with the license.  And to

16  tell you the truth, Your Honor, I don't know if it's 100 percent

17  of what was incurred to comply with the license during that

18  period or not.  This is the kind of thing we were saying should

19  be addressed in an evidentiary hearing.

20      THE COURT:  Well, I would give an evidentiary hearing

21  if and when I'm convinced that there are questions of --

22  unresolved questions of fact that need to be resolved.  So I'm

23  trying to drill down and find out whether there are any such

24  disputed questions of fact.  I'm asking specifically about the

25  bill that was -- I guess the copy I have is attached to the

objection to claim, but there's multiple copies at various places
in the record.  And at the bottom of the bill there are these
lines for statewide A-1, A-2, and licensed costs, and they add up
to something in the vicinity of $9 million, and I'm wondering
what those are.

MR. SMITH:  My understanding is that the -- I'm not --
first of all, I'm not sure you're reading the bill correctly.
There are -- I think two of those things do involve licensing
costs, but the other one does not.  I actually read it the same
you -- at first, I read it the same way you're reading it now.
But the licensing expenses are expenses incurred by SIC in the --
in performance of the license.

THE COURT:  Meaning?  Tell me more about what that
means.  I'm not quite sure I follow that.

MR. SMITH:  And I may not have a lot of detail, but I
do have Mr. Hee here in the room with me.  That's right, though
isn't it?

MR. HEE:  Yeah, the license is very simple.  You use
Hawaiian Home Lands; you have to provide infrastructure to
provide service.

MR. SMITH:  So what was the -- what is reflected in --

MR. HEE:  For the infrastructure to provide service to
those areas.

MR. SMITH:  Okay.  So that's all for construction, the
infrastructure.

1          MR. HEE:  Yeah.

2          MR. SMITH:  So, Your Honor, the licensing charges are

3    all for the construction of infrastructure.

4          THE COURT:  The terrestrial infrastructure?  In other

5    words, the poles, and lines, and stuff that's on the land?

6          MR. HEE:  Yes.  It's on the land, it's not poles.

7          MR. SMITH:  I think it's underground, but it's on the

8    land, not undersea.

9          THE COURT:  I see.  Okay.  There's another line there

10   right below that, current fiber conversion projects, which is one

11   point -- almost $1.8 million.  Can you tell me what that is?

12         MR. HEE:  Infrastructure projects on the land.

13         MR. SMITH:  Those are infrastructure projects also on

14   the land.

15         THE COURT:  On the land.  Okay.  I think that's all the

16   questions I have, so why don't you go ahead, Mr. Smith.

17         MR. SMITH:  Well, so let me point out that all of the

18   82 assets that were executed upon that were SIC's assets that

19   were executed upon by Paniolo and by virtue of the execution sale

20   became Paniolo's assets.  All of those are also on the land.

21         There are numerous expenses in that claim that are not

22   licensing fees and those also are entitled to at least an

23   evidentiary hearing in order to determine -- you know, if the

24   Court doesn't agree with all of them, I understand that, but an

25   evidentiary hearing ought to be held in order to determine which

1   ones the Court is inclined to award, because they were incurred

2   to maintain the Trustee's assets.

3            THE COURT:  Okay.  Okay.  Thank you.  Mr. Bolton, back

4   to you.

5            MR. BOLTON:  Yes, Your Honor.  We would point out that

6   Section 3.5 of the SIC lease did provide that SIC had the

7   obligation under that contract to perform all maintenance and

8   repair obligations with respect to lease, fiber and transport

9   services.  So that was a contractual obligation they took on as a

10  part of the SIC lease.  So anything they paid with respect to

11  maintenance and repair would have been a contractual obligation

12  that they were required to do with no right to any kind of

13  reimbursement.

14           I mean, the idea of the reimbursement is something that

15  they're claiming that if you look at their papers, they said they

16  acted as the Trustee's agent in making these payments.  Your

17  Honor, there's no evidence in the record that there's any

18  authority of SIC to be the Trustee's agent to make any payments.

19  That's their main argument is sort of a reimbursement theory it

20  seems.  And we believe that -- for example, in their statement of

21  concerns that they filed with respect to the sale motion, they

22  admitted, and I'll quote, Your Honor, it says, SIC continued to

23  pay the expenses necessary to assure service to the Hawaiian Home

24  Lands, meaning it was done for their own benefit, not necessarily

25  for the Trustee's benefit.

1      So, Your Honor, we don't think there's any right to

2   reimbursement, and we think that the claim should be disallowed

3   on that basis.

4      THE COURT:  Okay.  Thank you.  I don't think anybody

5   else filed anything on either the claim objection or the

6   estimation motion.  Anybody have anything they wish to add, in

7   any event?

8      MR. GERBER:  Your Honor, on behalf of the Petitioning

9   Creditors, this is Toby Gerber.  I would also add that they filed

10  this as an administrative expense claim, and they've done nothing

11  to show the benefit to the Estate, much less that they actually

12  spent this money.

13     We know, for example, of no infrastructure improvements

14  that they're now claiming, and we certainly know that they had

15  obligations under the old lease and under the new lease to spend

16  whatever monies they think they may have -- they are now claiming

17  to have spent.  So it wasn't done for our benefit.  It was done

18  pursuant to their obligations under both the old lease prior to

19  the settlement and under the new lease that was entered into as

20  part of the settlement.

21     So we don't think that they've met anywhere close to

22  the standards for an award of an administrative expense, and we

23  would join in the Trustee in establishing that.  The objection to

24  the claim should be granted and/or the motion should be

25  estimated.  The claim should be estimated at zero.

1          THE COURT:  Okay.  Thank you.  Anybody else?

2          Okay.  Very good.  All right.  I'm going to sustain the

3    objection to the claim.;  I don't think there's any basis -- any

4    legal basis to charge these expenses to the Trustee, or the

5    Debtor, or the Estate for the period prior to the consummation of

6    the sale to Hawaiian Tel.  There's no contract anybody has

7    pointed me to that's applicable to that period.  There's no claim

8    that I can see of unjust enrichment, because most of these

9    expenses were required just as much to run the Sandwich Isles

10   terrestrial system as they would have been to provide feeding

11   into the Paniolo undersea system.  So I don't see any legal basis

12   for that period.

13         Now that leaves the question, when was the sale

14   supposed to be consummated?  It is true that the orders had a

15   target date of September 2020, and that date wasn't met, but that

16   date is not built into the contract.  The date says it will be

17   whatever the Court orders, and the Court has allowed matters to

18   proceed.  Nobody has said the sale should not have closed or

19   tried to stop the sale closing at September 2020.

20         So I think the date, as of which somebody other than

21   Sandwich Isles became responsible for these expenses was the date

22   the sale actually closed, which if memory serves was December

23   2020, but I could be mistaken about the date on that.

24         So I will sustain the objection to the claim.  As an

25   alternative, I would think that the claim should at least be

1  estimated at zero for purposes of plan voting and confirmation.

2  I don't see any sufficient basis here to -- well, if a full

3  evidentiary hearing were required that would slow down plan

4  confirmation unreasonably and unnecessary.  As I said, I don't

5  see any basis for this claim.  So at least, it ought to be

6  estimated at zero for the purposes I just indicated.

7          So, Mr. Bolton, if you can please prepare that order.

8          MR. BOLTON:  Yes, Your Honor.  Thank you, Your Honor.

9          THE COURT:  Let's move on to the disclosure statement.

10  Mr. Bolton, I've seen your redline in your papers you filed over

11  the weekend.  Anything you would like to add to that?

12          MR. BOLTON:  Yeah, Your Honor -- yeah, the only thing I

13  was going to mention is I did, this morning, file a proposed

14  order.  It does have some dates to be filled in as far as the

15  confirmation hearing, objection deadlines.  It also does include

16  proposed notices to voting creditors in the form of a ballot and

17  so forth.  And I realize that we just filed it this morning and

18  people haven't had a chance to look at it, but I wanted to make

19  the Court aware of that.

20          And, Your Honor, I guess the only issue before the

21  Court is that what the Trustee really wants to put forward is

22  Section 14.3 of the plan with respect to the release and

23  exculpation.

24          And we did speak with the U.S. Trustee's Office to try

25  to come to an agreement, and we understand their position and

1  their position of what the law is in the Ninth Circuit.  We

2  believe that, you know, with the declaration that was submitted

3  by the Trustee in support of keeping the Petitioning Creditors

4  and Hawaiian Telcom in that form of release, we think it does

5  qualify under Blixseth, and Hawaiian Telcom's participation not

6  only as a purchaser, Your Honor, but also as an agent of the

7  Trustee for a significant amount of time since December of last

8  year when the sale was approved under the services agreement

9  would also qualify them to be a part of that provision.

10        Your Honor, with respect to -- except those two parties

11  being added, we've basically adopted all of the U.S. Trustee's

12  suggested changes to that provision, as well as the other release

13  provision.  Your Honor, we wanted to just add the Trustee on

14  that, because we think the Trustee should be added in, in

15  addition to the Debtor, but other than that we have agreement

16  with the U.S. Trustee.  And as set forth in Mr. Katzenstein's

17  declaration, as I said we think the facts would support including

18  those two parties int hat release.

19        Other than that, we did add a reference to SIC's

20  recently filed complaint.  We think that reference to the

21  complaint and the counts brought in there is sufficient and would

22  provide adequate information under the applicable rules and case

23  law regarding a disclosure statement.  Thank you, Your Honor.

24        THE COURT:  Okay.  Thank you.

25        Let me start with Pau Loa.  Mr. Bonner, how does your

1   client have standing to object to the disclosure statement in

2   this case?

3            MR. BONNER:  Well, Your Honor, I mean, my client's

4   position is really that it's an interested party here, and so

5   that's why we're not -- I mean, we didn't style our position as

6   an objection per se.  It's just to provide the Court with notice

7   of our position.

8            THE COURT:  And your position is that the Trustee and

9   the Bankruptcy Court in this case, the Paniolo Court case ought

10  to be concerned about the treatment of the creditors of another

11  company, Sandwich Isles?  Is that basically your position you're

12  trying to advocate?

13           MR. BONNER:  It is, Your Honor.

14           THE COURT:  That's extraordinary.  I'm not aware of any

15  authority for that, that a bankruptcy trustee has to take account

16  of the interest of creditors of other entities from whom the

17  trustee is trying to collect money.  I just don't -- I don't see

18  that at all.

19           Okay.  Let me move on then to the U.S. Trustee.  Mr.

20  Verbrugge.

21           MR. VERBRUGGE:  Yes.  Thank you, Your Honor.  The only

22  real pure 1125 adequate information issue really is the plan

23  supplement timing issue.  And the Chapter 11 Trustee's reply,

24  we're satisfied with that if they're going to issue and file the

25  plan supplement regarding the plan agent identification

compensation terms seven days before balloting.  We think that's sufficient.

Maybe the only quibble we would have is, I believe the procedure is they're going to file it and then interested parties can then get -- request a copy.  We wonder if it wouldn't be more appropriate for the seven day mark that it get mailed out to everybody.  And I understand this is kind of an unusual case and that really, at this point, the only economic parties in interest are probably Mr. Gerber's client.  But, nonetheless, maybe procedurally it would be better to have those supplements as a matter of practice be mailed out.  But that would be our only suggestion on that.

The other matters that we had raised are we would understand if the Court deemed them to be confirmation issues and defer any rulings on those to confirmation, because at this point we wouldn't stand in the way of having the solicitation package go out based on what's currently in the record.  We only filed those objections as a matter of practice to let everybody know that -- and so we're not accused of sandbagging people later on by objecting to things that are in the disclosure statement.

And in this case, it actually has proven to be fruitful in the sense that we have narrowed quite a few of the issues on the exculpations.  The first exculpation is the planned agent advanced exculpation.  I didn't see it in the redline, but in speaking with counsel for the Chapter 11 Trustee, my

1  understanding is that they agree that the advanced exculpation of

2  the plan agent is inappropriate in a Chapter 11 plan.  And so

3  they're going to --

4           THE COURT:  I see it crossed out here on page 5 of

5  the --

6           MR. VERBRUGGE:  Oh, okay.

7           THE COURT:  Yeah.  Uh-huh.

8           MR. VERBRUGGE:  I'm sorry, I must have missed that.  I

9  did look at the redline plan, and I don't know if paragraph 12.4

10 and 12.6 were deleted yet, but if I missed that my apologies.

11          THE COURT:  Oh, I'm sorry.  I was looking at the memo,

12 and there's a change to 14.3 of the plan, which took the plan

13 agent out.  So maybe I'm talking about a different provision.

14          MR. VERBRUGGE:  Oh, okay.  My understanding is that

15 that was the intent, and I think it's just a matter of cleaning

16 up the papers.  And I'm sure Mr. Bolton can address this as well,

17 but I don't know if it's actually addressed in the reply

18 squarely, but that's my understanding.  So I think that matter is

19 resolved.

20          The exculpation provision itself, 14.3, thank you to

21 the Chapter 11 Trustee counsel.  They've been very cooperative in

22 addressing the issues that can be addressed.  And so I will say

23 that any ambiguity regarding our objections to the temporal scope

24 have been resolved.  Any ambiguities regarding the scope of the

25 exculpated acts language has been resolved by their adopting the

1    redline agreements.

2            So the only outstanding issue is really the scope of

3    the exculpated parties to be covered.  We understand if Your

4    Honor doesn't want to rule on that today and maybe reserves that

5    to be a plan confirmation issue and gives everybody more time to

6    kind of flesh out those issues.  And we've just had a chance to

7    look at the reply, so it's possible that there may be some

8    additional compromised language that could be reached on those.

9    I can't commit to that at this point.

10           And we do understand the arguments under Blixseth and

11   the other case law, so we'll take a look at the language and see

12   if there's any other further compromises that could be reached.

13           And then on the Debtor injunction, you know, we did

14   have a fundamental kind of threshold issue, which is whether or

15   not a Debtor injunction is even appropriate in this case.  So,

16   you know, I'm not sure if that's a plan confirmation issue or

17   not.  But in any event, if the Debtor injunction language is

18   appropriate -- because it does appear to be limited to -- I

19   believe the intent is to try to make sure that there's no

20   interference with whatever the plan agent ends up doing with the

21   plan assets.

22           But in any event, the language -- the limiting language

23   that they've redlined, that appears to be appropriate.  We will

24   reserve our rights to still take a look at that a little bit

25   further in terms of the plan confirmation context, whether or not

1  the release and exculpation by the Chapter 11 Trustee is

2  essentially a mirror image of the release and exculpation in the

3  exculpation clause.

4          But that's all the comments we have, Your Honor.  I

5  don't think our office has any objections in terms of sending out

6  the solicitation package at this point, but we will reserve

7  comments and positions going forward in terms of the plan

8  confirmation context, if necessary.  Thank you, Your Honor.

9          THE COURT:  Okay.  Very good.  All right.  Let's see,

10  Mr. Smith, you filed an objection to the disclosure statement

11  also.  They didn't do everything you asked for, but they did some

12  of it.

13          MR. SMITH:  Yes, Your Honor.  I, unfortunately, haven't

14  had a chance to look at the amendments.  Our only real complaint

15  here is that we thought it should disclose the situation with our

16  adversary proceeding and the fact that we think the agreement

17  should be specifically enforced, but Hawaiian Telcom is saying

18  they cannot be specifically enforced.  And if that's true, we

19  feel we have a substantial damage claim against the Trustee.

20          THE COURT:  Okay.  All right.  Anybody else on the

21  disclosure statement before I go back to Mr. Bolton?  Okay.

22  Apparently not.  Mr. Bolton, I think that the solution proposed

23  by the U.S. Trustee on the indemnification, exculpation, et

24  cetera, provisions is reasonable that it could be sent out for

25  solicitation at this point and if any tweaks are necessary -- I

haven't had time to study it that carefully myself.

I do see you've made substantial moves to the direction of the position taken by the U.S. Trustee's office, and I do appreciate that. I haven't had a chance to dig into it deeply to just tell you whether I think you've gone far enough or not, but I think we can deal with that at the confirmation hearing.

MR. BOLTON: I agree. I agree, Your Honor. And I will point out I did miss the changes in 12.4 and 12.6, so I will make those plan changes before it goes out.

THE COURT: Right. And, you know, we don't need to defer it necessarily to the confirmation hearing. If you can continue discussing matters with the U.S. Trustee's office, I'm sure that whatever the two of you agree to will probably be okay with me.

MR. BOLTON: Thank you, Your Honor.

THE COURT: So with that, I will approve the disclosure statement and overrule the objections, and that can go out. Now for dates, what I typically do is just give you a confirmation hearing date and then leave it to the parties to discuss, off the record, what the other dates ought to be. You can always come back to me if there is an impasse or a problem with that.

So let me start with Mr. Bolton. What do you think would be a good approximate time for a confirmation hearing?

MR. BOLTON: Your Honor, we were talking about the first week of December, which I think -- the first full week. I

1  think it's the week of the 6th.  And I don't know if the Court

2  has any availability during that week.  But certainly we want,

3  you know, at least 28 days and plus a couple just to get our

4  ducks all in a row.  So that's the week we were shooting for, if

5  possible, or as close to that week as we can get, Your Honor.

6          THE COURT:  Okay.  Before I go around and ask for

7  comments on that, I'll ask the Clerk to take a look at the

8  calendar.  I've got some dates that week that are blocked for

9  possible settlement conferences in the Chapter 11 case of the

10  Archdiocese of Guam, which may or may not happen, but I have to

11  keep that open for the time being.  But could we accommodate them

12  on that Monday, Madam Clerk, the 6th?

13          THE CLERK:  Yes, Your Honor.  December 6th, at 2:00

14  p.m.

15          THE COURT:  Okay.  So that's the bidding now, December

16  6th, at 2:00 p.m.  Any comment on that date for a plan

17  confirmation hearing?

18          MR. GERBER:  Your Honor, Toby Gerber on behalf of the

19  Petitioning Creditors.  That would be fine.  That was one of the

20  dates we were shooting for.  Thank you.

21          THE COURT:  Okay.  All right.  Anybody else?  Okay.

22          MR. YOUNG:  Your Honor, Theodore Young for Hawaiian

23  Telcom.  That date is also fine with us, Your Honor.

24          THE COURT:  Great.  Okay.  Good.  Good.  Okay.  Any

25  objections to that date?  It doesn't sound like it.  Okay.

1    December 6th, at 2:00 for your plan confirmation hearing.  And as

2    I mentioned, please work with the parties on the other dates and

3    deadlines, and if you come to agreement, fill them in and send it

4    on over.  If not, let me know, and we can have another quick

5    discussion about it.

6              MR. BOLTON:  Thank you, Your Honor.

7              THE COURT:  All right.  That takes us to the motion to

8    enforce the plan.  And let me start by telling you my concerns

9    about that motion.  Let me get to the first page, the page I need

10   first.

11             Okay.  My concern is sort of a jurisdictional one.  I

12   think the only basis for bankruptcy court jurisdiction over this

13   particular issue is enforcement of the sale order, because I

14   don't see how the outcome of this dispute -- it doesn't arise

15   under bankruptcy law; it doesn't really arise in the bankruptcy

16   case.  I don't see how it's related to either, because I don't

17   see how the outcome of this particular dispute affects the estate

18   or the administration of the bankruptcy case.  It's basically a

19   fight between Hawaiian Telcom and Sandwich Isles in which the

20   United States and the Department of Hawaiian Home Lands have an

21   interest, but I have difficulty seeing how it could affect the

22   bankruptcy case.

23             So I think the only basis for bankruptcy court

24   jurisdiction is the order, and there's only one provision of the

25   order that I think potentially encompasses that, and that's

1  paragraph 39, page 44 of ECF 366, which says it's an order --

2  it's an injunction requiring all parties, including Sandwich

3  Isles and its affiliates to surrender possession of the

4  transferred assets, and transferred assets is a capitalized

5  defined term.  That already is an injunction.  So the question is

6  what does it mean, what does it require.  And I think the focus

7  of the motion, as I understand it, is not really the transferred

8  assets as such.  Nothing tangible.

9       The focus really is on getting information about,

10 effectively, Sandwich Isles customers, people who use 911

11 service, schools, ambulances, fire departments, and so on.  And I

12 do not see how that information is capital T transferred, capital

13 A assets, within the meaning of this order.  And if it's not in

14 this order, I don't see how I have jurisdiction over it.

15      So that's my concern.  Let me start with Mr. Young or

16 whoever is going to speak for Hawaiian Telcom.

17      MR. YOUNG:  Yes, Your Honor.  Thank you very much.

18 Theodore Young for Hawaiian Telcom, Your Honor.  To address your

19 specific concern, Your Honor, with regard to the language of the

20 order, the language of paragraph 39 of the order and the issue of

21 transferred assets, Your Honor, clearly -- I think the motion

22 makes clear, Your Honor, that the crux of the issue here regards

23 or relates to SIC's failure to cooperate with regard to the

24 turnover of certain assets, with regard to removing its property

25 from the Paniolo premises.  And I think the issue that Your Honor

1   is most concerned with here regards the turnover of information

2   with regard to the transfer of the assets, Your Honor.

3          But I think, Your Honor, a fair reading of this order

4   -- and the order does include specific language that says that

5   the order should be interpreted broadly, Your Honor, relates to

6   the very practical issue here in fact here, which again is

7   unrebutted, and that is, Your Honor, that the assets that

8   Hawaiian Telcom acquired pursuant to the sale order and pursuant

9   to the APA, the asset purchase agreement, Your Honor, those

10  assets cannot be properly transitioned and utilized for the

11  purpose of utilizing the Paniolo Network, which, of course,

12  benefits the Home Lands' beneficiaries, Your Honor.  Those facts

13  cannot happen absent the cooperation of SIC and the SIC parties

14  with regard to the items that we set forth specifically in this

15  motion, Your Honor.

16         So I think that is the tie in, and the very specific

17  tie in, Your Honor, to the effect and to the specific language of

18  the order that impacts what Hawaiian Telcom is requesting with

19  this motion, Your Honor.  It goes specifically to the fact that

20  Hawaiian Telcom acquired these transferred assets, which include

21  the Paniolo Network, Your Honor.  And because of the SIC parties'

22  inaction and failure to cooperate with regard to the various

23  items that we specifically set forth in this motion, Your Honor,

24  Hawaiian Telcom is not able to effectively and properly

25  transition the facilities network and to utilize these assets,

1  Your Honor.

2          And, more importantly, Hawaiian Telcom won't be able to

3  ensure that they will be able to have continued service to the

4  users of this network, Your Honor, including the Hawaiian Home

5  Land beneficiaries.  And, of course, a very important aspect of

6  that, Your Honor, as we stated in our motion and in the reply,

7  relates to, you know, that portion of information that relates to

8  critical services, Your Honor.  We specifically detail the types

9  of the critical services that are impacted here.

10          And the clear and tangible effect on public health

11  safety and welfare, including, most importantly, the welfare --

12  the health and safety of the beneficiaries of the Hawaiian Home

13  Lands that are on that network, Your Honor, I think that's the

14  direct tie in to the sale order and that's why this Court does

15  have the jurisdiction and does have the authority to properly

16  rule on this motion, Your Honor.  Thank you.

17          THE COURT:  Okay.  Thank you.  All right.  I want to

18  call on the government parties, then Mr. Smith, then I'll go back

19  to Mr. Young for a reply.  I think that probably picks up

20  everybody who has filed something on this.

21          Let me start with Mr. Herring.  Anything you would like

22  to add or say to what's been filed?

23          MR. HERRING:  I join in Mr. Young's comments about the

24  significance of this information that's being requested to

25  effectively and efficiently utilize the transferred assets.

1  DHHLs concern -- I'm sorry, Your Honor.

2          THE COURT:  No, go ahead.  Go, please.

3          MR. HERRING:  The DHHL's concern is to avoid a

4  discontinuation or an interruption of critical telecommunication

5  services.  And we think that the information about the system

6  that was purchased is essential to its operation, and that

7  includes things like identifying 911 circuits and providing

8  information about critical services users, so that the new

9  operator of the network can, you know, provide necessary

10 functionality.

11         And so we think this is very important from the

12 perspective of health safety, and it's obviously critical to the

13 beneficiaries of DHHL, and it's for that reason that we joined in

14 the motion to the extent stated in our papers.  Thank you, Your

15 Honor.

16         THE COURT:  Okay.  Thank you.  Mr. Huang.

17         MR. HUANG:  Yes, Your Honor.  Thank you.  The United

18 States Government has an interest in avoiding disruption to

19 service for two reasons.  One is the public interest in health

20 and safety that DHHL and Hawaiian Telcom have already made clear,

21 and the other is the commercial interest.  The United States has

22 a commercial interest in the Sandwich Isles assets.  But the main

23 point that we wanted to make in our filing is that the disruption

24 that is threatened, threatens both of the United States'

25 interests.  So we tend to think of them together, both the

1  commercial interest and the public interest.

2          And consistent with our advocacy for the public and for

3  our agency RUS, the United States has been working with DHHL at

4  identifying a course of action that can transition Sandwich Isles

5  assets to a responsible operator.  And to that end, we did file a

6  motion earlier today, a few hours ago.  I'm still in the process

7  of noticing all of the interested parties.  But that has been

8  noticed for December 17th.  So we can deal with that motion at

9  that time.  We just wanted to bring the filing of that motion to

10  the attention of the Court.

11          But consistent with these interests, we are trying to

12  identify the course of action that minimizes disruption of

13  service to residents of the Hawaiian Home Lands, to critical

14  health and safety customers of either Sandwich Isles' network or

15  other telecommunication services that rely in some way on that.

16  And to the end, we do consider Hawaiian Telcom's request for

17  relief to be consistent with operating their purchased assets in

18  a manner consistent with state and federal regulations, you know,

19  on operating a telecommunication network.

20          So we do generally support the relief being requested

21  even if the United States Government does not have, you know,

22  firsthand knowledge of some of the facts underlying the dispute

23  between Hawaiian Telcom and Sandwich Isles.  We do feel that the

24  relief being requested is appropriate.

25          THE COURT:  Well, I guess -- you know, I'm certainly

1    sympathetic to DHHL's concerns about providing continuous service

2    to their beneficiaries.  I'm sympathetic to the United States'

3    concerns, but isn't this really abut Sandwich Isles' assets and

4    not so much about Paniolo's assets?  And what business do I have

5    dealing with Sandwich Isles' assets where Sandwich Isles is not

6    in bankruptcy?

7          MR. HUANG:  Your Honor, I think that's an important

8    point, and we -- I recognize that that's a difficult connection

9    to make but we do echo some of Mr. Young's comments about how in

10   order to operate the assets that they have acquired in this

11   bankruptcy, consistent with federal and state regulation, they

12   need to do so in a way that does not unnecessarily jeopardize

13   continuity of service to the customers who rely on that

14   connection through Sandwich Isles.

15         So I agree that it's a few steps -- a few jumps -- you

16   know, steps in the analysis, but we -- it seems to me that it is

17   related to the sale of the assets to Hawaiian Telcom.

18         THE COURT:  Okay.  Thank you.  Before I go to Mr.

19   Smith, is there anybody else who wishes to speak in support of

20   the motion or in opposition to the motion, either one?

21         MR. GERBER:  Your Honor, Toby Gerber on behalf of the

22   Petitioning Creditors.  We didn't file any papers, because we

23   thought the papers filed by Hawaiian Tel were quite -- more than

24   sufficient.  But I understand the Court's maybe struggling

25   somewhat with the jurisdictional issue, but the way we observed

1    it, you know, I'm beginning to feel bad (indiscernible) this

2    whole thing to your court and saddled you with the problem, Your

3    Honor, all those years ago.

4          But what -- and I think at the opening hearing in this

5    matter, we pledged we would do our best to maintain the

6    continuity of service to the Hawaiian Home Lands, and it wasn't

7    for altruistic reasons although that was -- it was certainly an

8    important part of the Petitioning Creditors view of their role in

9    the community.  But we also knew that it might be difficult in

10   finding Hawaiian Tel as a responsible operator of those assets

11   and of selling those assets to which our liens had attached.

12         We believe that we were selling them in a fashion and

13   this Court's order mandated that SIC, in particular, cooperate

14   and make sure that that transition occurred.  I think there is,

15   from my viewpoint anyway, the Court has jurisdiction over its own

16   orders and if there are sufficient allegations, as we believe

17   there are, that someone is operating in violation of the Court's

18   order, then from our viewpoint, the Court has jurisdiction to

19   enforce its own order.

20         And I think that's the central point that Hawaiian Tel

21   is trying to make, and I don't think SIC has really denied that,

22   that they were bound by the order and that they -- and the

23   evidence is significant that they had not.  They're not in

24   compliance with that order.

25         So just on the jurisdictional question -- I mean, I've

1 got my own view on the merits, but that's not for me to decide,

2 but on the jurisdictional side, whether or not this Court can

3 enforce its own orders I would say the answer is, at least in my

4 humble view, is clearly yes.

5 MR. BOLTON: Your Honor, the Trustee also supports the

6 motion. Obviously, we had troubles all along as -- you know, in

7 the record with SIC and the cooperation. And in our view it has

8 just sort of continued with HTI, and we feel their pain because

9 we've been down this road before, and we do support the relief

10 requested, Your Honor.

11 THE COURT: I have two questions, which are -- I don't

12 know who they're really for, but a question or comment I should

13 say. Would the situation be different if Hawaiian Tel had

14 elected to take the master relationship agreement and the assets

15 IRU rather than not take those agreements? I mean those

16 agreements, which the Trustee set up did create a working

17 relationship between the Sub c system and terrestrial system, but

18 Hawaiian Tel opted not to take those. I don't know if it's a

19 question for you or a question for anybody, but that's something

20 that I observed.

21 Another -- the other point that makes me feel

22 uncomfortable of my jurisdictional view is that, to put it real

23 bluntly, I think that if I don't decide this I'm effectively

24 handing some blackmail leverage to Sandwich Isles. I mean, I

25 think that's what it's really all about. So with that, Mr.

1  Smith, go ahead.

2         MR. SMITH:  Your Honor, this -- as we discussed a

3  little earlier, this was a -- the Sandwich Isles assets that were

4  sold by the Trustee were obtained in the execution of sale.  If

5  they weren't part of that execution sale, the Trustee never owned

6  them, and the Trustee could not have sold them to Hawaiian Tel.

7  That is the case with each and every one of the assets listed in

8  the request or in this motion, and that's the reason -- their

9  motion does not identify anything in the description of what was

10 executed upon that covers what they're asking for now, because

11 it's not there.

12        Now the more important point here, and the Court

13 brought it up, we had an agreement with the Trustee and the

14 Trustee, I believe, has mischaracterized our performance under

15 that agreement.  We had substantially performed.  All along we've

16 given them what they wanted.  The fact is that a public utility

17 normally is not broken up into pieces and sold off piecemeal,

18 because that jeopardizes service.  In this case --

19        THE COURT:  Well, but that's the structure that your

20 client set up by putting them into two separate entities and

21 financing them separately, so it's not a real sympathetic

22 position for your side.

23        MR. SMITH:  Well, we would have been before the Court

24 complaining about and saying that you couldn't do that, except we

25 had the master relationship agreement, the settlement agreement,

1    and the schedules to the master relationship agreement, all of

2    which guaranteed that service would continue and SIC would be

3    able to continue service.  That, unfortunately, we've now been

4    told it is not in effect.  We think there's a breach there.  We

5    think we're entitled to enforce that agreement, and we're going

6    to be pursuing that.

7              But that's the essence of this thing is that we've got

8    this -- we're being expected to cooperate and help people who are

9    threatening to terminate service.  They've given lip service to

10   you today about wanting to maintain service when, in fact,

11   they're all the ones who are -- who have rejected the very

12   agreements that would preserve service.  So with that, Your

13   Honor --

14             THE COURT:  Well, wait a minute.  So you're saying that

15   the Trustee's in breach because of this transaction?

16             MR. SMITH:  The settlement agreement expressly says

17   that the master relationship agreement and its schedules will be

18   binding on a purchaser.  They didn't --

19             THE COURT:  Doesn't that -- what I'm grabbing at,

20   doesn't that mean if -- doesn't that mean that this does have an

21   effect on the bankruptcy case?  In other words, if Hawaiian Tel

22   does what it says, apparently -- well, I don't know what Hawaiian

23   Tel is going to do, but if this goes forward your client thinks

24   it has a claim against the Trustee, right?

25             MR. SMITH:  Absolutely, and which we've made in our

1  adversary complaint.

2      THE COURT:  It sounds to me like that makes it related

3  to a proceeding.

4      MR. SMITH:  I don't know how it's related to this

5  request for information that the Trustee never owned.  The

6  Trustee couldn't have transferred it to them.

7      THE COURT:  I was talking about the jurisdictional

8  point, which is sort of where I started, but I understand your

9  point on the merits as well.

10      MR. SMITH:  Yes, Your Honor.  They're asking for things

11  that the Trustee never owned and could not have conveyed to them.

12  Not only the information, but the other assets that they say they

13  want, as well as the -- you know, SIC still holds a license,

14  which entitles it to access the licensed property.  They know

15  that's not exclusive.  SIC agreed they could use its license, but

16  we all know that's not exclusive.  They've all cited the FCC's

17  ruling to you, saying it can't be exclusive.

18      So, again, the Court should not be awarding those

19  things to them.

20      THE COURT:  Thank you.

21      MR. SMITH:  That's all I have.

22      THE COURT:  Thank you.  Mr. Young.

23      MR. YOUNG:  Thank you very much, Your Honor.  A couple

24  of points to make here, Your Honor.  With regard to Your Honor's

25  comments regarding the MRA and what would happen or what would

have happened if HT may have taken the MRA or didn't take it, one

factor is very clear, Your Honor. We make that clear on the

motion, and in the reply, and I think the record here is very

clear, Your Honor.

The record here is crystal clear that the MRA, and for

that matter the settlement agreement were not designated

contracts under the APA. And again, Your Honor, that goes back

to your initial concern regarding whether or not this is a

related to issue. Clearly, those issues relate to the order.

And even Mr. Smith, in this comments, I think agrees with that.

The bottom line here, Your Honor, is that the record is

clear that HT does not designate either the MRA or the settlement

agreement as designated contracts under the APA, which was

approved by the final sale order, Your Honor. That's really,

really important there.

And, by the way, there was nothing in this record to

rebut that fact, and it's clear that the record here shows that

neither of those contracts were ever designated. The record here

is also undisputed, Your Honor, that HT was not a party to either

of those contracts.

THE COURT: Well, I think that that cuts both ways. I

don't think there's any dispute about that, that Hawaiian Tel did

not take those agreements, but, in the absence of those

agreements, it seems to me, from what I've read, that the only

basis on which Hawaiian Tel is entitled to this information is

1  paragraph 39 of the sale order.  Is there any other legal basis

2  on which Hawaiian Tel has a legal claim to that information?

3          MR. YOUNG:  Well, I think the legal basis, Your Honor,

4  is the order itself and the asset purchase agreement.  And the

5  asset purchase agreement does refer to the Debtor's assets that

6  were purchased pursuant to that transaction that was approved by

7  the final sale order, Your Honor.

8          And look at the schedules, Schedule A-2 and A-2 to the

9  APA.  It does describe the assets.  And it also describes the

10  fact that -- especially as to Schedule A-2, as to, you know,

11  transferred equipment and property rights that the Trustee had

12  acquired from SIC pursuant to the U.S. Marshal sale and other

13  property rights and assets.  And it also refers to the fact that,

14  you know, Hawaiian Telcom was acquiring certain rights to a

15  standalone commercial operation, and use of the Paniolo cable

16  system, Your Honor.  And that's what I was talking about earlier.

17  These --

18          THE COURT:  Why does Paniolo or the owner of the

19  Paniolo undersea cable system need this information to run the

20  undersea cable system?

21          MR. YOUNG:  The information is important, Your Honor,

22  to ensure that the network facilities are properly transitioned

23  to HT, which is the buyer and to ensure that there can be ongoing

24  services to the users of this network, which are primarily the

25  Hone Lands beneficiaries, Your Honor.  That's why it's so

1    important.

2            THE COURT:  Well, I guess what I'm wondering is this.

3    It seems to me that the Trustee, I gather, didn't have this

4    information.  Maybe I'm wrong about that, but I don't think the

5    Trustee had this information.  The system was operated -- the

6    undersea system was operated -- and that's part of the confusion

7    here.  We talk about the network, which I think sometimes

8    includes both the terrestrial and the Sub C systems, and

9    sometimes it doesn't.

10           But I still don't understand how you could -- you're

11   prevented from operating the undersea cables if you don't know

12   where 911 calls are coming from on the terrestrial system.  I

13   just don't understand why that's the case.  Can you help me out

14   with that?

15           MR. YOUNG:  Could you state that question again, Your

16   Honor?  I'm sorry.

17           THE COURT:  So Paniolo has this undersea cable system.

18   Why does Paniolo need to know, in order to operate that undersea

19   cable system, where 911 calls are coming from that are placed on

20   the terrestrial system connected to the undersea cable system?

21           MR. YOUNG:  Because, Your Honor, that information, as

22   we tried to explain -- as we do explain in the motion and in the

23   reply, it's critical to the proper operation of that system for

24   the benefit of the end user, which are the Home Land

25   beneficiaries.  It is critical to the operation of that system.

1  And it's necessary for the proper functioning of that system and

2  that proper transitioning of that system to Hawaiian Telcom, as

3  the purchaser.

4        THE COURT:  Let me try and ask it a little bit

5  differently.  For purposes of operating the undersea cable

6  system, does it matter whether a call is a 911 call or somebody

7  calling somebody's uncle?  Maybe nobody -- none of us here are

8  telecom engineers, so maybe that's an unfair question to ask Mr.

9  Young or anybody on this --

10        MR. YOUNG:  I couldn't honestly answer that question.

11        THE COURT:  Yeah.  Yeah.

12        MR. HERRING:  Judge, if I may?

13        THE COURT:  Yes.  Mr. Herring, go ahead.

14        MR. HERRING:  So I'm not a telecommunications engineer

15  by any sense -- either, but as I understand it, the Paniolo cable

16  network system is what's been described as a middle-mile system,

17  which connects the last-mile.  And so there's many circuits that

18  are within the middle-mile system, and those middle-mile system

19  -- that middle-mile system connects to the last-mile system.

20        And so it's important to know if this particular

21  connection goes to the Molokai General Hospital, or if it's the

22  911 system, right.  And so that's the information that's

23  necessary to be able to efficiently run the middle-mile system is

24  where are these circuits located?  How do they connect to the

25  last-mile?  And, you know, the operator of that needs to know

1  where those circuits are, so that they can be preserved,

2  maintained, and not shut down.

3       THE COURT:  Well, why would Paniolo have the right to

4  shut down any of the circuits?

5       MR. HERRING:  Well, these are connections that are

6  coming in to their system, right, and there's a dispute between

7  Hawaiian Telcom and SIC about how that last-mile assets connect

8  to the middle-mile.  And from DHHL's perspective, we want to

9  ensure that there's a continuation of service and that there's

10 not an interruption in service.  And so we believe it's critical

11 to identify those 911 services, those connections, and the

12 critical services, so that they are not shut down.

13      And this information, which is about the Paniolo

14 Network, right, how these connect up to the last-mile, I believe

15 that would be also covered by the order.  It's Roman number 3,

16 small i, page 2 of the order, which I think the order itself is

17 predicated on this idea that there was a duty to cooperate, you

18 know, between SIC and the Debtor, and certainly this falls, I

19 would think, within that duty of cooperation to provide

20 information about how the transferred assets connect up the last-

21 mile to ensure that there's not a discontinuation of services.

22 Thank you, Your Honor.

23      THE COURT:  Okay.

24      MR. SMITH:  Your Honor, may I be heard?

25      THE COURT:  Yes, please.

1          MR. SMITH:  Your Honor, you have it exactly right.  The

2    information they're seeking, which they have no right to, the

3    Trustee never owned, is not necessary.  In fact, they've been

4    operating the network since December or January, without it.  And

5    it's -- everything has been operating fine.  These complaints are

6    all baseless.

7          THE COURT:  Well, let me ask you this, Mr. Smith.  Why

8    does your client need to have this information, and it can't

9    share it?

10          MR. SMITH:  The information is proprietary.  It's not

11    something that would normally be shared with a competitor.  Now

12    this -- if the agreements were in place, I think it probably

13    could be shared, but those agreements are, apparently, not going

14    to be enforced.

15          THE COURT:  It's proprietary that a particular phone

16    line is connected to a hospital?

17          MR. SMITH:  The way the circuits are organized is

18    proprietary.  And I can tell you right now, Hawaiian Telcom won't

19    share that information with us.

20          THE COURT:  Well, they could share it with me, because

21    I wouldn't know what it meant, so it wouldn't hurt anybody.

22          Well, I'm kind of stumped on this one, as you can

23    probably see from my expression.  I mean, I think that I totally

24    understand and sympathize with Hawaiian Home Land's concerns, and

25    the United States' concerns about the need to maintain continuous

service.  And I understand the frustration of Hawaiian Tel

because they -- if there is an interruption of service, they

don't want to be blamed for it.  And I have been -- for a long

time, been suspicious of Sandwich Isles' motives in this case.  I

don't think they have held themselves out as being a public

spirited, public interest company trying to protect the interest

of native Hawaiians and that just doesn't seem to have worked out

most of the time.

MR. YOUNG:  Your Honor, may I briefly respond?

THE COURT:  Sure.  Go ahead.

MR. YOUNG:  Yeah, Your Honor, these types of agreements

that Mr. Smith was referring to, Your Honor, that's ordinary

course of business among telecom companies.  And in this case,

Your Honor, that's all Hawaiian Telcom was asking for is their

cooperation with regard to, as Mr. Herring explained, that part

of the middle-mile network, to ensure that those connections

could be facilitated and transitioned, Your Honor.  And those

types of agreements are ordinary course agreements that are

common place in ordinary course in the telecom industries.  It's

nothing unusual, Your Honor.

And that is why we think -- Hawaiian Telcom believes,

Your Honor, strongly, that with regard to the purchase of these

assets again under this sale order and what Hawaiian Telcom

purchased, that this is a reasonable request, Your Honor, because

of SIC's none cooperation.

1          MR. SMITH:  Your Honor, this --

2          THE COURT:  Mr. Smith, go ahead.

3          MR. SMITH:  -- all comes down to does somebody -- does

4    the Trustee own it?  Is it a transferred asset?  The answer to

5    that is no.  And as far as SIC's motives, SIC has always been

6    motivated to sustain the service.  It's the only one that's been

7    motivated to sustain the service.  All of the rest of them are

8    just looking for a reason to blame SIC for sustaining service.

9          The master relationship agreement itself did nothing

10   for SIC or to benefit SIC, except give it the ability to sustain

11   service, and that's been taken.

12         THE COURT:  Okay.  I need to think about this.  I need

13   to study the sale agreements more and think these issues over.

14   I'm going to just take the matter under advisement right now.  I

15   may very well be asking for further memos on some of these

16   issues, but I don't want to just, at this point, ask for memos

17   and whatever you want to write about.  I want to think about it

18   some more and decide more precisely what questions I need help

19   with.

20         So for now I'll just take it under advisement, but

21   don't be surprised if you get a direction to file something and

22   maybe another notice of hearing.  And I understand the

23   frustration all around with that, but I'm stuck at the moment.

24         Anything else to cover today?  Mr. Bolton, have we

25   covered everything on your agenda?

1          MR. BOLTON:  Yes, Your Honor.  Thank you, Your Honor.

2          THE COURT:  Okay.  Anybody else have anything else you

3    want to raise today?  Okay.  Apparently not.  Thank you very

4    much.  Court's in recess.

5          MR. BOLTON:  Thank you, Your Honor.

6          MR. YOUNG:  Thank you very much, Your Honor.

7          MR. HERRING:  Thank you.

8          MR. GERBER:  Thank you.

9          THE CLERK:  Court stands in recess subject to call.

10       (Proceedings concluded at 3:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that pursuant to 28 U.S.C. §753, the foregoing is a complete, true, and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated: November 4, 2021

Jessica B. Cahill, CER/CET-708